## No. 09-2478

---

## UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

---

### UNITED STATES,
**Appellee**

**v.**

### ARTHUR GIANELLI,
**Defendant-Appellant**

---

On Appeal From A Judgment Of
The United States District Court, District Of Massachusetts

---

## Brief for Appellant

Patricia A. DeJuneas
BBO # 652997
One Exeter Plaza, 12th Floor
Boston, MA 02116
(617) 529-8300
dejuneaslaw@yahoo.com

Robert L. Sheketoff
BBO # 457340
One McKinley Square
Boston, MA 02109
(617) 367-3449
sheketoffr@aol.com

Attorneys for defendant
ARTHUR GIANELLI

## <u>Explanation of Abbreviations</u>

References to the trial transcript are as TT:1:1
     (Trial Transcript Day 1, Page 1)

The Addendum is referenced as Add:page.

The Appendix is referenced as App:page.

# **<u>TABLE OF CONTENTS</u>**

JURISDICTIONAL STATEMENT…………………………………………1

ISSUES…………………………………………………………………1

STATEMENT OF THE CASE……………………………………………...2

FACTS…………………………………………………………………3

      The Pre-Wiretap Investigation………………………………………3

      The Wiretaps……………………………………………………5

      The Arson-RelatedConvictions……………..……………………8

      Gianelli's Investment In The Big Dog…………………………8

      The Rift Between Gianelli And Colangelo………………………...11

      The Arson………………………………………………..14

The Arson-Related Calls…………………………………………16

SUMMARY OF ARGUMENT………………………………………...26

ARGUMENT………………………………………………………..29

  **I.**  THIS COURT MUST REVERSE EACH OF GIANELLI'S
      CONVICTIONS BECAUSE THE DISTRICT COURT
      ERRED IN DENYING DEFENDANTS' MOTION TO
      SUPPRESS THE FRUITS OF THE WIRETAPS…………………...29

        A. The District Attorney Did Not Properly
          Authorize The First Application…………………………..30

           1.  Standard Of Review………………………………31

2.  The Record Shows As A Matter Of
    Law That The District Attorney Did Not
    Properly Authorize The First Application............32

3.  In The Alternative, This Court Should
    Remand This Case For An Evidentiary
    Hearing On The Issue Of Whether The
    First Application Was Properly Authorized..........37

B.  The District Court Improperly Denied Defendants'
    Motion To Suppress Because The First Wiretap
    Was Issued In Violation Of The Necessity
    Requirement.................................................38

    1.  The First Application Resounds With
        Generic, Standardized Assertions Regarding
        Feasibility Of Normal Investigative Techniques
        Without Regard To The Specifics Of This Case.....39

C.  Each And Every Renewal Warrant Is Tainted And
    The Fruits Thereof Must Be Suppressed...................44

II.  THIS COURT MUST REVERSE GIANELLI'S
CONVICTIONS ON COUNTS 273-277 BECAUSE
THE DISTRICT JUDGE REPEATEDLY ABUSED HIS
DISCRETION BY PERMITTING A CASE AGENT TO
INTERPRET ORDINARY WORDS AND PHRASES IN
INTERCEPTED CALLS BASED ON HIS KNOWLEDGE
OF THE FAR-REACHING INVESTIGATION AND THE
GOVERNMENT CANNOT SHOW THAT THE ERRORS
DID NOT INFLUENCE THE VERDICT...........................44

A.  The District Judge's Rulings Were An
    Abuse Of Discretion........................................50

    1.  Kelsch's Interpretations Are Inadmissible
        Under Fed.R.Evid. 701 And 702. ....................50

**2.** Kelsch Improperly Testified As A "Summary" Witness And, Relatedly, That His Interpretations Were Derived From The Investigation As A Whole…………………53

B. The Government Cannot Prove That It Is Highly Probable That Kelsch's Improper Testimony Did Not Influence The Verdict………………..56

1. Kelsch's Interpretations Were Central To The Arson Case Against Gianelli…………………57

2. There Was Scant Other Evidence Linking Gianelli To The Arson……………………………..58

3. Kelsch's Improper Testimony Was Prejudicial………59

CONCLUSION……………………………………………………..62

CERTIFICATE OF COMPLIANCE…………………………………63

CERTIFICATE OF SERVICE………………………………………..63

ADDENDUM

## TABLE OF AUTHORITIES

**Cases**

Commonwealth v. D'Amour, 428 Mass. 725, 704 N.E.2d 1166 (1999)................36

Commonwealth v. Vitello, 367 Mass. 224; 327 N.E.2d 819 (1975) .......... 29, 30, 34

Crawford v. Washington, 541 U.S. 36 (2004).........................................................55

United States v. Blackmon, 273 F.3d 1204 (9th Cir. 2001) ....................................42

United States v. Cartagena, 593 F.3d 104 (1st Cir.),
    cert. denied, _ S.Ct. _ (2010)..................................................................38

United States v. Casas, 356 F.3d 104 (1st Cir. 2004)....................................... 56, 59

United States v. Corey, 207 F.3d 84 (1st Cir. 2000) ...............................................51

United States v. Flores-de-Jesus, 569 F.3d 8 (1st Cir.),
 cert. denied, Sabino-Morales, 130 S.Ct. 427 (2009)...................54, 55, 56, 59

United States v. DiMuro, 540 F.2d 503 (1st Cir. 1976,
    cert. denied, Hurley v. United States, 429 U.S. 1038 (1977)..............................41

United States v. Dukagjini, 326 F.3d 45 (2nd Cir. 2003) ................................. 55, 57

United States v. Dyer, 589 F.3d 520 (1st Cir. 2009),
    cert. denied, 130 S.Ct. 2422 (2010).......................................................32

United States v. Giordano, 416 U.S. 505 (1974) ............................................. 31, 44

United States v. LaMattina, 889 F.2d 1191 (1st Cir. 1989) ....................................51

United States v. Lilla, 699 F.2d 99 (2d Cir. 1983) ..................................................42

United States v. Lizardo, 445 F.3d 73 (1st Cir.),
    cert. denied, 549 U.S. 1007 (2006).......................................................53

United States v. Mejia, 545 F.3d 179 (2nd Cir. 2008) ............................61

United States v. O'Malley, 764 F.3d 38 (1st Cir. 1985)...........................35

United States v. Perez-Ruiz, 353 F.3d 1 (1st Cir. 2003),
    cert. denied, 541 U.S. 1005 (2004); ..................................................50

United States v. Smith, 587 F.Supp. 653 (D.Mass. 1984),
    aff'd, United States v. DeJesus, 752 F.2d 640 (1st Cir. 1985)..............37

United States v. Smith, 726 F.2d 852 (1st Cir. 1984)(en banc)............. 30, 31, 33, 38

United States v. Weiner, 3 F.3d 17 (1st Cir. 1993) ................................52

**Statutes**

18 U.S.C. § 2…………………………………………………………….2

18 U.S.C. § 844…………………………………………………………..2

18 U.S.C. § 1951…………………………………………………………2

18 U.S.C. § 1952…………………………………………………………2

18 U.S.C. § 2510.....................................................................................29

18 U.S.C. § 2516.....................................................................................29

18 U.S.C. § 3231 ......................................................................................1

28 U.S.C. §1291 ......................................................................................1

G.L. c. 272, §99.............................................................................. passim

v

**Rules**

Fed.R.Evid. 701 ................................................................ 44, 50, 52

Fed.R.Evid. 702 ............................................................ 44, 50, 51, 53

**Treatises**

J. Carr, <u>The Law of Electronic Surveillance</u>, § 4-60 (1988)....................................39

J. Carr, <u>The Law of Electronic Surveillance</u>, (West 2004)....................................41

<u>**JURISDICTIONAL STATEMENT**</u>

By his timely notice of appeal filed on October 8, 2009, Arthur Gianelli

appeals from the final judgments of conviction entered in the United States District

Court, District of Massachusetts on October 7, 2009.    Because Gianelli was

charged with violations of federal criminal laws, the lower court had jurisdiction

pursuant to 18 U.S.C. §3231, and this Court has jurisdiction pursuant to 28 U.S.C.

§1291.

<u>**ISSUES**</u>

(1)    This Court must reverse each of Gianelli's convictions because the
district court improperly denied Defendants' Motion To Suppress
Fruits Of Wiretaps.  The district court's denial was erroneous for three
reasons:

First, because the record shows as a matter of law that the
district attorney did not properly authorize the application for the
wiretap warrant;

Second, because the first application did not set forth facts
minimally sufficient to show that, prior to seeking a wiretap, the
police had tried normal investigative procedures, but they failed, or
that such normal procedures reasonably appear likely to fail; and

Third, because the first application failed to establish probable
cause to believe that the targets were committing the alleged
designated offense.

(2)    This Court must reverse Gianelli's convictions on Counts 273-277
because the district judge abused his discretion by allowing a case
agent, over repeated defense objections, to interpret the meaning of
ordinary words and phrases in a series of intercepted calls, testify that
those interpretations were based on the knowledge he gained over the

1

course of a long and far-reaching investigation, and because the government cannot prove that the errors were harmless.

## STATEMENT OF THE CASE

The 519 Second Superseding Indictment ("SSI") was filed on September 13, 2006 against Arthur Gianelli and 13 co-defendants. The SSI charged Gianelli with RICO and RICO conspiracy (Counts 1-2); operating illegal gambling businesses and related offenses (Counts 3-7); conspiracy to commit and substantive money laundering offenses (Counts 8; 88-185; 187-234; 236-272; 284-329); conspiracy to commit extortionate collection of credit and the substantive offenses (Counts 512-513; 516-519); conspiracy and attempt to commit extortion (Counts 280-283); conspiracy to commit arson, to use fire and explosive to commit a federal felony (extortion), and to travel in interstate commerce to facilitate unlawful activity; and each substantive offense, in violation of 18 U.S.C. §§ 2; 844(i); 844(h)(1); 1952(a)(3); and 1951 (Count 273-275); and conspiracy to commit and attempted extortion in violation of 18 U.S.C. § 1951 (Counts 276-277).

On March 20, 2008, Gianelli and 9 co-defendants filed a Motion To Suppress Fruits Of Wiretaps And Memorandum Of Law ("motion to suppress"). Without evidentiary hearing, the district court (Gorton, J.), denied the motion on October 8, 2008.[1]

_____

[1] A copy of Judge Gorton's decision is at Add:1.

On March 3, 2009, trial commenced (before Gorton, J.) for Gianelli, Dennis Albertelli ("Albertelli"), Gisele Albertelli, and Frank Iacaboni.[2]  Thirty-one trial days later, on April 22, 2009, the jury returned verdicts of conviction against Gianelli on all counts except Counts 5 and 278, on which the district court entered judgments of acquittal, and Counts 236-238 and 241, which were later dismissed upon  government motion.

On October 7, 2009, Gianelli was sentenced to a term of incarceration of 271 months (151 months to run concurrently on all counts except 275, and 120 months on Count 275 to run consecutively to the sentence on all other counts), 36 months of supervised release, and a special assessment of $32,400.

## FACTS

The following facts are relevant to the legal issues raised herein.

**The Pre-Wiretap Investigation**

In 2003, the Special Services Section of the Massachusetts State Police ("MSP") - led by Troopers Nunzio Orlando and Pasquale Russolillo –began an in-depth investigation of Gianelli, who they had long known to be a bookmaker. App:671-672.

In the beginning, they used several normal investigative techniques, including confidential informants ("CIs"), telephone analysis, and physical

---

[2] By that time, 6 co-defendants had plead guilty, 2 remained at large, and Gianelli's wife, Mary Ann, plead guilty the following day.

surveillance.  App:674; 689; 695-702; 706-708; 713-716. Through the use of these and other normal investigative techniques, the MSP knew the following before they decided to facilitate their investigation by turning to the most intrusive of investigative tools: wiretaps.

Gianelli was the highest-ranking member of an extensive bookmaking operation.  App:672-673; 676-684; 702-703.[3]   Albertelli, Gianelli's most trusted associate, was his second in command and in charge of day-to-day activities. Salvatore Ramasci was the only other major participant and was in charge of paying/collecting gambling debts.  App:683-685; 689-691.

In 2003, Gianelli put an end to operations as a "typical" bookmaking operation, e.g., he no longer relied upon "street bookies" or local or area bookmaking offices to disseminate lines and register bets.  Instead, he opened an offshore bookmaking office called "Duke Sports" to fulfill those roles.  Duke Sports kept track of all wagers and transmitted the results to Gianelli via internet and/or fax each week.  Only the payment, collection, and settlement of disputes were handled locally.  Gianelli, Albertelli, and/or Ramasci personally handled those matters themselves.  App:684-694.

In another radical change, Gianelli no longer took extreme measures to hide his involvement, but rather, increased his visibility substantially,  going so far as to

---

[3] Gianelli also operated an "elaborate illegal video game business."  Id.

give his beeper and home phone numbers to his agents and bettors, including the

CIs, and meeting them face-to-face.  App:658-660; 682-685; 609-697.

To conduct their bookmaking work, Albertelli and Ramasci used three

cellular telephones ("Albertelli phones"); each was registered to Albertelli.  In a

three month period of time, several thousand calls were made by or received on the

Albertelli phones.  At least several hundred of those calls were to/from known

bookmakers and agents.  App:695-701.

**The Wiretaps**

Essex County District Attorney Jonathan Blodgett purported to specially

designate three of his assistant district attorneys (collectively, "the Essex ADAs")

to apply for a wiretap of the Albertelli phones via letter dated Wednesday,[4]

October 29, 2003 ("Authorization Letter").  The Authorization Letter states in part,

> I…authorize and designate you to personally make presentment to a
> justice of competent jurisdiction of the application for the interception
> warrant, as well as all…renewal applications…. I or my designee will
> personally review all of the above-mentioned documents before you
> present them.

Add:38.

On October 30, 2003, Blodgett signed a letter addressed to Justice Welch of

the Essex Superior Court ("Authorization Letter"), stating that he had specially

designated and authorized the Essex ADAs to present an application for a wiretap

---

[4] Gianelli respectfully submits that the Court take judicial notice that October 29,
2003 fell on a Wednesday.

warrant for the Albertelli phones, as well as renewal applications, "all of which shall have been reviewed by me or my designee before being presented to you." Add:39.

On October 31, 2003, the ADAs presented the application ("First Application")[5] to Judge Welch, who issued the warrant ("First Wiretap") that same day. Add:50.

The First Application states that Blodgett had specially designated and "authorized [the Essex ADAs] to personally make presentment to the Court of the application, as well as all…renewal applications …all of which shall have been reviewed by District Attorney Blodgett or his designee before being presented by these applicants." Add:45-46.

The First Application also alleged probable cause to believe that Gianelli, Albertelli, Ramasci, "and other persons as yet unknown are part of a highly organized and sophisticated group engaged in a continuing conspiracy to commit violations of the Massachusetts gaming statute" and that the Albertelli phones were

---

[5] The First Application consists of, inter alia, a document entitled "Application For An Order And Warrant Pursuant To Massachusetts General Laws, Chapter 272, Section 99, Authorizing The Interception Of Certain Wire Communications" ("Application"); Add:40-50; and a document entitled "Affidavit Of Trooper Nunzio Orlando" ("Orlando Affidavit"); App.651-737. The Essex ADAs signed the Application on October 30, 2003, but the Orlando Affidavit was not finalized until October 31, 2003, which is the same date that Justice Welch affixed his signature to the Application. App:737; Add:50.

being used in furtherance of that conspiracy.  Add:41.  It also alleged the following

investigative goals:

- "to infiltrate Gianelli's organization, identify his associates, discover and exploit his association with members of…[La Cosa Nostra], and to ultimately dismantle his criminal enterprise[;]"

- "to identify, apprehend, and bring about the successful prosecution of those persons involved at all levels of this organization and conspiracy, including Arthur Gianelli, Dennis Albertelli, Salvatore Ramasci, he `street bookies,' persons operating 'local gaming offices,' persons operating `area bookmaking offices,' and persons at higher levels of the organization[;]"  and

- "to trace the manner in which the proceeds of the bookmaking operation have been, and are being spent, stored or invested, and to seize and seek forfeiture of those proceeds[.]"

App:693-694.

Relying upon communications intercepted during the First Wiretap, the

Essex ADAs applied for, and obtained, 9 renewal warrants.[6]  App:749-834.

In total, the MSP intercepted between 14,000 and 18,000 calls, more than

200 of which were introduced at trial. TT:16:141; see generally TT:6; TT:7; TT:8;

TT:10; TT: 14; TT:15; TT:16; TT:17; TT:18; TT:21; TT:23; TT:24; TT:25; TT:26.

---

[6] Over time, the renewal applications named new targets, telephones, and designated offenses.  App:749-834.

**The Arson-Related Convictions**

From 1995 to 1999, Edward Fitzsimmons was (on paper only) the sole

shareholder of Canine Entertainment Corporation ("CEC"), which owned The Big

Dog Sports Grille in Lynnfield ("The Big Dog" or "original Big Dog"), a small

sports bar  approximately 2,000 square feet in size.  Fitzsimmons' s close friend

Mark Colangelo[7] was a full partner, but his interest was kept secret because a prior

larceny conviction made him ineligible for a liquor license.[8]   TT:21:164;

TT:23:20.

Fitzsimmons and Colangelo also operated, but did not own, another small

sports bar in North Reading, which also bore The Big Dog name ("Big Dog/NR").

TT:21:61-62.  They leased the building and sublet the space adjacent to the Big

Dog/NR to Romeo's Pizza.  TT:22:71-72.

**Gianelli's Investment In The Big Dog**

Gianelli first met Colangelo in 1999 and they soon began a gambling

relationship.  Colangelo agreed to install one of Gianelli's video-poker machines at

---

[7]Before they went into the restaurant business, Fitzsimmons and Colangelo worked together in the used car industry.  The Attorney General, however, issued a cease and desist order, forbidding Colangelo from working in the used car industry; he was later held in contempt for violating that order.  TT:22:88-92.

[8] Colangelo continued to lie about his true ownership interest in the original Big Dog until at least 2004, when he told agents investigating this case that he was merely the marketing manager.  TT:22:106-107.

The Big Dog, and he and Fitzsimmons became agents for Gianelli's sports-betting business. TT:21:166-168. The arrangement was lucrative for Fitzsimmons and Colangelo, who pocketed at least $600-1200/week in cash, none of which they reported as income. TT:22:93-97; 129.

Colangelo testified to ambitions well beyond his small sports bars. He had a vision for a large-scale sports-themed bar/restaurant/arcade, but knew he could not afford to finance such an enormous project himself. He also knew, however, that Gianelli could, and approached him with his idea. Gianelli agreed to invest and, as Colangelo knew all along, planned to finance the project with the proceeds of his illegal gambling businesses. TT:22:99-100.

By June, 1999, Colangelo and Gianelli decided to buy the property on which the original Big Dog was located. Once Gianelli put down a non-refundable $25,000 cash deposit towards the $2,850,000 purchase price, they began their plans to transform Colangelo's 2,000 square foot original Big Dog into a 25,000 square foot state-of-the-art bar/restaurant/arcade. TT:21:164-168; TT:23:93. Gianelli thereafter gave Colangelo enough cash each week to cover one-half of the week's expenses. Colangelo agreed to, but rarely did, cover the other half. TT:22:32-33.

In 2002, after a falling out with Gianelli, the original builder left the project. Up until that point, Colangelo and Gianelli had been 50/50 partners, even though

Colangelo had not been living up to his end of the agreement.   That changed, however, when Colangelo devised a plan to bring in his friend Richard Dalton as the new builder.  Colangelo did not tell Gianelli of their friendship and, according to Colangelo, he "somehow" persuaded Gianelli to give Dalton $150,000 cash and a 3% stake in CEC.  TT:23:19.   Because Dalton always voted with him, Colangelo had succeeded in garnering control of CEC.   TT:23:19.

To reflect the new ownership, CEC's corporate structure was changed, and in addition to Fitzsimmons, Colangelo's wife Karen, Larry Murray, and Dalton were added as shareholders.  TT:22:17-19.  According to Colangelo, Murray was Gianelli's "shill," but even though Colangelo's wife had not worked at the original Big Dog since 1999, Colangelo insisted that there was nothing untoward in hiding his true ownership interest in her name.   TT:21:163; TT:22:14.

When it came time for CEC to submit an amended application for a liquor license because of the change in ownership, neither Colangelo nor Gianelli disclosed their ownership interests.  TT:22:24-25.

When Dalton began construction in May, 2002, Colangelo was able to keep his original Big Dog open.  Colangelo could not (or would not) say, however, how much it generated in weekly profits at that time, nor at the time it closed in May 2003, so that construction could proceed.   TT:22:29-35; 91.

10

**The Rift Between Gianelli And Colangelo**

By May of 2003, the relationship between Gianelli and Colangelo had soured, in large part because Colangelo had long ago fallen behind on his end of paying the bills. As Colangelo knew, Gianelli believed Colangelo was stealing. TT:22:38-41; 107-114. Also, "a distrust arose as to who was going to have control" of the project. TT:19:36.

Consequently, Gianelli arranged for Albertelli and Ramasci[9] to be his eyes and ears at the site, and they took a hands-on approach to monitoring construction and financial matters. TT:22:119. Plainly, Colangelo was not happy with that arrangement. TT:22:34-35.

As expenses continued to mount, and Colangelo continued to lag behind on his end, Gianelli began raising money from investors. By selling option agreements, he raised $750,000 from several friends and acquaintances. Colangelo and his allies (i.e., his wife, Fitzsimmons, and Dalton) were aware of Gianeill's efforts and signed off on the first two option agreements. TT:22:37-50.

Relations between the parties grew even worse with time, and Ramasci, on Gianelli's behalf, called for what turned out to be a heated meeting to discuss Colangelo's financial contributions as well as the ownership interests of Gianelli's

---

[9] Ramasci, who holds an accounting degree and has worked as a controller earning over $100,000/year, was well-qualified to manage the project's finances. TT:19:47-48. Ramasci testified that he too had concerns that Colangelo was stealing, and that bills frequently went unpaid or were lost. TT:19:35-40.

11

investors. On July 3, 2003, Gianelli, Ramasci, Murray, Albertelli, Fitzsimmons, Dalton, and Colangelo attended the meeting, held at a local hotel. TT:22:54.

At the meeting, Gianelli produced documentation (which Colangelo did not dispute) showing he had contributed nearly $900,000. On his end, however, Colangelo could prove only $710,000. TT:22:60-62. The opposing sides also discussed the status of the new investors. On the one hand, Gianelli stood firmly by his investors, insisted they bought 18% of CEC, full voting rights, and, because they had assigned their voting rights to Murray, Gianelli, in effect, had taken back control of CEC. Colangelo and his allies, on the other hand, fought to maintain their majority control, claiming they had not understood the option agreements they had signed, denying that Gianelli's investors had full voting rights, and refusing to sign any more option agreements. TT:22:54-58. The meeting ended with no resolution, and when Colangelo again refused to sign the agreements the next day, Gianelli said, "Okay, I'll take care of you in my own way." TT:22:64.

A month later, the opposing camps collided again, this time at the office of CEC's lawyer. Ramasci, Colangelo, and Fitzsimmons first argued about the ownership of the video machines, towards which Gianelli had contributed $175,000. Gianelli insisted that his business, Fairway Amusement Company, owned the machines; Colangelo maintained that they belonged to CEC. TT:22:123; 137-138. When Colangelo called Gianelli from the lawyer's office,

Gianelli stood his ground and after an argument, hung up, telling Colangelo,

"You'd better get a lawyer." Gianelli and Colangelo never spoke again.

TT:22:64-66. Also during the meeting, Ramasci presented the option agreements

which would have given Gianelli majority control, but CEC's lawyer refused to

accept them. TT:22:62-66.

Not long after, Colangelo's cohorts removed Murray from CEC's board of

directors.[10] Gianelli stopped funneling his money into the project and, in fact,

disengaged entirely. TT:22:69-70. He chose instead to file suit against CEC,

asserting his rightful ownership of the video machines. Albertelli, Murray, and

another investor filed suit against CEC, Colangelo's wife, Fitzsimmons, and

Dalton, seeking to enforce the option agreements. Gianelli and the others filed

motions for preliminary injunctive relief in their respective cases; those motions

were denied on October 23 and November 5, 2003. TT:22:65-69.[11]

After Gianelli cut off the money, Colangelo claimed he was forced to rely on

income from his other businesses, including the Big Dog/NR, to finish the project.

He professed, however, not to know how much the Big Dog/NR generated in

---

[10] Colangelo testified that Murray later went to the site and said "that Mr. Gianelli was never going to let this place open and that they were going to have a lot of fun with us." TT:22:70.

[11] Colangelo's side ultimately prevailed after Gianelli was indicted and had no choice but to invoke his Fifth Amendment rights. TT:22:139-140.

profits each week, saying only that it was "somewhere" between $500 and $50,000

per week – a remarkable swing of up to $45,000 weekly.  TT:22:91.

**The Arson**

Retired Trooper John Tutungian testified that during the course of the First

Wiretap, the MSP intercepted calls which they believed showed a plan to set fire to

the Big Dog/NR.   In the early morning hours of November 13, 2003, investigators

on surveillance saw two men set fire to a container of gasoline on the steps leading

to Romeo's Pizza.   Within minutes, the North Reading Fire Department

extinguished the fire, leaving minimal damage to the steps of the building.

TT:3:98-100; TT:15:73-77.

The MSP arrested McCormack and Slater as they drove away, and Deeb

Homsi was arrested several months later.  TT:3:96-100; 115-120; TT:3:96-100;

115-120;TT:21:51-52.

In accordance with their plea/cooperation agreements,  Homsi and

McCormack testified about meetings and conversations with Albertelli which, if

believed, directly implicated Albertelli in the arson.  Neither, however, testified to

any such conversations with Gianelli.  In fact, McCormack never spoke to or met

Gianelli,  and Homsi, who met Gianelli only two times (once at a Bickford's

restaurant, and once to install a video-poker machine at a motorcycle club), had not

seen or spoken to Gianelli since at least 2001.  TT:21:97-100.

14

In October or November, 2003, Albertelli told Homsi he had a lot of money tied up in The Big Dog, that the owner owed him money but was stalling on the repayment, and Albertelli "wanted to burn the pizza joint" and "the guy's" white Cadillac Escalade.[12]  TT:21:64; 65.

Homsi recruited McCormack to set the fires[13] and McCormack, in turn, recruited Slater.  TT:21:66-67.  Homsi told McCormack that Albertelli wanted them to damage the building "a little bit" in order to "send a message" for the owner of the pizza restaurant to pay what he owed, then later, that Albertelli "wasn't happy, they wanted it burned to the ground." TT:19:160-162. McCormack acknowledged, however, that he had never discussed these matters with Albertelli.  TT:20:16.

Albertelli's long-time friend and family attorney Mark O'Connor [14] also testified about events related to the arson.  According to him, by late October/early November, 2003, Albertelli and Gianelli "seemed frustrated with the lawsuits" and asked him to call Dalton to negotiate the sale of Dalton's 3% interest, but Dalton

---

[12] Colangelo owned a white Escalade at that time.  TT:22:70.

[13] Homsi knew that McCormack needed money and planned to sell his motorcycle; McCormack found the idea of committing arson more palatable.  TT:19:88.

[14] O'Connor, who admitted to laundering more than $800,000, was given immunity in exchange for his testimony.  O'Connor also testified that, to his knowledge, the government had not reported his criminal activities to the Board of Bar Overseers. TT:17:116.

refused to sell.   TT:17:56; 93-96.  A short time later, O'Connor claimed, Albertelli told him,

> people wanted things to go faster and that wouldn't it be good if there was a way to cut the money that's keeping these other partners paying the bills and paying what they have to pay in the new Big Dog, in the construction and all the mounting bills.  If they could cut off their funds, wouldn't they fall faster in a financial house of cards?
>
> \*\*\*
>
> What if there was a fired at the Big Dog in North Reading and they weren't able to take any income out of the place?

TT:17:96-97.

Also, John Mousis, a friend of Gianelli's who owned Palace Pizza, testified that he had a conversation with Gianelli "about those fires," and Gianelli told him, "Those are Dennis's headache."  TT:15:153.

**The Arson-Related Calls**

Most central to the government's arson case were a series of 46 calls,[15] many of which had been intercepted during the First Wiretap.    Very near to the end of its case-in-chief, the government introduced those calls[16] into evidence, mostly

---

[15]Before the calls were introduced into evidence, the government distributed a binder of transcripts (217 A for Identification) to the jurors, and directed them to the relevant transcript before each call was played and again each time Kelsch interpreted portions of the calls.  The jurors kept the binders until Kelsch left the stand. The transcripts of the arson-related calls are found at App:991-1178.

[16] Some calls were also introduced during Homsi's direct testimony.

during the direct testimony of arson investigator and case agent Mattheu Kelsch, a

Special Agent of the Bureau of Alcohol, Tobacco, Firearms, and Explosives.

Over repeated defense objections, the district judge permitted Kelsch to interpret

many of the calls for the jury.[17]

The interpreted calls which specifically concern Gianelli included the

following:

On November 2,[18] the MSP intercepted the following conversation (“**Call

1**”).[19]

Gianelli:  I forgot to ask you.  What ah, you talk to that kid?

Albertelli:  Yes.

***

Albertelli:  Ahh, don’t know what he’s gonna do.  Don’t know when
he’s gonna do it.

Gianelli:  Oh, what did you do, give him information and everything?

***

Albertelli:  Yeah cause, when I was…with him…  What day did I see
you, Friday?  I was with him the next morning, and asked if he wanted
to take a ride, and he said he had to take care of the shop, so.  Wanted
the information, and I just said to him ahh….well, I’ll tell you what I
said to him when I see you.

Gianelli:  All right.  Gotta make sure nobody is in there you know.

---

[17] Homsi also interpreted some of his intercepted conversations with Albertelli.

[18] Except where otherwise stated, these calls were intercepted in 2003.

[19] Call 1, and other calls similarly designated (e.g., “Call 2”) are among the calls
Kelsch was permitted to interpret.  Those of his interpretations relevant to
Gianelli’s appeal are discussed infra in Argument II.

17

App:992.

On November 4, the MSP intercepted Albertelli and Homsi several times. App:1000-1013. Homsi testified that they met face-to-face that day to discuss "the pizza joint," and Homsi told Albertelli, "I think it's all set, it's a go. Mikey's going to take care of it." TT:21:70.

On November 5, the MSP intercepted the following conversation ("**Call 2**").

Albertelli: Yeah, my friend Frank's gonna come by and see me tomorrow. Um, the only other thing is…my other friend… you just want me to go forward, right?

Gianelli:   Oh positively.

Albertelli: Okay, 'cause I was gonna say if anything happens in the next few days, they, you know pointing to you ah that's all I'm saying….
                                    ***
Gianelli: And all right and ah…and if there's anything that needs to be done ah…do it and let me know.

                                    ***
Gianelli: Well talk to that guy tomorrow and ah yeah go forward.

                                    ***
Albertelli: I yeah, yeah, I spoke to him last night so he's gonna…give me a couple days up front before it, before it happens.
                                    ***
Albertelli: Just in case ah you know we want to go for a ride or something.

App:1029-1033.

About an hour later, Albertelli left Colangelo's home address on Homsi's voicemail.  App:1035.

On November 6, Gianelli and Albertelli were intercepted discussing their lawsuits ("**Call 3**").  During that call, Gianelli said to Albertelli, "All I do is pay money.  All day every day.  It's not an issue.  I'm trying to get us some fucking results.  I mean these, these fucking results reminded me of when I go to the racetrack.  You get nothing for your money.  So, ah, but this fucker got to shut down.  Period.  Has to be shut down."  App:1040-1041.

On November 8, the MSP intercepted the following conversation ("**Call 4**").

Gianelli:  How's that other kid?  Everything all right there?

Albertelli:  Tells me he's working on it.

Gianelli:  That looks like our only hope.

Albertelli:  Yeah.

Gianelli:  I'm telling you.  That looks like our only hope.  Which I knew all along was the best way.

Albertelli:  Yeah.  He, um, he did say that um, it's Monday that they're coming into town, so.

App:1056.

A half-hour later, the MSP intercepted ("**Call 5**"), Gianelli say to Albertelli, "And ah more importantly talk to the other kid, it looks like that might be the only fuckin' solution.  That's … the real solution.  So stay on top of that."  App:1058.

19

On November 10, ("**Call 6**"), the MSP intercepted the following.

Gianelli:  Forgot to ask ya…what time, are you gonna see that kid today?

Albertelli:  I'm going to see him tomorrow morning.

Gianelli:  Oh tomorrow morning?

Albertelli:  Yeah, they did…they came in today.

\*\*\*

Albertelli:  So I'm gonna see him tomorrow morning and go from there.

App:1063.

Three hours later, the MSP intercepted the following ("**Call 7**").

Gianelli:  Whatever it is, it is.  It looks like ah, our way might be the only right way.

Albertelli:  Huh, huh.

Gianelli:  See what happens tomorrow….

\*\*\*

Gianelli:  Alright, what time are you gonna see that kid?

Albertelli:  Umm, well, nine o'clock tomorrow, so.

\*\*\*

Albertelli:  I kind of…talked to him half ass on the phone, but ah he doesn't speak English too good.

Gianelli:  Well ah, okay.  Is everything alright?

20

Albertelli:  Ya, I believe so…. I'm gonna see him face-to-face….

Gianelli:  Alright, well go and see him, do what you gotta do.

Albertelli:  I think they're gonna  go over tomorrow and I'll find out and I'll get a feel for what…they think, you know?  I don't know if they, they're going over there to, to look around tonight or what?

App:1071-1072.

On the morning of November 11, Homsi was intercepted telling Albertelli that he was waiting for McCormack  and that they "might be all set."  App:1074. Two hours later, Homsi was intercepted asking if Albertelli was "going out of town that day," which, Homsi testified, was a signal for Albertelli to create an alibi.  TT:21:72.

Later that day, the MSP intercepted the following call ("**Call 8**").

Gianelli:  Did the meeting go off?

Albertelli:  Yes.

Gianelli:  Good, bad, you don't know?

Albertelli:  Umm, I…think it's good.  I'm not a hundred percent sure that it's good.  But they say they go home Saturday morning.  So it will be between now and Saturday.…

App:1082.

At  2:11 p.m. on November 13, the MSP intercepted Homsi telling Albertelli, "A couple of friends of mine are in jail[.]"  App:1094.   Homsi testified

that he was letting Albertelli know "that the two guys that were going to burn the

pizza place down got arrested."  TT:21:73.

A few hours later, the MSP intercepted Gianelli and Albertelli say the

following ("**Call 9**").

> Gianelli:  Anything else?  How's the pizza?
>
> Albertelli:  Umm, not a fucking word.
>
> Gianelli:  Okay.
>
> Albertelli:  I don't know.  I don't know.  Not a, I didn't hear
> anything from any of them.  If I don't hear nothing by tomorrow,
> say lunch time, I'll call him down at the store and see if he wants
> to see me.

App:1096.

Over the week or so, McCormack asked Homsi for money for bail and

attorney fees.  TT:19:104-106.  When Homsi relayed McCormack's request in one

intercepted call, Albertelli responded, "I don't think I want you to do nothing but I

really haven't talked to the other kid yet."  App:1100.  In another intercepted call,

Albertelli said, "Let me see if I can get a hold of the other kid, and I'll call you

back."  App:1113.

In the early morning on November 21,[20] the MSP intercepted Albertelli and Gianelli discussing when and how they heard about the arson ("**Call 10**"). Their conversation included the following.

Gianelli:  But I'm wondering who, I'm wondering who it was?

Albertelli:  Well…that makes me think it was you telling me that you got someone else on it.

Gianelli:  That's what I'm saying.  You know?  And I…did that ah, Friday.  So it very well could be.  That's interesting.

Albertelli:  Ya 'cause I heard it…Monday….

***

Albertelli:  You know, or in the paper or something.  See I didn't put the two and two together.  And then you know, and then I thought about it a little bit, and you know, I didn't ask him anything.  I didn't want to make it look like I knew anything.

Gianelli:  And they got picked up by the State Police?

Albertelli:  That's what I heard….

***

Gianelli:  It's not good….  How the fuck did they get picked up by the State Police?  What are they fucked up?  Huh.  This kid probably tried to burn the fucking place down.  That's what I'm thinking.

Albertelli:  It was him?

---

[20] Homsi and McCormack testified that the following night, Albertelli gave McCormack $10,000 cash.  TT:21:80.  After he used $5000 to bail Slater, McCormack gave Homsi $4000 to return to Albertelli; Homsi, however, spent the money on drugs.  TT:21:81; 126.

23

Gianelli:  Ya, that's what I'm thinking.  I mean ah, well, anyhow, that's the story….

App:1103-1106.

On November, 24, the MSP intercepted the following ("**Call 11**").

Gianelli:  All right, you didn't hear nothing more bad about that thing, did ya?

Albertelli:  Yeah but I'll talk to you later about it, I know where it's from.

Gianelli:  Was it your guys?

***

Albertelli:  Not the, ah not those guys but someone else that, that I had talk about with it earlier.

Gianelli:  Oh, so we had three or four fuckin' parties goin' here.

Albertelli:  Ya yeah and ah I'll talk to you about that when I'm face to face but I know exactly, I know exactly who bcecuase them came to me.

Gianelli:  There's no trouble in there?

Albertelli:  Ahm, I don't, I don't believe so.

Gianelli:  All right.

Albertelli:  They came, they came to me Friday, but I'll talk to you about that when I, when I physically see you.

App:1131.

24

On December 13, 2003, the MSP intercepted the following conversation ("**Call 12**").

> Gianelli:  And ah, I don't what happened to the kid yesterday, I mean he went right, so?
>
> Albertelli:  I don't know if he did or not.
>
> Gianelli:  Well I don't know either, Larry didn't know.  So.
>
> Albertelli:  Ya well I'm not, I'm not gonna, go have that come back to me.
>
> Gianelli:  No.
>
> Albertelli:  Unless I can see you face to face.
>
> Gianelli:  Ya right.  All right.  All right kid.  That's the story….

App:1156-1157.

The MSP intercepted the following conversation on February 5, 2004 ("**Call 13**").

> Gianelli:  Nothing serious, but ahm, Larry Murray come over last night, and this kid, I don't know, he might be talking a little bit you know.  Um because according to fuckin' Larry, the attorney said, the kid don't say anything, he he says that bookmaker hired him, which a I found a little disturbing, so—
>
> Albertelli:  Hired who?
>
> Gianelli:  Hired him to burn down this building.  You follow me?
>
> Albertelli:  Yeah.
>
> Gianelli:  I found that a little odd, and, you know, so, I mean, I don't know.  I just want to alert you just so you, you know,  if

25

there is something you can do, or something you can find out, I
mean, I don't know….

***

Gianelli:  So, I mean, I just figured I'd you know.  I mean, I don't
want to alarm you, but, I mean, that, that's—

Albertelli:  I'm not too worried about it.

App:1168-1169.

## SUMMARY OF ARGUMENT

### Argument I

Each of Gianelli's convictions must be reversed because the district court
improperly denied Defendants' motion to suppress for three reasons.

    A.    First, District Attorney Blodgett failed to comply with clearly
established law which mandates that he **personally**, fully, and carefully
review the finalized First Application before he specially designated and
authorized the Essex ADAs to present the First Application to Judge Welch.
The documentation submitted along with the First Application, however, as
well as the First Application itself, state by their plain terms that he had not
done so and, in fact, that he may never, and instead might delegate that
nondelegable task to "his designee."   In support of its opposition to
Defendants' motion to suppress, the government submitted the Blodgett
Affidavit, which cements what the other documents strongly suggest, i.e.,
that Blodgett had not actually authorized the First Application.

26

Blodgett's failure to properly authorize the First Application mandates suppression of the fruits of the First Wiretap, as well as each renewal wiretap.  See infra, Arguments IA; IC.

B.    Second, the First Application did not set forth facts minimally sufficient to show that, prior to seeking the First Wiretap, the MSP had tried normal investigative procedures, but they failed, or that normal procedures reasonably appear likely to fail.  Even though the MSP had first attempted just a few less-invasive investigative procedures, they were so productive that they had reached most of their stated goals before the Essex ADAs even presented the First Application.  Moreover, the First Application relied heavily upon generic allegations which pertain to "typical" bookmaking businesses; the MSP knew, however, that Gianelli's bookmaking business was far from "typical" and shared little to none of the generic characteristics which make "typical" bookmaking businesses tough to crack.  Also, many of the most important allegations regarding necessity were literally cut-and-pasted from affidavits in other, unrelated wiretap applications.  Finally, the MSP failed to even attempt at least two normal investigative procedures which were quite likely to yield significant results and which would have likely accomplished several stated goals.  As such, suppression is the only appropriate remedy.  See infra, Argument I B.

C.     Third, and as explained more fully in co-defendant Gisele

Albertelli's brief, the wiretap warrant was issued without probable cause.

**Argument II**

This Court must reverse Gianelli's convictions on Counts 273-277 because

the government's presentation of the arson-related counts was rife with improper

interpretations, "opinions," and "understandings" from ATF Special Agent Kelsch,

whose testimony - by virtue of his status as an important case agent – no doubt had

a significant and undue influence on the jury.   Making matters worse, because the

district judge ruled such testimony admissible, the jury was told over and over and

over that Kelsch's "opinions" and "understandings" were derived from the wealth

of knowledge he had accumulated over the course of the vast, multi-year

investigation.

The district judge's repeated errors were clear abuses of discretion which

were so detrimental to Gianelli that a new trial is required.  This is so because the

government cannot show that it is highly probable that the myriad evidentiary

errors – most particularly, Kelsch's inadmissible interpretations of the calls - did

not influence the verdict.   See infra, Argument II.

28

## ARGUMENT

### I. THIS COURT MUST REVERSE EACH OF GIANELLI'S CONVICTIONS BECAUSE THE DISTRICT COURT ERRED IN DENYING DEFENDANTS' MOTION TO SUPPRESS THE FRUITS OF THE WIRETAPS.

Title III of the Omnibus Crime Control and Safe Streets Act, codified at 18 U.S.C. § 2510, et seq. ("Title III") sets forth detailed procedures which must be followed before a wiretap warrant may issue. Title III permits states to pass comparable legislation, but only if the state requirements are no less stringent than Title III. The fruits of state-sanctioned wiretaps are admissible only if issued in compliance with Title III and the applicable state law; 18 U.S.C. § 2516(2); which in Massachusetts is codified at G.L. c. 272, §99 ("Section 99").

The fruits of the wiretaps in this case are not admissible because the First Wiretap was issued in violation of three of Section 99's requirements: first, it was issued in violation of Section 99F1 (requiring district attorneys to follow strict guidelines before designating and  authorizing an assistant district attorney to apply for a wiretap warrant), as Section 99F1 was construed in Commonwealth v. Vitello, 367 Mass. 224; 327 N.E.2d 819 (1975); second, it was issued in violation of Section 99E3, which prevents resort to wiretaps as a preliminary step; and third, it was issued without probable cause. The first two reasons are addressed in turn below; the third is addressed in co-defendant Gisele Albertelli's brief.

29

A. **The District Attorney Did Not Properly Authorize The First Application.**

The authorization requirement is set forth in Section 99F1, which states:

The attorney general, any assistant attorney general specially designated by the attorney general, any district attorney, or any assistant district attorney specially designated by the district attorney may apply <u>ex parte</u> to a judge of competent jurisdiction for a warrant to intercept wire or oral communications. Each application <u>ex parte</u> for a warrant must be in writing, subscribed and sworn to by the applicant authorized by this subparagraph.

Only as interpreted in <u>Vitello</u>, <u>supra</u>, does Section 99F satisfy Title III.

<u>United States v. Smith</u>, 726 F.2d 852, 857-858 (1st Cir. 1984)(en banc)("<u>Smith I</u>").

The specific requirements include the following.

(1) Before an assistant district attorney can be "specially designated," s/he "must bring the matter for examination before his senior officer, the district attorney." <u>Vitello</u>, 367 Mass. at 256; 327 N.E.2d at 838.

(2) The district attorney must personally "determine whether a particular proposed use of electronic surveillance would be consistent with the overall policy." <u>Id.</u> at 256 n. 16; 327 N.E.2d at 839 n. 16. Compliance with this directive requires "'not a cursory but full examination by the district attorney of the application.'" <u>Id.</u>

(3) A district attorney must reduce his authorization to writing and only on a case-by-case basis. Likewise, "the special designation of [an] assistant district attorney must be on a case by case basis with written authorization." <u>Id.</u> at 257 n. 17; 327 N.E.2d at 839 n. 17.

As for the final requirement, <u>Vitello</u> recommends that the district attorney

"cosign the application for the warrant with the designated assistant." <u>Id.</u> at 232;

30

327 N.E.2d at 826.  This Court placed significant emphasis on this recommended

practice, stressing that where it is followed, there is

> no questioning the sufficiency of [the district attorney's]
> authorization.  This is so because the [application] itself would have
> contained the detailed considerations that are expected to underlie a
> knowledgeable authorization.  The presumption of regularity would
> be at its strongest.

Smith I, 726 F.2d at 859.  At the same time, the lack of a district attorney's

signature is not necessarily fatal, and "can be remedied by proof of actual

authorization."  Id.   But, where the district attorney does not co-sign the

application, as was true of the First Application, "litigation is invited."  Id.

Also, Blodgett was required to properly authorize the First Application

**before** it was presented to a judge, as after-the-fact determinations run contrary to

the very purpose of the authorization requirement.   United States v. Giordano,

416 U.S. 505, 523 n. 12 (1974)(emphasis added).

Finally, because the authorization requirement "was intended to play a

central role in the statutory scheme … suppression must follow when it is shown

that this statutory requirement has been ignored."  Id. at 528.

### 1.  Standard Of Review

Whether the authorization requirement is satisfied is ordinarily a mixed

question of law and fact, but here, where the relevant facts consist of a set of

uncontested documents, it is predominantly a question of law.  Therefore, this

Court applies the de novo standard of review. See United States v. Dyer, 589 F.3d 520, 530 (1st Cir. 2009), cert. denied, 130 S.Ct. 2422 (2010). With this standard in mind, this Court will no doubt find that the authorization requirement went unmet in this case.

1. **The Record Shows As A Matter Of Law That The District Attorney Did Not Properly Authorize The First Application.**

The Designation Letter, Authorization Letter, and the First Application - whether considered alone or collectively - do not affirm, or even suggest, that Blodgett personally reviewed the First Application before he specially designated the Essex ADAs, before he authorized them to apply for the First Wiretap, and/or before they presented the First Application to Judge Welch. Rather, these documents explicitly state that he had **not** yet personally reviewed the First Application in its final form and, even contemplate that he might **never** do so. See Add:38 (Designation Letter, stating in part that "[Blodgett] **or [his] designee** will personally review" the First Application and all renewal applications before presentment) (emphasis added); Add:39 (Authorization Letter, stating in part that Blodgett authorized the Essex ADAs to present the First Application and renewal applications to Judge Welch, "all of which shall have been reviewed by [Blodgett] **or [his] designee** before being presented to you.")(emphasis added); Add:45-46 (First Application, stating in part that Blodgett "authorized [the Essex ADAs] to personally make presentment to the Court of the application, as well as

32

all…renewal applications …all of which shall have been reviewed by District
Attorney Blodgett **or his designee** before being presented by these applicants.")
(emphasis added).

Defendants argued in their motion to suppress that these documents were
facially insufficient to satisfy Section 99F, and consequently, that they were
entitled to an evidentiary hearing at which the burden would shift to the
government to prove Blodgett's actual authorization. App:620, <u>citing</u> <u>Smith I</u>, 726
F.2d at 860.

The government therefore had a choice:  (1) make a purely legal argument
that the Designation Letter, Authorization Letter, and First Application were
facially sufficient in and of themselves to show proper authorization; (2) agree to a
courtroom confrontation at which Defendants would have the opportunity to cross-
examine Blodgett and the Essex ADAs; or (3) avoid an evidentiary hearing by
presenting its best case for **actual** authorization on paper.  Here, the government
chose (3), and to that end, submitted a sworn affidavit from Blodgett ("Blodgett
Affidavit").   App:895-899; 927-929; Add:48-50.  In choosing to rely upon the
Blodgett Affidavit, however, the government utterly failed to sustain its burden
under <u>Smith I</u>  of proving actual authorization.

33

The Blodgett Affidavit does in fact clarify the ambiguities of the other documents, albeit not in the government's favor.  Indeed, Blodgett himself confirmed Defendants' allegations that he had not complied with Section 99F1 and Vitello, by testifying, inter alia:

> 2. In October, 2003, I was made aware of an investigation by the Massachusetts State Police of a gaming operation in Essex County.  I assigned [the Essex ADAs] to oversee the investigation.

> 3. **In late October**, the [Essex ADAs] requested approval to apply for an order authorizing interception of oral communications.  Thereafter, prior to my approval to do so, **I reviewed draft copies of an affidavit setting forth the probable cause and an application setting forth the statutory requirements defining how the order was to be implemented.**  I was satisfied that as a matter of uniform law enforcement policy within this jurisdiction, the initiation of a wiretap was proper and required.  I was satisfied that the application and affidavit were in compliance with section 99.

> 4. On **October 29, 2003** I specially designated [the ADAs] as my designees to oversee the investigation and delegated to them the responsibility of apply for and supervising the execution of the intercept order and all renewals, amendments, status reports and returns.

> ***

> 6. **I personally reviewed every renewal application** and **supporting affidavit.**

Add:48-50 (emphasis added).

Through his careful choice of words, Blodgett made clear that he never reviewed the First Application, which expressly incorporated the Orlando Affidavit, in its final form.   Indeed, Blodgett's differentiation between "drafts"

and "an application" and "an affidavit" is significant, and fatal to the validity of the

First Wiretap.  The term "application" has a very specific meaning in the wiretap

context.  See Section 99F (setting forth in detail the required contents of "an

application").   A "draft," however, is clearly something short of an "application;"

in this context, it is nothing but "an initial or preliminary version[]" of an

application.  Black's Law Dictionary, 7th ed. (1999).

Yet, having reviewed nothing but "drafts" of "an application" and "an

affidavit" at some unknown time "in late October," Blodgett issued the

Designation Letter on Wednesday,  October 29, 2003,  and the Authorization Letter

on Thursday, October 29, 2003.  The First Application, however, was not in its

complete and final form[21] until two business days **after** he issued the Designation

Letter and one business day **after** he issued the Authorization Letter.

Moreover, it is notable that while Blodgett says he designated the Essex

ADAs on October 29, 2003, he never says that he **authorized** them to present the

First Application on October 30th (the date of the Authorization Letter) or at any

other time.  Certainly, if he had, Blodgett or the Essex ADAs would have said so in

at least one of the relevant documents.   Compare United States v. O'Malley, 764

F.3d 38, 39 (1st Cir. 1985)(defendants not entitled to evidentiary hearing where

application explicitly said "it had been approved" by authorized official).

---

[21] See supra, n. 5 (explaining that Application explicitly incorporated Orlando
Affidavit, which was not signed until October 31, 2003).

Their failure to say so was neither accident nor oversight: by his own admission, Blodgett reviewed only **"drafts"** of "an application setting forth the statutory requirements defining how the order was to be implemented" and "an affidavit setting forth the probable cause," and did so at some **unspecified** time in **"late October."** In other words, he looked at some incomplete documents possibly up to two weeks before he purported to specially designate the Essex ADAs, possibly two weeks before he purported to authorize them to present the First Application, and possibly two weeks before the Essex ADAs presented the First Application to Judge Welch. Even further undermining the government's cause, Blodgett does **not** say that he reviewed anything which set forth Section 99's other requirements, not the least of which is the necessity requirement, <u>i.e.,</u> that before applying for the First Wiretap, "normal investigative procedures have been tried and have failed or reasonably appear unlikely to succeed if tried." Section 99E3.

These circumstances do not show by any measure that Blodgett was familiar with the contents of the finalized First Application and, therefore, there are no grounds upon which proper authorization may be inferred. More importantly, there is more than ample evidence to the contrary, <u>i.e.,</u> Blodgett's own affidavit. <u>Compare</u> <u>Commonwealth v. D'Amour</u>, 428 Mass. 725, 734-735, 704 N.E.2d 1166 (1999)("Here, there is ample evidence that the district attorney properly reviewed

the application **and there was no evidence to the contrary**.  The district

attorney's familiarity with the case was indicated by the description of life

insurance fraud and larceny in the authorization letter. Indeed, **the authorization**

**and the application were bound together and <u>shared the same date</u>, suggesting**

**that the district attorney was familiar with the content of the application when**

**she signed the authorization.**")(emphasis added; footnote omitted).  <u>Compare</u>

<u>also</u> <u>United States v. Smith</u>, 587 F.Supp. 653, 656 (D.Mass. 1984)("<u>Smith</u>

<u>II</u>")(after remand, district court found actual authorization where specially

designated ADA provided district attorney with applications and renewal

applications,  supporting affidavits, warrants, and special designation letter and

where district attorney "fully examined the documents submitted to him[, and] on

several occasions, [the district attorney] was initially dissatisfied with the contents

of the documents and, consequently, revisions were made[.]"); <u>aff'd</u>, <u>United States</u>

<u>v. DeJesus</u>, 752 F.2d 640 (1st Cir. 1985).

> **2.  In The Alternative, This Court Should Remand This Case For**
> **An Evidentiary Hearing On The Issue Of Whether The First**
> **Application Was Properly Authorized.**

Because the government's own proof conclusively shows that Blodgett did

not properly authorize the First Application, there is no basis or need for an

evidentiary hearing, as the government has already been afforded its one bite at the

apple. Should this Court determine, however, that the question of Blodgett's actual

authorization remains subject to debate, Gianelli respectfully requests that this

Court remand this case for an evidentiary hearing, at which the government must

prove actual authorization or bear the consequence of suppression.  Smith I, 726

F.2d at 860.

**B. The District Court Improperly Denied Defendants' Motion To Suppress Because The First Wiretap Was Issued In Violation Of The Necessity Requirement.**

Section 99E3 (the necessity requirement) provides that a wiretap warrant

may issue only upon a "showing…that normal investigative procedures have been

tried and have failed or reasonably appear unlikely to succeed if tried."

On appeal, this Court must determine whether "the facts set forth in the application

were minimally adequate to support" the issuing court's determination United

States v. Cartagena, 593 F.3d 104, 109 (1st Cir.)(citation omitted), cert. denied, _

S.Ct. _ (2010).  While the application need not show that all other methods were

exhausted, it nevertheless must show "a reasonable good faith effort to run the

gamut of  normal investigative procedures before resorting to means so as intrusive

as electronic surveillance of telephone calls."  Id. (citation omitted).   Because even

this low standard went unmet in this case, the district court erred in denying

Defendants' motion to suppress.

1. **The First Application Resounds With Generic, Standardized Assertions Regarding Feasibility Of Normal Investigative Techniques Without Regard To The Specifics Of This Case.**

The Orlando Affidavit alleges that wiretapping is appropriate because it "will provide the best available means of identifying, apprehending and prosecuting all the members of this organization and achieving all of the goals of this investigation." App:315-316. It matters not, however, that wiretapping is "the best available means" - it goes without saying that wiretapping will **always** be the best investigative tool available. Rather, the burden was upon the applicants to show why, **in this particular case,**[22] normal investigative techniques would not suffice to accomplish these goals. J. Carr, <u>The Law of Electronic Surveillance</u>, § 4-60 (1988)("Courts should reject the repetitious incantation of standardized assertions with their implicit invitation to use eavesdropping indiscriminatory and without regard to the actual needs of the particular case.")

Yet many of the allegations in the Orlando Affidavit which are critical to satisfying the necessity requirement in **this** particular case are **identical or near-identical allegations from affidavits in unrelated wiretap investigations**, in some instances, sharing even the same typographical errors**.** These mirror and near-mirror allegations concern important steps in the pre-wiretap investigation, including investigators' lack of first hand information, limitations of informants,

───────────────

difficulties of using undercover agents, limited utility of interviews, grand jury

subpoenas, trash analysis, and telephone analysis, the dangers and shortcomings of

physical surveillance and, finally, the failings of normal investigative techniques in

general.  See Add:51-59 (chart setting forth striking similarities in three different

wiretap affidavits); see also App:598-606  (same chart as part of motion to

suppress).

      The Orlando Affidavit is otherwise replete with boilerplate allegations,

including many generic allegations that "typical" gaming organizations are

structured and operated to make detection by law enforcement difficult.  See

Add:658-665 (alleging that street bookies register wagers from bettors, then

forward them to local bookmaking offices, which are managed by agents; area

bookmaking offices give out lines and manage local offices and street bookies;

almost all activity occurs over phones; most phones registered under false names;

high-level bookmakers often use payphones; bookmakers use land-line phones

which do not provide information on non-toll calls;  call-forwarding is used so

police do not know where local and area offices are located; co-conspirators often

use counter-surveillance techniques; bookmaking offices frequently kept in homes

or high-security buildings; local and area bookmaking offices frequently moved to

new locations; bookmakers often use fear and physical harm; bookmakers keep

records on flash paper; and high-ranking bookmakers only meet with closely

trusted associates.)

Allegations of this ilk do not demonstrate necessity.  United States v.

DiMuro, 540 F.2d 503, 510-11 (1st Cir. 1976)("If mere conclusion by the affiant

based solely on past experience that gambling experiences are `tough to crack'

were held sufficient to authorize a wiretap, the government would need to show

`only the probability that illegal gambling is afoot' to justify electronic

surveillance."), cert. denied, Hurley v. United States, 429 U.S. 1038 (1977).

The generic allegations are even more meaningless to **this** specific case,

because before the MSP sought the wiretap, they knew that Gianelli no longer

operated a "typical" bookmaking business.   App:693-694 ("As I have touched

upon throughout this affidavit, this case is not your typical organized

crime/bookmaking investigation.  Gianelli's newfound reliance on an off-shore

gaming office has made this investigation different.")

Furthermore, the MSP had already identified those at the highest levels of

the organization:   Gianelli, Albertelli, and Ramasci.   See J. Carr, The Law of

Electronic Surveillance, § 2.4 (West 2004)( Title III "was drafted to enable

investigators to go `up the ladder' from a specific, often minor, crime or criminal

to major offenses and offenders.")   Relatedly, they knew that once Gianelli moved

his gambling office offshore, his visibility and availability had actually **increased.**

41

United States v. Lilla, 699 F.2d 99, 104 (2d Cir. 1983)("The affidavit does not

enlighten us as to why this narcotics case presented problems different from any

other small-time narcotics case; if anything, Lilla operated more openly than most

and with less care in terms of evading detection.")  They knew, also, that Duke

Sports shared little to none of the characteristics of typical bookmaking businesses

described at App:658-666.

      Orlando's allegations of the failings of other normal investigative procedures

do not add up to necessity.  For example, Orlando recounts only two specific

instances where Gianelli **migh**t have used "counter-surveillance techniques."[23]

See United States v. Blackmon, 273 F.3d 1204, 1209 (9th Cir. 2001)(no necessity

where, inter alia, affidavit alleged only one specific instance where surveillance

was "almost compromised.")    He does not allege any difficulties with

surveillance of Ramasci and/or Albertelli and, in fact, suggests that there were

none.  App:706 ("on several occasions during the past several months [the MSP]

have conducted periodic surveillance of Gianelli, Albertelli, Ramasci and their

associates meeting with one or more of the above [CIs.]"

---

[23] In one instance, Gianelli, who was entering on a highway on-ramp, "peered" in his review mirror, a perfectly normal, and safe, thing to do.  App:706-707 ("[i]t **appeared** to [Orlando] that [Gianelli] could have detected [his] surveillance.")(emphasis added); see also App:709-710 ( Gianelli observed driving at a high rate of speed near his home).

Finally, the Orlando Affidavit fails to offer any justification for the MSP's failure to even attempt several other available, cost-effective, and less-intrusive investigative techniques. Perhaps most glaring is any reasonable explanation why the MSP made no effort to introduce an undercover agent[24] into the Gianelli Organization, particular because sure, in the past, both Orlando and Russolillo had infiltrated bookmaking organizations by going undercover. App:651-652. Doing so here would have likely been particularly fruitful – even if just as a bettor - because, unlike the higher-ranking members of a "typical" bookmaking organization, Gianelli, Albertelli, and/or Ramasci personally met with bettors on a regular basis.

 Further, the MSP made no attempt to cultivate new informants or investigate Gianelli's, Albertelli's, or Ramasci's finances, even though the discovery, seizure, and forfeiture of Gianelli's ill-gottens assets was one of the stated goals of the investigation.

In short, the MSP skipped right over the logical next steps in their investigation, opting instead for the quick and easy shortcut that a wiretap provides.

---

[24]Orlando says only that the CIs were not willing to introduce an undercover agent into Gianelli's organization and that, at most, undercover agents could pose as bettors. App:715-716.

43

**C. Each And Every Renewal Warrant Is Tainted And The Fruits Thereof Must Be Suppressed.**

If this Court agrees that the First Wiretap was issued in violation of the authorization and/or necessity requirements, then the fruits of **each** wiretap must be suppressed, because by statute, each renewal wiretap was necessarily dependent upon each previous application, going back to the First Application.  Section 99J; see also Giordano, 416 U.S. at 529-533; 530 (holding that where initial wiretap order unlawful, fruits of all extension orders must be suppressed because Title III requires that applications for extensions include "a statement setting forth the results thus far obtained from the interception, or a reasonable explanation of the failure to obtain such results.")

**II.  THIS COURT MUST REVERSE GIANELLI'S CONVICTIONS ON COUNTS 273-277 BECAUSE THE DISTRICT JUDGE REPEATEDLY ABUSED HIS DISCRETION BY PERMITTING A CASE AGENT TO INTERPRET ORDINARY WORDS AND PHRASES IN INTERCEPTED CALLS BASED ON HIS KNOWLEDGE OF THE FAR-REACHING INVESTIGATION AND THE GOVERNMENT CANNOT SHOW THAT THE ERRORS DID NOT INFLUENCE THE VERDICT.**

Before Kelsch testified, Defendants filed a Motion To Preclude Expert And Lay Opinion Testimony ("motion in limine"), asking the district court to preclude Kelsch from interpreting the arson-related calls because such testimony would run afoul of Fed.R.Evid. 701 and 702.  App:541.   The district judge granted the motion in part, ruling as follows.

44

It is my inclination at this time to allow Mr. Kelsch to testify with respect to specific matters that may be within his expertise as someone who knows about arson and arson investigation. **But I am not going to allow more general questions as to what happened in that conversation.** If the questions are directed specifically to specific responses or portions of the conversation and they relate to matters that I believe are not entirely clear to laypersons, I will allow such testimony. But if they don't, I will sustain objections. **And, specifically, I would expect to sustain an objection to – after we've heard a conversation, if the question is, What is happening in that conversation, that is an objectionable question.** But if they are pinpointed to matters such as the – getting out of town and the alibi and maybe specifically about boats, if that is a question that leaves a layperson with some ambiguity, I would allow such a question. **But the more generalized questions I would not allow.**

TT:22:85-86 (emphasis added).

The district judge nevertheless permitted Kelsch to testify over repeated defense objections as to his "opinion" and "understanding" of "[w]hat was happening in [the] conversation[s]," thereby enabling the prosecution to prove the most serious and vigorously disputed charges[25] with an enormously prejudicial and unfair advantage. Examples of the improper rulings specific to Gianelli include the following.

Over objection, Kelsch interpreted **Call 1** as follows:

- When Gianelli said, "What, ah, you talk to that kid[,]" and Albertelli said, "I was with him the next morning, and asked if he wanted to take

---

[25] The defense made clear from the very beginning that   crux of Gianelli's defensecentered around the arson-related charges.  See, e.g., TT:3:55-56 (opening statement)("Every case has a prize, something that is going to be fought over.  And in this case, it's the arson and the arson for extortion.  These are the most serious charges.")

45

a ride, and he said he had to take of the shop," Kelsch understood that
they were referring to Homsi, whose brother owned a motorcycle repair
shop." TT:23:116 .

- When Gianelli said, "Gotta make sure nobody is in there, you know[,]"
  Kelsch understood that Gianelli was "referring to the Big Dog in North
  Reading." T23:116-117.

Over objection, Kelsch interpreted **Call 2** as follows:

- When Albertelli said, "My other friend, do you want me – you just
  want me to go forward, right" and when Gianelli said, "Talk to that guy
  tomorrow and go forward[,]" Kelsch understood that they were
  referring to Homsi.  TT:23:119-120.

- When Albertelli said, "Just in case, you know, we want to go for a ride
  or something[,]"   Kelsch understood that he meant "[t]o make sure
  they had an alibi in place."  TT:23:120.

Over objection, Kelsch testified that when Gianelli said in **Call 3**, "This fucker

got to be shut down, period, has to be shut down[,]" it was Kelsch's opinion that he

was referring to Colangelo.  TT:23:122.

Over objection, Kelsch interpreted **Call 4** as follows:

- When Gianelli said, "How's that other kid[,]" Kelsch understood that
  he was referring to Homsi.  TT:23:124.

- When Albertelli said, "it's Monday that they're coming into town,"
  Kelsch understood that he meant that Slater was coming from New
  York on Monday.  TT23:125.

Regarding **Call 5**, the district court permitted Kelsch to testify, over

objection, that when Gianelli said, "And ah more importantly talk to the other kid,

46

it looks like that might be the only fuckin' solution[,]" Kelsch understood that "the

other kid" was Homsi. TT:23:125.

Regarding **Call 6**, the district court permitted Kelsch to testify, over

objection, that when Gianelli said, "I forgot to ask you what time are you going to

see that kid today[,]" and when Albertelli said, "I'm going to see him tomorrow[,]"

Kelsch understood they were referring to Homsi.  TT:23:130.

Over objection, Kelsch interpreted **Call 7** as follows:

- When Gianelli said, "Our way might be the only right way[,]"
  Kelsch understood that he was "referring to setting a fire."
  TT:23:132.

- When Gianelli said, "what time are you going to see that kid[,]"
  Kelsch understood that Gianelli was "speaking of Deeb Homsi once
  again."  TT:23:132.

- When Albertelli said, "I kind of talked to him half ass on the phone,
  but ah, he doesn't speak English too good[,]" Kelsch said he was
  referring to Homsi and "that they don't want to speak openly on the
  telephone."  TT:24:41.

- When Albertelli said, "I think they're going to come over tomorrow,
  I'll find out, I'll get a feel for what they think.  I don't know if
  they're going to go over there to – to look around tonight or what[,]"
  Kelsch understood that he was referring to "the people who will be
  setting the fire."  TT:23:132-133.

Regarding **Call 8**, the district court permitted Kelsch to testify, over

objection, that when Albertelli said, "But they say they go home Saturday morning.

So it will be between now and Saturday[,]" Kelsch understood that he was

"speaking about McCormack and more directly Sean Slater, who would be

returning to New York after Saturday morning."  TT:24:5.

Over objection, Kelsch interpreted **Call 9** as follows:

- When Gianelli said, "How's the pizza[,]"Kelsch understood that he was referring to Romeo's Pizza. TT:24:6.

- When Albertelli said, "I'll call him down at the store and see if he wants to see me[,]" Kelsch understood that he was talking about "Deeb Homsi, who works at his brother's shop."  TT:24:6.

Over objection, Kelsch interpreted **Call 10** as follows:

- When Gianelli said, "I'm wondering who it was" and Albertelli responded, "Well…that makes me think it was you telling me that you got someone else on it[,]"  it was Kelsch's opinion that Albertelli was "asking Mr. Gianelli if he had asked someone else to set the fire." TT:24:6-7.  Kelsch later opined, "it's apparent, when he says, `I didn't want to make it look like I knew anything,' that Albertelli and Gianelli have an understanding that a fire was to be set … And then he moves on to say, `They got picked up by the state police?'  That is referring to the fact at this point that Alberteilli has not told him about what had happened.  So there's kind of two things going on in that area there." TT25:81.

- When Gianelli said, "I did that Friday, so it very well could be[,]" it was Kelsch's opinion that he meant "[t]hat he had a conversation with another party about setting that fire."  TT:24:7.

- When Albertelli said, "I didn't want to make it look like I knew anything[,]" Kelsch understood that he was "trying to conceal any knowledge he had about by whom and how the fire was set."  TT:24:7-8.

- When Gianelli said, "This kid probably tried to burn the f'ing place down.  That's what I'm thinking[,]" Kelsch understood that he was

48

"placing blame on Mark Colangelo….  They're strategizing about what their story would be."  TT24:8-9.

- When Albertelli said, "Well, no.  I mean, Arthur, I told so many people about it….  [S]omeone said to me that they heard that, that someone got picked up at the Big Dog.  Ah, on an arson charge.  And I…said, ah, in, in Lynnfied?  And they said no, no it wasn't Lynnfield, but it was another one[,]"  it was Kelsch's opinion that Albertelli was "trying to make Arthur Gianelli believe that he just heard about this from another individual when, in turn, he had already heard about it from Deeb Homsi."  TT:25:78.

- When Gianelli said, "Just make sure it's right[,]" Kelsch understood that he was telling Albertelli to have "the arson…done correctly."  TT:25:78-79.

The district court permitted Kelsch, over objection, to interpret **Call 11** as

follows:

- When Gianelli said, "You didn't hear nothing more bad about that thing, did you[,]" Kelsch understood that he was "referring to the fire that happened at Romeo's Pizza on November 13[th]."  TT:24:12.

- When Gianelli said, "Was it your guys[,]" Kelsch understood that he was "[r]eferring to someone that Mr. Albertelli had contacted to set the fire."  TT:24:12.

- When Albertelli said, "Not those guys, but someone else that I had talked about with it earlier[,]" and when Gianelli responded, "So we had three or four fucking parties going here[,]"  Kelsch understood they meant "that either Mr. Albertelli and/or Mr. Gianelli have spoken to at least three or four separate individuals or groups to set the fire."  TT:24:12-13.

- When Albertelli said, "I know exactly who because they came to me[,]" Kelsch understood that he was "speaking of Mr. McCormack and Mr. Homsi, who met him two days prior." TT:24:13.

Regarding **Call 12**, Kelsch testified over objection, that when Gianelli said, "I don't know what happened to the kid yesterday," Kelsch understood that he was referring to McCormack.  TT:24:16.

Regarding **Call 13**, Kelsch testified over objection that when Gianelli said, "Larry Murray came over last night, and this kid, I don't know, he might be talking a little bit[,]" Kelsch understood that he was referring to McCormack.  TT:24:19-20.

## A. The District Judge's Rulings Were An Abuse Of Discretion.

Although this Court reviews the district judge's evidentiary rulings under the deferential abuse of discretion standard; United States v. Perez-Ruiz, 353 F.3d 1, 10 (1st Cir. 2003), cert. denied, 541 U.S. 1005 (2004); it is clear for the following reasons that he abused that discretion in this case.

### 1. Kelsch's Interpretations Are Inadmissible Under Fed.R.Evid. 701 And 702.

As Defendants argued in their motion in limine, and for the reasons set forth below, Kelsch's interpretations are not admissible under Fed.R.Evid. 702 or 701.

Before Kelsch could properly testify as an expert on the meaning of the calls, the government had to show that (1) he was qualified to do so by knowledge, skill, experience, training or education on the relevant topic(s); (2) his opinions

were derived from scientific, technical, or other specialized knowledge; and (3) his

opinions would assist the jury in understanding the calls.  Fed.R.Evid. 702; United

States v. Corey, 207 F.3d 84, 88 (1st Cir. 2000).

In an effort to satisfy these requirements, the government elicited testimony

from Kelsch that he had been an ATF agent for 8 years, had specialized training in

conducting criminal and arson investigations, was a certified Explosives Specialist,

taught at a state fire academy, investigated "numerous" fires, and occasionally

participated in consensually recorded conversations.   TT:23:102-106.  As for his

purported expertise interpreting other people's conversations, he testified as

follows:

> From my experience…in these consensual monitoring, it's very
> unlikely for people to speak openly about fires and fires that have
> been set.  A lot of times they will use code words, or sometimes
> they'll just refer to it as "it."  So, they won't all the times speak
> clearly about a fire, say, I set that fire.  They say, "I set it" or
> something to that sort.  Now, of course, you do have times when
> people do say that, but for a majority of times you don't.

TT:23:106.  These qualifications do not render Kelsch an expert on the meaning of

the calls at issue.

"Under Fed.R.Evid. 702, the proper inquiry is whether the untrained layman

would be qualified to determine intelligently and to the best possible degree the

particular issue without enlightenment from those having a specialized

understanding of the subject matter involved."  United States v. LaMattina, 889

F.2d 1191, 1194 (1st Cir. 1989)(citation and quotation marks omitted).   As relevant here, expert testimony is admissible where "juries must determine the meaning and significance in recorded conversations of the jargon used in criminal operations [and where without an expert's specialized knowledge], the jury would probably [be] at a loss to understand the significant part of the evidence." Id.

Kelsch's areas of expertise, however, did not qualify him to offer his expert interpretations of Calls 1-13.   Nowhere in those calls did anyone speak in the specialized lexicon of the criminal or arsonist communities.  An average juror could discern the meaning of the calls by her applying common sense and considering the testimony of the lay witnesses and the surrounding circumstances. Accordingly, the district judge's evidentiary rulings were improper.  United States v. Weiner, 3 F.3d 17, 21-22 (1st Cir. 1993)(error to allow government expert to testify that references in loansharking ledger to "Sid," "Sid the bank," and "Sid Weiner" were the same person because interpreting the references was "a matter of routine inference that the jury could draw on its own.")

Thus, the only other possible basis for allowing Kelsch's interpretations was Fed.R.Evid. 701, which states:

If the witness is not testifying as an expert, the witness's testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue, and (c) not based on

52

the scientific, technical, or other specialized knowledge within the scope of Rule 702.

To satisfy (a), the government was required to show that Kelsch had first-hand or "inside knowledge" about the content of the calls.  United States v. Lizardo, 445 F.3d 73, 83 (1st Cir.), cert. denied, 549 U.S. 1007 (2006). Here, however, it is undisputed that Kelsch did not stand in such a position.  He did no more than listen to the calls well after the fact, which, notably, is exactly what the jurors did.

### 2. Kelsch Improperly Testified As A "Summary" Witness And, Relatedly, That His Interpretations Were Derived From The Investigation As A Whole.

For the reasons described in Argument III of co-defendant Iacaboni's brief, much of Kelsch's testimony constituted improper expert "summary" evidence. This is particularly so because Kelsch repeatedly alerted the jury that his interpretations were based not just on what the jurors themselves knew, but rather, on the investigation as a whole.  See, e.g.,

- TT:25:71 (Kelsch's opinion that arson was for purpose of extortion was based on what he learned during "a number of" grand juries.)

- T25:30 (Kelsch testified that "[a]fter we had the full facts of what had gone on in this investigation," all of the case agents agreed that the arson was for the purpose of extortion.)

- T25:107 (Kelsch testified that his opinion regarding Defendants' motive changed after he talked to Homsi and McCormack, who had "inside information.")

53

- TT:26:68 ("Well, for these particular calls, we listened to the phone calls to determine if any of them were related to the arson. Also, we used interviews that we had with cooperating defendants such as Michael McCormack and Homsi. And that information they gave us allowed us to put a lot of these calls in context and determine what they were talking about, especially within the timing.")

- TT:25:69 ("The opinions were formulated over the course of the investigation [which] went on for years…. Numerous witnesses were brought in. Other people were brought in and spoken to. It's taking all that information that we've collected over those years…that led me to my conclusions and my opinions[.]")

- TT:25:121 (Kelsch's opinions "[b]ased upon all the evidence in the case[.]")

- T24:82 ("[Slater] certainly wasn't planning to get arrested, I know that much. I know that from speaking to other people in this investigation.")

- T24:83 ("I'm not sure if it's in a report or the grand jury, but I was told that, yes.")

- TT:25:54 (When asked how he knew Gianelli's reference to "the pizza" was not a reference to John Mousis, who also owned a pizza restaurant, Kelsch testified, "John Mousis was spoke of regularly in the calls, and he was either referred to as `Mousis' or `the Z kid.' They never referred to him as `pizza' or `house of pizza.'"); see also T25:101 ( "The majority of the times of what I've seen in the calls I listened to [Mousis is] always been referred to as between Dennis Albertelli and Arthur Gianelli as `the Z kid' or `Mousis.'")

Testimony of this sort is improper for several reasons. First, it presents a risk that "the jury may unduly credit the opinion testimony of an investigating officer based on a perception that the expert was privy to facts about the defendant not presented at trial." United States v. Flores-de-Jesus, 569 F.3d 8, 21 (1st Cir.)

54

(citation omitted), <u>cert. denied</u>, <u>Sabino-Morales</u>, 130 S.Ct. 427 (2009).  Second, it

is riddled with hearsay.  <u>Id.</u> at 19.  Third, it implicated, and likely violated,[26]

Gianelli's right of confrontation.   <u>Id.</u>, <u>citing Crawford v. Washington</u>, 541 U.S. 36

(2004).  Also, "[w]hen the witness is a case agent who testifies about the facts of

the case and states that he is basing his expert conclusions on his knowledge of the

case, a juror understandably will find it difficult to navigate the tangled thicket of

expert and factual testimony from the single witness, thus impairing the jurors'

ability to evaluate credibility."  <u>United States v. Dukagjini</u>, 326 F.3d 45, 54 (2nd

Cir. 2003)(cited with approval in <u>Flores-de-Jesus</u>, 569 F.3d at 21).

Furthermore, Kelsch repeatedly and improperly endorsed the testimony of

other witnesses, most particularly, Homsi and McCormack.  <u>Flores-de-Jesus</u>, 569

F.3d at 26.  <u>See</u>, <u>e.g.</u>,

- T24:92 ("Well, no.  I'm assuming that Deeb Homsi testified in this court that that's  what he meant when he called Dennis Albertelli.  That's what I've been told during prep sessions.  I assume he said the same to his Court.  But I agree with his opinion about what this phone call is about.")

- T24:37-39 (when challenged about his testimony that "they came in today" meant that McCormack and Slater came in today, Kelsch testified, "I'm reaching this opinion because Michael McCormack told us that he elicited Sean Slater to come into town for this fire.")

---

[26] It is impossible to tell whether any of Kelsch's understandings and opinions were based upon information garnered from people who did not testify, and therefore were not subject to cross-examination. <u>See</u>, <u>e.g.</u>, TT:25:69.

- T24:52 (when asked the basis for his interpretation of Call _, Kelsch testified, "I didn't tell you that, Deeb Homsi did…. I'm not the first person to say that.   It was Deeb Homsi that told the Court that.")

- T24:84 ("I've had conversations with Mr. McCormack, where he said that Sean Slater was only coming in for the week.")

See also TT:23:116;  TT:23:125; TT:24:5; TT:24:6; TT:25:54-55; TT:25:78.

### B.     The Government Cannot Prove That It Is Highly Probable That Kelsch's Improper Testimony Did Not Influence The Verdict.

This Court must reverse Gianelli's convictions on Counts 273-277 unless the government can prove that the errors described above were harmless, i.e., that "it is highly probable that the error[s] did not influence the verdict." United States v. Casas, 356 F.3d 104, 121 (1st Cir. 2004).   Relevant factors include the importance of the testimony to the government's case; the strength of the government's case without the improper testimony; and whether the improper testimony had a prejudicial impact.  Flores-de-Jesus, 569 F.3d at 27.

In weighing the degree of prejudice, "the appropriate inquiry is **not** whether a reasonable jury could have looked at the evidence and reasonably found [Gianelli] guilty, but rather whether it is `highly probable' that the error did not influence the verdict." Id. at 28 (emphasis added).   The government simply cannot make that showing on this record.

**1. Kelsch's Interpretations Were Central To The Arson Case Against Gianelli.**

Without a doubt, Kelsch's interpretations were central to the arson case against Gianelli. Indeed, they were the glue which linked him to Homsi, McCormack, Slater, and the events of November 13, 2003. They provided a narrative for the jurors to follow, obviating the need for them to independently weigh and consider each call, the testimony of those with relevant first-hand information, and other relevant evidence.

Moreover, his testimony came at the tail end of the trial, which is surely no coincidence, as O'Connor, McCormack, and Homsi had testified between six and three days earlier. By saving Kelsch for nearly the end of its case-in-chief, the government was able to present his testimony as a precursor to what would soon be its closing argument. This was highly improper. See Dukagjini, 326 F.3d at 54 ("Although we approve of testimony approving drug code words, such expert testimony, unless closely monitored by the district court, may unfairly provide the government with an additional summation by having the expert interpret the evidence and may come dangerously close to usurping the jury's function.")(citation and internal quotation marks omitted).

57

## 2. There Was Scant Other Evidence Linking Gianelli To The Arson.

Without Kelsch's improper interpretations, the calls in and of themselves do not convincingly point to Gianelli's complicity in the arson. To be sure, the government did not point to a single call where, prior to November 13th, Gianelli could be heard explicitly discussing Homsi, McCormack, Slater, Romeo's Pizza, and/or The Big Dog/NR. Relatedly, Kelsch's incriminating interpretations were not corroborated by any witness with first-hand knowledge.

The best the government had to offer came from Homsi, whose credibility was dubious at best.[27] According to Homsi, when Albertelli said he wanted to talk to "the other kid" about McCormack's request for bail money, Homsi understood that he was referring to Gianelli. TT:21:76. The basis for Homsi's understanding? Several years earlier, Homsi testified, "[t]hat's the way [Albertelli] referred to him." TT:21:126. Specifically, between 1996 and 2001, Albertelli had said to Homsi, "Me and **the kid** will bring the poker machine down, I want you to

---

[27] Several years earlier, Homsi, an admittedly heavy drug user, had been thrown out of the Hells Angels after a tribunal found he had lied about another Hells Angel, which was a very serious violation of the gang's code of honor. TT:21:93-97. Moreover, McCormack testified that he trusted Homsi only "sometimes[;]" TT:19:156-157; and that he had insisted on meeting personally with Albertelli in part because he did not trust that Homsi would not take Slater's bail money for himself. TT:20:15-16.

meet **the kid** at Bickford's, the other kid, I have to talk to **the other kid**."  Id.
(emphasis added).

It should not escape this Court's attention that Kelsch told the jury that when
Gianelli and Albertelli used these same terms, Kelsch somehow knew they were
referring to **Homsi**.  See TT:23:116; 124; 125; 130; 132.

### 3.  **Kelsch's Improper Testimony Was Prejudicial.**

The government cannot credibly dispute that Kelsch's seemingly
authoritative "opinions" and "understandings" carried great weight with the jury.
Indeed, it is well recognized that "juries may place greater weight on evidence
perceived to have the imprimatur of the government."  Flores-de-Jesus, 569 F.3d at
17.  Put another way, "[b]y appearing to put the expert's stamp of approval on the
government's theory, such testimony might unduly influence the jury's own
assessment of the inference that is being urged." Casas, 456 F.3d at 120 (citation
omitted).  And the imprimatur problem was exacerbated in this case because, as
discussed above, Kelsch repeatedly told that the jurors that he knew far more about
the case than they did.

Further compounding the prejudice to Gianelli was the pervasive confusion
surrounding Kelsch's role as a witness.   At times, Kelsch seemed to testify (1) as
an expert (e.g., when expressed an opinion), (2) as a lay opinion witness (e.g.,

when he said he "understood" what was being said), and (3) as a fact witness with

inside information.

As to the latter, Kelsch frequently testified with the sort of authority and

certainty which one would expect only from a witness with an insider's knowledge

of relevant events and people.  See, e.g., T24:48 (when asked how he knew that "I

got to get a hold of the other kid and I'll call you back later" meant Gianelli,

Kelsch testified that his opinion would not change  "[b]ecause whether he called

Arthur Gianelli or not, he's clearly referring to Arthur Gianelli."); T24:99 ("In fact,

when [Albertelli] tells [Gianelli] about the fire, [Albertelli] lies in that conversation

too, because he's saying that he heard it from a co-worker, when we know that he

had heard from Deeb Homsi how the fire had been set and what happened.  So,

he's still lying in that conversation, giving a partial truth."); TT:25:52 ("I know

who he's referring to when he used the word `kid.'"); TT:25:54 (when asked if it

was possible that "the pizza" was a reference to Mousis, Kelsch responded, "No.

That's a fact that they referred to him to him as `Mousis' and `the Z kid' in phone

calls[.]"); TT:25:54-55 (when asked if it was possible that "the store" meant

something other than Homsi's brother's store, Kelsch responded, "It could.  But in

this particular conversation, he's talking about the shop that Deeb Homsi is

working at. … I'm telling you, in this particular conversation, he's referring to the

store…Deeb Homsi worked at for his brother."); TT25:56 ("They discuss a fire

60

that's going to happen.  This is the first time they discuss the fire that happened on November 13th at the Big Dog."); T25:77 ("It's apparent from the phone calls that Mr. Albertelli already knew that they had been arrested by this point in time.")

In sum, when a so-called expert like Kelsch narrows his focus from translating the esoteric terminology generally used in arson conspiracies to the more generic and ordinary conversations in the case then being tried, he

> transforms into the hub of the case, displacing the jury by connecting and combining all other testimony and physical evidence into a coherent, discernible, internally consistent picture of the defendant's guilt.

> In such instances it is a little too convenient that the Government has found an individual who is expert on precisely these facts that the Government must prove to secure a guilty verdict – even more so when that expert happens to be one of the Government's own investigators.

***

> [W]hen [an] officer expert[] comes to court and simply disgorge[s] [his] factual knowledge to the jury, [he] is no longer aiding the jury in its factfinding; [he is] instructing the jury on the existence of the facts needed to satisfy the elements of the charges offense.

United States v. Mejia, 545 F.3d 179, 190-191 (2nd Cir. 2008).

In Gianelli's case, the resulting prejudice was so great that this Court must reverse his convictions on Counts 273-277.

## CONCLUSION

For the reasons stated in Argument I, as well as those reasons stated in the brief of co-defendant Gisele Albertelli, Gianelli respectfully requests that this Court reverse each of his convictions and remands his case with instructions to the district court to grant Defendants' Motion To Suppress Fruits Of Wiretaps.

For the reasons stated in Argument II, Gianelli respectfully requests that this Court reverse his convictions on Counts 273-277.

Respectfully submitted,

*Patricia A. DeJuneas*
Patricia A. DeJuneas
BBO # 652997
One Exeter Plaza, 12th Floor
Boston, MA 02116
(617) 529-8300
dejuneaslaw@yahoo.com

/s/  Robert L. Sheketoff
Robert L. Sheketoff
BBO # 457340
One McKinley Square
Boston, MA 02109
(617) 367-3449
sheketoffr@aol.com

Attorneys for defendant
ARTHUR GIANELLI

**CERTIFICATE OF COMPLIANCE WITH RULE 32(a)**

This brief complies with the type-volume limitation, the typeface requirements, and the type style requirements of Fed.R.App.P. 32 because this brief contains 13, 908 words and has been prepared in 14-point Times New Roman typeface.

November 15, 2010                     *Patricia A. DeJuneas*

**CERTIFICATE OF SERVICE**

      I, Patricia A. DeJuneas, certify that I have caused copies of the above CORRECTED brief to be served electronically through the ECF system and procedures to all parties herein on November 15, 2010.

*Patricia A. DeJuneas*

## Addendum

## Table Of Contents

Judgment…………………………………………………………..1

Order Denying Motion To Suppress Fruits Of Wiretaps………………..25

G.L. 272, § 99…………………………………………………….42

Fed.R.Evid. 701…………………………………………………….60

Fed.R.Evid. 702…………………………………………………….61

Designation Letter………………………………………………….62

Authorization Letter……………………………………………….63

First Application (w/o Orlando Affidavit)……………………………64

Blodgett Affidavit………………………………………………….72

Chart Of Necessity Allegations……………………………………75

≈AO 245B(05-MA)     (Rev 06/05) Judgment in a Criminal Case
Sheet 1 - D  Massachusetts - 10/05

# UNITED STATES DISTRICT COURT
## District of Massachusetts

UNITED STATES OF AMERICA
v.

**ARTHUR GIANELLI**

**JUDGMENT IN A CRIMINAL CASE**

Case Number: **1:  05 CR 10003   - 001 - NMG**

USM Number: 19705-038

Robert L. Sheketoff, Esq.,

Defendant's Attorney

☐ Additional documents attached

☐

**THE DEFENDANT:**

☐ pleaded guilty to count(s) _____

☐ pleaded nolo contendere to count(s) _____
   which was accepted by the court.

☑ was found guilty on count(s)   See Pages 2-18 "Itemized List of Charges"
   after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

Additional Counts - See continuation page ☑

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 USC § 1962 (d) | Racketeering Conpiracy | 09/13/06 | 1ss |
| 18 USC § 1962 (c) | Racketeering | 09/13/06 | 2ss |
| 18 USC § 1955 | Illegal Gambling Business | 04/01/05 | 3ss |
| 18 USC § 1955 | Illegal Gambling Business | 06/01/06 | 4ss |
| 18 USC § 1084 | Use of Wire Communication Facility | 04/01/05 | 6ss |

The defendant is sentenced as provided in pages 2 through ___28___ of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☑ The defendant has been found not guilty on count(s)   5ss & 278ss

☑ Count(s)   236ss-238ss & 241Ss   ☐ is   ☑ are  dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

10/07/09

Date of Imposition of Judgment

*Nathaniel M. Gorton*

Signature of Judge

The Honorable Nathaniel M. Gorton

U.S. District Judge

Name and Title of Judge

10/23/09

Date

1

## ITEMIZED LIST OF CHARGES

| 7ss | Use of Wire Communication Facility;<br>18 U.S.C. § 1084; Class E Felony | 4/05 |
|---|---|---|
| 8ss | Money Laundering Conspiracy;<br>18 U.S.C. § 1956(h); Class C Felony | 9/13/06 |
| 10ss | Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)<br>& 1956(a)(1)(B)(i); Class C Felony | 8/31/02 |
| 11ss | Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)<br>& 1956(a)(1)(B)(i); Class C Felony | 9/8/02 |
| 12ss | Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)<br>& 1956(a)(1)(B)(i); Class C Felony | 9/11/02 |
| 13ss | Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)<br>& 1956(a)(1)(B)(i); Class C Felony | 9/18/02 |
| 14ss | Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)<br>& 1956(a)(1)(B)(i); Class C Felony | 9/27/02 |
| 15ss | Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)<br>& 1956(a)(1)(B)(i); Class C Felony | 9/28/02 |
| 16ss | Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)<br>& 1956(a)(1)(B)(i); Class C Felony | 9/28/02 |
| 17ss | Money Laundering; 18 U.S.C. § 1956(a)(1)(A)<br>& 1956(a)(1)(B)(i); Class C Felony | 10/10/02 |
| 18ss | Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)<br>& 1956(a)(1)(B)(i); Class C Felony | 10/25/02 |
| 19ss | Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)<br>& 1956(a)(1)(B)(i); Class C Felony | 10/31/02 |

20ss    Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    11/8/02
        & 1956(a)(1)(B)(i); Class C Felony

21ss    Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    11/8/02
        & 1956(a)(1)(B)(i); Class C Felony

22ss    Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    11/16/02
        & 1956(a)(1)(B)(i); Class C Felony

23ss    Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    11/19/02
        & 1956(a)(1)(B)(i); Class C Felony

24ss    Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    11/25/02
        & 1956(a)(1)(B)(i); Class C Felony

25ss    Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    12/5/02
        & 1956(a)(1)(B)(i); Class C Felony

26ss    Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    12/10/02
        & 1956(a)(1)(B)(i); Class C Felony

27ss    Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    12/10/02
        & 1956(a)(1)(B)(i); Class C Felony

28ss    Money Laundering; 18 U.S.C. § 1956(a)(1)(A)    12/10/02
        & 1956(a)(1)(B)(i); Class C Felony

29ss    Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    12/21/02
        & 1956(a)(1)(B)(i); Class C Felony

30ss    Money Laundering; 18 U.S.C. § 1956(a)(1)(A)    12/24/02
        & 1956(a)(1)(B)(i); Class C Felony

31ss    Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    12/30/02
        & 1956(a)(1)(B)(i); Class C Felony

32ss    Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    1/9/03
        & 1956(a)(1)(B)(i); Class C Felony

33ss    Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    1/16/03
        & 1956(a)(1)(B)(i); Class C Felony

34ss    Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    1/16/03
        & 1956(a)(1)(B)(i); Class C Felony

35ss    Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    1/27/03
        & 1956(a)(1)(B)(i); Class C Felony

36ss    Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    2/6/03
        & 1956(a)(1)(B)(i); Class C Felony

37ss    Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    2/11/03
        & 1956(a)(1)(B)(i); Class C Felony

38ss    Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    2/19/03
        & 1956(a)(1)(B)(i); Class C Felony

39ss    Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    2/25/03
        & 1956(a)(1)(B)(i); Class C Felony

4

| 40ss | Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A) & 1956(a)(1)(B)(i); Class C Felony | 2/25/03 |
|---|---|---|
| 41ss | Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A) & 1956(a)(1)(B)(i); Class C Felony | 2/25/03 |
| 42ss | Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A) & 1956(a)(1)(B)(i); Class C Felony | 3/12/03 |
| 43ss | Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A) & 1956(a)(1)(B)(i); Class C Felony | 3/18/03 |
| 44ss | Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A) & 1956(a)(1)(B)(i); Class C Felony | 3/27/03 |
| 45ss | Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A) & 1956(a)(1)(B)(i); Class C Felony | 4/2/03 |
| 46ss | Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A) & 1956(a)(1)(B)(i); Class C Felony | 4/2/03 |
| 47ss | Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A) & 1956(a)(1)(B)(i); Class C Felony | 4/8/03 |
| 48ss | Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A) & 1956(a)(1)(B)(i); Class C Felony | 4/14/03 |
| 49ss | Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A) & 1956(a)(1)(B)(i); Class C Felony | 4/14/03 |
| 50ss | Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A) & 1956(a)(1)(B)(i); Class C Felony | 4/16/03 |
| 51ss | Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A) & 1956(a)(1)(B)(i); Class C Felony | 4/22/03 |
| 52ss | Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A) & 1956(a)(1)(B)(i); Class C Felony | 4/30/03 |
| 53ss | Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A) & 1956(a)(1)(B)(i); Class C Felony | 5/6/03 |
| 54ss | Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A) & 1956(a)(1)(B)(i); Class C Felony | 5/23/03 |
| 55ss | Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A) & 1956(a)(1)(B)(i); Class C Felony | 5/27/03 |
| 56ss | Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A) & 1956(a)(1)(B)(i); Class C Felony | 6/7/03 |
| 57ss | Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A) & 1956(a)(1)(B)(i); Class C Felony | 6/12/03 |
| 58ss | Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A) & 1956(a)(1)(B)(i); Class C Felony | 6/20/03 |
| 59ss | Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A) & 1956(a)(1)(B)(i); Class C Felony | 6/26/03 |



60ss    Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    7/3/03
        & 1956(a)(1)(B)(i); Class C Felony

61ss    Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    7/12/03
        & 1956(a)(1)(B)(i); Class C Felony

62ss    Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    7/21/03
        & 1956(a)(1)(B)(i); Class C Felony

63ss    Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    7/21/03
        & 1956(a)(1)(B)(i); Class C Felony

64ss    Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    7/26/03
        & 1956(a)(1)(B)(i); Class C Felony

65ss    Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    8/8/03
        & 1956(a)(1)(B)(i); Class C Felony

66ss    Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    8/14/03
        & 1956(a)(1)(B)(i); Class C Felony

67ss    Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    8/22/03
        & 1956(a)(1)(B)(i); Class C Felony

68ss    Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    8/22/03
        & 1956(a)(1)(B)(i); Class C Felony

69ss    Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    8/22/03
        & 1956(a)(1)(B)(i); Class C Felony

70ss    Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    8/29/03
        & 1956(a)(1)(B)(i); Class C Felony

71ss    Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    9/15/03
        & 1956(a)(1)(B)(i); Class C Felony

72ss    Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    9/25/03
        & 1956(a)(1)(B)(i); Class C Felony

73ss    Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    9/25/03
        & 1956(a)(1)(B)(i); Class C Felony

74ss    Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    9/25/03
        & 1956(a)(1)(B)(i); Class C Felony

75ss    Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    10/1/03
        & 1956(a)(1)(B)(i); Class C Felony

76ss    Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    10/11/03
        & 1956(a)(1)(B)(i); Class C Felony

77ss    Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    10/16/03
        & 1956(a)(1)(B)(i); Class C Felony

78ss    Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    10/22/03
        & 1956(a)(1)(B)(i); Class C Felony

79ss    Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    10/22/03
        & 1956(a)(1)(B)(i); Class C Felony

| 80ss | Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A) & 1956(a)(1)(B)(i); Class C Felony | 10/22/03 |
|---|---|---|
| 81ss | Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A) & 1956(a)(1)(B)(i); Class C Felony | 10/22/03 |
| 82ss | Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A) & 1956(a)(1)(B)(i); Class C Felony | 11/3/03 |
| 83ss | Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A) & 1956(a)(1)(B)(i); Class C Felony | 11/5/03 |
| 84ss | Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A) & 1956(a)(1)(B)(i); Class C Felony | 11/12/03 |
| 85ss | Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A) & 1956(a)(1)(B)(i); Class C Felony | 11/21/03 |
| 86ss | Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A) & 1956(a)(1)(B)(i); Class C Felony | 11/21/03 |
| 88ss | Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A) & 1956(a)(1)(B)(i); Class C Felony | 8/31/02 |
| 89ss | Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A) & 1956(a)(1)(B)(i); Class C Felony | 8/31/02 |
| 90ss | Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A) & 1956(a)(1)(B)(i); Class C Felony | 8/31/02 |
| 91ss | Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A) & 1956(a)(1)(B)(i); Class C Felony | 9/8/02 |
| 92ss | Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A) & 1956(a)(1)(B)(i); Class C Felony | 9/8/02 |
| 93ss | Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A) & 1956(a)(1)(B)(i); Class C Felony | 9/11/02 |
| 94ss | Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A) & 1956(a)(1)(B)(i); Class C Felony | 9/18/02 |
| 95ss | Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A) & 1956(a)(1)(B)(i); Class C Felony | 9/27/02 |
| 96ss | Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A) & 1956(a)(1)(B)(i); Class C Felony | 10/22/02 |
| 97ss | Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A) & 1956(a)(1)(B)(i); Class C Felony | 11/5/02 |
| 98ss | Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A) & 1956(a)(1)(B)(i); Class C Felony | 11/5/02 |
| 99ss | Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A) & 1956(a)(1)(B)(i); Class C Felony | 11/16/02 |
| 100ss | Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A) & 1956(a)(1)(B)(i); Class C Felony | 11/19/02 |

| 101ss | Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A) & 1956(a)(1)(B)(i); Class C Felony | 11/19/02 |
| 102ss | Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A) & 1956(a)(1)(B)(i); Class C Felony | 11/21/02 |
| 103ss | Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A) & 1956(a)(1)(B)(i); Class C Felony | 11/23/02 |
| 104ss | Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A) & 1956(a)(1)(B)(i); Class C Felony | 11/25/02 |
| 105ss | Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A) & 1956(a)(1)(B)(i); Class C Felony | 11/25/02 |
| 106ss | Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A) & 1956(a)(1)(B)(i); Class C Felony | 11/26/02 |
| 107ss | Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A) & 1956(a)(1)(B)(i); Class C Felony | 12/4/02 |
| 108ss | Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A) & 1956(a)(1)(B)(i); Class C Felony | 12/10/02 |
| 109ss | Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A) & 1956(a)(1)(B)(i); Class C Felony | 12/10/02 |
| 110ss | Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A) & 1956(a)(1)(B)(i); Class C Felony | 12/10/02 |
| 111ss | Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A) & 1956(a)(1)(B)(i); Class C Felony | 12/21/02 |
| 112ss | Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A) & 1956(a)(1)(B)(i); Class C Felony | 12/21/02 |
| 113ss | Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A) & 1956(a)(1)(B)(i); Class C Felony | 12/24/02 |
| 114ss | Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A) & 1956(a)(1)(B)(i); Class C Felony | 12/30/02 |
| 115ss | Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A) & 1956(a)(1)(B)(i); Class C Felony | 1/9/03 |
| 116ss | Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A) & 1956(a)(1)(B)(i); Class C Felony | 1/9/03 |
| 117ss | Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A) & 1956(a)(1)(B)(i); Class C Felony | 1/21/03 |
| 118ss | Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A) & 1956(a)(1)(B)(i); Class C Felony | 1/21/03 |
| 119ss | Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A) & 1956(a)(1)(B)(i); Class C Felony | 1/27/03 |
| 120ss | Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A) & 1956(a)(1)(B)(i); Class C Felony | 1/29/03 |

121ss   Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)   1/29/03
        & 1956(a)(1)(B)(i); Class C Felony

122ss   Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)   1/30/03
        & 1956(a)(1)(B)(i); Class C Felony

123ss   Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)   2/6/03
        & 1956(a)(1)(B)(i); Class C Felony

124ss   Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)   2/6/03
        & 1956(a)(1)(B)(i); Class C Felony

125ss   Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)   2/6/03
        & 1956(a)(1)(B)(i); Class C Felony

126ss   Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)   2/6/03
        & 1956(a)(1)(B)(i); Class C Felony

127ss   Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)   2/11/03
        & 1956(a)(1)(B)(i); Class C Felony

128ss   Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)   2/19/03
        & 1956(a)(1)(B)(i); Class C Felony

129ss   Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)   2/25/03
        & 1956(a)(1)(B)(i); Class C Felony

130ss   Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)   3/4/03
        & 1956(a)(1)(B)(i); Class C Felony

131ss   Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)   3/5/03
        & 1956(a)(1)(B)(i); Class C Felony

132ss   Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)   3/12/03
        & 1956(a)(1)(B)(i); Class C Felony

133ss   Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)   3/12/03
        & 1956(a)(1)(B)(i); Class C Felony

134ss   Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)   3/12/03
        & 1956(a)(1)(B)(i); Class C Felony

135ss   Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)   3/13/03
        & 1956(a)(1)(B)(i); Class C Felony

136ss   Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)   3/18/03
        & 1956(a)(1)(B)(i); Class C Felony

137ss   Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)   3/27/03
        & 1956(a)(1)(B)(i); Class C Felony

138ss   Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)   3/31/03
        & 1956(a)(1)(B)(i); Class C Felony

139ss   Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)   3/31/03
        & 1956(a)(1)(B)(i); Class C Felony

140ss   Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)   4/8/03
        & 1956(a)(1)(B)(i); Class C Felony

141ss  Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    4/14/03
       & 1956(a)(1)(B)(i); Class C Felony

142ss  Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    4/14/03
       & 1956(a)(1)(B)(i); Class C Felony

143ss  Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    4/16/03
       & 1956(a)(1)(B)(i); Class C Felony

144ss  Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    5/6/03
       & 1956(a)(1)(B)(i); Class C Felony

145ss  Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    5/6/03
       & 1956(a)(1)(B)(i); Class C Felony

146ss  Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    5/8/03
       & 1956(a)(1)(B)(i); Class C Felony

147ss  Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    5/23/03
       & 1956(a)(1)(B)(i); Class C Felony

148ss  Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    5/27/03
       & 1956(a)(1)(B)(i); Class C Felony

149ss  Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    6/2/03
       & 1956(a)(1)(B)(i); Class C Felony

150ss  Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    6/7/03
       & 1956(a)(1)(B)(i); Class C Felony

151ss  Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    6/12/03
       & 1956(a)(1)(B)(i); Class C Felony

152ss  Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    6/20/03
       & 1956(a)(1)(B)(i); Class C Felony

153ss  Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    6/26/03
       & 1956(a)(1)(B)(i); Class C Felony

154ss  Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    7/3/03
       & 1956(a)(1)(B)(i); Class C Felony

155ss  Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    7/12/03
       & 1956(a)(1)(B)(i); Class C Felony

156ss  Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    7/16/03
       & 1956(a)(1)(B)(i); Class C Felony

157ss  Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    7/26/03
       & 1956(a)(1)(B)(i); Class C Felony

158ss  Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    8/2/03
       & 1956(a)(1)(B)(i); Class C Felony

159ss  Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    8/2/03
       & 1956(a)(1)(B)(i); Class C Felony

160ss  Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    8/8/03
       & 1956(a)(1)(B)(i); Class C Felony

161ss  Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    8/14/03
       & 1956(a)(1)(B)(i); Class C Felony

162ss  Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    8/14/03
       & 1956(a)(1)(B)(i); Class C Felony

163ss  Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    8/22/03
       & 1956(a)(1)(B)(i); Class C Felony

164ss  Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    8/29/03
       & 1956(a)(1)(B)(i); Class C Felony

165ss  Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    8/29/03
       & 1956(a)(1)(B)(i); Class C Felony

166ss  Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    8/29/03
       & 1956(a)(1)(B)(i); Class C Felony

167ss  Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    8/30/03
       & 1956(a)(1)(B)(i); Class C Felony

168ss  Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    9/15/03
       & 1956(a)(1)(B)(i); Class C Felony

169ss  Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    9/25/03
       & 1956(a)(1)(B)(i); Class C Felony

170ss  Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    10/1/03
       & 1956(a)(1)(B)(i); Class C Felony

171ss  Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    10/1/03
       & 1956(a)(1)(B)(i); Class C Felony

172ss  Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    10/9/03
       & 1956(a)(1)(B)(i); Class C Felony

173ss  Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    10/11/03
       & 1956(a)(1)(B)(i); Class C Felony

174ss  Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    10/22/03
       & 1956(a)(1)(B)(i); Class C Felony

175ss  Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    11/5/03
       & 1956(a)(1)(B)(i); Class C Felony

176ss  Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    11/5/03
       & 1956(a)(1)(B)(i); Class C Felony

177ss  Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    11/6/03
       & 1956(a)(1)(B)(i); Class C Felony

178ss  Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    11/12/03
       & 1956(a)(1)(B)(i); Class C Felony

179ss  Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    12/3/03
       & 1956(a)(1)(B)(i); Class C Felony

180ss  Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    12/3/03
       & 1956(a)(1)(B)(i); Class C Felony

| 181ss | Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A) & 1956(a)(1)(B)(i); Class C Felony | 12/10/03 |
| 182ss | Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A) & 1956(a)(1)(B)(i); Class C Felony | 12/10/03 |
| 183ss | Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A) & 1956(a)(1)(B)(i); Class C Felony | 12/10/03 |
| 184ss | Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A) & 1956(a)(1)(B)(i); Class C Felony | 12/17/03 |
| 185ss | Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A) & 1956(a)(1)(B)(i); Class C Felony | 7/3/03 |
| 187ss | Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A) & 1956(a)(1)(B)(i); Class C Felony | 5/18/00 |
| 188ss | Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A) & 1956(a)(1)(B)(i); Class C Felony | 6/1/00 |
| 189ss | Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A) & 1956(a)(1)(B)(i); Class C Felony | 7/6/00 |
| 190ss | Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A) & 1956(a)(1)(B)(i); Class C Felony | 8/3/00 |
| 191ss | Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A) & 1956(a)(1)(B)(i); Class C Felony | 9/7/00 |
| 192ss | Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A) & 1956(a)(1)(B)(i); Class C Felony | 10/5/00 |
| 193ss | Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A) & 1956(a)(1)(B)(i); Class C Felony | 11/2/00 |
| 194ss | Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A) & 1956(a)(1)(B)(i); Class C Felony | 12/7/00 |
| 195ss | Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A) & 1956(a)(1)(B)(i); Class C Felony | 1/4/01 |
| 196ss | Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A) & 1956(a)(1)(B)(i); Class C Felony | 2/1/01 |
| 197ss | Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A) & 1956(a)(1)(B)(i); Class C Felony | 3/1/01 |
| 198ss | Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A) & 1956(a)(1)(B)(i); Class C Felony | 4/5/01 |
| 199ss | Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A) & 1956(a)(1)(B)(i); Class C Felony | 5/3/01 |
| 200ss | Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A) & 1956(a)(1)(B)(i); Class C Felony | 6/7/01 |
| 201ss | Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A) & 1956(a)(1)(B)(i); Class C Felony | 7/5/01 |

12

202ss   Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    8/2/01
        & 1956(a)(1)(B)(i); Class C Felony

203ss   Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    8/20/01
        & 1956(a)(1)(B)(i); Class C Felony

204ss   Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    9/6/01
        & 1956(a)(1)(B)(i); Class C Felony

205ss   Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    10/4/01
        & 1956(a)(1)(B)(i); Class C Felony

206ss   Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    11/1/01
        & 1956(a)(1)(B)(i); Class C Felony

207ss   Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    12/6/01
        & 1956(a)(1)(B)(i); Class C Felony

208ss   Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    1/3/02
        & 1956(a)(1)(B)(i); Class C Felony

209ss   Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    2/7/02
        & 1956(a)(1)(B)(i); Class C Felony

210ss   Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    3/7/02
        & 1956(a)(1)(B)(i); Class C Felony

211ss   Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    4/4/02
        & 1956(a)(1)(B)(i); Class C Felony

212ss   Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    5/16/02
        & 1956(a)(1)(B)(i); Class C Felony

213ss   Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    6/6/02
        & 1956(a)(1)(B)(i); Class C Felony

214ss   Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    7/5/02
        & 1956(a)(1)(B)(i); Class C Felony

215ss   Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    8/1/02
        & 1956(a)(1)(B)(i); Class C Felony

216ss   Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    9/5/02
        & 1956(a)(1)(B)(i); Class C Felony

217ss   Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    10/3/02
        & 1956(a)(1)(B)(i); Class C Felony

218ss   Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    11/7/02
        & 1956(a)(1)(B)(i); Class C Felony

219ss   Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    12/5/02
        & 1956(a)(1)(B)(i); Class C Felony

220ss   Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    1/2/03
        & 1956(a)(1)(B)(i); Class C Felony

221ss   Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    2/20/03
        & 1956(a)(1)(B)(i); Class C Felony

222ss   Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)   3/6/03
        & 1956(a)(1)(B)(i); Class C Felony

223ss   Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)   4/3/03
        & 1956(a)(1)(B)(i); Class C Felony

224ss   Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)   5/1/03
        & 1956(a)(1)(B)(i); Class C Felony

225ss   Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)   5/13/03
        & 1956(a)(1)(B)(i); Class C Felony

226ss   Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)   6/19/03
        & 1956(a)(1)(B)(i); Class C Felony

227ss   Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)   7/3/03
        & 1956(a)(1)(B)(i); Class C Felony

228ss   Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)   8/7/03
        & 1956(a)(1)(B)(i); Class C Felony

229ss   Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)   9/4/03
        & 1956(a)(1)(B)(i); Class C Felony

230ss   Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)   10/2/03
        & 1956(a)(1)(B)(i); Class C Felony

231ss   Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)   11/6/03
        & 1956(a)(1)(B)(i); Class C Felony

232ss   Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)   12/4/03
        & 1956(a)(1)(B)(i); Class C Felony

233ss   Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)   1/1/04
        & 1956(a)(1)(B)(i); Class C Felony

234ss   Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)   2/5/04
        & 1956(a)(1)(B)(i); Class C Felony

239ss   Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)   8/7/00
        & 1956(a)(1)(B)(i); Class C Felony

240ss   Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)   9/21/00
        & 1956(a)(1)(B)(i); Class C Felony

242ss   Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)   12/4/00
        & 1956(a)(1)(B)(i); Class C Felony

243ss   Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)   12/18/00
        & 1956(a)(1)(B)(i); Class C Felony

244ss   Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)   7/11/01
        & 1956(a)(1)(B)(i); Class C Felony

245ss   Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)   7/16/01
        & 1956(a)(1)(B)(i); Class C Felony

246ss   Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)   8/9/01
        & 1956(a)(1)(B)(i); Class C Felony

247ss  Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    10/13/01
       & 1956(a)(1)(B)(i); Class C Felony

248ss  Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    11/14/01
       & 1956(a)(1)(B)(i); Class C Felony

249ss  Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    1/10/02
       & 1956(a)(1)(B)(i); Class C Felony

250ss  Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    2/15/02
       & 1956(a)(1)(B)(i); Class C Felony

251ss  Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    4/18/03
       & 1956(a)(1)(B)(i); Class C Felony

252ss  Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    4/24/02
       & 1956(a)(1)(B)(i); Class C Felony

253ss  Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    5/15/02
       & 1956(a)(1)(B)(i); Class C Felony

254ss  Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    5/27/02
       & 1956(a)(1)(B)(i); Class C Felony

255ss  Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    6/6/02
       & 1956(a)(1)(B)(i); Class C Felony

256ss  Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    6/13/02
       & 1956(a)(1)(B)(i); Class C Felony

257ss  Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    7/10/02
       & 1956(a)(1)(B)(i); Class C Felony

258ss  Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    7/11/02
       & 1956(a)(1)(B)(i); Class C Felony

259ss  Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    8/15/02
       & 1956(a)(1)(B)(i); Class C Felony

260ss  Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    9/13/02
       & 1956(a)(1)(B)(i); Class C Felony

261ss  Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    10/17/02
       & 1956(a)(1)(B)(i); Class C Felony

262ss  Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    4/18/03
       & 1956(a)(1)(B)(i); Class C Felony

263ss  Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    5/03
       & 1956(a)(1)(B)(i); Class C Felony

264ss  Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    5/7/03
       & 1956(a)(1)(B)(i); Class C Felony

265ss  Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    5/16/03
       & 1956(a)(1)(B)(i); Class C Felony

266ss  Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    5/16/03
       & 1956(a)(1)(B)(i); Class C Felony



| 267ss | Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A) & 1956(a)(1)(B)(i); Class C Felony | 6/6/03 |
| 268ss | Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A) & 1956(a)(1)(B)(i); Class C Felony | 6/24/03 |
| 269ss | Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A) & 1956(a)(1)(B)(i); Class C Felony | 6/30/03 |
| 270ss | Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A) & 1956(a)(1)(B)(i); Class C Felony | 7/3/03 |
| 271ss | Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A) & 1956(a)(1)(B)(i); Class C Felony | 7/7/03 |
| 272ss | Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A) & 1956(a)(1)(B)(i); Class C Felony | 8/03 |
| 273ss | Conspiracy to Commit Arson, and Travel in Interstate Commerce to Promote, Manage, Establish, Carry On and Facilitation in the Promotion, Management, Establishment, Carrying on of Unlawful Activity; 18 U.S.C. § 371; Class D Felony | 11/13/03 |
| 274ss | Arson; 18 U.S.C. §§ 844(i) and 2; Class C Felony | 11/13/03 |
| 275ss | Using Fire and an Explosive to Commit a Felony; 18 U.S.C. §§ 844(h)(1) and 2; Class C Felony | 11/13/03 |
| 276ss | Conspiracy to Commit Extortion; 18 U.S.C. § 1951; Class C Felony | 11/30/03 |
| 277ss | Attempted Extortion; 18 U.S.C. §§ 1951 and 2; Class C Felony | 11/30/03 |
| 280ss | Conspiracy to Commit Extortion; 18 U.S.C. § 1951; Class C Felony | 2002 |
| 281ss | Attempt to Commit Extortion; 18 U.S.C. §§ 1951 and 2; Class C Felony | 2002 |
| 282ss | Conspiracy to Commit Extortion; 18 U.S.C. § 1951; Class C Felony | 2002 |
| 283ss | Attempt to Commit Extortion; 18 U.S.C. §§ 1951 and 2; Class C Felony | 2002 |
| 284ss | Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A) & 1956(a)(1)(B)(i); Class C Felony | 9/30/02 |
| 285ss | Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A) & 1956(a)(1)(B)(i); Class C Felony | 9/30/02 |
| 286ss | Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A) & 1956(a)(1)(B)(i); Class C Felony | 9/30/02 |

287ss    Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    11/1/02
         & 1956(a)(1)(B)(i); Class C Felony

288ss    Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    11/1/02
         & 1956(a)(1)(B)(i); Class C Felony

289ss    Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    11/1/02
         & 1956(a)(1)(B)(i); Class C Felony

290ss    Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    1/29/03
         & 1956(a)(1)(B)(i); Class C Felony

291ss    Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    1/29/03
         & 1956(a)(1)(B)(i); Class C Felony

292ss    Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    1/29/03
         & 1956(a)(1)(B)(i); Class C Felony

293ss    Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    1/29/03
         & 1956(a)(1)(B)(i); Class C Felony

294ss    Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    4/28/03
         & 1956(a)(1)(B)(i); Class C Felony

295ss    Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    4/28/03
         & 1956(a)(1)(B)(i); Class C Felony

296ss    Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    6/25/03
         & 1956(a)(1)(B)(i); Class C Felony

297ss    Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    6/25/03
         & 1956(a)(1)(B)(i); Class C Felony

298ss    Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    8/26/03
         & 1956(a)(1)(B)(i); Class C Felony

299ss    Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    8/26/03
         & 1956(a)(1)(B)(i); Class C Felony

300ss    Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    8/26/03
         & 1956(a)(1)(B)(i); Class C Felony

301ss    Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    9/30/03
         & 1956(a)(1)(B)(i); Class C Felony

302ss    Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    9/30/03
         & 1956(a)(1)(B)(i); Class C Felony

303ss    Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    9/30/03
         & 1956(a)(1)(B)(i); Class C Felony

304ss    Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    11/28/03
         & 1956(a)(1)(B)(i); Class C Felony

305ss    Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    11/28/03
         & 1956(a)(1)(B)(i); Class C Felony

306ss    Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    11/28/03
         & 1956(a)(1)(B)(i); Class C Felony

307ss   Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)   7/7/02
        & 1956(a)(1)(B)(i); Class C Felony

308ss   Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)   8/8/02
        & 1956(a)(1)(B)(i); Class C Felony

309ss   Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)   8/26/02
        & 1956(a)(1)(B)(i); Class C Felony

310ss   Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)   6/23/04
        & 1956(a)(1)(B)(i); Class C Felony

311ss   Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)   6/25/04
        & 1956(a)(1)(B)(i); Class C Felony

312ss   Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)   6/29/04
        & 1956(a)(1)(B)(i); Class C Felony

313ss   Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)   7/14/04
        & 1956(a)(1)(B)(i); Class C Felony

314ss   Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)   7/20/04
        & 1956(a)(1)(B)(i); Class C Felony

315ss   Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)   8/4/04
        & 1956(a)(1)(B)(i); Class C Felony

316ss   Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)   8/9/04
        & 1956(a)(1)(B)(i); Class C Felony

317ss   Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)   8/11/04
        & 1956(a)(1)(B)(i); Class C Felony

318ss   Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)   8/12/04
        & 1956(a)(1)(B)(i); Class C Felony

319ss   Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)   9/2/04
        & 1956(a)(1)(B)(i); Class C Felony

320ss   Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)   9/14/04
        & 1956(a)(1)(B)(i); Class C Felony

321ss   Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)   9/22/04
        & 1956(a)(1)(B)(i); Class C Felony

322ss   Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)   9/29/04
        & 1956(a)(1)(B)(i); Class C Felony

323ss   Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)   10/15/04
        & 1956(a)(1)(B)(i); Class C Felony

324ss   Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)   10/25/04
        & 1956(a)(1)(B)(i); Class C Felony

325ss   Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)   11/16/04
        & 1956(a)(1)(B)(i); Class C Felony

326ss   Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)   11/18/04
        & 1956(a)(1)(B)(i); Class C Felony

327ss   Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    12/15/04
        & 1956(a)(1)(B)(i); Class C Felony

328ss   Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    12/17/04
        & 1956(a)(1)(B)(i); Class C Felony

329ss   Money Laundering; 18 U.S.C. §§ 1956(a)(1)(A)    12/23/04
        & 1956(a)(1)(B)(i); Class C Felony

512ss   Extortionate Collection of Credit              2005
        Conspiracy;
        18 U.S.C. § 894(a)(1); Class C Felony

513ss   Extortionate Collection of Credit;             2005
        18 U.S.C. § 894(a)(1); Class C Felony

516ss   Extortionate Collection of Credit              12/05
        Conspiracy;
        18 U.S.C. § 894(a)(1); Class C Felony

517ss   Extortionate Collection of Credit;             12/05
        18 U.S.C. § 894(a)(1); Class C Felony

518ss   Extortionate Collection of Credit              2004
        Conspiracy;
        18 U.S.C. § 894(a)(1); Class C Felony

519ss   Extortionate Collection of Credit;             2004
        18 U.S.C. § 894(a)(1); Class C Felony

        Racketeering Forfeiture Allegation;
        18 U.S.C. § 1963

        Gambling Forfeiture Allegation;
        18 U.S.C. §§ 981(a)(1)(C) and 1955(d) and 28
        U.S.C. § 2461(c)

        Money Laundering Forfeiture Allegation;
        18 U.S.C. § 982(a)(1)

        Arson Forfeiture Allegation;
        18 U.S.C. § 982

        Extortion Forfeiture Allegations;
        18 U.S.C. § 981 and 28 U.S.C. § 2461(c).

AO 245B(05-MA)    (Rev. 06/05) Judgment in a Criminal Case
Sheet 2 - D Massachusetts - 10/05

| | Judgment — Page 19 of 28 |

DEFENDANT: **ARTHUR GIANELLI**
CASE NUMBER: **I: 05 CR 10003   - 001 - NMG**

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of:    271    month(s)

*151 months on all counts except count 275ss to be served concurrently, 120 months on count 275ss to be served consecutively to all other counts.*

☑ The court makes the following recommendations to the Bureau of Prisons:

That defendant be incarcerated at Otisville if facility is the appropriate security level for this defendant.

☑ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

☐ at _____   ☐ a.m.  ☐ p.m.   on _____ .

☐ as notified by the United States Marshal.

☐ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

☐ before 2 p.m. on _____ .

☐ as notified by the United States Marshal.

☐ as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

a_____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

19

⟡AO 245B(05-MA)    (Rev. 06/05) Judgment in a Criminal Case
Sheet 3 – D Massachusetts - 10/05

|  |  | Judgment—Page | 20 | of | 28 |
|---|---|---|---|---|---|

DEFENDANT:    **ARTHUR GIANELLI**
CASE NUMBER:    **1: 05 CR 10003    - 001 - NMG**

## SUPERVISED RELEASE

☑ **See continuation page**

Upon release from imprisonment, the defendant shall be on supervised release for a term of :    36    month(s)

The defendant must report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

The defendant shall not commit another federal, state or local crime.

The defendant shall not unlawfully possess a controlled substance. The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, not to exceed  50  tests per year, as directed by the probation officer.

☐  The above drug testing condition is suspended, based on the court's determination that the defendant poses a low risk of future substance abuse. (Check, if applicable.)

☑  The defendant shall not possess a firearm, ammunition, destructive device, or any other dangerous weapon. (Check, if applicable.)

☑  The defendant shall cooperate in the collection of DNA as directed by the probation officer. (Check, if applicable.)

☐  The defendant shall register with the state sex offender registration agency in the state where the defendant resides, works, or is a student, as directed by the probation officer. (Check, if applicable.)

☐  The defendant shall participate in an approved program for domestic violence. (Check, if applicable.)

If this judgment imposes a fine or restitution, it is a condition of supervised release that the defendant pay in accordance with the Schedule of Payments sheet of this judgment.

The defendant must comply with the standard conditions that have been adopted by this court as well as with any additional conditions on the attached page.

## STANDARD CONDITIONS OF SUPERVISION

1) the defendant shall not leave the judicial district without the permission of the court or probation officer;

2) the defendant shall report to the probation officer and shall submit a truthful and complete written report within the first five days of each month;

3) the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;

4) the defendant shall support his or her dependents and meet other family responsibilities;

5) the defendant shall work regularly at a lawful occupation, unless excused by the probation officer for schooling, training, or other acceptable reasons;

6) the defendant shall notify the probation officer at least ten days prior to any change in residence or employment;

7) the defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any controlled substance or any paraphernalia related to any controlled substances, except as prescribed by a physician;

8) the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;

9) the defendant shall not associate with any persons engaged in criminal activity and shall not associate with any person convicted of a felony, unless granted permission to do so by the probation officer;

10) the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer;

11) the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;

12) the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court; and

13) as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

20

AO 245B(05-MA)    (Rev 06/05) Judgment in a Criminal Case
Sheet 4A - Continuation Page - Supervised Release/Probation -10/05

DEFENDANT:        **ARTHUR GIANELLI**
CASE NUMBER: **1: 05 CR 10003  - 001 - NMG**

Judgment—Page __21__ of __28__

## ADDITIONAL ☑ SUPERVISED RELEASE ☐ PROBATION TERMS

The defendant is prohibited from participating in any gambling activities including, casino gambling, on-line gambling, lotteries, sports/track betting, office pools, Keno, or any other activities similar in nature.

The defendant is prohibited from incurring new credit charges or opening additional lines of credit without the approval of the Probation Office.

The defendant is to provide the Probation Office access to any requested financial information, which may be shared with the Financial Litigation Unit of the U.S. Attorney's Office.

**Continuation of Conditions of ☐ Supervised Release ☐ Probation**

AO 245B(05-MA)    (Rev 06/05) Judgment in a Criminal Case
Sheet 5 - D. Massachusetts - 10/05

Judgment — Page __22__ of __28__

DEFENDANT: **ARTHUR GIANELLI**
CASE NUMBER: **1: 05  CR  10003   - 001  - NMG**

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | Assessment | Fine | Restitution |
|---|---|---|---|
| TOTALS | $ $32,400.00 | $ | $ |

☐ The determination of restitution is deferred until _____. An *Amended Judgment in a Criminal Case* (AO 245C) will be entered after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss* | Restitution Ordered | Priority or Percentage |
|---|---|---|---|

☐ See Continuation Page

| TOTALS | $ $0.00 | $ $0.00 | |
|---|---|---|---|

☐ Restitution amount ordered pursuant to plea agreement  $ _____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

    ☐ the interest requirement is waived for the   ☐ fine  ☐ restitution.

    ☐ the interest requirement for the   ☐ fine   ☐ restitution is modified as follows:

* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

22

AO 245B(05-MA)    (Rev 06/05) Judgment in a Criminal Case
Sheet 6 - D Massachusetts - 10/05

|  |  | Judgment — Page | 23 | of | 28 |
|---|---|---|---|---|---|

DEFENDANT:    **ARTHUR GIANELLI**
CASE NUMBER: **1: 05 CR 10003 - 001 - NMG**

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties are due as follows:

A  [X] Lump sum payment of $ __32,400.00__ due immediately, balance due

☐ not later than _____ , or
☐ in accordance ☐ C,  ☐ D,  ☐ E, or  ☐ F below; or

B  ☐ Payment to begin immediately (may be combined with ☐ C,  ☐ D, or  ☐ F below); or

C  ☐ Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of _____ (e.g , months or years), to commence _____ (e.g., 30 or 60 days) after the date of this judgment; or

D  ☐ Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of _____ (e.g , months or years), to commence _____ (e.g., 30 or 60 days) after release from imprisonment to a term of supervision; or

E  ☐ Payment during the term of supervised release will commence within _____ (e.g., 30 or 60 days) after release from imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

F  ☐ Special instructions regarding the payment of criminal monetary penalties:

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐ See Continuation Page

☐ Joint and Several

Defendant and Co-Defendant Names and Case Numbers (including defendant number), Total Amount, Joint and Several Amount, and corresponding payee, if appropriate.

☐ The defendant shall pay the cost of prosecution.

☐ The defendant shall pay the following court cost(s):

☐ The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) fine interest, (6) community restitution, (7) penalties, and (8) costs, including cost of prosecution and court costs.

&AO 245B(05-MA)    (Rev 06/05) Judgment in a Criminal Case
                   Sheet 6B - D Massachusetts - 10/05

DEFENDANT:      **ARTHUR GIANELLI**                    Judgment—Page __24__ of __28__
CASE NUMBER:    **1: 05 CR 10003  - 001 - NMG**

### ADDITIONAL FORFEITED PROPERTY

As Ordered in Preliminary Order of Forfeiture of May 8, 2009.

Westlaw.

585 F.Supp.2d 150
**(Cite as: 585 F.Supp.2d 150)**

**H**

United States District Court,
D. Massachusetts.
UNITED STATES of America,
v.
Arthur **GIANELLI**, Mary Ann Gianelli, Frank Ia-
coboni, Philip Puopolo, Dennis Albertelli, Randy
Albertelli, Gisele Albertelli, Salvatore Ramasci, Ste-
phen Russo, Rafia Feghi, and Joseph Yerardi, De-
fendants.
**Criminal No. 05-10003-NMG.**

Oct. 8, 2008.

**Background:** Racketeering defendants filed joint
motion to suppress the "fruits" of a wiretap. Two
defendants also filed motions to suppress the "fruits"
of searches of their residences.

**Holdings:** The District Court, Gorton, J., held that:
(1) necessity requirement for obtaining wiretap order
was satisfied;
(2) evidence was sufficient to establish the reliability
and credibility of the informants; and
(3) probable cause was established for issuance of
warrants authorizing search of defendants' residences.

Motions denied.

West Headnotes

**[1] Federal Courts 170B ⟐404**

170B Federal Courts
    170BVI State Laws as Rules of Decision
        170BVI(C) Application to Particular Matters
            170Bk404 k. Arrest and Search; Criminal
Law and Procedure. Most Cited Cases
Federal law controls the admissibility of the fruits of
state electronic surveillance in federal court. 18
U.S.C.A. § 2517(3).

**[2] Criminal Law 110 ⟐394.3**

110 Criminal Law
    110XVII Evidence

110XVII(I) Competency in General
    110k394 Evidence Wrongfully Obtained
        110k394.3 k. Wiretapping or Other
Interception. Most Cited Cases
Suppression is only required for errors in procuring a
wiretap warrant when there is a failure to satisfy a
statutory requirement that directly and substantially
implement the congressional intention to limit wire-
taps. 18 U.S.C.A. § 2517(3).

**[3] Telecommunications 372 ⟐1479**

372 Telecommunications
    372X Interception or Disclosure of Electronic
Communications; Electronic Surveillance
        372X(B) Authorization by Courts or Public
Officers
            372k1479 k. Review of Proceedings;
Standing. Most Cited Cases
In reviewing a wiretap order of another judge, court
does not make a de novo determination of sufficiency;
instead, court examines the face of the affidavit and
decides whether the facts set forth in the application
were minimally adequate to support the determination
that was made. 18 U.S.C.A. § 2518.

**[4] Telecommunications 372 ⟐1468**

372 Telecommunications
    372X Interception or Disclosure of Electronic
Communications; Electronic Surveillance
        372X(B) Authorization by Courts or Public
Officers
            372k1464 Application or Affidavit
                372k1468 k. Necessity; Inadequacy of
Other Procedures. Most Cited Cases
Necessity requirement for obtaining wiretap order was
satisfied with respect to investigation of gambling
conspiracy notwithstanding use of boilerplate allega-
tions; there was no reasonable prospect that traditional
investigative methods would expose the full scope and
membership of the conspiracy. 18 U.S.C.A. §
2518(3)(c).

**[5] Telecommunications 372 ⟐1468**

372 Telecommunications

585 F.Supp.2d 150
**(Cite as: 585 F.Supp.2d 150)**

372X Interception or Disclosure of Electronic Communications; Electronic Surveillance
372X(B) Authorization by Courts or Public Officers
372k1464 Application or Affidavit
372k1468 k. Necessity; Inadequacy of Other Procedures. Most Cited Cases
In order to obtain wiretap order, government must establish necessity with the particulars of a given investigation but the ordinariness of the investigation does not preclude a finding of necessity for the use of wiretaps to further the investigation. 18 U.S.C.A. § 2518(3)(c).

**[6] Telecommunications 372 ⟨⟩1461**

372 Telecommunications
372X Interception or Disclosure of Electronic Communications; Electronic Surveillance
372X(B) Authorization by Courts or Public Officers
372k1461 k. Executive Authorization or Application. Most Cited Cases
Although failure to secure approval from an authorized authority is grounds for suppression of wiretap order, the absence of a compelling signature on a critical document can be remedied by proof of actual authority. 18 U.S.C.A. § 2516(2).

**[7] Telecommunications 372 ⟨⟩1461**

372 Telecommunications
372X Interception or Disclosure of Electronic Communications; Electronic Surveillance
372X(B) Authorization by Courts or Public Officers
372k1461 k. Executive Authorization or Application. Most Cited Cases
Letters submitted by district attorneys (DAs) were sufficient to satisfy the requirements of Massachusetts wiretap statute and establish that the appropriate official authorized the original wiretap warrant application; one DA explicitly stated in her letter to the warrant-issuing judge that she had personally reviewed and authorized the application, and while other DA's letter did not include as detailed information about the crimes, it specifically named the three individuals being investigated. M.G.L.A. c. 272, § 99(F)(1).

**[8] Telecommunications 372 ⟨⟩1461**

372 Telecommunications
372X Interception or Disclosure of Electronic Communications; Electronic Surveillance
372X(B) Authorization by Courts or Public Officers
372k1461 k. Executive Authorization or Application. Most Cited Cases
Actual authorization by the district attorney for amendment applications is not required under Massachusetts wiretap statute; additionally, no written authorization is required for renewal applications. M.G.L.A. c. 272, § 99.

**[9] Telecommunications 372 ⟨⟩1465**

372 Telecommunications
372X Interception or Disclosure of Electronic Communications; Electronic Surveillance
372X(B) Authorization by Courts or Public Officers
372k1464 Application or Affidavit
372k1465 k. In General. Most Cited Cases
Existence of an obvious typographical error is not a basis for suppressing the fruits of a wiretap. 18 U.S.C.A. § 2510 et seq.

**[10] Telecommunications 372 ⟨⟩1469**

372 Telecommunications
372X Interception or Disclosure of Electronic Communications; Electronic Surveillance
372X(B) Authorization by Courts or Public Officers
372k1464 Application or Affidavit
372k1469 k. Identification of Persons Subject to Interception. Most Cited Cases
Wiretap evidence would not be suppressed on basis that wiretap orders authorized government to intercept calls in which target was not a party where courts issuing the orders further instructed the applicants that if a person other than one of the targets engaged in a conversation related to the designated offenses and was identified, such conversation should be reported to the judge in a status report in order that the judge may determine whether a sufficient showing of probable cause had been made to amend the order to include other persons.

585 F.Supp.2d 150
(Cite as: 585 F.Supp.2d 150)

[11] Telecommunications 372 ⟜1465

372 Telecommunications
   372X Interception or Disclosure of Electronic Communications; Electronic Surveillance
      372X(B) Authorization by Courts or Public Officers
         372k1464 Application or Affidavit
            372k1465 k. In General. Most Cited Cases
Typographical error in the identification of the specific statutory offense was not grounds to suppress wiretap evidence under Massachusetts law. M.G.L.A. c. 272, § 99.

[12] Telecommunications 372 ⟜1466

372 Telecommunications
   372X Interception or Disclosure of Electronic Communications; Electronic Surveillance
      372X(B) Authorization by Courts or Public Officers
         372k1464 Application or Affidavit
            372k1466 k. Probable Cause. Most Cited Cases

Telecommunications 372 ⟜1479

372 Telecommunications
   372X Interception or Disclosure of Electronic Communications; Electronic Surveillance
      372X(B) Authorization by Courts or Public Officers
         372k1479 k. Review of Proceedings; Standing. Most Cited Cases
Probable cause to issue federal wiretap order exists when there is a fair probability that a crime is being committed, and a prior judicial determination of probable cause is entitled to great deference by the reviewing court. 18 U.S.C.A. § 2518(3)(a).

[13] Telecommunications 372 ⟜1466

372 Telecommunications
   372X Interception or Disclosure of Electronic Communications; Electronic Surveillance
      372X(B) Authorization by Courts or Public Officers
         372k1464 Application or Affidavit
            372k1466 k. Probable Cause. Most

Cited Cases
Possession of any recorded memorandum intended to be a minute of a bet is sufficient to demonstrate a violation of Massachusetts gambling statute, and thus give rise to probable cause to issue wiretap order. M.G.L.A. c. 271, § 17.

[14] Telecommunications 372 ⟜1467(3)

372 Telecommunications
   372X Interception or Disclosure of Electronic Communications; Electronic Surveillance
      372X(B) Authorization by Courts or Public Officers
         372k1464 Application or Affidavit
            372k1467 Competency of Information; Hearsay
               372k1467(3) k. Reliability or Credibility; Corroboration. Most Cited Cases
Information regarding informants' identities and information provided in the past, combined with the fact that the state police corroborated some that the informants provided, was sufficient to establish the reliability and credibility of the informants for purposes of establishing probable cause to issue wiretap orders. 18 U.S.C.A. § 2518(3)(a).

[15] Telecommunications 372 ⟜1472

372 Telecommunications
   372X Interception or Disclosure of Electronic Communications; Electronic Surveillance
      372X(B) Authorization by Courts or Public Officers
         372k1471 Conduct and Duration of Surveillance
            372k1472 k. In General. Most Cited Cases
Massachusetts wiretap statute empowers state courts in Massachusetts to authorize the interception of cellular phone conversations. M.G.L.A. c. 272, § 99.

[16] Searches and Seizures 349 ⟜44

349 Searches and Seizures
   349I In General
      349k42 Emergencies and Exigent Circumstances; Opportunity to Obtain Warrant
      349k44 k. Presence of Probable Cause. Most Cited Cases

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

585 F.Supp.2d 150
**(Cite as: 585 F.Supp.2d 150)**

Probable cause to believe one has committed a crime is not enough necessarily to search a suspect's residence; nexus element can be inferred, however, from the kind of crime, the nature of the items sought, the extent of the opportunity for concealment and normal inferences as to where a criminal would hide evidence of a crime, and there must also be a fair probability that evidence or contraband will be discovered at the place of the search at about the time the search warrant would issue. U.S.C.A. Const.Amend. 4.

**[17] Searches and Seizures 349** ☜114

349 Searches and Seizures
    349II Warrants
        349k113 Probable or Reasonable Cause
           349k114 k. Particular Concrete Applications. Most Cited Cases
Nexus element was satisfied for purposes of establishing probable cause to issue warrant authorizing search of defendant's residence; law enforcement had information that 1) defendant met with co-defendants at his home on matters relating to gaming, 2) defendant continued to have telephone conversations and engage in activities relating to his gaming organization up until a few days before the execution of the search warrant, and 3) bookmakers often keep records and money in their residences. U.S.C.A. Const.Amend. 4.

**[18] Searches and Seizures 349** ☜114

349 Searches and Seizures
    349II Warrants
        349k113 Probable or Reasonable Cause
           349k114 k. Particular Concrete Applications. Most Cited Cases
Search warrant application affidavit, as well as the affidavits incorporated by reference, established probable cause that evidence of a crime would be found in defendant's residence; during intercepted calls, defendant discussed with at least two other co-defendants money won, lost, due and owed to him as well as the results in sporting events that would be beneficial for him and his gaming organization, and those conversations, conducted over defendant's home telephone while he was at his residence, indicated by a fair probability that he had information with respect to betting in his home. U.S.C.A. Const.Amend. 4.

**[19] Searches and Seizures 349** ☜126

349 Searches and Seizures
    349II Warrants
        349k123 Form and Contents of Warrant; Signature
           349k126 k. Places, Objects, or Persons to Be Searched. Most Cited Cases
In order for a search warrant to be reasonable and thereby conform with the dictates of the Fourth Amendment, it must state with particularity the items to be seized and the place to be searched. U.S.C.A. Const.Amend. 4.

**[20] Searches and Seizures 349** ☜125

349 Searches and Seizures
    349II Warrants
        349k123 Form and Contents of Warrant; Signature
           349k125 k. Objects or Information Sought. Most Cited Cases
Warrants authorizing a search of defendant's residence and an apartment satisfied the particularity requirement of the Fourth Amendment; the fungible nature of money made the seizure of a wide-range of financial records appropriate, and seizure of computers was limited to those computers used to facilitate the unlawful registration of bets. U.S.C.A. Const.Amend. 4.

**[21] Criminal Law 110** ☜394.4(6)

110 Criminal Law
    110XVII Evidence
        110XVII(I) Competency in General
           110k394 Evidence Wrongfully Obtained
               110k394.4 Unlawful Search or Seizure
                  110k394.4(5) Search Under Warrant
                     110k394.4(6) k. Affidavit or Complaint; Probable Cause. Most Cited Cases
Even if search warrants were invalid, suppression is not appropriate where the officers' good faith reliance on the warrants was reasonable.
*152 Fred M. Wyshak, Jr., Michael L. Tabak, John A. Wortmann, Jr., United States Attorney's Office, Boston, MA, Joseph Wheatley, U.S. Department of Justice, Washington, DC, for Plaintiff.

Joseph J. Balliro, Jr., Balliro & Mondano, Juliane Balliro, Wolf, Block, Schorr & Solis-Cohen, Kevin L. Barron, Michael C. Boubeau, Bourbeau and Bonilla,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

585 F.Supp.2d 150
(Cite as: 585 F.Supp.2d 150)

Patricia A. DeJuneas, Law Offices of Richard Egbert, Boston, MA, Debra A. DelVecchio, DelVecchio & Houseman, Salem, MA, Richard M. Egbert, Law Office of Richard M. Egbert, Robert M. Goldstein, Boston, MA, Edward A. Gottlieb Law Offices of Edward A. Gottlieb, Brighton, MA, David R. Kerrigan, Kenney & Sams, P.C., Framingham, MA, Robert L. Sheketoff, Boston, MA, for Defendants.

Edward A. Gottlieb, Law Offices of Edward A. Gottlieb, Brighton, MA, Roger Witkin, Boston, MA, for Interested Party

### MEMORANDUM & ORDER

GORTON, District Judge.

In this criminal case, involving 11 defendants, ten (all except Stephen Russo) have filed a joint motion to suppress and two (Arthur Gianelli and Philip Puopolo) have filed individual motions to suppress.

### I. *Background*

On September 13, 2006, a Second Superseding Indictment was returned charging 13 defendants with 520 counts, all related to racketeering. Ten of those *153 defendants have filed a joint motion to suppress the "fruits" of a wiretap. Two defendants have filed motions to suppress the "fruits" of searches conducted pursuant to warrants. Still pending but not addressed in this memorandum and order are three motions to sever and four motions to dismiss.

According to the government, the defendants were members of a criminal organization ("the Gianelli Group") which accrued revenue through illegal gambling activities, loansharking, extortion and money laundering and committed crimes of violence, including arson. Arthur Gianelli ("Gianelli") was the purported leader of the Gianelli Group. Joseph Yerardi, Jr. ("Yerardi"), who was in jail for racketeering for all but two months of the ten years between 1995 and 2005, maintained his contact with the Gianelli Group and, in fact, the government alleges that Gianelli ran Yerardi's gambling business and forwarded the proceeds to Yerardi and Yerardi's wife, who is also a defendant.

The government alleges that defendant Dennis Al-

bertelli ("Albertelli") managed the sports betting business and helped with the electronic gaming machine business of Gianelli, acted as an agent for the sports betting and operated an illegal gambling business involving football cards. Defendant Philip Puopolo ("Puopolo") is alleged to have engaged in illegal bookmaking and loansharking with other members of the Gianelli Group. He also purportedly operated a sports betting office, acted as an agent for Gianelli, illegally operated electronic gaming machines at the Revere Businessmen's Association ("RBA") and attempted to persuade witnesses to provide false testimony. Stephen Russo ("Russo") allegedly managed the sports betting office operated by Puopolo and participated in illegal bookmaking. Salvatore Ramasci ("Ramasci") allegedly acted as bookkeeper for the Gianelli Group's illegal sports betting business, coordinated the collection and payout of money to and from the gambling business and participated in the distribution of proceeds of the illegal gambling business.

The government also alleges that the Gianelli Group associated itself with certain members of organized crime including members of the New England Family of La Cosa Nostra ("the Family"). The leaders of the Gianelli Group purportedly made payments to certain members of the Family for the right to operate their criminal businesses.

The original indictment in this case was filed on January 5, 2005. A superseding indictment was filed three months later and a second superseding indictment was filed September 13, 2006. Three of the original 17 defendants have pled guilty, one is a defunct corporation and two are fugitives. The motion to suppress the fruits of the wiretap was filed March 21, 2008 and on that same day, Puopolo filed a motion to suppress the fruits of the search of his residence and the RBA. Five days later, Gianelli filed a motion to suppress the fruits of a search warrant. All three motions are opposed.

### II. *Joint Motion to Suppress Fruits of Wiretap Warrant*

The Defendants argue that the wiretap warrants were not valid and therefore any inculpatory evidence resulting from those warrants must be suppressed.

### A. General Overview of Wiretap Law

585 F.Supp.2d 150
**(Cite as: 585 F.Supp.2d 150)**

[1] The issuing of wiretap warrants is regulated under both state and federal law. Title III of the Omnibus Crime Control and Safe Streets Act, 18 U.S.C. § 2510 *et seq.* ("Title III"), outlines the circumstances under which electronic surveillance may occur provided there is judicial approval.*154 The corresponding Massachusetts state laws with respect to wiretaps are codified at M.G.L. c. 272, § 99 ("Section 99"). Although certain of the Title III provisions incorporate state law, *see* 18 U.S.C. § 2516(2), federal law controls the admissibility of the fruits of state electronic surveillance in federal court. *United States v. Sutherland,* 929 F.2d 765, 769-70 (1st Cir.1991).

[2] Intercepted communications or evidence derived therefrom may be admitted into evidence if the interception occurred in accordance with the provisions of Title III. 18 U.S.C. § 2517(3). Certain kinds of errors in procuring a wiretap warrant do not result in suppression. *United States v. Chavez,* 416 U.S. 562, 575, 94 S.Ct. 1849, 40 L.Ed.2d 380 (1974). Suppression is only required when there is a failure to satisfy a statutory requirement that "directly and substantially implement the congressional intention" to limit wiretaps. *Id.*

**B. Relevant Factual Background**

**1. The Investigation**

The Special Service Section of the Massachusetts State Police Department led the investigation that resulted in the pending indictment. Troopers Nunzio Orlando ("Orlando") and Pasquale Russolillo ("Russolillo") were the lead investigators.

On October 31, 2003, Essex County Assistant District Attorneys John Dawley, Brian O'Keefe and Alexander Cain ("the Essex ADAs") applied for and obtained a warrant ("the October 31 warrant") authorizing them to intercept wire communications over three cellular telephones, two belonging to Albertelli and one belonging to Ramasci. Essex County District Attorney Jonathan W. Blodgett ("DA Blodgett") wrote a letter to the Essex ADAs and the judge specifically designating and empowering the ADAs to apply for the warrants. In support of the application, Orlando submitted an affidavit in which he stated that there was probable cause to believe that Gianelli, Albertelli, Ramasci and others unknown are part of an organized group engaged in a conspiracy to commit violations of

the Massachusetts gaming statute. The Middlesex County District Attorney at the time, Martha Coakley ("DA Coakley"), also reviewed and authorized several Middlesex ADAs to apply for the wiretap warrant.

Relying upon communications intercepted during the execution of the first wiretap between November 13, 2003 and February 25, 2004, the Essex ADAs sought and obtained 10 renewal wiretap warrants for the Albertelli phones as well as additional cellular telephones. One of the renewal warrant applications stated that the warrant was being obtained to investigate a violation of M.G.L. c. 271, § 17A, which prohibits the registering and placing of bets over the telephone. Between November 18, 2004 and February 28, 2005, several ADAs in Middlesex County applied for and obtained 15 wiretap warrants seeking to intercept communications involving, among others, Puopolo and Russo.

**2. Allegations with Respect to the October 31, 2003 Warrant Application**

Based upon information from two informants, "CI-1" and "CI-2", and police surveillance, in the October 31, 2003 application for a wiretap in Essex County, Orlando alleged that:

a) in 1991, Gianelli was intercepted in a wiretap investigation which proved that he was a bookmaker and involved in an elaborate illegal video poker machine business;

b) in 2003, Gianelli had poker machines used for illegal gaming purposes in a restaurant in Revere and inside the East Side Athletic Club in Malden;

*155 c) in July, 2001, CI-1 reported that Gianelli ran a high-stakes card game once a month at the RBA;

d) Gianelli then ran a large gaming organization, still associated with Yerardi and utilized his former agents and bettors;

e) Gianelli, Albertelli and Ramasci used their cellular telephones to conduct gaming activities;

f) Puopolo and Russo were agents of Gianelli;

g) Gianelli gave out to bettors a "1-800" telephone

Page 7

585 F.Supp.2d 150
(Cite as: 585 F.Supp.2d 150)

number to an off-shore gaming office where customers had to retrieve betting lines and submit their wagers;

h) although Gianelli moved the location of his central gaming office offshore, bettors still met with Gianelli to resolve gaming-related issues and with Ramasci to pay gaming debts and to collect winnings; and

i) payments, collections, resolution of debts and other gambling related transactions were all handled by Gianelli and his staff including Ramasci and Albertelli.

## C. Analysis

In their motion to suppress the fruits of the wiretap warrant, the Defendants argue that 1) the October 31 Warrant was issued in violation of the necessity requirement under federal law, 2) many of the wiretap applications were deficient on their face, 3) the October 31 Warrant was issued without probable cause, 4) the December 31, 2003 Warrant was issued for an offense not designated in <u>Section 99</u> and 5) <u>Section 99</u> does not give courts the authority to issue a wiretap warrant for cellular phones.

### 1. The Necessity Requirement

#### a. Legal Standard

[3] Wiretap warrants are not to be "routinely employed as the initial step in criminal investigation". <u>United States v. Giordano, 416 U.S. 505, 515, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974)</u>. As such, the federal wiretap statute requires that the application for a wiretap warrant contain

a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous.

<u>18 U.S.C. § 2518(1)(c)</u>. Before a judge may approve a wiretap order, he must be satisfied that the applicant has made such a showing ("the necessity requirement"). <u>18 U.S.C. § 2518(3)(c)</u>. The application must demonstrate that the government made "a reasonable, good faith effort to run the gamut of normal investig-

ative procedures" before applying for a wiretap, <u>United States v. Santana, 342 F.3d 60, 65 (1st Cir.2003)</u>, and the supporting affidavit must indicate a "reasonable likelihood that alternative techniques would fail to expose the crime". <u>United States v. Ashley, 876 F.2d 1069, 1073 (1st Cir.1989)</u>. In reviewing a wiretap order of another judge, this Court does not make a *de novo* determination of sufficiency. <u>Id.</u> at 1074. Instead, this Court examines the face of the affidavit and decides whether the facts set forth in the application were "minimally adequate to support the determination that was made". <u>United States v. Villarman-Oviedo, 325 F.3d 1, 9 (1st Cir.2003)</u>.

#### b. Analysis

[4] The Defendants argue that the first Essex wiretap failed to meet the necessity requirement because 1) Orlando's description of the investigative goals is misleading, 2) necessity cannot be based *156 on generalized allegations, 3) the particularized allegations were boilerplate, 4) normal investigative techniques had been successful and still were available.

### i. Description of the Investigative Goals

The Defendants argue that Orlando's description of the investigation goals were lofty and far-reaching. Those goals included 1) identifying and bringing about the successful prosecution of persons at all levels of the organization and conspiracy, 2) tracing the proceeds of the bookmaking operation so as to seize and seek forfeiture of those proceeds, 3) infiltrating the Gianelli Group, 4) discovering and exploiting Gianelli's associations with members of the La Cosa Nostra and 5) dismantling his enterprise. The Defendants claim that Orlando exaggerated the investigation goals in order to declare that measures short of wiretapping would not allow for completion of those goals. They also contend that information in the affidavit made it clear that the wiretap would not provide information about others involved in the Gianelli group.

As the government points out, the police may "cast a wide net" in its investigative goals. <u>United States v. Martinez, 452 F.3d 1, 6 (1st Cir.2006)</u> (upholding a wiretap where the investigative objectives were broadly defined). The First Circuit Court of Appeals has upheld wiretaps where the goals of the investigation were to uncover the "full scope" of the crimes under investigation and the people involved and to

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 8

585 F.Supp.2d 150
**(Cite as: 585 F.Supp.2d 150)**

obtain information about the "totality of offenses" in which the targets were involved. *Villarman-Oviedo,* 325 F.3d at 10. The goals identified by Orlando closely match those goals the First Circuit has approved.

Orlando also made clear in his affidavit that, although Gianelli was using an offshore bookmaking office, he continued to employ staff and to interact and communicate with his agents and bettors in Massachusetts. Results from traditional investigative techniques revealed that illegal gaming activities were occurring in Massachusetts. Consequently, the State Police had reason to try to uncover the entirety of the conspiracy with respect to the people and activities involved. The police did not improperly exaggerate the goals of the investigation and the motion to suppress will not be allowed on that ground.

**ii. Boilerplate and General Accusations**

The Defendants next contend that Orlando improperly asserts necessity through the use of boilerplate allegations. They argue that Orlando does nothing more than set forth generic and standardized allegations of why normal measures are not productive or feasible in a gambling investigation instead of listing facts specific to the current case. Some of the generalizations, such as the ones relating to the use of pay telephones, are irrelevant to this case. The Defendants suggest that explanations of necessity that discuss typical problems with a certain kind of case instead of reference to specific facts about the defendant are insufficient to establish necessity.

[5] There is no requirement, however, that the government establish that the investigation at issue is different from an ordinary investigation for a crime of that kind. *United States v. Martinez,* 452 F.3d 1, 5-6 (1st Cir.2006). The government must establish necessity with the particulars of a given investigation but "[t]he ordinariness of the investigation does not preclude a finding of necessity for the use of wiretaps to further the investigation." *Id.* Orlando demonstrated necessity by referencing common difficulties in gaming investigations because those difficulties also *157 apply in this case (as discussed in more detail below). Consequently, the motion to suppress will not be allowed on that ground.

**iii. The Particularized Allegations**

The Defendants further assert that Orlando's affidavit contains few particularized explanations of why normal investigative techniques would not be sufficient in this case. The few particularized allegations that do exist are mirror (or near-mirror) images of allegations contained in affidavits filed by Orlando and Russolillo in other wiretap cases. The Defendants include a chart in their brief comparing language from various affidavits submitted by the officers in other cases. The charts reveal that the officers have used remarkably similar language in their prior affidavits.

As the government notes, the police need not draft entirely new language for every wiretap affidavit. As explained above, wiretaps may be used in "ordinary" investigations. Because investigations of gambling conspiracies may encounter the same difficulties when using normal investigative techniques, Orlando and Russolillo may have encountered the same reasons for necessity in more than one of their cases. Because the circumstances they identified as creating necessity were applicable to this case (as explained in more detail below), the fact that Orlando or Russolillo may have encountered similar necessity in other cases is not cause for suppression. *See Martinez,* 452 F.3d at 5-6 (finding that an investigation need not be unique in order to establish necessity for a wiretap).

**iv. Success and Availability of Normal Investigative Techniques**

The Defendants finally argue that normal investigative techniques were yielding results and therefore wiretapping was premature. They contend that 1) Orlando's discounting of physical surveillance is unsubstantiated and that those techniques had been successful, 2) that the informants had significant dealings with Gianelli, Albertelli and Ramasci and that the informants provided significant information and 3) telephone analysis produced relevant information. The Defendants suggest that such success with normal investigative techniques means that the government cannot show that "it has encountered difficulties in penetrating a criminal enterprise or in gathering evidence". *United States v. Abou-Saada,* 785 F.2d 1, 11 (1st Cir.1986). Moreover, the Defendants aver that the police failed to use several available normal investigative techniques including 1) using CI-1 and CI-2 to gather more information, 2) utilizing controlled calls, 3) cultivating additional informants, 4) obtaining

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

32

Page 9

585 F.Supp.2d 150
(Cite as: 585 F.Supp.2d 150)

telephone records and 5) conducting an investigation into the defendants' finances.

The affidavits that were submitted with the October 31 application demonstrated that the police had made a good faith effort to use the other techniques and that there was a reasonable likelihood that alternative techniques would fail. Although the State Police had gained some information from traditional techniques, Orlando made clear in the affidavit that there was still much to be done that had not and could not be done by conventional methods. *See United States v. Cao,* 471 F.3d 1, 3 (1st Cir.2006) (holding that partial success using investigative techniques does not disprove necessity). The affidavit explains in detail (encompassing six pages) how and why other normal investigative techniques were either exhausted or not feasible.

The State Police had acquired evidence sufficient to establish probable cause, but it had not obtained, nor could it, proof beyond a reasonable doubt for the named **158** subjects using traditional investigative techniques. There was also no reasonable prospect that traditional investigative methods would expose the full scope and membership of the conspiracy. Such detail and reasoning is sufficient to meet the necessity requirement. *See Martinez,* 452 F.3d at 5; *see also United States v. Rivera-Rosario,* 300 F.3d 1, 19 (1st Cir.2002).

**2. Alleged Deficiencies in the Wiretap Applications**

The Defendants next argue that the Essex and Middlesex County applications suffered from a number of deficiencies. They contend that 1) the warrant applications fail to demonstrate the requisite review and authorization by the District Attorney, 2) the December 23, 2003 Essex County application relies upon a non-existent designation letter, 3) the December 2, 2004 Monitoring Instruction Memorandum authorized interception of an unknown telephone number and 4) the Essex and Middlesex ADAs unilaterally expanded the court orders to authorize law enforcement officials to intercept and monitor all communications over targeted phones improperly.

**a. District Attorney Review and Authorization**

**i. Legal Standard**

**[6]** Under Title III, only the principal prosecuting attorney of the state or the "principal prosecuting attorney of any political subdivision thereof", if the state wiretap statute authorizes him to make applications, may apply for a state order authorizing the interception of wire communications. 18 U.S.C. § 2516(2). The Massachusetts wiretap statute authorizes specially designated assistant district attorneys to submit wiretap applications. M.G.L. c. 272, § 99(F)(1). In *Commonwealth v. Vitello,* 367 Mass. 224, 327 N.E.2d 819 (1975), in order to ensure that Massachusetts law conformed with federal law, the SJC interpreted the special designation provision of Section 99

to mean that an assistant district attorney may not apply at will for wiretap orders but must bring the matter for examination before his senior officer, the district attorney.

*Id.* at 256, 327 N.E.2d 819. The district attorney must review and authorize each application in writing. *Id.* Although failure to secure approval from an authorized authority is grounds for suppression, *United States v. Giordano,* 416 U.S. 505, 528, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974), "[t]he absence of a compelling signature on a critical document can be remedied by proof of actual authority". *See United States v. Smith,* 726 F.2d 852, 859 (1st Cir.1984) (en banc).

**ii. The Initial Applications**

The Defendants argue that none of the relevant Essex County documents, i.e., DA Blodgett's October 29, 2003 designation letter, his October 29, 2003 letter to the warrant-issuing judge and all of the applications, are sufficient to demonstrate compliance with the requirement that the district attorney carefully review the application before authorizing it and submitting it to court. They contend that the relevant documents do not confirm that DA Blodgett personally reviewed the application. Although he designated the Essex ADAs to make applications, Blodgett states that the applications will be reviewed by "me or my designee before being presented to you". Blodgett also did not sign the applications, a practice that while not mandatory has been recommended by the SJC. *Vitello,* 367 Mass. at 232, 327 N.E.2d 819.

Similarly, the Defendants assert that because former DA Coakley did not co-sign the first Middlesex

Page 10

585 F.Supp.2d 150
(Cite as: 585 F.Supp.2d 150)

County application, it *159 was not appropriately authorized. Because of those alleged deficiencies, the Defendants contend the applications were insufficient on their face or, in the very least, the Court should hold an evidentiary hearing to determine whether the applications were properly authorized, citing *United States v. Smith*, 726 F.2d 852, 860 (1st Cir.1984) (remanding the issue of authorization to the District Court for an evidentiary hearing because it had not previously made a particularized inquiry into that issue).

[7] The letters submitted by DAs Blodgett and Coakley are sufficient to satisfy the requirements of the statute and establish that the appropriate official authorized the original wiretap warrant application. Coakley explicitly states in her letter to the warrant-issuing judge that she had personally reviewed and authorized the application. With respect to the Essex County applications, in a case with a very similar designation letter to DA Blodgett's letter, the SJC found proper authorization because, as in this case, the letter was dated near to the day of filing, the letter and application were bound together and the defendant offered no evidence that the application had not been properly authorized. *See Commonwealth v. D'Amour*, 428 Mass. 725, 734-35, 704 N.E.2d 1166 (1999). DA Blodgett's letter did not include as detailed information about the crimes as the letter did in *D'Amour* but it specifically named the three individuals being investigated. Although it is unfortunate that DA Blodgett has not adopted the SJC's suggestion of co-signing the application, as the First Circuit pointed out in *Smith*, such an oversight is not fatal to the wiretap. 726 F.2d at 859.

The Defendants rely heavily on *Smith* for their contention that the Court should hold an evidentiary hearing to determine whether DA Blodgett actually authorized the original warrant application. In that case, however, in which the First Circuit remanded for an evidentiary hearing, the Court of Appeals specifically found that the district court "did not make a particularistic inquiry" into the issue of authorization. *Smith*, 726 F.2d at 860. There also was considerable confusion about what documents had been produced in the district court, which is not our case. This Court has a copy of DA Blodgett's letter and affidavit and has made a particularized inquiry into whether the warrant was authorized. That inquiry leads to the conclusion that the written authorizations were suffi-

cient and that a hearing is unnecessary.

### iii. Renewals and Amendments

[8] The Defendants next contend that written designation letters are required for amendment and renewal applications in order to comport with federal law. With respect to "amendments" (i.e., successive applications that seek to intercept communications occurring over telephones or between individuals not identified in an original designation letter), DA Coakley in Middlesex County submitted a new designation letter with each application requesting amendment, but the Essex County applications seeking amendment did not include new designation letters, referring instead to the October 30 designation letter. Such an omission is not fatal, however, because actual authorization by the district attorney for amendment applications is not required. *See United States v. DeJesus*, 752 F.2d 640, 643 (1st Cir.1985) (affirming lower court decision holding that Section 99 does not require actual authorization in amendment applications).

With respect to renewal applications, in both Essex and Middlesex Counties they referred to earlier designation letters rather than including new designation letters.*160 Under Massachusetts law, no written authorization is required for renewal applications. *See D'Amour*, 428 Mass. at 735, 704 N.E.2d 1166. The Defendants urge this Court to hold, however, that written authorization is required in order for Massachusetts law to comport with federal law. Although the Defendants argue that in *D'Amour* the SJC relied on the assumption that a renewal is not an "application" in reaching the conclusion that renewal applications do not require written authorization, the Court concluded simply that "neither the wiretap statute nor *Vitello* requires written authorization for renewals". *Id.* As the First Circuit did in *DeJesus* with respect to amendment applications, this Court will, with respect to renewal applications,

> decline to attempt to provide [the Court's] own gloss covering this aspect of Massachusetts wiretap law ... [and] not infer a requirement of district attorney authorization from this otherwise silent statute.

752 F.2d at 643. Because authorization is not required for renewal or amendment applications, the Court will not suppress evidence for any alleged deficiency in

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

585 F.Supp.2d 150
(Cite as: 585 F.Supp.2d 150)

such authorization.

**b. The December 28, 2003 Designation Letter**

[9] The December 23, 2003 application in Essex County cites a designation letter dated December 28, 2003 to show that the application was authorized by the district attorney. No such letter exists. The Defendants argue that failure to identify the designation authority for the December 23 application properly requires suppression of all evidence derived from that application and the resulting order. As the government points out, all of the earlier and later Essex County wiretap applications referred to the October 29, 2003 authorization letter and that it is therefore clear that reference to the December 28, 2003 letter was simply a typographical error. The existence of an obvious typographical error is not a basis for suppressing the fruits of the wiretap. *See United States v. Chavez,* 416 U.S. 562, 569, 94 S.Ct. 1849, 40 L.Ed.2d 380 (1974) (holding suppression to be inappropriate when the application was properly authorized but the authorizing authority was misidentified).

**c. The Telephone Number in the December 2, 2004 Application**

The Monitoring Instruction Memorandum dated December 2, 2004, a memorandum issued to law enforcement officers that accompanied the warrant order, authorized law enforcement officials to intercept and monitor communications occurring over the telephone number (617) 331-1167. That number was not the subject of the accompanying application or court order provided to the Defendants. Consequently, the Defendants move the Court to issue an order requiring the government to disclose whether communications over that telephone number were intercepted and whose communications were intercepted pursuant to the instructions in the memorandum.

The telephone line at that number was apparently subscribed to by Albert Sacramone who died in 2005 and was never a defendant in this case. None of the defendants in this case were intercepted over the line. The government has now supplied the Defendants with the separate order and application for the mystery phone number rendering this argument moot.

**d. The Extent of the Monitoring**

[10] The Middlesex and Essex ADAs issued a Monitoring Instruction Memoranda to the monitoring teams of the relevant law enforcement agencies after they secured*161 the wiretap warrants. Those memoranda authorized the interception and monitoring of all conversations occurring over the identified telephone numbers even if none of the individuals identified in the order were a party to the intercepted conversations. The Defendants contend that because the orders in this case limited interception to "communications of [the targets identified in the application] and their associates, agents and co-conspirators" rather than anyone using the telephone, the issuing court intended to limit interception to those conversations that included one of the targets. The courts issuing the orders further instructed the applicants that if a person other than one of the targets engaged in a conversation related to the designated offenses and was identified, such conversation should be reported to the judge in a Status Report in order that the judge may determine whether a sufficient showing of probable cause had been made to amend the order to include other persons.

In *United States v. Kahn,* 415 U.S. 143, 94 S.Ct. 977, 39 L.Ed.2d 225 (1974), the Supreme Court was confronted with a wiretap order that authorized the government to "intercept wire communications of Irving Kahn and others as yet unknown". It held that, under the warrant, the government could intercept calls in which Irving Kahn was not a party. *Id.* at 156-57, 94 S.Ct. 977. Although the warrant in this case included instructions about reporting third party conversations to the Judge, an instruction apparently not included in the *Kahn* warrant, this Court finds the holding in *Kahn* controlling, especially in light of the fact that the warrant-issuing judge, after receiving the warrant monitoring instructions, continued to approve the renewals. The evidence will not be suppressed based on this argument.

**3. The December 31, 2003 Warrant**

The Defendants next argue that the December 31, 2003 warrant was issued for an offense not designated in Section 99. On December 31, 2003, the Essex ADAs applied for and obtained a renewal warrant alleging that they had probable cause to believe that the targets of the investigation were violating M.G.L. c. 271, § 17A. Section 99 does not authorize warrants for alleged violations of § 17A. M.G.L. c. 272, §

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

585 F.Supp.2d 150
**(Cite as: 585 F.Supp.2d 150)**

99(B)(7). Moreover, violations of § 17A are not punishable by imprisonment for more than a year and therefore no wiretap may be issued for such a violation under Title III.

[11] The designation of § 17A appears to have been a typographical error. The December 31, 2003 application was captioned as a renewal application and all prior and subsequent applications referred to § 17, which is among the crimes for which Section 99 authorizes wiretaps. Moreover, § 17A proscribes the use of a telephone for gambling purposes whereas § 17 proscribes the retention of a place for registering bets. The application specifically states that there is probable cause with respect to the registering of bets. The application also incorporates Orlando's affidavit which states at least four times that the crime under investigation was a violation of § 17, not § 17A. Such a typographical error in the identification of the specific statute is not grounds to suppress the wiretap evidence. *Chavez*, 416 U.S. at 569, 94 S.Ct. 1849 (holding suppression to be inappropriate when the application was properly authorized but the authorizing authority was misidentified).

**4. Probable Cause for the First Essex County Wiretap**

**a. Legal Standard**

[12] Title III requires the issuing judge to find that the applicant has established**162 probable cause to believe that an individual has committed, is committing or is about to commit a designated offense. 18 U.S.C. § 2518(3)(a). The judge must also find probable cause that communications concerning the crime will be obtained through such interception. 18 U.S.C. § 2518(3)(b). Probable cause exists when there is a fair probability that a crime is being committed. *United States v. Moore*, 790 F.2d 13, 15 (1st Cir.1986). A prior judicial determination of probable cause is entitled to great deference by the reviewing court. *Illinois v. Gates*, 462 U.S. 213, 236, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983).

**b. Analysis**

The Defendants argue that when Orlando first applied for the Essex County wiretap warrant he did not have probable cause to believe that the targets had violated M.G.L. c. 271, § 17 because 1) there was not sufficient evidence that the targets were registering bets or had apparatus in Massachusetts and 2) the evidence from the informants was uncorroborated and unreliable.

**i. Location of the Violations**

The Defendants argue that Orlando's affidavit failed to set forth facts adequate to support probable cause for a violation of M.G.L. c. 271, § 17 because it failed to establish "a place" in Massachusetts where bets were registered or where apparatus was kept. The affidavit stated that Gianelli had moved all bet registering off-shore and therefore no such registration was occurring in Massachusetts.

[13] The application of § 17 is not, however, "limited to bookmaking in the traditional sense" and is, instead, "broad and encompassing". *United States v. Marder*, 48 F.3d 564, 567 (1st Cir.1995). Moreover, "[t]he possession of any recorded memorandum intended to be a minute of a bet is sufficient to demonstrate a violation of ... G.L. c. 271, § 17...." *Commonwealth v. Boyle*, 346 Mass. 1, 4, 189 N.E.2d 844 (1963). Although Orlando's affidavit stated that bet registering had been moved offshore, it also contained several allegations regarding the continuation of the payment and collection of bets by Gianelli, Albertelli and Ramasci in Massachusetts. That information established at least a fair probability that those three individuals had in their possession records of the amounts and nature of bets. Pursuant to the holding in *Boyle* and in light of the broad interpretation given to § 17, the fact that there was a fair probability that the Defendants kept betting records in Massachusetts, provided the applicants with probable cause to believe that the three co-defendants were violating M.G.L. c. 271, § 17. *See Boyle*, 346 Mass. at 4, 189 N.E.2d 844.

**ii. Informant Reliability**

[14] The Defendants argue that the informants lacked reliability and credibility because 1) the affidavit fails to disclose whether the informants had criminal records or were receiving rewards or incentives, 2) the State police did not corroborate the informants' claims by verifying their phone numbers and 3) Orlando did not confirm that the informants had actually contacted any of the target phones.

Despite the omissions the Defendants identified, Orlando provided a plethora of information from which

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

585 F.Supp.2d 150
(Cite as: 585 F.Supp.2d 150)

the warrant-issuing court was able to determine the informants' reliability. Such information included that:

1) Orlando had known the informants for more than five years, knew their true names and their home addresses,

2) CI-1 and CI-2 were unaware of each other's proffered information but that information was consistent,

**\*163** 3) CI-1 and CI-2 had provided information to Orlando for the preceding two years,

4) State police investigations that had resulted from information obtained from CI-1 and CI-2 had confirmed their information to be truthful and reliable,

5) CI-1 allowed Orlando and Russolillo secretly to observe meetings between him and various bookmakers,

6) CI-2 provided critical information that led to wiretap investigations, subsequent seizure of gambling proceeds and conviction of various defendants for gambling offenses in three different cases and

7) CI-1 and CI-2 feared for their safety if their cooperation was exposed and the State Police thought it imperative to omit details that might tend to reveal their identities.

This information, combined with the fact that the state police corroborated some that the informants provided, was more than enough to establish the reliability and credibility of the informants. *See United States v. Greenburg,* 410 F.3d 63, 67 (1st Cir.2005).

### 5. The Authority of the State Court with Respect to Cellular Telephones

[15] The Defendants' final argument that the fruits of the wiretap should be suppressed is based upon their claim that the state court is not authorized to issue an order permitting the interception of communications over cellular telephones.

The Defendants assert that the pre-1986 version of Title III, upon which Section 99 is based, did not authorize interception of cellular phones and point out

that even the Massachusetts House of Representatives has noted that Section 99 is limited as evidenced by a 2007 bill which would update the definition of "wire communications" to replicate that of the amended Title III.

The Court finds the Defendants' arguments unpersuasive. The SJC has held that the Massachusetts courts construe the Massachusetts statute in accordance with the construction given the federal statute by the federal courts. *O'Sullivan v. NYNEX Corp.,* 426 Mass. 261, 264 n. 5, 687 N.E.2d 1241 (1997). In fact, Massachusetts courts have previously interpreted the state wiretap statute to have incorporated an amendment to the federal wiretap statute. *See Dillon v. MBTA,* 49 Mass.App.Ct. 309, 314-16, 729 N.E.2d 329 (2000). The Massachusetts Superior Courts have repeatedly held that the Massachusetts wiretap statute empowers state courts in Massachusetts to authorize the interception of cellular phone conversations. *See, e.g., Commonwealth v. Alleyne,* 2007 WL 4997621, at \*2 (Mass.Super.Nov.1, 2007). This Court will follow their lead until a higher court holds otherwise.

Because this Court finds that the wiretap warrants were not unlawful in any way, the Defendants' motion to suppress the fruits of the wiretap will be denied.

### III. *Motions to Suppress*

Defendants Puopolo and Gianelli have also filed motions to suppress the fruits of searches of their residences and, in Puopolo's case, the RBA.

#### A. Relevant Factual Background

The facts relevant to their motions are as follows:

##### 1. The Warrant for Gianelli's Home

On March 5, 2004, Massachusetts State Trooper Pasquale Russolillo ("Russolillo") sought and obtained search warrants for **\*164** Gianelli's home (located at 420 Main Street, Lynnfield), automobile and person. The warrants were executed that same day.

The warrant authorized State Police to seize a wide variety of items including books, papers, documents, receipts, bills and notations reflecting financial transactions, computers and related hardware, and

585 F.Supp.2d 150
**(Cite as: 585 F.Supp.2d 150)**

other paraphernalia used to facilitate the unlawful registration of bets. In support of his application, Russolillo submitted a 49-page affidavit relating to Gianelli and three of his co-defendants.

To establish probable cause for a warrant for Gianelli's residence, Russolillo cited several telephone calls which had been intercepted during the execution of a wiretap. Those intercepted calls indicated that Gianelli was involved in an unlawful gaming organization. Russolillo also stated general information and his opinions with respect to the practices of persons involved in the operation of bookmaking and gaming offices. He explained, among other things, that 1) those involved in gaming often hide their records and money on their person, in their automobiles and in other secure areas, 2) hidden areas of residences are thought to provide a degree of security for records and money and 3) records reflecting a person's financial transactions and condition are typically found in a person's residence.

Russolillo also summarized the intercepted calls. He noted that conversations intercepted over Gianelli's cellular phone revealed that Gianelli regularly instructed Albertelli and Ramasci to come to his residence for paying or collecting monies due or owed on bets registered with the Gianelli Group. Russolillo further declared that 1) surveillance confirmed that those two individuals went to Gianelli's home, 2) physical and electronic surveillance revealed that on several occasions Gianelli reviewed the gains and losses incurred by the gaming organization at his home and 3) conversations between Gianelli and Albertelli indicated that Albertelli delivered money derived from gaming to Gianelli's wife at their home.

Russolillo made additional allegations based on specific activities seen or calls intercepted. In late November, 2003, Gianelli and Ramasci made arrangements over the telephone for Ramasci to deliver gaming material and money to the Gianelli residence. A police officer later observed Ramasci arrive by car at the Gianelli home and lean into his trunk. At the end of January, 2004, an intercepted call recorded Gianelli and Ramasci discussing gaming business that Ramasci had to attend to that day and setting a time to meet at Gianelli's home thereafter. In March, 2004, in an intercepted call, Gianelli told Albertelli that he was home and then stated that he would review "the sheets" that night. Other intercepted calls involving

Gianelli in March, 2004 provided evidence that he continued to be involved in gaming activities.

**2. The Warrant for Puopolo's Home and the RBA**

On March 3, 2005, Russolillo submitted an affidavit in support of three applications for search warrants for five different locations including Puopolo's residence (located at 350 Revere Beach Boulevard, Apartment P2-120, Revere) and the RBA. The affidavit explicitly referenced and incorporated additional affidavits written in support of an application and renewal application for a wiretap. The search warrants were issued by the Massachusetts Superior Court the same day and executed five days later. Law enforcement officials seized no items from Puopolo's person and seized very little from his residence but they did seize assorted items from the RBA.

**\*165** In the application for a warrant for Puopolo's residence, Russolillo opines, as he did in the affidavit in support of the application with respect to Gianelli's residence, that persons involved in bookmaking or gaming offenses often store records of the crimes in their homes, among other places. With respect to case specific information, Russolillo stated that several completed calls were intercepted to or from the telephone in Puopolo's residence and the majority of those calls included gaming related matters. Russolillo details five telephone calls intercepted between December 30, 2004 and February 21, 2005 in which Puopolo talks about gaming matters while in his home. Russolillo also states that Puopolo has used the RBA telephone number to discuss matters related to gaming and that intercepted conversations included Puopolo directing people to meet him at the RBA to pay or collect money. The intercepted calls also revealed that Puopolo is responsible for paying customers who win bets on allegedly illegal poker machines within the RBA.

**B. Analysis**

In their motions to suppress, Gianelli and Puopolo argue that the warrants were invalid because they lacked evidence of probable cause and particularity.

**1. Probable Cause for the Warrants**

Gianelli and Puopolo first contend that there was no

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

585 F.Supp.2d 150
**(Cite as: 585 F.Supp.2d 150)**

probable cause to search their homes because there was no probable cause to believe that evidence of gaming would be found there.

### a. Legal Standard

[16] A warrant application must demonstrate probable cause to believe that 1) a crime has been committed (the commission element) and 2) particular evidence of the offense will be found at the place to be searched (the nexus element). *United States v. Ribeiro*, 397 F.3d 43, 48 (1st Cir.2005). In determining whether the nexus element is satisfied, the Court must make

> a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, ... there is a fair probability that contraband or evidence of a crime will be found in a particular place.

*Id.* at 48-49 (quoting *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)). The court must consider

> whether the facts presented in the affidavit would "warrant a man of reasonable caution" to believe that evidence of crime will be found.

*United States v. Feliz*, 182 F.3d 82, 87 (1st Cir.1999) (quoting *Texas v. Brown*, 460 U.S. 730, 742, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983)). Probable cause to believe one has committed a crime is not enough necessarily to search a suspect's residence. *Feliz*, 182 F.3d at 88. The nexus element can be inferred, however, from the kind of crime, the nature of the items sought, the extent of the opportunity for concealment and normal inferences as to where a criminal would hide evidence of a crime. *Id.* The nexus element also has a temporal component in that there must be a fair probability that evidence or contraband will be discovered at the place of the search at about the time the search warrant would issue. *United States v. Zayas-Diaz*, 95 F.3d 105, 113 (1st Cir.1996). "In a doubtful or marginal case, the court defers to the issuing [judge's] determination of probable cause." *United States v. Barnard*, 299 F.3d 90, 93 (1st Cir.2002).

### b. Analysis of the Warrant Application for Gianelli's Residence

To support his argument that the warrant application did not satisfy the nexus *166 element, Gianelli contends that 1) Russolillo's allegations regarding Gianelli's dealings with a co-defendant in November, 2003 do not establish probable cause because they occurred three months prior to the execution of the warrant, 2) the intercepted calls from early 2004 do not create probable cause because they did not connect Gianelli's home to his gaming activities, 3) Russolillo's summaries of conversations are not supported by specific information about conversations and they have no temporal reference, 4) Russolillo refers to less than a handful of calls relating to Gianelli's home and 5) each of the intercepted conversations specifically cited by Russolillo are over Gianelli's cellular telephone and therefore he could have been talking from anywhere.

[17] Gianelli may be correct that each allegation of Russolillo, when taken individually, is insufficient to establish probable cause, but when the evidence presented in the affidavit is considered together, it satisfies the nexus element. Law enforcement had information that 1) Gianelli met with co-defendants at his home on matters relating to gaming in November, 2003, 2) Gianelli continued to have telephone conversations and engage in activities relating to his gaming organization up until a few days before the execution of the search warrant and 3) bookmakers often keep records and money in their residences. Russolillo's opinion, gleaned from experience in gaming investigations, that bookmakers keep records at their residences was corroborated in this case by the conversations and activities of Gianelli and his co-defendants. When law enforcement continued to observe activities and intercept calls suggesting Gianelli's involvement in gaming activities, there was a fair probability that evidence of Gianelli's gaming activities would be found in his home. Consequently, the evidence obtained as a result of the search of Gianelli's residence will not be suppressed for lack of probable cause.

### c. Analysis of The Warrant Application for Puopolo's Residence

[18] Puopolo argues in his motion to suppress, as did Gianelli, that the warrant application did not satisfy the nexus element. In support of that contention, he notes that the only evidence connecting Puopolo's residence to alleged contraband are the "general opi-

Page 16

585 F.Supp.2d 150
(Cite as: 585 F.Supp.2d 150)

nions" of Russolillo as well as five intercepted telephone conversations none of which indicated any evidence of gaming in Puopolo's home. He points to facts available to Russolillo suggesting the absence of probable cause, including:

1) Puopolo was on notice of the ability and intent of law enforcement to search residences of targets because police had earlier searched the homes of other defendants,

2) Russolillo had a pre-conceived opinion that bookmakers attempt to conceal from law enforcement those assets which are used to facilitate their gaming activities,

3) the intercepted telephone conversations do not provide the requisite nexus to Puopolo's home and

4) there were no assertions in the search warrant affidavit that law enforcement officials ever observed Puopolo conducting gaming or collection activities in his home.

Puopolo's arguments are unpersuasive. The application affidavit, as well as the affidavits incorporated by reference, establish probable cause that evidence of a crime would be found in Puopolo's residence. During intercepted calls, Puopolo discussed with at least two other co-defendants*167 money won, lost, due and owed to him as well as the results in sporting events that would be beneficial for him and his gaming organization. Those conversations, conducted over Puopolo's home telephone while he was at his residence, indicate by a fair probability that he had information with respect to betting in his home. Moreover, although probable cause cannot rest entirely on a law officer's opinions based on his experience and training, Russolillo's statement that bookmakers generally keep records in their home further supports a finding of probable cause in this case.

Despite Puopolo's argument to the contrary, his knowledge that residences of others had been searched and that bookmakers generally like to conceal evidence of gaming does not eliminate probable cause that evidence would be found in his residence, especially in this case where, after the earlier searches occurred, law enforcement officers continued to observe and hear Puopolo engaging in conversations relating to gaming activities. Moreover, the fact that

law enforcement officials did not observe evidence of gaming activity at Puopolo's home prior to the search does not disprove the existence of probable cause. Puopolo's storage of records and/or cash in the house would be easy to conceal from law enforcement engaged in surveillance.

### 2. The Particularity of the Warrant

Puopolo next contends (and Gianelli adopts his argument) that the warrants violated the Fourth Amendment particularity requirement.

#### a. Legal Standard

[19] In order for a warrant to be reasonable and thereby conform with the dictates of the Fourth Amendment, it must state with particularity the items to be seized and the place to be searched. *United States v. Vega-Figueroa*, 234 F.3d 744, 756 (1st Cir.2000). The purpose of the particularity requirement is to prevent wide-ranging general searches by the police. *Id.* If a warrant fails to conform to the particularity requirement of the Fourth Amendment, it is generally unconstitutional. *Groh v. Ramirez*, 540 U.S. 551, 557, 124 S.Ct. 1284, 157 L.Ed.2d 1068 (2004).

#### b. Analysis

[20] Puopolo argues that the warrants authorizing a search of his residence and the RBA "authorize[ ] ... wide-ranging and indiscriminate rummaging for anything and everything". He argues that they lack particularity because they 1) fail to specify the criminal offenses under investigation, 2) call for the seizure of any and all financial records without temporal or subject limitation and 3) permit the seizure of computers and related hardware despite the lack of probable cause that Puopolo used any computers.

With respect to Puopolo's first concern, the search warrants incorporated by reference the underlying search warrant affidavit which stated the offense under investigation. *See Groh*, 540 U.S. at 557-58, 124 S.Ct. 1284 (holding that a warrant may cross-reference other documents). Moreover, the search warrants repeatedly described the substance of the offense by stating, for example, that the items to be seized should be those items "evidencing the unlawful placement, receipt and registration of bets on the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

585 F.Supp.2d 150
**(Cite as: 585 F.Supp.2d 150)**

outcome of sports events".

With respect to Puopolo's second concern, as the government points out, the fungible nature of money makes the seizure of a wide-range of financial records appropriate. Money made in illegal activities can easily be commingled with money made from legal activities and, therefore, *168 tracing ill-gotten money requires access to all kinds of financial information and documentation.

Finally, with respect to Puopolo's third concern, the seizure of computers was limited to those computers used to facilitate the unlawful registration of bets. That limitation narrowed the items subject to seizure, eliminating any Fourth Amendment difficulties with respect to the seizure of computers. Because the warrants satisfied the particularity requirement of the Fourth Amendment, defendants' motions to suppress the fruits of the search of the residences of Gianelli and Puopolo, as well as the search of the RBA, will be denied.

### 3. The Good Faith Exception

[21] Even if the warrants were invalid, suppression is not appropriate where, as here, the officers' good faith reliance on the warrants was reasonable. *United States v. Leon*, 468 U.S. 897, 922, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). Supposing that the warrants did not adequately state probable cause, the fruits of the search would still be admissible because the warrants were not "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *See id.* at 923, 104 S.Ct. 3405. Nor did any possible lack of particularity render the warrant "so facially deficient ... that the executing officers cannot reasonably presume it to be valid." *See id.* Consequently, the good faith exception provides another basis on which to deny the motions of Puopolo and Gianelli to suppress.

### ORDER

In accordance with the foregoing, Defendants' Motion to Suppress the Fruits of a Wiretap (Docket No. 458), Puopolo's Motion to Suppress Fruits (Docket No. 462) and Gianelli's Motion to Suppress Fruits (Docket No. 470) are **DENIED.**

**So ordered.**

D.Mass.,2008.
U.S. v. Gianelli
585 F.Supp.2d 150

END OF DOCUMENT

▷

**Effective:[See Text Amendments]**

Massachusetts General Laws Annotated <u>Currentness</u>
  Part IV. Crimes, Punishments and Proceedings in Criminal Cases (Ch. 263-280)
    ▣ <u>Title I</u>. Crimes and Punishments (Ch. 263-274)
      ▣ <u>Chapter 272</u>. Crimes Against Chastity, Morality, Decency and Good Order
      (Refs & Annos)
       → **§ 99. Interception of wire and oral communications**

Interception of wire and oral communications.--

A. Preamble.

The general court finds that organized crime exists within the commonwealth and that the increasing activities of organized crime constitute a grave danger to the public welfare and safety. Organized crime, as it exists in the commonwealth today, consists of a continuing conspiracy among highly organized and disciplined groups to engage in supplying illegal goods and services. In supplying these goods and services organized crime commits unlawful acts and employs brutal and violent tactics. Organized crime is infiltrating legitimate business activities and depriving honest businessmen of the right to make a living.

The general court further finds that because organized crime carries on its activities through layers of insulation and behind a wall of secrecy, government has been unsuccessful in curtailing and eliminating it. Normal investigative procedures are not effective in the investigation of illegal acts committed by organized crime. Therefore, law enforcement officials must be permitted to use modern methods of electronic surveillance, under strict judicial supervision, when investigating these organized criminal activities.

The general court further finds that the uncontrolled development and unrestricted use of modern electronic surveillance devices pose grave dangers to the privacy of all citizens of the commonwealth. Therefore, the secret use of such devices by private individuals must be prohibited. The use of such devices by law enforcement officials must be conducted under strict judicial supervision and should be limited to the investigation of organized crime.

42

B. Definitions. As used in this section--

1. The term "wire communication" means any communication made in whole or in part through the use of facilities for the transmission of communications by the aid of wire, cable, or other like connection between the point of origin and the point of reception.

2. The term "oral communication" means speech, except such speech as is transmitted over the public air waves by radio or other similar device.

3. The term "intercepting device" means any device or apparatus which is capable of transmitting, receiving, amplifying, or recording a wire or oral communication other than a hearing aid or similar device which is being used to correct subnormal hearing to normal and other than any telephone or telegraph instrument, equipment, facility, or a component thereof, (a) furnished to a subscriber or user by a communications common carrier in the ordinary course of its business under its tariff and being used by the subscriber or user in the ordinary course of its business; or (b) being used by a communications common carrier in the ordinary course of its business.

4. The term "interception" means to secretly hear, secretly record, or aid another to secretly hear or secretly record the contents of any wire or oral communication through the use of any intercepting device by any person other than a person given prior authority by all parties to such communication; provided that it shall not constitute an interception for an investigative or law enforcement officer, as defined in this section, to record or transmit a wire or oral communication if the officer is a party to such communication or has been given prior authorization to record or transmit the communication by such a party and if recorded or transmitted in the course of an investigation of a designated offense as defined herein.

5. The term "contents", when used with respect to any wire or oral communication, means any information concerning the identity of the parties to such communication or the existence, contents, substance, purport, or meaning of that communication.

6. The term "aggrieved person" means any individual who was a party to an intercepted wire or oral communication or who was named in the warrant authorizing the interception, or who would otherwise have standing to complain that his personal or

property interest or privacy was invaded in the course of an interception.

7. The term "designated offense" shall include the following offenses in connection with organized crime as defined in the preamble: arson, assault and battery with a dangerous weapon, extortion, bribery, burglary, embezzlement, forgery, gaming in violation of <u>section seventeen of chapter two hundred and seventy-one of the general laws</u>, intimidation of a witness or juror, kidnapping, larceny, lending of money or things of value in violation of the general laws, mayhem, murder, any offense involving the possession or sale of a narcotic or harmful drug, perjury, prostitution, robbery, subornation of perjury, any violation of this section, being an accessory to any of the foregoing offenses and conspiracy or attempt or solicitation to commit any of the foregoing offenses.

8. The term "investigative or law enforcement officer" means any officer of the United States, a state or a political subdivision of a state, who is empowered by law to conduct investigations of, or to make arrests for, the designated offenses, and any attorney authorized by law to participate in the prosecution of such offenses.

9. The term "judge of competent jurisdiction" means any justice of the superior court of the commonwealth.

10. The term "chief justice" means the chief justice of the superior court of the commonwealth.

11. The term "issuing judge" means any justice of the superior court who shall issue a warrant as provided herein or in the event of his disability or unavailability any other judge of competent jurisdiction designated by the chief justice.

12. The term "communication common carrier" means any person engaged as a common carrier in providing or operating wire communication facilities.

13. The term "person" means any individual, partnership, association, joint stock company, trust, or corporation, whether or not any of the foregoing is an officer, agent or employee of the United States, a state, or a political subdivision of a state.

14. The terms "sworn" or "under oath" as they appear in this section shall mean an oath or affirmation or a statement subscribed to under the pains and penalties of

perjury.

15. The terms "applicant attorney general" or "applicant district attorney" shall mean the attorney general of the commonwealth or a district attorney of the commonwealth who has made application for a warrant pursuant to this section.

16. The term "exigent circumstances" shall mean the showing of special facts to the issuing judge as to the nature of the investigation for which a warrant is sought pursuant to this section which require secrecy in order to obtain the information desired from the interception sought to be authorized.

17. The term "financial institution" shall mean a bank, as defined in section 1 of chapter 167, and an investment bank, securities broker, securities dealer, investment adviser, mutual fund, investment company or securities custodian as defined in section 1.165-12(c)(1) of the United States Treasury regulations.

18. The term "corporate and institutional trading partners" shall mean financial institutions and general business entities and corporations which engage in the business of cash and asset management, asset management directed to custody operations, securities trading, and wholesale capital markets including foreign exchange, securities lending, and the purchase, sale or exchange of securities, options, futures, swaps, derivatives, repurchase agreements and other similar financial instruments with such financial institution.

C. Offenses.

1. Interception, oral communications prohibited.

Except as otherwise specifically provided in this section any person who--

willfully commits an interception, attempts to commit an interception, or procures any other person to commit an interception or to attempt to commit an interception of any wire or oral communication shall be fined not more than ten thousand dollars, or imprisoned in the state prison for not more than five years, or imprisoned in a jail or house of correction for not more than two and one half years, or both so fined and given one such imprisonment.

Proof of the installation of any intercepting device by any person under circumstances evincing an intent to commit an interception, which is not authorized or permitted by this section, shall be prima facie evidence of a violation of this subparagraph.

2. Editing of tape recordings in judicial proceeding prohibited.

Except as otherwise specifically provided in this section any person who willfully edits, alters or tampers with any tape, transcription or recording of oral or wire communications by any means, or attempts to edit, alter or tamper with any tape, transcription or recording of oral or wire communications by any means with the intent to present in any judicial proceeding or proceeding under oath, or who presents such recording or permits such recording to be presented in any judicial proceeding or proceeding under oath, without fully indicating the nature of the changes made in the original state of the recording, shall be fined not more than ten thousand dollars or imprisoned in the state prison for not more than five years or imprisoned in a jail or house of correction for not more than two years or both so fined and given one such imprisonment.

3. Disclosure or use of wire or oral communications prohibited.

Except as otherwise specifically provided in this section any person who--

a. willfully discloses or attempts to disclose to any person the contents of any wire or oral communication, knowing that the information was obtained through interception; or

b. willfully uses or attempts to use the contents of any wire or oral communication, knowing that the information was obtained through interception, shall be guilty of a misdemeanor punishable by imprisonment in a jail or a house of correction for not more than two years or by a fine of not more than five thousand dollars or both.

4. Disclosure of contents of applications, warrants, renewals, and returns prohibited.

Except as otherwise specifically provided in this section any person who--

willfully discloses to any person, any information concerning or contained in, the

application for, the granting or denial of orders for interception, renewals, notice or return on an ex parte order granted pursuant to this section, or the contents of any document, tape, or recording kept in accordance with paragraph N, shall be guilty of a misdemeanor punishable by imprisonment in a jail or a house of correction for not more than two years or by a fine of not more than five thousand dollars or both.

5. Possession of interception devices prohibited.

A person who possesses any intercepting device under circumstances evincing an intent to commit an interception not permitted or authorized by this section, or a person who permits an intercepting device to be used or employed for an interception not permitted or authorized by this section, or a person who possesses an intercepting device knowing that the same is intended to be used to commit an interception not permitted or authorized by this section, shall be guilty of a misdemeanor punishable by imprisonment in a jail or house of correction for not more than two years or by a fine of not more than five thousand dollars or both.

The installation of any such intercepting device by such person or with his permission or at his direction shall be prima facie evidence of possession as required by this subparagraph.

6. Any person who permits or on behalf of any other person commits or attempts to commit, or any person who participates in a conspiracy to commit or to attempt to commit, or any accessory to a person who commits a violation of subparagraphs 1 through 5 of paragraph C of this section shall be punished in the same manner as is provided for the respective offenses as described in subparagraphs 1 through 5 of paragraph C.

D. Exemptions.

1. Permitted interception of wire or oral communications.

It shall not be a violation of this section--

a. for an operator of a switchboard, or an officer, employee, or agent of any communication common carrier, whose facilities are used in the transmission of a wire communication, to intercept, disclose, or use that communication in the normal

course of his employment while engaged in any activity which is a necessary incident to the rendition of service or to the protection of the rights or property of the carrier of such communication, or which is necessary to prevent the use of such facilities in violation of section fourteen A of chapter two hundred and sixty-nine of the general laws; provided, that said communication common carriers shall not utilize service observing or random monitoring except for mechanical or service quality control checks.

b. for persons to possess an office intercommunication system which is used in the ordinary course of their business or to use such office intercommunication system in the ordinary course of their business.

c. for investigative and law enforcement officers of the United States of America to violate the provisions of this section if acting pursuant to authority of the laws of the United States and within the scope of their authority.

d. for any person duly authorized to make specified interceptions by a warrant issued pursuant to this section.

e. for investigative or law enforcement officers to violate the provisions of this section for the purposes of ensuring the safety of any law enforcement officer or agent thereof who is acting in an undercover capacity, or as a witness for the commonwealth; provided, however, that any such interception which is not otherwise permitted by this section shall be deemed unlawful for purposes of paragraph P.

f. for a financial institution to record telephone communications with its corporate or institutional trading partners in the ordinary course of its business; provided, however, that such financial institution shall establish and maintain a procedure to provide semi-annual written notice to its corporate and institutional trading partners that telephone communications over designated lines will be recorded.

2. Permitted disclosure and use of intercepted wire or oral communications.

a. Any investigative or law enforcement officer, who, by any means authorized by this section, has obtained knowledge of the contents of any wire or oral communication, or evidence derived therefrom, may disclose such contents or evidence in the proper performance of his official duties.

48

b. Any investigative or law enforcement officer, who, by any means authorized by this section has obtained knowledge of the contents of any wire or oral communication, or evidence derived therefrom, may use such contents or evidence in the proper performance of his official duties.

c. Any person who has obtained, by any means authorized by this section, knowledge of the contents of any wire or oral communication, or evidence derived therefrom, may disclose such contents while giving testimony under oath or affirmation in any criminal proceeding in any court of the United States or of any state or in any federal or state grand jury proceeding.

d. The contents of any wire or oral communication intercepted pursuant to a warrant in accordance with the provisions of this section, or evidence derived therefrom, may otherwise be disclosed only upon a showing of good cause before a judge of competent jurisdiction.

e. No otherwise privileged wire or oral communication intercepted in accordance with, or in violation of, the provisions of this section shall lose its privileged character.

E. Warrants: when issuable:

A warrant may issue only:

1. Upon a sworn application in conformity with this section; and

2. Upon a showing by the applicant that there is probable cause to believe that a designated offense has been, is being, or is about to be committed and that evidence of the commission of such an offense may thus be obtained or that information which will aid in the apprehension of a person who the applicant has probable cause to believe has committed, is committing, or is about to commit a designated offense may thus be obtained; and

3. Upon a showing by the applicant that normal investigative procedures have been tried and have failed or reasonably appear unlikely to succeed if tried.

49

F. Warrants: application.

1. Application. The attorney general, any assistant attorney general specially designated by the attorney general, any district attorney, or any assistant district attorney specially designated by the district attorney may apply ex parte to a judge of competent jurisdiction for a warrant to intercept wire or oral communications. Each application ex parte for a warrant must be in writing, subscribed and sworn to by the applicant authorized by this subparagraph.

2. The application must contain the following:

a. A statement of facts establishing probable cause to believe that a particularly described designated offense has been, is being, or is about to be committed; and

b. A statement of facts establishing probable cause to believe that oral or wire communications of a particularly described person will constitute evidence of such designated offense or will aid in the apprehension of a person who the applicant has probable cause to believe has committed, is committing, or is about to commit a designated offense; and

c. That the oral or wire communications of the particularly described person or persons will occur in a particularly described place and premises or over particularly described telephone or telegraph lines; and

d. A particular description of the nature of the oral or wire communications sought to be overheard; and

e. A statement that the oral or wire communications sought are material to a particularly described investigation or prosecution and that such conversations are not legally privileged; and

f. A statement of the period of time for which the interception is required to be maintained. If practicable, the application should designate hours of the day or night during which the oral or wire communications may be reasonably expected to occur. If the nature of the investigation is such that the authorization for the interception should not automatically terminate when the described oral or wire communications have been first obtained, the application must specifically state facts establishing

probable cause to believe that additional oral or wire communications of the same nature will occur thereafter; and

g. If it is reasonably necessary to make a secret entry upon a private place and premises in order to install an intercepting device to effectuate the interception, a statement to such effect; and

h. If a prior application has been submitted or a warrant previously obtained for interception of oral or wire communications, a statement fully disclosing the date, court, applicant, execution, results, and present status thereof; and

i. If there is good cause for requiring the postponement of service pursuant to paragraph L, subparagraph 2, a description of such circumstances, including reasons for the applicant's belief that secrecy is essential to obtaining the evidence or information sought.

3. Allegations of fact in the application may be based either upon the personal knowledge of the applicant or upon information and belief. If the applicant personally knows the facts alleged, it must be so stated. If the facts establishing such probable cause are derived in whole or part from the statements of persons other than the applicant, the sources of such information and belief must be either disclosed or described; and the application must contain facts establishing the existence and reliability of any informant and the reliability of the information supplied by him. The application must also state, so far as possible, the basis of the informant's knowledge or belief. If the applicant's information and belief is derived from tangible evidence or recorded oral evidence, a copy or detailed description thereof should be annexed to or included in the application. Affidavits of persons other than the applicant may be submitted in conjunction with the application if they tend to support any fact or conclusion alleged therein. Such accompanying affidavits may be based either on personal knowledge of the affiant or information and belief, with the source thereof, and reason therefor, specified.

G. Warrants: application to whom made.

Application for a warrant authorized by this section must be made to a judge of competent jurisdiction in the county where the interception is to occur, or the county where the office of the applicant is located, or in the event that there is no judge of

competent jurisdiction sitting in said county at such time, to a judge of competent jurisdiction sitting in Suffolk County; except that for these purposes, the office of the attorney general shall be deemed to be located in Suffolk County.

H. Warrants: application how determined.

1. If the application conforms to paragraph F, the issuing judge may examine under oath any person for the purpose of determining whether probable cause exists for the issuance of the warrant pursuant to paragraph E. A verbatim transcript of every such interrogation or examination must be taken, and a transcription of the same, sworn to by the stenographer, shall be attached to the application and be deemed a part thereof.

2. If satisfied that probable cause exists for the issuance of a warrant the judge may grant the application and issue a warrant in accordance with paragraph *I*. The application and an attested copy of the warrant shall be retained by the issuing judge and transported to the chief justice of the superior court in accordance with the provisions of paragraph N of this section.

3. If the application does not conform to paragraph F, or if the judge is not satisfied that probable cause has been shown sufficient for the issuance of a warrant, the application must be denied.

*I*. Warrants: form and content.

A warrant must contain the following:

1. The subscription and title of the issuing judge; and

2. The date of issuance, the date of effect, and termination date which in no event shall exceed thirty days from the date of effect. The warrant shall permit interception of oral or wire communications for a period not to exceed fifteen days. If physical installation of a device is necessary, the thirty-day period shall begin upon the date of installation. If the effective period of the warrant is to terminate upon the acquisition of particular evidence or information or oral or wire communication, the warrant shall so provide; and

3. A particular description of the person and the place, premises or telephone or telegraph line upon which the interception may be conducted; and

4. A particular description of the nature of the oral or wire communications to be obtained by the interception including a statement of the designated offense to which they relate; and

5. An express authorization to make secret entry upon a private place or premises to install a specified intercepting device, if such entry is necessary to execute the warrant; and

6. A statement providing for service of the warrant pursuant to paragraph L except that if there has been a finding of good cause shown requiring the postponement of such service, a statement of such finding together with the basis therefor must be included and an alternative direction for deferred service pursuant to paragraph L, subparagraph 2.

J. Warrants: renewals.

1. Any time prior to the expiration of a warrant or a renewal thereof, the applicant may apply to the issuing judge for a renewal thereof with respect to the same person, place, premises or telephone or telegraph line. An application for renewal must incorporate the warrant sought to be renewed together with the application therefor and any accompanying papers upon which it was issued. The application for renewal must set forth the results of the interceptions thus far conducted. In addition, it must set forth present grounds for extension in conformity with paragraph F, and the judge may interrogate under oath and in such an event a transcript must be provided and attached to the renewal application in the same manner as is set forth in sub-paragraph 1 of paragraph H.

2. Upon such application, the judge may issue an order renewing the warrant and extending the authorization for a period not exceeding fifteen (15) days from the entry thereof. Such an order shall specify the grounds for the issuance thereof. The application and an attested copy of the order shall be retained by the issuing judge to be transported to the chief justice in accordance with the provisions of subparagraph N of this section. In no event shall a renewal be granted which shall terminate later than two years following the effective date of the warrant.

K. Warrants: manner and time of execution.

1. A warrant may be executed pursuant to its terms anywhere in the commonwealth.

2. Such warrant may be executed by the authorized applicant personally or by any investigative or law enforcement officer of the commonwealth designated by him for the purpose.

3. The warrant may be executed according to its terms during the hours specified therein, and for the period therein authorized, or a part thereof. The authorization shall terminate upon the acquisition of the oral or wire communications, evidence or information described in the warrant. Upon termination of the authorization in the warrant and any renewals thereof, the interception must cease at once, and any device installed for the purpose of the interception must be removed as soon thereafter as practicable. Entry upon private premises for the removal of such device is deemed to be authorized by the warrant.

L. Warrants: service thereof.

1. Prior to the execution of a warrant authorized by this section or any renewal thereof, an attested copy of the warrant or the renewal must, except as otherwise provided in subparagraph 2 of this paragraph, be served upon a person whose oral or wire communications are to be obtained, and if an intercepting device is to be installed, upon the owner, lessee, or occupant of the place or premises, or upon the subscriber to the telephone or owner or lessee of the telegraph line described in the warrant.

2. If the application specially alleges exigent circumstances requiring the postponement of service and the issuing judge finds that such circumstances exist, the warrant may provide that an attested copy thereof may be served within thirty days after the expiration of the warrant or, in case of any renewals thereof, within thirty days after the expiration of the last renewal; except that upon a showing of important special facts which set forth the need for continued secrecy to the satisfaction of the issuing judge, said judge may direct that the attested copy of the warrant be served on such parties as are required by this section at such time as may be appropriate in the circumstances but in no event may he order it to be served later than three (3)

years from the time of expiration of the warrant or the last renewal thereof. In the event that the service required herein is postponed in accordance with this paragraph, in addition to the requirements of any other paragraph of this section, service of an attested copy of the warrant shall be made upon any aggrieved person who should reasonably be known to the person who executed or obtained the warrant as a result of the information obtained from the interception authorized thereby.

3. The attested copy of the warrant shall be served on persons required by this section by an investigative or law enforcement officer of the commonwealth by leaving the same at his usual place of abode, or in hand, or if this is not possible by mailing the same by certified or registered mail to his last known place of abode. A return of service shall be made to the issuing judge, except, that if such service is postponed as provided in subparagraph 2 of paragraph L, it shall be made to the chief justice. The return of service shall be deemed a part of the return of the warrant and attached thereto.

M. Warrant: return.

Within seven days after termination of the warrant or the last renewal thereof, a return must be made thereon to the judge issuing the warrant by the applicant therefor, containing the following:

a. a statement of the nature and location of the communications facilities, if any, and premise or places where the interceptions were made; and

b. the periods of time during which such interceptions were made; and

c. the names of the parties to the communications intercepted if known; and

d. the original recording of the oral or wire communications intercepted, if any; and

e. a statement attested under the pains and penalties of perjury by each person who heard oral or wire communications as a result of the interception authorized by the warrant, which were not recorded, stating everything that was overheard to the best of his recollection at the time of the execution of the statement.

N. Custody and secrecy of papers and recordings made pursuant to a warrant.

1. The contents of any wire or oral communication intercepted pursuant to a warrant issued pursuant to this section shall, if possible, be recorded on tape or wire or other similar device. Duplicate recordings may be made for use pursuant to subparagraphs 2 (a) and (b) of paragraph D for investigations. Upon examination of the return and a determination that it complies with this section, the issuing judge shall forthwith order that the application, all renewal applications, warrant, all renewal orders and the return thereto be transmitted to the chief justice by such persons as he shall designate. Their contents shall not be disclosed except as provided in this section. The application, renewal applications, warrant, the renewal order and the return or any one of them or any part of them may be transferred to any trial court, grand jury proceeding of any jurisdiction by any law enforcement or investigative officer or court officer designated by the chief justice and a trial justice may allow them to be disclosed in accordance with paragraph D, subparagraph 2, or paragraph O or any other applicable provision of this section.

The application, all renewal applications, warrant, all renewal orders and the return shall be stored in a secure place which shall be designated by the chief justice, to which access shall be denied to all persons except the chief justice or such court officers or administrative personnel of the court as he shall designate.

2. Any violation of the terms and conditions of any order of the chief justice, pursuant to the authority granted in this paragraph, shall be punished as a criminal contempt of court in addition to any other punishment authorized by law.

3. The application, warrant, renewal and return shall be kept for a period of five (5) years from the date of the issuance of the warrant or the last renewal thereof at which time they shall be destroyed by a person designated by the chief justice. Notice prior to the destruction shall be given to the applicant attorney general or his successor or the applicant district attorney or his successor and upon a showing of good cause to the chief justice, the application, warrant, renewal, and return may be kept for such additional period as the chief justice shall determine but in no event longer than the longest period of limitation for any designated offense specified in the warrant, after which time they must be destroyed by a person designated by the chief justice.

O. Introduction of evidence.

1. Notwithstanding any other provisions of this section or any order issued pursuant thereto, in any criminal trial where the commonwealth intends to offer in evidence any portions of the contents of any interception or any evidence derived therefrom the defendant shall be served with a complete copy of each document and item which make up each application, renewal application, warrant, renewal order, and return pursuant to which the information was obtained, except that he shall be furnished a copy of any recording instead of the original. The service must be made at the arraignment of the defendant or, if a period in excess of thirty (30) days shall elapse prior to the commencement of the trial of the defendant, the service may be made at least thirty (30) days before the commencement of the criminal trial. Service shall be made in hand upon the defendant or his attorney by any investigative or law enforcement officer of the commonwealth. Return of the service required by this subparagraph including the date of service shall be entered into the record of trial of the defendant by the commonwealth and such return shall be deemed prima facie evidence of the service described therein. Failure by the commonwealth to make such service at the arraignment, or if delayed, at least thirty days before the commencement of the criminal trial, shall render such evidence illegally obtained for purposes of the trial against the defendant; and such evidence shall not be offered nor received at the trial notwithstanding the provisions of any other law or rules of court.

2. In any criminal trial where the commonwealth intends to offer in evidence any portions of a recording or transmission or any evidence derived therefrom, made pursuant to the exceptions set forth in paragraph B, subparagraph 4, of this section, the defendant shall be served with a complete copy of each recording or a statement under oath of the evidence overheard as a result of the transmission. The service must be made at the arraignment of the defendant or if a period in excess of thirty days shall elapse prior to the commencement of the trial of the defendant, the service may be made at least thirty days before the commencement of the criminal trial. Service shall be made in hand upon the defendant or his attorney by any investigative or law enforcement officer of the commonwealth. Return of the service required by this subparagraph including the date of service shall be entered into the record of trial of the defendant by the commonwealth and such return shall be deemed prima facie evidence of the service described therein. Failure by the commonwealth to make such service at the arraignment, or if delayed at least thirty days before the commencement of the criminal trial, shall render such service illegally obtained for purposes of the trial against the defendant and such evidence shall not be offered nor

received at the trial notwithstanding the provisions of any other law or rules of court.

P. Suppression of evidence.

Any person who is a defendant in a criminal trial in a court of the commonwealth may move to suppress the contents of any intercepted wire or oral communication or evidence derived therefrom, for the following reasons:

1. That the communication was unlawfully intercepted.

2. That the communication was not intercepted in accordance with the terms of this section.

3. That the application or renewal application fails to set forth facts sufficient to establish probable cause for the issuance of a warrant.

4. That the interception was not made in conformity with the warrant.

5. That the evidence sought to be introduced was illegally obtained.

6. That the warrant does not conform to the provisions of this section.

Q. Civil remedy.

Any aggrieved person whose oral or wire communications were intercepted, disclosed or used except as permitted or authorized by this section or whose personal or property interests or privacy were violated by means of an interception except as permitted or authorized by this section shall have a civil cause of action against any person who so intercepts, discloses or uses such communications or who so violates his personal, property or privacy interest, and shall be entitled to recover from any such person--

1. actual damages but not less than liquidated damages computed at the rate of $100 per day for each day of violation or $1000, whichever is higher;

2. punitive damages; and

3. a reasonable attorney's fee and other litigation disbursements reasonably incurred. Good faith reliance on a warrant issued under this section shall constitute a complete defense to an action brought under this paragraph.

R. Annual report of interceptions of the general court.

On the second Friday of January, each year, the attorney general and each district attorney shall submit a report to the general court stating (1) the number of applications made for warrants during the previous year, (2) the name of the applicant, (3) the number of warrants issued, (4) the effective period for the warrants, (5) the number and designation of the offenses for which those applications were sought, and for each of the designated offenses the following: (a) the number of renewals, (b) the number of interceptions made during the previous year, (c) the number of indictments believed to be obtained as a result of those interceptions, (d) the number of criminal convictions obtained in trials where interception evidence or evidence derived therefrom was introduced. This report shall be a public document and be made available to the public at the offices of the attorney general and district attorneys. In the event of failure to comply with the provisions of this paragraph any person may compel compliance by means of an action of mandamus.

CREDIT(S)

Amended by St.1959, c. 449, § 1; St.1968, c. 738, § 1; St.1986, c. 557, § 199; St.1993, c. 432, § 13; St.1998, c. 163, §§ 7, 8.

Federal Rules of Evidence Rule 701, 28 U.S.C.A.

United States Code Annotated Currentness
Rules of Evidence for United States Courts and Magistrates (Refs & Annos)
Article VII. Opinions and Expert Testimony
**Rule 701. Opinion Testimony by Lay Witnesses**

If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

CREDIT(S)

(Pub.L. 93-595, § 1, Jan. 2, 1975, 88 Stat.1937; Mar. 2, 1987, eff. Oct. 1, 1987; Apr. 17, 2000, eff. Dec. 1, 2000.)

60

Westlaw.

Federal Rules of Evidence Rule 702, 28 U.S.C.A.                                                    Page 1

**C**
United States Code Annotated <u>Currentness</u>
  Rules of Evidence for United States Courts and Magistrates <u>(Refs & Annos)</u>
    ▦ <u>Article VII</u>. Opinions and Expert Testimony
      → **Rule 702. Testimony by Experts**

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

CREDIT(S)

(<u>Pub.L. 93-595</u>, § 1, Jan. 2, 1975, 88 Stat. 1937; Apr. 17, 2000, eff. Dec. 1, 2000.)

THE COMMONWEALTH OF MASSACHUSETTS
OFFICE OF THE
DISTRICT ATTORNEY FOR THE ESSEX DISTRICT
SALEM          NEWBURYPORT          LAWRENCE

**JONATHAN W. BLODGETT**
District Attorney

Museum Place
Two East India Square
Salem, Massachusetts  01970

TELEPHONE
SALEM    (978)745-6610
FAX      (978)741-4971
TTY      (978)741-3163

October 29, 2003

John T. Dawley
Brian T. O'Keefe
Alexander R. Cain
Assistant District Attorney's
Essex County District Attorney's Office
Two East India Square
Salem, MA 01970

Dear Mr. Dawley, O'Keefe and Cain:

I hereby specially designate you to make application pursuant to Massachusetts General Laws, Chapter 272, Section 99, for an interception warrant, and to make applications for any amendments, renewals and extensions thereof, to intercept certain wire communications of Dennis Albertelli, Salvatore Ramasci and Arthur Gianelli and their associates occurring over telephones numbered (781) 710-2154, (978) 758-8575 and (617) 571-8262.

I further authorize and designate you to personally make presentment to a justice of competent jurisdiction of the application for the interception warrant, as well as all extension and renewal applications, amendment applications, status reports, and return documents emanating from the above-mentioned interception warrant.  I or my designee will personally review all of the above-mentioned documents before you present them.

I further delegate to you the responsibility of supervising the execution of the requested interception warrant.

Sincerely,

Jonathan W. Blodgett
District Attorney



THE COMMONWEALTH OF MASSACHUSETTS
OFFICE OF THE
DISTRICT ATTORNEY FOR THE ESSEX DISTRICT
SALEM        NEWBURYPORT        LAWRENCE

JONATHAN W. BLODGETT
District Attorney

Museum Place
Two East India Square
Salem, Massachusetts 01970

TELEPHONE
SALEM    (978)745-6610
FAX      (978)741-4971
TTY      (978)741-3163



October 30, 2003

Honorable Richard Welch
Associate Justice of the Supreme Court

Dear Justice Welch:

I have specially designated First Assistant District Attorney John T. Dawley and Assistant District Attorneys Brian T. O'Keefe and Alexander R. Cain, pursuant to Massachusetts General Laws, Chapter 272, Section 99, to make application for an interception warrant, and any amendments, renewals and extensions thereof, to intercept certain wire communications of Dennis Albertelli, Salvatore Ramasci and Arthur Gianelli and their associates occurring over telephone numbers (781) 710-2154, (978) 758-8575 and (617) 571-8262.

I have authorized and designated First Assistant District Attorney John T. Dawley and Assistant District Attorneys Brian T. O'Keefe and Alexander R. Cain to personally make presentment to the Court of the attached application, as well as all extension and renewal applications, all amendment applications, all status reports, and all return documents emanating from the interception warrant, all of which shall be reviewed by me or my designee before being presented to you.

I have further delegated First Assistant District Attorney John T. Dawley and Assistant District Attorneys O'Keefe and Cain the responsibility of supervising the execution of the interception warrant. A copy of my letter to First Assistant District Attorney John T. Dawley and Assistant District Attorneys O'Keefe and Cain is attached hereto.

Sincerely,

Jonathan W. Blodgett
District Attorney



## COMMONWEALTH OF MASSACHUSETTS

Essex, ss.
                                      Trial Court of Massachusetts
                                      Superior Court Department


### APPLICATION FOR AN ORDER AND WARRANT PURSUANT TO MASSACHUSETTS GENERAL LAWS, CHAPTER 272, SECTION 99, AUTHORIZING THE INTERCEPTION OF CERTAIN WIRE COMMUNICATIONS

We, John T. Dawley, Brian T. O'Keefe and Alexander R. Cain, hereby swear under the pains and penalties of perjury that the following facts are true to the best of our knowledge and belief:

We, John T. Dawley, Brian T. O'Keefe and Alexander R. Cain, Assistant District Attorneys for the Commonwealth of Massachusetts, hereby make application for a warrant to intercept wire communications pursuant to the provisions of Massachusetts General Laws, Chapter 272, section 99. In support of this application, we submit the following:

1.    We are the Assistant District Attorneys within the meaning of General Laws Chapter 272, Section 99(F)(1) in that, by means of a letter dated October 29, 2003, the duly elected District Attorney for the Eastern District of the Commonwealth of Massachusetts, has specially designated us to make application ex parte to a judge of competent jurisdiction for an order and warrant to intercept certain wire communications pursuant to the provisions of Massachusetts General Laws, Chapter 272, section 99.

2.    That, upon our information and belief, there is probable cause to believe that one or more organized and continuing conspiracies, as described below, exist in the Eastern District (also known as Essex County) and, in particular, in the Town of Lynnfield, and elsewhere to supply illegal services relating to the registering of bets by the commission of violations of Massachusetts General Laws, Chapter 271, Section 17, and that the persons who participate in, control and organize said conspiracies and reap the profits from the same have insulated themselves from apprehension and prosecution by using others to conduct the illegal activities of the organization and/or conducting the illegal activities of the organization in a clandestine manner.

Further, that these conspiracies in Essex County utilize:

a.    Telephone numbered (781) 710-2154 which according to the records of Verizon Wireless, Inc., is a cellular telephone subscribed to by Dennis Albertelli with a billing address of 151 Hudson Road, Stow, Massachusetts;

b.    (978) 758-8575 which according to the records of Verizon Wireless, Inc., is a cellular telephone subscribed to by Dennis Albertelli with a billing address of 151 Hudson Road.

Stow, Massachusetts;

c.    (617) 571-8262 which according to the records of Verizon Wireless, Inc., is a cellular telephone subscribed to by Dennis Albertelli with a billing address of 151 Hudson Road, Stow, Massachusetts;

In order to discover the full extent to which these conspiracies relate to Essex County, and to gather sufficient evidence to identify, apprehend and successfully prosecute the participants in these conspiracies, the District Attorney has determined that as a matter of uniform law enforcement policy within Essex County, the authorization of this wiretap is proper, is required, and is consistent with his overall policy of eliminating the operation of conspiracies to supply services relating to registering of bets in violation of General Laws Chapter 271, §17.

3.    Based upon the facts contained herein and in the Affidavit of Trooper Nunzio S. Orlando of the Massachusetts State Police which is attached hereto and incorporated herein for all purposes (see attached Affidavit), and the reasonable inferences derived therefrom, we believe that designated offenses, namely, organized and controlled violations of Massachusetts General Laws Chapter 271, §17, relating to gaming and conspiracy to commit the same, have been committed, are being committed, and will continue to be committed by Dennis Albertelli, Salvatore Ramasci and Arthur Gianelli and other persons whose identities are as of yet unknown.

Further, based on the facts contained in the aforementioned Affidavit by Trooper Orlando, we believe that there is probable cause to believe that the above named Dennis Albertelli, Salvatore Ramasci and Arthur Gianelli together with other persons whose identities are as yet unknown, are using the aforementioned telephone numbers (781) 710-2154, (978) 758-8575 and (617) 571-8262 in connection with, to accomplish, to discuss, and/or otherwise commit or conspire to commit the above-described designated offenses.

4.    We believe that intercepting the wire communications of Dennis Albertelli, Salvatore Ramasci and Arthur Gianelli and their associates as they occur over the aforementioned telephones will yield material evidence that the aforementioned designated offenses have been committed, are being committed, and will continue to be committed. Further, we believe that the interception of these communications will also aid in the identification, apprehension and prosecution of those engaged with Dennis Albertelli, Salvatore Ramasci and Arthur Gianelli in the commission of the designated offenses who are as of now unknown to the applicants. The factual basis of such probable cause is provided in the attached Affidavit by Trooper Orlando. Some of the inferences and conclusions that can be derived from the Affidavit are as follows:

(a)    That the aforementioned Dennis Albertelli, Salvatore Ramasci and Arthur Gianelli and others participate in an organized conspiracy relating to gaming and conspiring to commit the same.

(b)    These persons are actively involved in such a group or groups as shown by the

facts and information set forth in the attached Affidavit of Trooper Nunzio S. Orlando; and

(c)     These persons utilize the telephone lines during the commission of the designated offenses. We further believe that these communications are not legally privileged and are material to the investigation and intended prosecution of Dennis Albertelli, Salvatore Ramasci and Arthur Gianelli and others for the foregoing designated offenses; and

(d)     These persons are members of one or more highly organized groups which would be necessary to implement this criminal conspiracy.

5.     Authority is sought to utilize dial number recorders, voice recorders, pen-register and cross-frame trap and Caller ID devices, which are types of intercepting devices, to intercept and record wire communications occurring over telephone numbers (781) 710-2154, (978) 758-8575 and (617) 571-8262. Said communications would include those particular communications which concern the following:

(a)     Communications concerning the operation of an illegal gaming operation;

(b)     Communications concerning the receipt and registration of wagers or bets upon the results of trials or contests of skill, speed or endurance of man or beast;

(c)     Communications concerning the receiving and furnishing of the results of events or contests, and the requesting, receiving and furnishing of the lines or odds pending events or contests;

(d)     Discussions of amounts of moneys owed or due, and the arrangements for the collection, payoff, and delivery of moneys related to said illegal gaming wagers and operation;

(e)     Communications which reveal the identities of those individuals who are involved in this illegal gaming operation;

(f)     Communications concerning the arrangement of loan payments and the manner in which the proceeds of the illegal profits of this gaming operation are stored, hidden, invested, used or spent;

(g)     Communications concerning the planning and security methods of this illegal gaming operation.

Such communications are not legally privileged and are material to this investigation of violations of G.L. c. 271 §17, and conspiracy or attempt or solicitation to commit the same, or being an accessory to the foregoing "designated offenses" (as defined in Section 99 of Chapter 272 of the General Laws).

6.     . The communications which are sought to be intercepted are material to the investigation and intended prosecution of Dennis Albertelli, Salvatore Ramasci and Arthur Gianelli and their as of yet unknown associates involved in these illegal activities.

7.    As set forth in the attached Affidavit of Trooper Orlando, normal investigative procedures have been utilized, and continue to be utilized in an effort to gather sufficient evidence to successfully identify and prosecute all of the participants in the conspiracies which have been detailed in Trooper Orlando attached affidavit. However, these normal investigative procedures have been utilized with limited success and those which have not been tried appear unlikely to succeed, if tried. Attempts to make further clandestine observations and any further attempt to infiltrate these conspiracies would be extremely difficult and hazardous, would most likely result in the compromise of this investigation, and would jeopardize the safety of the officers conducting the investigation and the people identified in Trooper Orlando affidavit as cooperating with the investigating officers.

Investigating officers have not yet been able to determine all of the locations, if any, to search for material evidence, such as records and moneys, which, without more, would bring about the successful prosecution of all the bosses and participants in the conspiracy, including Dennis Albertelli, Salvatore Ramasci and Arthur Gianelli.

Trooper Orlando has reported in his attached affidavit that there are several informants known to him who are willing to provide limited assistance in this investigation. However, they have stated that they are unwilling or unable to testify against Dennis Albertelli, Salvatore Ramasci and Arthur Gianelli and their associates, and they agreed to provide information to Trooper Orlando about Dennis Albertelli, Salvatore Ramasci and Arthur Gianelli and the illegal gaming operation only if their identities are not disclosed. These informants also possess limited information about the structure and operation of the gaming business and the many people involved in the various levels of the organization. As such, their knowledge is insufficient to successfully identify and prosecute all members of these conspiracies.

Calling the persons presently known or suspected to be associated with this gaming organization to testify before a Grand Jury at this time would likely cause the persons directly involved in these ongoing gaming activities to learn that their associates had been called before that body. Once the existence of the investigation was made known, it is very likely that the other members of the organizations would take steps to further insulate their activities from detection by law enforcement.

In summary, the only investigative method that is likely to succeed in identifying and gaining sufficient evidence against the members of these conspiracies and the bosses or persons in charge is the use of court authorized electronic surveillance. Furthermore, the investigation is at a point where it would be extremely difficult to gain sufficient competent evidence against these co-conspirators exclusively through the use of normal investigative procedures without, as previously stated, compromising and defeating the investigation.

8.    We request that electronic surveillance of the above-described communications be permitted for fifteen (15) days commencing on the date of the first interception made pursuant to

the Order and Warrant.

Analysis of similar gaming enterprises and surveillance to date, per the affidavit of Trooper Orlando, indicates that telephones numbered (781) 710-2154, (978) 758-8575 and (617) 571-8262 are likely to be used primarily between the hours of 6:00 a.m. and 12:00 a.m. As such, we request that the warrant initially authorize law enforcement officers to fully intercept, monitor, and record communications occurring over said telephones between the hours of 6:00 a.m. and 12:00 a.m. With respect to the time between 12:01 a.m. and 5:59 a.m., we request that the warrant initially authorize the use of pen register devices, cross-frame traps and Caller ID on said telephones for the limited purpose of generating records of the date, time and duration of calls occurring over said telephone lines, and determining the telephone numbers called from said telephones and used to call said telephones. Law enforcement officers will not monitor or record conversations occurring over said telephone between the hours of 12:01 a.m. and 5:59 a.m.

The termination of this warrant is, in no event, to exceed thirty (30) days from the date of effect on the Order and Warrant. The date of effect of the Order and Warrant, should such be granted, will be the date upon which the installation of the devices necessary to intercept communications is complete. It is anticipated that this installation will be completed within fifteen (15) days.

9.    The nature of this investigation is such that the authorization for interceptions should not automatically terminate when the above-described wire communications have first been obtained because the following facts, together with the inferences and conclusions drawn from them, establish probable cause to believe that additional wire communications of the same nature will occur thereafter:

(a)    It is clear from Trooper Orlando's attached affidavit that this organization involves people other than those persons using the aforementioned telephone. In order to determine the identity of these individuals and to obtain competent evidence of their conspiratorial acts, it will be necessary to intercept communications after the first wire communication has been intercepted.

(b)    It is clear that Dennis Albertelli, Salvatore Ramasci and Arthur Gianelli and other as of yet unidentified individuals are involved in a recurring pattern of illegal activities. There is probable cause to believe that this group of individuals will commit repeated violations of Chapter 271, Section 17, of the Massachusetts General Laws. For this reason, it is requested that the electronic surveillance not automatically terminate after the initial interception.

(c)    A purpose of the Legislature in authorizing applications such as this one is to enable law enforcement to pierce the layers of insulation of such a criminal organization so that the sources of supply, leadership and personnel of the

criminal organization may be apprehended for criminal prosecution. The automatic termination of the Order and Warrant after the first interception will not enable law enforcement to identify and apprehend the leadership and other members of this criminal conspiracy.

10.    As noted in Trooper Orlando attached affidavit, to the best of his knowledge, and to the best of the applicants' knowledge, there have been no prior applications submitted, or warrants issued pursuant to General Laws 272, Section 99, authorizing the interception of oral or wire communications of Dennis Albertelli, Salvatore Ramasci and Arthur Gianelli except as noted Trooper Orlando's affidavit in support of this affidavit.

11.    There is good cause for requiring the postponement of service under General Laws Chapter 272, Section 99(L)(2) because secrecy is essential to obtain the sought-after communications in that:

(a)    Dennis Albertelli, Salvatore Ramasci and Arthur Gianelli are closely associated with other persons who are now or will be co-conspirators and/or co-defendants in these illegal gaming conspiracies.

(b)    Since the wire communications to be intercepted likely will yield material evidence Dennis Albertelli, Salvatore Ramasci and Arthur Gianelli and others involved in the unlawful gaming activities, notice to them will compromise any interceptions in the future as well as this investigation.

(c)    If notice is not postponed, there is a great danger that this or other investigations will be jeopardized and lawful enforcement will be unable to pierce the layers of insulation and break down the wall of secrecy with which the persons involved in this gaming conspiracy have protected themselves.

(d)    The apprehension and successful prosecution of Dennis Albertelli, Salvatore Ramasci and Arthur Gianelli would not be likely to result in dismantling of the entire illegal gaming organization.

12.    For the above reasons, and upon facts sworn, it is hereby respectfully requested that the Court issue a wiretap Order and Warrant authorizing these applicants, Trooper Nunzio S. Orlando of the Massachusetts State Police and other designated officers to intercept, under the supervision of these applicants, those wire communications of Dennis Albertelli, Salvatore Ramasci and Arthur Gianelli and their associates, some of whom have not been identified, as they occur over telephones numbered (781) 710-2154, (978) 758-8575 and (617) 571-8262 within the limitations discussed above.

As set forth previously, District Attorney Blodgett has specially designated these applicants to act in this supervisory capacity and has delegated to these applicants the responsibility of supervising the execution of the requested wiretap warrant, should it be issued. Further, as set forth in the aforementioned letter, the District Attorney has authorized these

applicants to personally make presentment to the Court of this application, as well as all extension and renewal applications, all amendment applications, all status reports, and all return documents emanating from the requested wiretap warrant, all of which shall have been reviewed by District Attorney Blodgett or his designee before being presented by these applicants.

13.    It is also requested, as one of the necessary and proper systems to intercept communications, that this Court specifically authorize the use of pen registers or other similar devices which will generate written records of the numbers dialed from telephone numbered (781) 710-2154, (978) 758-8575 and (617) 571-8262. This type of device is built into the equipment used to intercept wire communications and is a necessary device in order to identify the persons with whom Dennis Albertelli, Salvatore Ramasci and Arthur Gianelli communicate in furtherance of their illegal gaming activities. Further, we request that the Court order Verizon Wireless, Inc. to provide lease lines and other technical equipment and assistance if such are necessary for the implementation of the Court's Order. It is also requested that the Court authorize the use of cross-frame traps, Caller ID or similar devices to trap and trace the numbers of telephones used to place calls to telephone numbered (781) 710-2154, (978) 758-8575 and (617) 571-8262 such being necessary and proper systems to aid law enforcement officers assigned to this investigation in identifying the persons communicating with Dennis Albertelli, Salvatore Ramasci and Arthur Gianelli. Finally, we request that Verizon Wireless, Inc. be ordered to provide subscriber information for telephones identified by the pen registers and cross-frame trap devices as being used to communicate with Dennis Albertelli, Salvatore Ramasci and Arthur Gianelli.

Signed under the pains and penalties of perjury this 30th day of October 2003.

JOHN T. DAWLEY
Special Designated Assistant
District Attorney for the
Eastern District of the
Commonwealth of Massachusetts

BRIAN T. O'KEEFE
Special Designated Assistant
District Attorney for the
Eastern District of the
Commonwealth of Massachusetts

ALEXANDER R. CAIN
Special Designated Assistant
District Attorney for the
Eastern District of the
Commonwealth of Massachusetts

Then appeared before me, John T. Dawley, First Assistant District Attorney, Brian T. O'Keefe and Alexander R. Cain, Assistant District Attorney's, and being duly sworn under oath under the pains and penalties of perjury that the statements contained herein are true to the best of their (Brian T. O'Keefe's and Alexander R. Cain's) knowledge, information and belief.

DATED this 30th day of October 2003

Associate Justice Richard Welch
Massachusetts Superior Court
Commonwealth of Massachusetts

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA

v

ARTHUR GIANELLI
MARYANN GIANELLI
FRANK IACOBONI                    Criminal No. 05-10003-NMG
PHILIP PUOPOLO
DENNIS ALBERTELLI
RANDY ALBERTELLI
GISELE ALBERTELLI
SALVATORE RAMASCI
RAFIA FEGHI and
JOSEPH YERARDI

I, Jonathan W. Blodgett, upon my oath, state as follows:

    1.   I hold office as the District Attorney for Essex County. As the District

Attorney, I am the principal prosecuting attorney for an application for an order

authorizing interception of oral communications pursuant to General Laws chapter 272,

section 99.

    2.   In October, 2003, I was made aware of an investigation by the Massachusetts

State Police of a gaming operation in Essex County. I assigned First Assistant John T.

Dawley and Assistant District Attorneys Brian O'Keefe and Alexander Cain to oversee

the investigation.

    3.   In late October, the assistants requested approval to apply for an order

authorizing interception of oral communications. Thereafter, prior to my approval to do

so, I reviewed draft copies of an affidavit setting forth the probable cause and an

application setting forth the statutory requirements defining how the order was to be implemented. I was satisfied that as a matter of uniform law enforcement policy within this jurisdiction, the initiation of a wiretap was proper and required. I was satisfied that the application and affidavit were in compliance with section 99.

4. On October 29, 2003 I specially designated First Assistant Dawley and Assistant District Attorneys O'Keefe and Cain as my designees to oversee the investigation and delegated to them the responsibility of applying for and supervising the execution of the intercept order and all renewals, amendments, status reports and returns.

5. After the initial order of October 31, renewals and /or amendments to the initial application occurred on November 13, November 26, December 12, December 23, December 31, 2003, January 9, January 26, January 30, February 10 and February 25, 2004. In each instance, the specially designated Assistants continued to oversee the investigation and supervised the execution of the orders.

6. I personally reviewed every renewal application and supporting affidavit.

7. I met on a regular basis with the specially designated Assistant District Attorneys to keep informed of developments of the investigation, including developmentally of the expansion of the investigation so as to include target telephones and persons for criminal conduct not initially mentioned in the initial application and supporting affidavit.

8. I intended for the specially designated Assistant District Attorneys to oversee the investigation in its entirety which I anticipated would include a number of target telephones and persons for criminal conduct set forth in latter applications that were not mentioned in the initial application and affidavit.

Signed under the penalties of perjury this 28 day of April, 2008

Jonathan W. Blodgett

| Type of allegation | This Case | Orlando's 2002 Affidavit | Russolillo's 2000 Affidavit |
|---|---|---|---|
| Generalized failings | "In my opinion, normal investigative procedures have been tried and have failed to gather sufficient evidence to (1) identify fully, apprehend and successfully prosecute [the targets and their co-conspirators]; (2) expose the full scope of the gaming activities of the persons involved in this organization, including [the targets]; (3) locate, seize and successfully forfeit the proceeds of the gaming activities; and (4) obtain competent evidence of the criminal activities of this organization.  A continued exclusive reliance of normal investigative procedures is unlikely to result in the collection of sufficient evidence to identify fully all of the [sic] those persons who participate in the various levels of this conspiracy, and to achieve the other goals of this investigation detailed above." Para. 68. | In my opinion, normal investigative procedures have been tried and have failed to gather sufficient evidence to (1) identify fully, apprehend and successfully prosecute [the targets and their co-conspirators]; (2) expose the full scope of the gaming activities and extortionate acts of the persons involved in this organization; (3) locate, seize and successfully forfeit the proceeds of the gaming activities; and (4) obtain competent evidence of the criminal activities of this organization. A continued exclusive reliance of normal investigative procedures is unlikely to result in the collection of sufficient evidence to identify fully all of the [sic] those persons who participate in the various levels of this conspiracy, and to achieve the other goals of this investigation detailed above."  Para. 53.  **Note that the same typo appears in both of Orlando's affidavit* | "In my opinion, normal investigative procedures  have been tried and have failed to gather sufficient evidence to (1) identify fully, apprehend and successfully prosecute [the targets and their co-conspirators]; (2) expose the full scope of the gaming activities of the persons involved in this organization, including [the targets]; (3) locate, seize and successfully forfeit the proceeds of the gaming activities; and (4) obtain competent evidence of the criminal activities of this organization." Para. 74.  "So, too, the continued exclusive reliance of normal investigative procedures is unlikely to result in the collection of sufficient evidence to identify fully all of  those persons who participate in the various levels of this conspiracy, and to achieve the other goals of this investigation detailed above." Para. 76. |
| First hand information | "As of this date, I know of no person willing to assist | "As of this date, I know of no person willing to assist | "To date, I know of no person willing to assist law enforcement in |

| | | |
|---|---|---|
| | law enforcement in this investigation who has sufficient first-hand information to bring about the achievement of the goals of this investigation based exclusively on normal investigative procedures." Para. 68. | law enforcement in this investigation who has sufficient first-hand information to bring about the achievement of the goals of this investigation based exclusively on normal investigative procedures." Para. 53. | this investigation who has sufficient first-hand information to bring about the achievement of the goals of this investigation based exclusively on normal investigative procedures." Para. 78. |
| **Informants** | "Although I continue to receive information from both of the informants discussed earlier in this affidavit, these informants are unable to penetrate into the organization to any significant degree. Also, it is my opinion that these informants do not possess sufficient first-hand information, and are unable to acquire sufficient first-hand information, through which the continued exclusive reliance on information received from them in conjunction with other normal investigative procedures is likely to result in the achievement of the goals of this investigation. Neither informant is familiar with the entire conspiracy. Moreover, these informants have provided cooperation and assistance on condition that their identities remain confidential and that they will not be compelled to testify against [the targets]. These informants have also stated that they will not wear any kind of electronic wire or bugging device on their person, due to their | "Although I continue to receive information from both of the informants discussed earlier in this affidavit, these informants are unable to penetrate into the organization to any significant degree. Also, it is my opinion that these informants do not possess sufficient first-hand information, and are unable to acquire sufficient first-hand information, through which the continued exclusive reliance on information received from them in conjunction with other normal investigative procedures is likely to result in the achievement of the goals of this investigation. Neither informant is familiar with the entire conspiracy. Moreover, these informants have provided cooperation and assistance on condition that their identities remain confidential and that they will not be compelled to testify against [the targets]. These informants have also stated that they will not wear any kind of electronic wire or bugging device on their person, due to their | "Although I continue to receive information from both of the informants discussed earlier in this affidavit, these informants are unable to penetrate into the organization to any significant degree. Also, it is my opinion that these informants do not possess sufficient first-hand information, and are unable to acquire sufficient first-hand information, through which the continued exclusive reliance on information received from them in conjunction with other normal investigative procedures is likely to result in the achievement of the goals of this investigation.<br><br>Moreover, these informants have provided cooperation and assistance on condition that their identities remain confidential and that they will not be compelled to testify against [the targets] and their associates. Attempts to have the informants further penetrate this organization as agents of the police might place them at substantial risk of their roles as informants being discovered. |

| | | |
|---|---|---|
| fear of being discovered by the targets of this invesitigation (which includes higher-ranking members of this organized criminal enterprise). Any attempt by these confidential informants to further penetrate this ongoing criminal conspiracy as agents of the police would place them at substantial risk of being discovered and, in turn, of being harmed. Both confidential informants have told me of their fear of [the targets] and their higher-ranking associates." Para. 69.<br><br>"None of the informants currently assisting law enforcement authorities is willing to attempt to introduce and undercover officer into the organization. As explained previously, the informants listed herein are very fearful of [the targets] and their associates. Based on my knowledge of this particular organization, as well as what I have learned from the confidential informants, without such an introduction an undercover police officer would not be able to infiltrate the conspiracy at high enough levels to gather sufficient evidence to achieve the goals of this investigation. At best, an undercover officer | fear of being discovered by the targets of this invesitigation (which includes higher-ranking members of this organized criminal enterprise). Any attempt by these confidential informants to further penetrate this ongoing criminal conspiracy as agents of the police would place them at substantial risk of being discovered and, in turn, of being harmed. Both confidential informants have told me of their fear of [the targets] and their higher-ranking associates, and have described specific acts of violence committed by these individuals, including severe beatings and stabbings." Para. 54.<br><br>"None of the informants currently assisting law enforcement authorities is willing to attempt to introduce and undercover officer into the organization. As explained previously, the informants listed herein are very fearful of [the targets] and their associates. Based on my knowledge of this particular organization, as well as what I have learned from the confidential informants, without such an introduction an undercover police officer would not be able to infiltrate the conspiracy at high enough levels to | This, in turn, might place them at substantial risk of being threatened or harmed." Para. 77. |

| | | | |
|---|---|---|---|
| | attempting to infiltrate the organization without an introduction would be able to do littler more than place bets.  For similar reasons, I believe that conducting trash analysis would at most reveal the existence of evidence of illegal gaming and would not fully identify the scope of this conspiracy or its higher-ranking members." Para. 71. | gather sufficient evidence to achieve the goals of this investigation.  At best, an undercover officer attempting to infiltrate the organization without an introduction would be able to do littler more than place bets.  For similar reasons, I believe that conducting trash analysis would at most reveal the existence of evidence of illegal gaming and would not fully identify the scope of this conspiracy or its higher-ranking members." Para. 56. | |
| **Search warrants** | "It is also my opinion that executing a search warrant at the homes [of the targets] or other locations discussed herein (assuming probable cause existed to search the residence) would fail to result in the collection of sufficient evidence to identify fully all persons involved in this conspiracy, and to bring about the achievement of the other goals of this investigation. Although it is possible that some records might be found, and some persons arrested, it is unlikely that the seizure of such records and the arrests of such persons, without more, would lead to the identification of all the participants in the various levels of the organization and achieve the other goals of this investigation. | "It is also my opinion that executing a search warrant at the homes [of the targets] or other locations discussed herein (assuming probable cause existed to search the residence) would fail to result in the collection of sufficient evidence to identify fully all persons involved in this conspiracy, and to bring about the achievement of the other goals of this investigation. Although it is possible that some records might be found, and some persons arrested, it is unlikely that the seizure of such records and the arrests of such persons, without more, would lead to the identification of all the participants in the various levels of the organization and achieve the other goals of this investigation. | "It is also my opinion that executing a search warrant at the homes [of the targets] or other locations discussed herein (assuming probable cause existed to search the residence) would fail to result in the collection of sufficient evidence to identify fully all persons involved in this conspiracy, and to bring about the achievement of the other goals of this investigation. Although it is possible that some records might be found, and some persons arrested, it is unlikely that the seizure of such records and the arrests of such persons, without more, would lead to the identification of all the participants in the various levels of the organization and achieve  the other goals of this investigation. |

|  | | | |
|---|---|---|---|
|  | Furthermore, I know from my training and experience that once [the targets] learned of the execution of the search warrants, it is likely that records and other evidence relating to this criminal conspiracy would be destroyed, their operations moved, and the organization's activities made more secretive and, as a result, we would not be successful in identifying fully all persons involved in this conspiracy and achieving the goals of this investigation." Para. 70 | Furthermore, I know from my training and experience that once [the targets] learned of the execution of the search warrants, it is likely that records and other evidence relating to this criminal conspiracy would be destroyed, their operations moved, and the organization's activities made more secretive and, as a result, we would not be successful in identifying fully all persons involved in this conspiracy and achieving the goals of this investigation." Para. 55 | Furthermore, once [the targets] learned of the execution of the search warrants, it is likely that records and other evidence would be destroyed, their operations moved, and the organization's activities made more secretive." Para. 79. |
| **Grand jury** | "It is also my opinion that confronting [the targets], whether through a grand jury proceeding or less formally, in an attempt to persuade them to cooperate would be futile for two main reasons. First, at this time, confronting [the targets] with any gaming evidence possessed by law enforcement, or the evidence we can acquire through normal investigative techniques, would not provide sufficient incentive for them to cooperate with this investigation and thereby risk the substantial likelihood of retribution. Second, my personal knowledge of this organization (including information learned from confidential informants) lead to me to believe that the loyalty of the | "It is also my opinion that confronting [the targets], whether through a grand jury proceeding or less formally, in an attempt to persuade them to cooperate would be futile for two main reasons. First, at this time, confronting [the targets] with any gaming evidence possessed by law enforcement, or the evidence we can acquire through normal investigative techniques, would not provide sufficient incentive for them to cooperate with this investigation and thereby risk the substantial likelihood of retribution. Second, my personal knowledge of this organization (including information learned from confidential informants) lead to me to believe that the loyalty of the | "It is also my opinion that confronting [the targets] whether through a grand jury proceeding or less formally, in an attempt to persuade them to cooperate in this investigation would be futile and would jeopardize the objectives of this investigation. If any of these persons refused to co-operate, they would likely alert the other members of the organization to the existence of this investigation. As such, efforts to identify, apprehend and prosecute all the members of the conspiracy would be made more difficult." Para. 80. |

| | | |
|---|---|---|
| | organization's members and its close-knit nature would preclude a member from cooperating with law enforcement. Furthermore, such action would jeopardize the objectives of this investigation because, if any of these persons refused to cooperate, they would likely alert the other members of this organization to the existence of this investigation. As such, efforts to identify fully all the members of the conspiracy would jeopardize the achievement of the goals of this investigation." Para. 70. | organization's members and its close-knit nature would preclude a member from cooperating with law enforcement. Furthermore, such action would jeopardize the objectives of this investigation because, if any of these persons refused to cooperate, they would likely alert the other members of this organization to the existence of this investigation. As such, efforts to identify fully all the members of the conspiracy would jeopardize the achievement of the goals of this investigation." Para. 55 | |
| **Telephone records** | "It is my opinion that continued exclusive reliance of normal investigative procedures such as telephone toll analysis and public record analysis will likewise fail to result in the collection of sufficient evidence to identify fully the members of this entire organization and otherwise achieve the goals of this investigation. It is important to note that telephone toll information will never be current, since I cannot obtain these records on a prompt, regular basis. As described above (Toll Analysis Section), my review of telephone toll records has provided only limited identification of certain individuals placing calls to | "It is my opinion that continued exclusive reliance of normal investigative procedures such as telephone toll analysis and public record analysis will likewise fail to result in the collection of sufficient evidence to identify fully the members of this entire organization and otherwise achieve the goals of this investigation. It is important to note that telephone toll information I receive from T-Mobile and Nextel will never be current, since I cannot obtain these records on a prompt, regular basis. As described above (Para. 45), my review of telephone toll records has provided only limited identification of certain individuals placing | "It is my opinion that continued exclusive reliance on normal investigative procedures such as telephone toll analysis and public record analysis will likewise fail to result in the collection of sufficient evidence to identify and dismantle this entire organization.<br><br>It is important to note all telephone information I receive from Bell Atlantic will never be current relying on normal investigative procedures since I can only obtain these records approximately two weeks following the end of the monthly billing cycle for each telephone. Furthermore, because Bell Atlantic billing records do not identify local calls, |

| | | |
|---|---|---|
| | and receiving calls from the target telephones. Furthermore, while I have noted the timing of the calls above, review of the toll records does not reveal the full nature or purpose of the communications." Para. 74. | calls to and receiving calls from the target telephones. Furthermore, while I have noted the timing of the calls above, review of the toll records does not reveal the full nature or purpose of the communications." Para. 58. | the billing records are of limited assistance." Para. 83. |
| **Physical Surveillance** | "Although physical surveillance of [the targets] and their associates have been conducted in the past, I believe that conducting extensive additional surveillance at this time would be detrimental to this investigation. Past surveillance of [the targets] have shown that they employ counter-surveillance techniques in the event they are being followed. They have been observed by members of the Special Services Section, making abrupt stops, accelerating to great speeds, and otherwise operating in such a manner that poses too great a risk of the surveillance being exposed. This, in turn, would jeopardize the investigation. Also, while physical surveillance might identify some other persons with whom [the targets] associate, this information, without more, is not likely to bring about the achievement of the goals of this investigation. Because of the practical limitations of, and risks associate with, conducting prolonged | "Although physical surveillance of [the targets] and their associates have been conducted in the past, I believe that conducting extensive additional surveillance at this time would be detrimental to this investigation. Past surveillance of [the targets] have shown that they employ counter-surveillance techniques in the event they are being followed. They have been observed by members of the Special Services Section, making abrupt stops, accelerating to great speeds, and otherwise operating in such a manner that poses too great a risk of the surveillance being exposed. This, in turn, would jeopardize the investigation. Also, while physical surveillance might identify some other persons with whom [the targets] associate, this information, without more, is not likely to bring about the achievement of the goals of this investigation. Because of the practical limitations of, and risks associate with, conducting prolonged | |

| | | | |
|---|---|---|---|
| | surveillance of large-scale bookmakers, I have not attempted prolonged surveillance is my investigation of [the targets].  Members of the Special Services Section and I believe, based on upon our collective experience and in particular our experience conducting organized crime investigations, that if surveillance were conducted on any sort of prolonged or regular basis, the risk that the police would be detected is too great.  If [the targets] and their associates detected the police, they likely would drastically alter their methods of operation and the progress made in this investigation would be jeopardized.  In particular, [the targets] and their associates might change their telephone numbers, disassociate themselves from confidential informants, change locations for meetings, further insulate and hide their activities and/or move to different residences." Para. 72. | surveillance of large-scale bookmakers, I have not attempted prolonged surveillance is my investigation of [the targets].  Members of the Special Services Section and I believe, based on upon our collective experience and in particular our experience with the 2001 Wiretap Investigation which involved many of the same suspects, that if surveillance were conducted on any sort of prolonged or regular basis, the risk that the police would be detected is too great.  If [the targets] and their associates detected the police, they likely would drastically alter their methods of operation and the progress made in this investigation would be jeopardized.  In particular, [the targets] and their associates might change their telephone numbers, disassociate themselves from confidential informants, change locations for meetings, further insulate and hide their activities and/or move to different residences." Para.57. | |
| **Summary** | "In summary, since the normal investigative techniques employed in the past and in the course of this investigation have failed to produce sufficient evidence to identify fully | "In summary, since the normal investigative techniques employed in the past and in the course of this investigation have failed to produce sufficient evidence to identify fully | "In summary, since the normal investigative techniques employed in the past and in the course of this investigation have failed to produce sufficient evidence to identify, apprehend |

| | | |
|---|---|---|
| all the members of this organization and achieve the goals of this investigation, there is a reasonable likelihood that the continued exclusive use of normal investigative procedures would similarly fail to produce sufficient evidence.  Give the limitations of the informants involved in this investigation, the inability to utilize effectively search warrants and grand jury investigations, the observed and understood risks of prolonged physical surveillance and trash analysis, and the insufficiency of relying upon toll record and public record analysis, as described above, I believe that court-authorized electronic surveillance will provide the best available means of identifying, apprehending and prosecuting all the members of this organization and achieving all of the goals of this investigation." Para. 74. | all the members of this organization and achieve the goals of this investigation, there is a reasonable likelihood that the continued exclusive use of normal investigative procedures would similarly fail to produce sufficient evidence.  Give the limitations of the informants involved in this investigation, the inability to utilize effectively search warrants and grand jury investigations, the observed and understood risks of prolonged physical surveillance and trash analysis, and the insufficiency of relying upon toll record and public record analysis, as described above, I believe that court-authorized electronic surveillance will provide the best available means of identifying, apprehending and prosecuting all the members of this organization and achieving all of the goals of this investigation." Para. 59. | and prosecute all members of this organization and to achieve the goals of this investigation, there is reason to believe that the continued exclusive use of normal investigative procedures would similarly fail to produce sufficient evidence. As such, I believe that the best available means of identifying, apprehending and prosecuting all the members of this organization and to achieve all of the goals of this investigation is the use of court authorized electronic surveillance." Para. 84. |

83