Nos. 09-2213, 09-2478, 09-2606, 10-1214

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

————————————

## UNITED STATES OF AMERICA,
## APPELLEE

**v.**

## GISELE ALBERTELLI, ARTHUR GIANELLI,
## FRANK IACABONI, AND DENNIS ALBERTELLI, A/K/A "FISH",
## DEFENDANTS-APPELLANTS

————————————

### ON APPEAL FROM JUDGMENTS IN A CRIMINAL CASE,
### ENTERED IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MASSACHUSETTS

————————————

### BRIEF FOR THE UNITED STATES

————————————

CARMEN M. ORTIZ
UNITED STATES ATTORNEY

MARK T. QUINLIVAN
ASSISTANT U.S. ATTORNEY
JOHN JOSEPH MOAKLEY U.S. COURTHOUSE
1 COURTHOUSE WAY
SUITE 9200
BOSTON, MASSACHUSETTS 02210
(617) 748-3606

## TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vii

STATEMENT OF ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

A.    The Gianelli Organization . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

B.    The Attempted Arson . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

       1.    Gianelli's Investment in the Lynnfield Big Dog . . . . . . . . . . . . . . . 8

       2.    The Deteriorating Relationship . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

       3.    The Planned Arson . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

I.    THE    DISTRICT    COURT    CORRECTLY    DENIED    THE
      DEFENDANTS' MOTION TO SUPPRESS THE FRUITS OF THE
      WIRETAPS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

      A.    Procedural History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

            1.    The October 31, 2003 Wiretap Application . . . . . . . . . . . . . 21

            2.    The Defendants' Motion to Suppress . . . . . . . . . . . . . . . . . . 23

            3.    The District Court's Memorandum and Order
                  Denying the Motion to Suppress . . . . . . . . . . . . . . . . . . . . 25

-i-

B.      Standard of Review  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

C.      The October 31, 2003 Wiretap Application Was Properly
        Authorized . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

D.      The October 31, 2003 Wiretap Application Satisfied the
        Necessity Requirement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

E.      The October 31, 2003 Wiretap Application Established
        Probable Cause . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

        1.      The Preserved Probable Cause Claim  . . . . . . . . . . . . . . . . . . 45

        2.      The Unpreserved Claims  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

F.      The Fruits of the Wiretap Should Not Be Suppressed  . . . . . . . . . . 54

II.     THE DISTRICT COURT DID NOT ERR IN ALLOWING SPECIAL
        AGENT KELSCH TO PROVIDE EXPERT TESTIMONY
        REGARDING WORDS USED IN INTERCEPTED
        CONVERSATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

A.      Procedural History  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

        1.      The Motion to Preclude Kelsch's Testimony . . . . . . . . . . . . 57

        2.      Kelsch's Testimony  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

B.      Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

C.      The District Court Did Not Abuse its Discretion in
        Admitting Special Agent Kelsch's Testimony . . . . . . . . . . . . . . . . . 62

D.      Kelsch Did Not Provide Improper "Summary" Testimony  . . . . . . . 66

E.      Any Error Was Harmless  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

-ii-

III. IACABONI WAIVED HIS CONTENTION THAT LAW ENFORCEMENT OFFICERS IMPROPERLY TESTIFIED AS "FACT," "EXPERT" AND "OVERVIEW" WITNESSES SIMULTANEOUSLY, BECAUSE HE FIRST PRESENTED THAT ARGUMENT TO THE DISTRICT COURT IN A MOTION FOR RECONSIDERATION, THE DENIAL OF WHICH HE DOES CHALLENGE ON APPEAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

A. Procedural History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

1. The Objection at Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

2. Iacaboni's Motion for Reconsideration . . . . . . . . . . . . . . . . 79

B. Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

C. Iacaboni's Claims are Waived . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

D. Any Error Was Harmless . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

IV. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN ALLOWING SERGEANT RUSSOLILLO TO TESTIFY THAT DENNIS ALBERTELLI WAS A PARTNER IN THE GAMBLING BUSINESS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

A. Procedural History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

B. Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

C. Sergeant Russolillo's Testimony Was Not Improper Overview Testimony . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

D. Any Error Was Harmless . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93

V.    THE DISTRICT COURT DID NOT ERR IN ALLOWING MARK O'CONNOR TO TESTIFY ABOUT CONVERSATIONS WITH ALBERTELLI, BECAUSE ALBERTELLI DID NOT ESTABLISH THAT THE TWO HAD AN ATTORNEY-CLIENT RELATIONSHIP ABOUT THE MATTER AT ISSUE, AND THE TESTIMONY IN ANY EVENT WAS ADMISSIBLE UNDER THE CRIME-FRAUD EXCEPTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

   A.    Procedural History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

   B.    Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

   C.    The District Court Did Not Err in Allowing O'Connor to Testify About His Conversations with Albertelli . . . . . . . . . . . . . . 98

D.    Any Error Was Harmless . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 103

V.    IACABONI WAIVED HIS CONTENTION THAT HE IS ENTITLED TO A NEW TRIAL BECAUSE THE DISTRICT COURT ALLOWED PREJUDICIAL TESTIMONY REGARDING ORGANIZED CRIME FIGURES, AS HE DID NOT RAISE IT IN A PRETRIAL MOTION TO SEVER, AND EVEN IF NOT WAIVED, HE CANNOT SHOW PLAIN ERROR ON APPEAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 103

   A.    Procedural History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 104

       1.    The Pretrial Motions to Sever . . . . . . . . . . . . . . . . . . . . . . . 104

       2.    Iacaboni's Request at Trial . . . . . . . . . . . . . . . . . . . . . . . . . 105

       3.    Iacaboni's Motion for Reconsideration . . . . . . . . . . . . . . . . 107

   B.    Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 107

   C.    Iacaboni Waived His Claim of Prejudicial Spillover . . . . . . . . . . . 107

VII.  THE EVIDENCE WAS SUFFICIENT FOR A REASONABLE JURY
      TO CONVICT IACABONI ON ALL COUNTS OF CONVICTION . . . 112

      A.   Procedural History  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 112

           1.   Iacaboni's Rule 29 and Rule 33 Motions . . . . . . . . . . . . . . 112

           2.   Iacaboni's Motions for Reconsideration  . . . . . . . . . . . . . . 113

      B.   Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114

      C.   The Evidence Was Sufficient to Convict Iacaboni of the
           Arson and Extortion Counts  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 115

      D.   The Evidence Was Sufficient to Convict Iacaboni of the
           Illegal Gambling Counts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 119

VIII. THE  DISTRICT  DEFENDANTS'  CUMULATIVE  ERROR
      ARGUMENT  FAILS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 122

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 123

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 124

CERTIFICATE OF SERVICE  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 125

# <u>TABLE OF AUTHORITIES</u>

## CASES

*CMM Cable Rep, Inc. v. Ocean Front Properties, Inc.*,
    97 F.3d 1504 (1st Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

*Commonwealth v. Boyle*,
    346 Mass. 1, 189 N.E.2d 844 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

*Commonwealth v. Carlson*,
    331 Mass. 449, 120 N.E.2d 384 (1954) . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

*Commonwealth v. Chagnon*,
    330 Mass. 278, 113 N.E.2d 50 (1953) . . . . . . . . . . . . . . . . . . . . . . . 47, 50, 51

*Commonwealth v. Cosolito*,
    359 Mass. 467, 269 N.E.2d 679 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*Commonwealth v. D'Amour*,
    428 Mass. 725, 704 N.E.2d 1166 (1999) . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Commonwealth v. Demogenes*,
    349 Mass. 585, 211 N.E.2d 226 (1965) . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*Commonwealth v. Fenderson*,
    410 Mass. 82, 571 N.E.2d 11 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Commonwealth v. Morris M.*,
    70 Mass. App. Ct. 688, 876 N.E.2d 462 (2007) . . . . . . . . . . . . . . . . . . . . . 49

*Commonwealth v. Sousa*,
    33 Mass. App. Ct. 433, 600 N.E.2d 1012 (1992) . . . . . . . . . . . . . . . . . . . . 51

*Commonwealth v. Vitello*,
    367 Mass. 224, 327 N.E.2d 819 (1974) . . . . . . . . . . . . . . . 23, 24, 31, 32, 35

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
    509 U.S. 579 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

*In re Bonanno*,
    344 F.2d 830 (2d Cir. 1965) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

*In re Grand Jury Subpoena*,
    662 F.3d 65 (1st Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98-100

*Hernandez-Loring v. Universidad Metropolitana*,
    233 F.3d 49 (1st Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 119

*Herring v. United States*,
    555 U.S. 135 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55, 56

*Hudson v. Michigan*,
    547 U.S. 586 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

*Illinois v. Gates*,
    462 U.S. 213 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 45

*In re Keeper of Records*,
    348 F.3d 16 (1st Cir.2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

*Lluberes v. Uncommon Productions, LLC*,
    —F.3d —, 2011 WL 6015606 (1st Cir. 2011) . . . . . . . . . . . . . . . . . . 98, 99

*Murray v. United States*,
    928 F.2d 1242 (1st Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 120

*Pinkerton v. United States*,
    328 U.S. 640 (1946) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 113, 115, 116

*Sanabria v. United States*,
    437 U.S. 54 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 120

*Sheinkopf v. Stone*,
  927 F.2d 1259 (1st Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

*Trenkler v. United States*,
  536 F.3d 85 (1st Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

*United States v. Allen*,
  573 F.3d 42 (1st Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

*United States v. Ashley*,
  876 F.2d 1069 (1st Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*United States v. Barnard*,
  299 F.3d 90 (1st Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*United States v. Bashorun*,
  225 F.3d 9 (1st Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

*United States v. Bayard*,
  642 F.3d 59 (1st Cir.), *cert. denied*, 131 S. Ct. 2944 (2011) . . . . . . . 71, 122

*United States v. Brown*,
  621 F.3d 48 (1st Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . 81, 82, 107, 115

*United States v. Burnett*,
  579 F.3d 129 (1st Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 107

*United States v. Cartagena*,
  593 F.3d 104 (1st Cir.), *cert. denied*, 131 S. Ct. 247 (2010) . . . . . . . . 38, 44

*United States v. Casas*,
  356 F.3d 104 (1st Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70, 92

*United States v. Ceballos*,
  302 F.3d 679 (7th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

*United States v. Chavez*,
    416 U.S. 562 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*United States v. David*,
    940 F.2d 722 (1st Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

*United States v. Davila-Felix*,
    —F.3d —, 2011 WL 6155721 (1st Cir. 2011) . . . . . . . . . . . . . . . . . . . . . 53

*United States v. DeCologero*,
    530 F.3d 36 (1st Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 110, 112

*United States v. DeLeon*,
    187 F.3d 60 (1st Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 111

*United States v. Dellosantos*,
    649 F.3d 109 (1st Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 116, 117

*United States v. Duarte*,
    246 F.3d 56 (1st Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

*United States v. Fernandez-Hernandez*,
    652 F.3d 56 (1st Cir.), *cert. denied*,132 S. Ct. 353 (2011) . . . . . . . . . . . . 111

*United States v. Flores-de-Jesus*,
    569 F.3d 8 (1st Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69, 70, 92

*United States v. Flores-Rivera*,
    56 F.3d 319 (1st Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108, 111

*United States v. Garcia-Morales*,
    382 F.3d 12 (1st Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

*United States v. Gianelli*,
    585 F. Supp. 2d 150 (D. Mass. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*United States v. Gianelli*,
    585 F. Supp. 2d 186 (D. Mass. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 105

*United States v. Gianelli*,
    667 F. Supp. 2d 215 (D. Mass. 2009) . . . . . . . . . . . . . . . . . . 80, 82, 107, 114

*United States v. Giordano*,
    416 U.S. 505 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*United States v. Gonzalez-Mercado*,
    402 F.3d 294 (1st Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69, 83

*United States v. Heilman*,
    377 F. App'x 157 (3d Cir.), *cert. denied*, 131 S. Ct. 490 (2010) . . . . . . . . 55

*United States v. Hicks*,
    575 F.3d 130 (1st Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*United States v. Hoffman*,
    832 F.2d 1299 (1st Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65, 84

*United States v. Lamattina*, ,
    889 F.2d 1191 (1st Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64, 84

*United States v. Leon*,
    468 U.S. 897 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55, 56

*United States v. Lizardo*,
    445 F.3d 73 (1st Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66, 67, 72

*United States v. Marder*,
    48 F.3d 564 (1st Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 47

*United States v. Martinez*,
    452 F.3d 1 (1st Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 40, 41

*United States v. McElroy*,
      587 F.3d 73 (1st Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*United States v. Meises*,
      645 F.3d 5 (1st Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70, 92, 93

*United States v. Mercado*,
      412 F.3d 243 (1st Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69, 82

*United States v. Miliano*,
      480 F.3d 605 (1st Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

*United States v. Mubayyid*,
      658 F.3d 35 (1st Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 112

*United States v. O'Bryant*,
      998 F.2d 21 (1st Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 110

*United States v. O'Malley*,
      764 F.2d 38 (1st Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*United States v. Page*,
      521 F.3d 101 (1st Cir.), *modified on other grounds*,
      542 F.3d 257 (1st Cir. 2008), *cert. denied,* 129 S. Ct. 958 (2009) . . . 86, 109

*United States v. Pires*,
      642 F.3d 1 (1st Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114

*United States v. Poulin*,
      631 F.3d 17 (1st Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 115

*United States v. Pratt*,
      568 F.3d 11 (1st Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 115

*United States v. Reeder*,
      170 F.3d 93 (1st Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 103

*United States v. Reyes-Guerrero*,
 638 F. Supp. 2d 177 (D.P.R. 2009), *vacated and remanded*,
 *United States v. Meises*, 645 F.3d 5 (1st Cir. 2011). . . . . . . . . . . . . . . . . . . 93

*United States v. Ribeiro*,
 397 F.3d 43 (1st Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*United States v. Rivera-Rivera*,
 477 F.3d 17 (1st Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66, 67, 72

*United States v. Rivera-Rivera*,
 555 F.3d 277 (1st Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 115

*United States v. Rivera-Rodriguez*,
 617 F.3d 581 (1st Cir. 2010), *cert. denied*,
 131 S. Ct. 960, 131 S. Ct. 968, 131 S. Ct. 1706 (2011) . . . . . . . . . . 113, 117

*United States v. Rivera-Rosario*,
 300 F.3d 1 (1st Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64, 84

*United States v. Rosado-Perez*,
 605 F.3d 48 (1st Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . 64, 65, 70, 74, 84

*United States v. Sanabria*,
 645 F.3d 505 (1st Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

*United States v. Santana*,
 342 F.3d 60 (1st Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*United States v. Santiago*,
 560 F.3d 62 (1st Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

*United States v. Shay*,
 57 F.3d 126 (1st Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

*United States v. Smith*,
 726 F.2d 852 (1st Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 27, 32, 35

*United States v. Tedder*,
    801 F.2d 1437 (4th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101

*United States v. Torres*,
    162 F.3d 6 (1st Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

*United States v. Trinh*,
    —F.3d —, 2011 WL 6349842 (1st Cir. 2011) . . . . . . . . . . . . . . . . 110-112

*United States v. Vazquez-Rivera,*
    —F.3d —, 2011 WL 6415039 (1st Cir. 2011) . . . . . . . . . . . . 70, 72, 83, 98

*United States v. Ventresca,*
    380 U.S. 102 (1965) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*United States v. Vest*,
    842 F.2d 1319 (1st Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55, 57

*United States v. Villarman-Oviedo*,
    325 F.3d 1 (1st Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 28, 29, 42

*United States v. Walker,*
    —F.3d —, 2011 WL 5865652 (1st Cir. 2011) . . . . . . . . 52, 53, 55, 107, 109

*United States v. Weekes*,
    611 F.3d 68 (1st Cir. 2010), *cert. denied*, 131 S. Ct. 3121 (2011) . . . . 61, 91

*United States v. Zafiro*,
    945 F.2d 881 (7th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 117

*United States v. Zannino*,
    895 F.2d 1 (1st Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . 72, 84, 120, 122

*United States v. Zayas-Diaz*,
    95 F.3d 105 (1st Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*United States v. Zolin,*
    491 U.S. 554 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 102

*Upjohn Co. v. United States,*
    449 U.S. 383 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

*Villanueva v. United States,*
    662 F.3d 124 (1st Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

*Zafiro v. United States,*
    506 U.S. 534 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 110

## STATUTES

## United States Code

18 U.S.C. §371 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

18 U.S.C. §844 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

18 U.S.C. §894(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

18 U.S.C. §1084 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

18 U.S.C. §1951 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

18 U.S.C. §1952(a)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

18 U.S.C. §1955 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 119, 120

18 U.S.C. §1956 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

18 U.S.C. §1962(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

18 U.S.C. §2516(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 31

18 U.S.C. §2518(10)(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

18 U.S.C. §2518(1)(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 21, 23, 37

18 U.S.C. §3231 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. §1291 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Title III of the Omnibus Crime Control and Safe Streets Act,
    18 U.S.C. §§2510-2521 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

## Massachusetts General Laws

Mass. Gen. Laws ch. 271, §17 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Mass. Gen. Laws ch. 272, §99  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21-22

Mass. Gen. Laws ch. 272, §99(B)(7) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46, 52

Mass. Gen. Laws ch. 272, §99(E)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

Mass. Gen. Laws ch. 272, §99(E)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 38

Mass. Gen. Laws ch. 272, §99(F)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Mass. Gen. Laws ch. 272, §99(F)(2)(b)  . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

## RULES OF PROCEDURE AND EVIDENCE

## Federal Rules of Appellate Procedure

Fed. R. App. P. 4(b)(2)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

## Federal Rules of Criminal Procedure

Fed. R. Crim. P. 12(b)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

Fed. R. Crim. P. 12(b)(3)(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

Fed. R. Crim. P. 12(b)(3)(D) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108

Fed. R. Crim. P. 12(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52, 53, 107, 108

Fed. R. Crim. P. 14 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108

Fed. R. Crim. P. 29(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 112

Fed. R. Crim. P. 33 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

## Federal Rules of Evidence

Fed. R. Evid. 701 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

Fed. R. Evid. 702 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

## STATEMENT OF JURISDICTION

The district court had subject matter jurisdiction over the case because the indictment charged the defendants with offenses against the United States. 18 U.S.C. §3231.

The Judgment as to Gisele Albertelli was docketed on August 17, 2009. [D.849; App.236-248].[1]  She filed a timely notice of appeal on August 12, 2009. [D.843; App.168; *see* Fed. R. App. P. 4(b)(2)].

The Judgment as to Arthur Gianelli was docketed on October 27, 2009.  [D.893; App.170-197].  He filed a timely notice of appeal on October 8, 2009.  [D.882; App.165].

The Judgment as to Frank Iacaboni was docketed on November 24, 2009. [D.910; App.225-235].  He filed a timely notice of appeal on November 13, 2009. [D.906; App.166-67].

---

[1] Citations are as follows:  Docket entries are cited as "[D._]."  Arthur Gianelli's brief is cited as "(AGBrief at __)"; Dennis Albertelli's brief is cited as (DABrief at __)"; Frank Iacaboni's brief is cited as "(FIBrief at __)"; and Gisele Albertelli's brief is cited as "(GABrief at __)."  The defendants' joint appendix is cited as "[App.__]," and the government's supplemental appendix is cited as "[G.App.__]."  The trial testimony ("TT")  is cited by the day of the trial and the page (for example, "[TT2:50]" refers to page 50 of the second day of trial).

The Judgment as to Dennis Albertelli was docketed on January 29, 2010.

[D.917; App.198-224].  He filed a timely notice of appeal on January 28, 2010.

[D.922; App.169].[2]

This Court has jurisdiction over the defendants' appeals from their convictions

pursuant to 28 U.S.C. §1291.

## STATEMENT OF ISSUES

1.  The district court correctly denied the defendants' motion to suppress the fruits of the wiretaps.

2.  The district court did not err in allowing Special Agent Kelsch to provide expert testimony regarding words used in intercepted conversations.

3.  Iacaboni waived his contention that law enforcement officers improperly testified as "fact," "expert" and "overview" witnesses simultaneously, because he first presented that argument to the district court in a motion for reconsideration, the denial of which he has not challenged on appeal.

4.  The district court did not abuse its discretion in allowing Sergeant Russolillo to testify that Albertelli was a partner in the gambling business.

_____

[2] The government refers to Dennis Albertelli herein by his surname and Gisele Albertelli by her full name.

5.  The district court did not err in allowing Mark O'Connor to testify about conversations with Albertelli, because Albertelli did not establish that the two had an attorney-client relationship about the matter at issue, and the testimony in any event was admissible under the crime-fraud exception.

6.  Iacaboni waived his contention that he is entitled to a new trial because the district court allowed prejudicial testimony regarding organized crime figures, as he did not raise it in a pretrial motion to sever, and even if not waived, he cannot show plain error on appeal.

7.  The evidence was sufficient for a reasonable jury to convict Iacaboni on all counts of conviction.

8.  The defendants' cumulative error argument fails.

## **STATEMENT OF THE CASE**

On September 13, 2006, a federal grand jury in the District of Massachusetts returned a 520-count second superseding indictment charging 13 defendants – Arthur Gianelli, Joseph Yerardi, Jr., Dennis Albertelli, a/k/a "Fish", Philip Puopolo, Salvatore Ramasci, a/k/a "Lefty," Frank Iacaboni, Randy Albertelli, Stephen Russo, a/k/a "Moon," Michael Pinialis, a/k/a "Max," Eneyda Gonzalez Rodriguez, Mary Ann Gianelli, Gisele Albertelli, and Rafia Feghi, a/k/a Rafia Yerardi – with multiple violations of federal law.  [D.222; App.365-520].  The second superseding indictment

was subsequently redacted to name only the four defendants in these consolidated

appeals who went to trial, and charged them with the following violations:

- racketeering conspiracy, in violation of 18 U.S.C. §1962(d) (Count 1);

- racketeering, in violation of 18 U.S.C. §1962(c) (Count 2);

- illegal gambling business, in violation of 18 U.S.C. §1955 (Counts 3-5);

- use of wire communication facility, in violation of 18 U.S.C. §1084 (Counts 6-7);

- money laundering conspiracy, in violation of 18 U.S.C. §1956(h) (Counts 8, 184);

- money laundering, in violation of 18 U.S.C.§§1956(a)(1)(A)(i) and/or 1956(a)(1)(B)(i) (Counts 9-183, 185-236, 273, 278-327);

- conspiracy to commit arson, in violation of 18 U.S.C. §371 (Count 267);

- arson, in violation of 18 U.S.C. §844(i) (Count 268);

- using fire and an explosive to commit a felony, in violation of 18 U.S.C. §844(h)(1) (Count 269);

- conspiracy to commit extortion, in violation of 18 U.S.C. §1951 (Counts 270, 274, 276);

- attempt to commit extortion, in violation of 18 U.S.C. §1951 (Counts 271, 275, 277);

- interstate travel in aid of racketeering, in violation of 18 U.S.C. §1952(a)(3) (Count 272);

- extortionate collection of credit conspiracy, in violation of 18 U.S.C. §894(a)(1) (Counts 328, 330, 332); and

- extortionate collection of credit, in violation of 18 U.S.C. §894(a)(1) (Counts 329, 331, 333).

[D.761; G.App.1-111]. Gianelli was indicted on Counts 1-183, 185-272, 274-323, and 328-333; Albertelli was indicted on Counts 1-183, 185-273, 278-300, and 324-327; Iacaboni was indicted on Counts 1-3, 5, and 267-271; and Gisele Albertelli was indicted on Counts 1, 2, 5, and 184-232. [*Id.*].

On March 20, 2008, all four defendants joined in an omnibus motion to suppress the fruits of what they alleged were unlawful wiretaps. [D.456; App.570-651]. On October 8, 2008, the district court (Gorton, J.) denied the motion in a published memorandum and order. *See United States v. Gianelli*, 585 F. Supp. 2d 150 (D. Mass. 2008).

On April 22, 2009, following a 31-day trial, a jury reached the following verdicts:

- Gianelli was convicted on Counts 1-4, 6-183, 185-271, 274-323, and 328-333, and acquitted of Counts 5 and 272.

- Albertelli was convicted on Counts 1-183, 185-271, 273, 278-300, and 324-327, and acquitted of Count 272.

- Iacaboni was convicted on Counts 1, 3, 5, and 267-271, and acquitted of Count 2.

- Gisele Albertelli was convicted on Counts 1, 2, 5, and 184, 188-200, 202-232, and acquitted of Counts 185-187, and 201.

[D.754].

The district court sentenced Gisele Albertelli on August 11, 2009, to 21 months' imprisonment followed by two years of supervised release [App.236-248]; Gianelli on October 7, 2009, to 271 months' imprisonment followed by three years of supervised release [App.170-197]; Iacaboni on November 10, 2009, to 183 months' imprisonment followed by three years of supervised release [ App.225-235]; and Albertelli on January 14, 2010, to 216 months' imprisonment followed by three years of supervised release [App.198-224].

## STATEMENT OF FACTS

The facts, taken in the light most compatible with the verdict, *see United States v. Mubayyid*, 658 F.3d 35, 41 (1st Cir. 2011), established the following.

### A.     The Gianelli Organization[3]

From in or before 1999 and continuing until approximately April 2005, Gianelli, Albertelli, Iacaboni, Gisele Albertelli, and others were members and associates of a criminal organization (hereafter the "Gianelli organization") which associated together for the purpose, *inter alia*, of earning money through illegal

---

[3] Due to space limitations, the government here provides an overview of the operation of the Gianelli organization.

gambling activities, extortion, and lending money at usurious rates; money laundering; and committing crimes of violence, including arson. The testimony at trial established that the Gianelli organization operated three separate illegal gambling businesses: (1) a sports betting business, which included the use of an offshore Internet site known as "Duke Sports" in San Jose, Costa Rica; (2) a video poker business; and (3) a football card business.[4] The organization laundered its illegal gambling proceeds in the form of cash, postal or Western Union money orders, investments in various businesses, or used it for personal expenses.

The Gianelli organization also engaged in the extortionate collection of credit, using threats and strong-arm tactics to collect gambling debts from bettors and borrowers. Gianelli coerced Anthony Bendetti and Kelley Cordova, for example, to sell him their interest in two sports bars in Boston – McCarthy's Bar and Grille on Boylston Street and Clarke's in Faneuil Hall – for far less than the value of the businesses' stock, threatening them that if they did not do so, they would never be able to open a planned restaurant in New York. [TT20:120-185; Exhs.212-214].

---

[4] A football card is an instrument that is used by bookmaking organizations in which a bettor pays an up-front fee to receive a card with a list of college and professional football games, picks who the bettor thinks will win, and receives a payout depending on how many teams the bettor chose in fact won. [TT3:93-94].

-7-

The Gianelli organization also associated itself with organized crime figures, including members of the New England Family of La Cosa Nostra ("LCN"), which enhanced the operation of the Gianelli organization's criminal businesses – for example, it aided the organization in collecting debts – and protected the members and associates of the Gianelli organization from encroachment by competitors. Gianelli, who was the leader of the organization with responsibility for the overall management of the organization's criminal activities, made payments (known as "tribute" or "rent") to the LCN for the "right" to operate its illegal businesses.

**B.      The Attempted Arson**

The evidence at trial also showed that Gianelli, Albertelli, and Iacaboni conspired with each other and others to commit an arson at The Big Dog Sports Grille in North Reading, Massachusetts (hereafter the "North Reading Big Dog"), in an effort to extort control of The Big Dog Sports Grille in Lynnfield, Massachusetts (hereafter the "Lynnfield Big Dog"), from Mark Colangelo and Edward Fitzsimons.

**1.      Gianelli's Investment in the Lynnfield Big Dog**

Colangelo and Fitzsimons were partners in the Canine Entertainment Corporation ("Canine Entertainment"), which owned the Lynnfield Big Dog, a sports-themed restaurant with pub-style food, and also were involved with To the Dogs Restaurant Management Corporation, which operated but did not own the North

Reading Big Dog. [TT21:159-162]. Canine Entertainment leased the building which housed the North Reading Big Dog, and sublet space in the building to Romeo's Pizza, which was adjacent to the North Reading Big Dog. [TT22:71-72].

In 1999, Colangelo met Gianelli and agreed to install a video-poker machine at the Lynnfield Big Dog, and began to act as an agent for Gianelli's sports betting business. [TT21:165-168]. When Colangelo later mentioned to Gianelli the prospect of purchasing the property where the Lynnfield Big Dog was located, Gianelli agreed, as the two had discussed the idea of replacing the modest-sized bar with a much larger sports bar with state-of-the-art entertainment equipment. [TT21:167-168]. Colangelo, Fitzsimons, and Gianelli agreed that Colangelo and Fitzsimons would put up their existing business and continue running it, and Gianelli would fund the construction of the new project. [TT21:169]. On June 24, 1999, Colangelo and Gianelli purchased the property from Coach Lane Realty Trust for $2.85 million, of which $25,000 was a non-refundable deposit that Gianelli paid in cash. [TT21:172-173; TT18:136; Exh.218]. Although Colangelo signed the purchase and sale agreement as a witness, neither Colangelo nor Gianelli wanted the agreement to be in their names for licensing purposes. [TT21:171-173; Exh.218]. Instead, Gianelli had Thomas Tuffo sign the agreement on their behalf. [TT21:171-173; Exh.218].

##### 2. The Deteriorating Relationship

Colangelo and Fitzsimons became concerned about working with Gianelli after reading a Boston Herald article in March 2000 about Gianelli attempting to take control over two other Boston sports bars – McCarthy's Bar and Grille and Clarke's – through extortionate means. [TT21:175; TT25:149-150]. Colangelo expressed his concern to Gianelli, who refused to withdraw from the deal, which Colangelo and Fitzsimons interpreted as a threat. [TT21:175; TT25:150]. Tuffo subsequently withdrew from the deal after a dispute with Gianelli, and Gianelli told Colangelo that Colangelo and Fitzsimons would now have to contribute funds for the construction of the project to make up for Tuffo's departure. [TT21:176]. Colangelo had difficulty obtaining funds to purchase the property outright, and he and Fitzsimons formed Big Dog Realty Trust to purchase what had been Tuffo's share. [TT 21:176-77, 180; TT23:25-26; Exh.219]. The Trust named Fitzsimons and Karen Colangelo (Colangelo's wife) as beneficiaries of 25% each of the trust, while Gianelli's wife, Mary Ann Gianelli, was to receive 50%. [TT21:180; Exh.220].

On August 7, 2000, Fitzsimons signed a second purchase and sale agreement on behalf of Big Dog Realty Trust with Coach Lane Realty Trust to replace the original agreement, with the same total purchase price of $2.85 million, but this time with a $53,000 deposit that Colangelo and Gianelli split evenly and paid in cash.

[TT22:5-7; Exh.221].  Because Colangelo could not finance an outright purchase of the property, the Big Dog Realty Trust also entered into a commercial lease with Coach Lane, whereby Big Dog Realty Trust would retain possession of the property, but would not take title until it paid the full purchase price. [TT22:8; Exh.222]. Gianelli and Colangelo each agreed to pay half of the rent on the commercial lease over the next year, when they expected to have paid the full purchase price. [TT22:7].

Colangelo and Gianelli subsequently took another partner, Colangelo's friend Richard Dalton, who received $150,000 and a 3% share of Canine Entertainment in exchange for serving as general contractor for the demolition and construction of the new facility.  [TT22:11-12].  As a result of this agreement, Colangelo succeeded in garnering control of Canine Entertainment.  [TT22:11; TT23:19].

Colangelo's and Gianelli's relationship began to deteriorate, as  Colangelo fell behind on paying his end of the bills, and "a distrust arose" as to who would have control of the project.  [TT19:36; TT22:37-50, 107-114].  Gianelli created a scheme to trick Colangelo and Fitzsimons into giving up majority control of Canine Entertainment, presenting them with a series of option agreements that Gianelli said would give investors small shares of the profits but which, he assured them, would not transfer voting interests.  [TT19:37; TT22:39-41, 140-141; TT22:56; TT25:159-160;

-11-

Exhs.25-28,39].  Colangelo encouraged his partners to sign the option agreements, believing Gianelli's representation.  [T22:41-43].

Relations between Colangelo and Gianelli further soured when Gianelli later insisted that the owners of the option agreements now had voting interests in the company – contrary to his earlier promises – which led Colangelo and his partners to refuse to sign any more.  [TT22:63-64].  Around the same time, Albertelli and Salvatore Ramasci, among others, began to visit the Lynnfield Big Dog construction site, interfering with daily business transactions and making explicit and veiled threats. [TT15:147; TT16:65-70; TT19:35-36; TT22:34-36, 52-54, 131; TT25:158].

The escalating tensions culminated in a confrontation in July 2003 at a meeting at Homewood Suites, in which Gianelli, Colangelo, Ramasci, Albertelli, Fitzsimons, Dalton, and Larry Murray, an associate of Gianelli's, were present,. [TT22:54].  At the meeting, Gianelli maintained that the investors who had signed the option agreements should be afforded voting rights, contrary to what Colangelo's faction had agreed to originally.  [TT22:56-58; 140-141].  Gianelli also insisted that Colangelo and his partners sign additional option agreements, and when they refused, Gianelli responded, "I'll take care of you in my own way." [TT22:63-64].

### 3.     The Planned Arson

After this and other confrontations, Gianelli sued Canine Entertainment for injunctive relief regarding ownership of the Lynnfield Big Dog. [TT22:67; Exhs.228-229].  After filing suit, Gianelli and Albertelli contacted Mark O'Connor, who had been involved with Gianelli's and Albertelli's illegal gambling and money laundering activities, and told O'Connor that they could gain a controlling interest and drop the suit if O'Connor could get Dalton to sell his 3% share in the Big Dog.  [TT 17:91-95].  After Dalton refused to meet with O'Connor, Albertelli proposed setting fire to the North Reading Big Dog to cut off Colangelo's alternate source of income.  [TT17:95-96].

Gianelli's motions for injunctive relief were denied on October 23, 2003. [Exh.228].  In late October or early November 2003, Albertelli met with Deeb Homsi, a former Hells Angel and longtime friend of Albertelli's, and told Homsi that "they had a lot of money tied up in the Big Dog and the guy was holding them back, stalling, and that was it, they wanted to burn the pizza joint." [TT21:64].  Albertelli told Homsi that the pizza place was in North Reading, gave Homsi a piece of paper with an address on it, and suggested that Homsi wear a uniform like an exterminator and a backpack with a solvent, walk around and spray the building, and ignite it. [TT21:65-66].

Homsi recruited Michael McCormack, a longtime friend who had associated with the Hells Angels, to set the fire, and McCormack, in turn, recruited his friend Sean Slater, a former member of the Hells Angel, to assist. [TT19:89-96, 118-119, 133, 160; TT22:69-70]. Homsi and McCormack estimated that McCormack's fee for the arson would be $10,000, which Homsi confirmed with Albertelli. [TT19:90; TT21:67]. In a recorded phone call on November 4, 2003, Homsi told Albertelli that "that other thing is a go," referring to burning Romeo's Pizza. [App.1000-1001; TT21:68-70]. Homsi met with Albertelli that night in Arlington to finalize plans to set fire to the pizza restaurant. [TT21:70-71].

Gianelli called Albertelli regularly for updates on Homsi's progress. On November 2, 2003, Gianelli asked Albertelli if he had talked "to that kid" – referring to Homsi – and had "give[n] him information and everything?," and instructed Albertelli, "Gotta make sure nobody is in there you know." [App.992-993]. On November 6, 2003, Gianelli insisted to Albertelli, "this fucker got to be shut down. Period. Has to be shut down." [App.1041]. Thereafter, Gianelli and Albertelli had a series of conversations in which Gianelli asked Albertelli when he would be meeting with "that kid"; admonished Albertelli to "stay on top" of Homsi because "[t]hat looks like our only hope"; and told Albertelli to "go and see him, do what you gotta do." [App.1056, 1058, 1063, 1071-1072]. Later, on November 13, 2003, the Gianelli

-14-

asked Albertelli, "How's the pizza?," a reference to Romeo's Pizza. [App.1096; TT24:5].

While this plan was ongoing, Albertelli had separate discussions with Iacaboni about committing arson at the North Reading Big Dog. In a lengthy telephone conversation on November 5, 2003, Albertelli described the problems that he and Gianelli were having with respect to the ownership of the Lynnfield Big Dog, and told Iacaboni that the "jumpin' bean" – a reference to Gianelli – did not want to wait for the legal proceedings to resolve but wanted to do "everything in a hurry." [App.1015-1026; TT23:19]. On November 10, 2003, Iacaboni requested information from Albertelli about "where the boat is being docked" – a reference to the North Reading Big Dog and Romeo's Pizza – as well as a diagram with "no signs or anything" including the "number of floors," which Albertelli was to give to the "Bullet" that day "in an envelope." [App.1060-1061; TT23:128]. Robert Davies, a runner for Albertelli's and Iacaboni's football gaming operation, was nicknamed "Bullet." [TT6:152-153; TT16:89-90].

Later that same day, after Albertelli had delivered the diagram (via Davies) to Iacaboni as requested, Albertelli answered Iacaboni's questions about the diagram, such as whether the "boat" had "one floor," and told Iacaboni that it was in North Reading, which Iacaboni said that he was "not going to write it down." [App.1066-

-15-

1068].  Albertelli said that the "boat" had "the thing on top," to which Iacaboni responded, "Yeah. I saw the triangle." [App.1068].  The North Reading Big Dog has a triangle on the top.  [TT15:71-72; Exh.183].

The following day, Iacaboni told Albertelli that he had met with "the people" who were "ready to go right?," and that "the positive was, was the pizza joint, [was] there right?" [App.1086].  However, Iacaboni informed Albertelli, the person he had met with – the arsonist – needed a key because, "[h]e says, 'no, you got to do it from the inside.'  See evidently, he figures that someone on an insurance thing, doesn't know it's a revenge thing, right?" [*Id.*].  Moreover, Iacaboni said, the arsonist had told him "the whole process and everything." which involved igniting toilet paper which "smolders right to a spot.  When it gets to the spot, poof, you know?" [App.1087].  In addition, Iacaboni said, the person had said that the plan was "perfect" because it would be near the ovens, which always malfunction. [*Id.*].  However, Iacaboni reported, the arsonist left when Iacaboni did not have a key.  [*Id.*].

Shortly after midnight on November 12, 2003, McCormack and Slater drove to Romeo's Pizza adjoining the North Reading Big Dog, where Slater placed a gasoline-filled water bottle with a rag as a wick.  [TT19:99-100].  The wick failed to ignite, and later that day, Homsi communicated Albertelli's displeasure with this outcome to McCormack and advised him that Albertelli wanted the entire building

-16-

burned. [TT19:100, 162-63]. Just after midnight on November 13, 2003, McCormack and Slater filled a large container with gasoline, placed a rag inside it, and Slater ignited it near the entrance to Romeo's Pizza. [TT19:100-102]. Massachusetts State Police ("MSP") Trooper Matthew Murphy, who was conducting surveillance of the North Reading Big Dog as a result of the intercepted telephone calls, called firefighters who extinguished the fire before it could damage the building, and two uniformed MSP officers arrested Slater and McCormack. [TT3:98-99, 134-135; TT15:57, 67; TT19:103; TT25:101].

After McCormack's and Slater's arrest, Homsi called Albertelli on November 13, 2003, and told him that "[a] couple of friends of mine are in jail," referring to McCormack and Slater. [App.1094; TT21:73]. Homsi met with Albertelli and McCormack on November 23, 2003, to discuss paying Slater's bail, and later that same day, Albertelli gave McCormack $10,000 to pay for Slater's bail. [TT19:105-110; TT21:78-80; Exh.44A].

Thereafter, on February 5, 2004, Gianelli informed Albertelli that "this kid" who had been caught "might be talking a little bit," and asked if there was something that Albertelli could do or find out. [App.1168]. Gianelli also informed Albertelli that "Kennedy" was handling "whoever this kid is," a reference to attorney Terrence

Kennedy, who represented McCormack, who wound up cooperating with the government. [App.1169; TT24:19-20].

## SUMMARY OF ARGUMENT

1. The district court correctly denied the defendants' motion to suppress the fruits of the wiretaps. First, the October 31, 2003 wiretap application was properly authorized by Essex County District Attorney ("DA") Jonathan W. Blodgett. DA Blodgett's authorization letter was dated October 30, 2003, one day before the wiretap application was submitted, the letter expressly identified the three targets of the investigation, and the letter was bound together with the wiretap application. These facts suggest that DA Blodgett was familiar with the content of the wiretap application when he signed the authorization letter, thereby satisfying the requirements of federal and Massachusetts law, a conclusion which is further supported by DA Blodgett's 2008 affidavit, in which he attested that he had reviewed drafts of the 2003 affidavit setting forth probable cause and an application setting forth the statutory requirements, and that he was satisfied that the initiation of a wiretap was proper and in compliance with state law.

Second, Trooper Nunzio Orlando's affidavit in support of the wiretap application established a "reasonable likelihood" that traditional investigative techniques had been tried and failed or appeared unlikely to succeed if tried or were

-18-

too dangerous to try, thereby satisfying the necessity requirement of 18 U.S.C. §2518(1)(c). Third, based on Trooper Orlando's affidavit, a magistrate could have concluded that there was "at least a fair probability" that the targets of the investigation had in their possession within Massachusetts slips or minutes of bets placed overseas with the Gianelli organization, and that those slips or minutes were in violation of Mass. Gen. Laws ch. 271, §17. Finally, suppression of the fruits of the wiretaps here is not appropriate in any event.

2. The district court did not err in allowing Special Agent Mattheu Kelsch of the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), who possessed specialized knowledge about arson investigations, to provide expert testimony regarding language used in intercepted conversations in which the defendants spoke in elliptic terms in general, and used many cryptic references that a juror might not recognize. His testimony also did not constitute improper "summary" testimony, and any error was harmless.

3. Iacaboni waived his contention that the law enforcement officers improperly testified as "fact," "expert" and "overview" witnesses simultaneously. Iacaboni raised this argument for the first time in a motion for reconsideration of the denial of his motion for a new trial, but Iacaboni does not argue on appeal that the district court abused its discretion in denying that motion. Even if this Court were to reach this

-19-

issue, the district court did not err in admitting the challenged testimony, and any error was harmless.

4.  The district court did not err in allowing MSP Sergeant Pasquale Russolillo to testify that Albertelli was a partner in the gambling business.  This testimony was elicited in the context of questions about documents that Russolillo had seized from Albertelli's residence during the execution of a search warrant, it did not constitute improper "overview" testimony, and any error was harmless.

5.  The district court did not err in allowing Mark O'Connor, an attorney, to testify about his conversation with Albertelli.  Albertelli did not establish that the two had an attorney-client relationship about the particular matter which they were discussing, the conversation was admissible in any event under the crime-fraud exception, and any error was harmless.

6.  Iacaboni waived his contention that the district court allowed prejudicial "spillover" testimony regarding organized crime figures and their associations with the Gianelli organization because he did not raise that argument in a pretrial motion to sever.  Even if deemed forfeited rather than waived, the claim would lack merit.

7.  The evidence was sufficient for a reasonable jury to convict Iacaboni on all counts of conviction.  A reasonable jury could conclude that Iacaboni and Albertelli conspired with Gianelli and others to set a fire at the North Reading Big Dog, and

reached a tacit agreement to do so no later than when Albertelli delivered copies of the Big Dog's layout to Iacaboni at Iacaboni's request, and then answered Iacaboni's questions about the diagram and informed Iacaboni that it was in North Reading. The evidence also was sufficient for a reasonable jury to conclude beyond a reasonable doubt that Iacaboni was guilty of the gambling charges, Counts 3 and 5.

8. The defendants' cumulative error argument fails because there was no error.

## **ARGUMENT**

## I.    **THE DISTRICT COURT CORRECTLY DENIED THE DEFENDANTS' MOTION TO SUPPRESS THE FRUITS OF THE WIRETAPS.**

All four defendants contend that the district court erred in denying their motion to suppress the fruits of the wiretaps.[5]   None of their contentions has merit, and suppression is not appropriate in the circumstances of this case in any event.

### A.    **Procedural History**

### 1.    **The October 31, 2003 Wiretap Application**

On October 31, 2003, Essex County First Assistant District Attorney John T. Dawley and Assistant District Attorneys Brian T. O'Keefe and Alexander R. Cain (collectively the "Essex ADAs") applied for an order and warrant pursuant to Mass.

---

[5] The government agrees that Gisele Albertelli is an aggrieved person under 18 U.S.C. §2518(10)(a), as she was a party to a call intercepted pursuant to the wiretap order issued on October 31, 2003.

Gen. Laws ch. 272, §99, authorizing the interception of wire communications over three cellular telephones subscribed to by Albertelli, which was supported by an affidavit of MSP Trooper Nunzio Orlando. [App.651-745]. The application also was accompanied by two letters from Jonathan W. Blodgett, the Essex County DA. [App.746-747]. The first letter, addressed to Associate Justice Richard Welsh of the Massachusetts Superior Court and dated October 30, 2003, stated that DA Blodgett had specially designated the Essex ADAs to apply for the "attached" wiretap application:

> I have specially designated [Dawley, O'Keefe, and Cain], pursuant to Massachusetts General Laws, Chapter 272, Section 99, to make application for an interception warrant, and any amendments, renewals and extensions thereof, to intercept certain wire communications of Dennis Albertelli, Salvatore Ramasci, and Arthur Gianelli and their associates occurring over telephone numbers (781) 710-2154, (978) 758-8575 and (617) 571-8262.

> I have authorized and designated [Dawley, O'Keefe, and Cain] to personally make presentment to the Court of the attached application, as well as all extensions and renewal applications, all amendment applications, all status reports, and all return documents emanating from the above-mentioned interception warrant, all of which shall be reviewed by me or my designee before being presented to you.

> I have further delegated [Dawley, O'Keefe, and Cain] the responsibility of supervising the execution of the requested

> interception warrant.  A copy of my letter to [Dawley,
> O'Keefe, and Cain] is attached hereto.

[App.746].

The second letter, dated October 29, 2003, stated that DA Blodgett had specially designated the Essex ADAs to make the wiretap application.  [App.747].  Justice Welsh signed the wiretap order on October 31, 2003.  [App.745, 747H].

### 2.    The Defendants' Motion to Suppress

On March 21, 2008, the defendants joined in an omnibus motion to suppress the fruits of what they alleged to be unlawful wiretaps.  [D.458; App.570-650].  As relevant to these appeals, the defendants made the following claims:  (1) neither the October 31, 2003 wiretap application nor any subsequent wiretap application demonstrated that they were properly authorized by DA Blodgett, as required by 18 U.S.C. §2516(2) and Mass. Gen. Laws ch. 272, §99(F)(1), and as interpreted in *Commonwealth v. Vitello*, 367 Mass. 224, 327 N.E.2d 819 (1974); (2) Trooper Orlando's affidavit failed to satisfy the necessity requirements of 18 U.S.C. §2518(1)(c) and Mass. Gen. Laws ch. 272, §99(E)(3); and (3) Orlando's affidavit failed to establish probable cause to believe that the targets of the wiretap were violating the Massachusetts gaming statute, Mass. Gen. Laws ch. 271, §17, because it did not identify a place in Massachusetts where bets were being registered, and

because the information from confidential informants was uncorroborated and unreliable.  [App.586-653].

The government opposed the motion to suppress. [D.486; App.863-926].  As to the authorization claim, the government argued that DA Blodgett's letters to Justice Welch and the Essex ADAs were legally sufficient under *Vitello* and *Commonwealth v. D'Amour*, 428 Mass. 725, 704 N.E.2d 1166 (1999), to ensure that he had taken personal and political responsibility and public accountability for each wiretap that his office had obtained.  [App.888-899].  In addition, to eliminate any possible doubt regarding this question, the government submitted an affidavit from DA Blodgett, dated April 28, 2008, in which he attested, *inter alia*, that:

> 2.   In October, 2003, I was made aware of an investigation by the [MSP] of a gaming operation in Essex County.   I assigned [Dawley, O'Keefe, and Cain] to oversee the investigation.

> 3.  In late October, the assistants requested approval to apply for an order authorizing interception or oral communications.  Thereafter, prior to my approval to do so, I reviewed draft copies of an affidavit setting forth the probable cause and an application setting forth the statutory requirements defining how the order was to be implemented.  I was satisfied that as a matter of uniform law enforcement policy within this jurisdiction, the initiation of a wiretap was proper and required.  I was satisfied that the application and affidavit were in compliance with section 99.

-24-

* * *

> 6.  I personally reviewed every renewal application
> and supporting affidavit.

[App.927-929].

The government also argued that Orlando's affidavit had appropriately explained the goals of the investigation and had demonstrated that the MSP had made "a reasonable, good faith effort to run the gamut of normal investigative procedures before" resorting to electronic interception, thereby satisfying the necessity requirement. [App.871-925]. Finally, the government argued that Orlando's affidavit established probable cause to believe that the Gianelli organization was violating the Massachusetts gaming statute *within* Massachusetts, explaining that although all bets were registered off-shore with "Duke Sports," all other facets of the organization were handled locally, including the exchange and collection of monies as well as the keeping and maintenance of records.  [App.907-912].

### 3.  The District Court's Memorandum and Order Denying the Motion to Suppress

On October 8, 2008, the district court denied the motion to suppress in a published memorandum and order.  The district court concluded that DA Blodgett's letters were "sufficient to satisfy the requirements of the statute and establish that the appropriate official authorized the original wiretap warrant application." 585 F. Supp.

-25-

2d at 159.  The court found relevant that, in *D'Amour*, "a case with a very similar designation letter to DA Blodgett's letter," the Supreme Judicial Court of Massachusetts ("SJC") had found that a wiretap application had been properly authorized because, "as in this case, the letter was dated near to the day of filing, the letter and application were bound together and the defendant offered no evidence that the application had not been properly authorized." *Id.* (citing *D'Amour*, 428 Mass. at 734-35, 704 N.E.2d 1166).

In reaching this conclusion, the district court acknowledged that DA Blodgett's letter did not include as detailed a description of the crimes being investigated as did the letter in *D'Amour*, but noted that the letter had specifically named the three individuals being investigated.  *Id.*  The district court also stated that, while it was "unfortunate that DA Blodgett has not adopted the SJC's suggestion of co-signing the application," this Court had made clear that "such an oversight is not fatal to the wiretap."  585 F. Supp. 2d at 159 (citing *United States v. Smith*, 726 F.2d 852, 860 (1st Cir. 1984) (en banc)).  The district court therefore determined that an evidentiary hearing on the claim was not warranted or necessary.  *Id.*

The district court also rejected each of the defendants' necessity arguments.  *Id.* at 156-58.  The court first rejected the contention that Orlando had exaggerated the investigative goals in order to declare that measures short of wiretapping would be

-26-

insufficient, noting that the police may "cast a wide net" in its investigative goals, and that this Court had upheld wiretaps "where the goals of the investigation were to uncover the 'full scope' of the crimes under investigation and the people involved and to obtain information about the 'totality of offenses' in which the targets were involved." *Id.* at 156 (quoting *United States v. Martinez*, 452 F.3d 1, 6 (1st Cir. 2006), and *United States v. Villarman-Oviedo*, 325 F.3d 1, 10 (1st Cir. 2003)). "The goals identified by Orlando," the court concluded, "closely match those goals the First Circuit has approved." *Id.*

The district court next rejected the defendants' contention that Orlando had improperly used generic and boilerplate allegations as to why normal investigative techniques were not working, stating that there was no requirement "that the government establish that the investigation at issue was different from an ordinary investigation for a crime of that kind," and that Orlando had appropriately demonstrated necessity "by referencing common difficulties in gaming investigations because those difficulties also apply in this case * * *." *Id.* at 156-57.

The district court also rejected the defendants' contention that Orlando's affidavit contained few particularized explanations of why normal investigative techniques would not be sufficient and instead merely parroted allegations contained in other affidavits filed by Orlando and Sergeant Russolillo. *Id.* at 157. "[T]he police

need not draft entirely new language for every wiretap affidavit," the court explained, and "[b]ecause investigations of gambling conspiracies may encounter the same difficulties when using normal investigative techniques, Orlando and Russolillo may have encountered the same reasons for necessity in more than one of their cases." *Id.*

The district court rejected as well the defendants' contention that normal investigative techniques were yielding results and therefore wiretapping was premature, concluding that the affidavit "demonstrated that the police had made a good faith effort to use the other techniques and that there was a reasonable likelihood that alternative techniques would fail." *Id.* In particular, the court noted, although the MSP had gained some information from traditional techniques, "Orlando made clear in the affidavit that there was still much to be done that had not and could not be done by conventional methods." *Id.* The court also explained that, although the MSP had acquired evidence sufficient to establish probable cause, it "had not obtained, nor could it, proof beyond a reasonable doubt for the named subjects using traditional investigative techniques" and "[t]here was also no reasonable prospect that traditional investigative methods would expose the full scope and membership of the conspiracy." *Id.* at 157-58.

Finally, the district court rejected the defendants' claim that Orlando had failed to set forth facts adequate to support probable cause for a violation of the

Massachusetts gaming statute because his affidavit did not describe a "place" in Massachusetts where bets were registered or apparatus were kept. *Id.* at 162. The Massachusetts gaming statute is not limited to bookmaking in the traditional sense but is "broad and encompassing," the court reasoned, and "[a]lthough Orlando's affidavit stated that bet registering had been moved offshore, it also contained several allegations regarding the continuation of the payment and collection of bets by Gianelli, Albertelli and Ramasci in Massachusetts." *Id.* (quoting *United States v. Marder*, 48 F.3d 564, 567 (1st Cir. 1995)). That information established "at least a fair probability that those three individuals had in their possession records of the amounts and nature of bets," the court explained, and because there was "a fair probability that the defendants kept betting records in Massachusetts, provided the applicants with probable cause to believe that the three co-defendants were violating" the gaming statute. *Id.*

B.    **Standard of Review**

This Court reviews the grant or denial of a motion to suppress which challenges the bona fides of a warrant application under a two-tiered standard, evaluating questions of law de novo, and factual questions for clear error. *United States v. Hicks*, 575 F.3d 130, 136 (1st Cir. 2009). In doing so, this Court "give[s] significant deference to the magistrate's initial evaluation." *United States v. Ribeiro*, 397 F.3d

-29-

43, 48 (1st Cir. 2005), as the Supreme Court has "repeatedly said that after-the-fact

scrutiny by courts of the sufficiency of an affidavit should not take the form of de

novo review." *Illinois v. Gates*, 462 U.S. 213, 236 (1983).  This is equally true under

Massachusetts law, as the SJC has held that a reviewing court tests warrant

applications "in a practical and common sense manner to determine whether the facts

the application sets forth are minimally adequate to support the findings made by the

issuing judge."  *D'Amour*, 428 Mass. at 736, 704 N.E.2d 1166.

## C.     The October 31, 2003 Wiretap Application Was Properly Authorized.

The defendants first contend (AGBrief at 31-38) that the district court erred in

denying their motion to suppress because the October 31, 2003 wiretap application

was not properly authorized by DA Blodgett.  That contention lacks merit.

Under Title III of the Omnibus Crime Control and Safe Streets Act, 18 U.S.C.

§§2510-2521 ("Title III"), state officials may apply for an order authorizing the

interception of wire, oral, or electronic communications as follows:

> The principal prosecuting attorney of any State, or the
> principal prosecuting attorney of any political subdivision
> thereof, if such attorney is authorized by a statute of that
> State to make application to a State court judge of
> competent jurisdiction for an order authorizing or
> approving the interception of wire, oral, or electronic
> communications, * * * and such judge may grant in
> conformity with section 2518 of this chapter and with the

-30-

> applicable State statute an order authorizing, or approving
> the interception of wire, oral, or electronic communications
> * * *.

18 U.S.C. §2516(2). The Massachusetts wiretap statute, in turn, provides that "[t]he

attorney general, any assistant attorney general specially designated by the attorney

general, any district attorney, or any assistant district attorney specially designated by

the district attorney may apply ex parte to a judge of competent jurisdiction for a

warrant to intercept wire or oral communications. Each application ex parte for a

warrant must be in writing, subscribed and sworn to by the applicant authorized by

this subparagraph." Mass. Gen. Laws. ch. 272, §99(F)(1).

In *Vitello*, the SJC held that §99(F)(1) was in substantial compliance with 18

U.S.C. §2516(2), interpreting the term "specially designated" in §99(F)(1) to mean

"that an assistant district attorney may not apply at will for wiretap orders but must

bring the matter for examination before his senior officer, the district attorney." 367

Mass. at 256, 327 N.E.2d 819. This process satisfied the federal standard, the SJC

concluded, because:

> We construe the provision for special designation to mean
> that the Attorney General or the district attorney is to
> determine whether a particular proposed use of electronic
> surveillance would be consistent with the over-all policy in
> respect to monitoring followed in his jurisdiction, and to
> this end the respective attorney must review and authorize
> each such application in writing. Through this process the

> necessary centralization is provided for as is the
> concomitant protection that the individual with final
> authority to regulate electronic surveillance be subject to
> public accountability.

*Id.* (footnote omitted). This procedure served the interests of public policy, the SJC

noted, because "the practice of authorizing an assistant district attorney to apply is

beneficial in that such assistant district attorney, through his closer association with

investigation of the case, may more completely and adequately respond to the judge's

inquiry with respect to the requirements of the State and Federal statutes requiring

proof that probable cause exists." *Id.* at 257, 327 N.E.2d 819. Following *Vitello*, this

Court in *Smith*, sitting en banc, held that §99(F)(1) did not conflict with or diminish

federal requirements because "[t]he detailed review by a district attorney of every

application for a proposed use of electronic surveillance on a case by case basis, and

his written special designation of an assistant to submit and prosecute the application

before a justice, would seem to satisfy fully the congressional objectives." 726 F.2d

at 858.

Subsequently, in *D'Amour*, the SJC rejected the contention that a warrant

application was infirm because it did not indicate that the district attorney fully

examined or considered the application, holding that "[t]he district attorney, subject

to public accountability, accepted responsibility for the application through the authorization letter."  428 Mass. at 734, 704 N.E.2d 1166.  Moreover, the SJC held, there was "ample evidence that the district attorney properly reviewed the application," as she had described the life insurance fraud and larceny in the authorization letter and the authorization letter and application were bound together and shared the same date, which "suggest[ed] that the district attorney was familiar with the content of the application when she signed the authorization."  *Id.* at 734 & n.10, 704 N.E.2d 1166.

Here, as the district court correctly found, DA Blodgett's authorization letter is similar to the letter which the SJC found sufficient to satisfy §99(F)(1)'s requirements in *D'Amour*.  DA Blodgett's letter to Justice Welch was dated October 30, 2003 – one day before the warrant was sought and obtained – and the letter and the wiretap application were bound together, as DA Blodgett expressly stated that he had authorized and designated the Essex ADAs "to personally make presentment to the Court of the *attached application*."  [App.746 (emphasis added)].  Moreover, although DA Blodgett did not specifically describe the crimes which the MSP were investigating in his letter, he did identify Gianelli, Albertelli, Ramasci, and their associates as the targets of the wiretap.  [App.746].  These facts, as in *D'Amour*, suggest that DA Blodgett was familiar with the content of the wiretap application

when he signed the authorization letter, thereby satisfying the requirements of §99(F)(1).

The defendants nonetheless argue (AGBrief at 32) that because DA Blodgett stated that any document would be "reviewed by me or my designee before being presented to you," the letter on its face suggested that DA Blodgett had *not* reviewed the warrant application. Such a reading is not supported by the language of the letter. DA Blodgett stated in the letter that he was authorizing the Essex ADAs to present the "attached application," and that he was also authorizing the Essex ADAs to present all extension and renewal applications, "all of which shall be reviewed by me or my designee before being presented to you." The best reading of this letter is that DA Blodgett had in fact reviewed the "attached application" – a common sense conclusion bolstered by his identification of the targets by name and the fact that the letter was dated one day before the warrant application was submitted to the court, and that the statement that he or his designee would review all documents before they were presented to the court was referring to the extension and renewal applications.

The defendants also attempt to distinguish *D'Amour* (AGBrief at 36) on the ground that, in that case, the authorization letter and warrant application "shared the same date." But the SJC nowhere suggested in *D'Amour* that the fact that the letter there shared the precise date as the warrant application was itself dispositive, or that

-34-

the court would have reached a different conclusion if the authorization letter had been dated one day earlier. Such a suggestion is contrary to common sense, as there are doubtless instances where it is simply is not possible to seek a warrant on the same day a district attorney signs an authorization letter. The defendants cite no case which holds that even a one-day difference between the signing of the authorization letter and submission of the application suggests that a district attorney did not review the application.

The defendants fare no better in asserting (AGBrief at 35-36) that DA Blodgett never stated that he authorized the Essex ADAs to present the warrant application on October 31, 2003. To the contrary, DA Blodgett expressly stated in his letter to Justice Welch that he had "authorized and designated [the Essex ADAs] to personally make presentment to the Court of the *attached application*," which suggests, as in *D'Amour*, that he had personally reviewed the application and had authorized the Essex ADAs to present it to the court. [App.764 (emphasis added)]. And while it is true that he did not cosign the application, as the SJC in *Vitello* suggested, it is equally true that "lack of such a document and the presumption it would enjoy is not fatal to the government. The absence of a compelling signature on a critical document can be remedied by proof of actual authority." *Smith*, 726 F.2d at 859. So here.

-35-

Furthermore, DA Blodgett's 2008 affidavit removes any possible doubt on this issue, as he attested therein that prior to authorizing the Essex ADAs to seek the wiretap application:

> I reviewed draft copies of an affidavit setting forth the probable cause and an application setting forth the statutory requirements defining how the order was to be implemented. I was satisfied that as a matter of uniform law enforcement policy within this jurisdiction, the initiation of a wiretap was proper and required. *I was satisfied that the application and affidavit were in compliance with section 99.*

[App.927-928 (emphasis added)]. The defendants contend (AGBrief at 34-35) that DA Blodgett's statement that he had only reviewed "drafts" of the affidavit is "fatal to the validity of the First Wiretap," as a draft by definition is not the final version of the affidavit. But no case so holds, and with good reason. Last-minute changes to a document are common, however, if only to correct typographical errors, and requiring a district attorney to approve each correction would be a paradigmatic example of exalting form over substance. Here, where DA Blodgett signed the authorization letter the day before the warrant application was submitted, expressly stated in his letter that the warrant application was attached, and further stated in his affidavit that he was "satisfied that the application and affidavit were in compliance with section 99," he unquestionably "was familiar with the content of the application" when he

signed the authorization letter. The district court therefore did not err in rejecting this claim and holding that an evidentiary hearing was not necessary. *See United States v. O'Malley*, 764 F.2d 38, 40-42 (1st Cir. 1985) (rejecting request for evidentiary hearing into sufficiency of Assistant Attorney General's review of wiretap application where record suggested that application had been properly authorized, and authorization therefore was not subject to further judicial review).

### D. The October 31, 2003 Wiretap Application Satisfied the Necessity Requirement

The defendants next contend (AGBrief at 38-43) that the October 31, 2003 warrant application failed to satisfy the necessity requirement of the Massachusetts wiretap statute. That contention, too, lacks merit.

Under Title III, each application for a wiretap order shall contain "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. §2518(1)(c).[6]  In reviewing the government's showing of necessity, this Court's role "is not to make a de novo determination of sufficiency as if it were [the issuing judge], but to decide if the facts set forth in the application were

---

[6] The Massachusetts wiretap statute imposes a similar requirement, providing that a warrant may issue "[u]pon a showing by the applicant that normal investigative procedures have been tried and have failed or reasonably appear unlikely to succeed if tried." Mass. Gen. Laws ch. 272, §99(E)(3).

-37-

minimally adequate to support the determination that was made." *United States v. Ashley*, 876 F.2d 1069, 1074 (1st Cir. 1989) (internal quotation omitted); *see Commonwealth v. Fenderson*, 410 Mass. 82, 83-84, 571 N.E.2d 11 (1991) (noting similarities between the necessity requirement under Title III and the Massachusetts wiretap statute and citing *Ashley* in construing the Massachusetts necessity requirement). Under the necessity requirement, "[t]he government is only required to show that it has made "a reasonable, good faith effort to run the gamut of normal investigative procedures before resorting to means so intrusive as electronic interception of telephone calls." *United States v. Cartagena*, 593 F.3d 104, 109 (1st Cir.) (internal citations omitted), *cert. denied*, 131 S. Ct. 247 (2010) (internal quotation omitted).

In this case, Orlando's affidavit easily satisfied the necessity requirement. Orlando explained in his affidavit that, as of that date, Gianelli, Albertelli, Ramasci, and other persons as yet unknown "are part of a highly organized and sophisticated group engaged in a continuing criminal conspiracy to commit violations of the Massachusetts gaming statute" [G.App.116, 174 ].[7] Orlando stated that "[a] primary goal of this investigation is to penetrate the bookmaking operation and conspiracy

---

[7] The copy of Orlando's affidavit in the defendants' appendix is missing page 64. [App.713-714]. The government therefore has included the complete version of the affidavit in its supplemental appendix, and cites to that version herein.

described in this affidavit, and to identify, apprehend, and bring about the successful prosecution of those persons involved at all levels of this organization and conspiracy, including persons other than [Gianelli, Albertelli, and Ramasci], such as the 'street bookies,' persons operating 'local gaming offices,' persons operating 'area bookmaking offices,' and persons at higher levels of the organization." [G.App.175].

Orlando also described in detail the investigative procedures that had been tried in the investigation and why they had failed to achieve the investigation's goals, and additionally described why other investigative procedures reasonably appeared to be unlikely to succeed or were too dangerous:

- There was no reason to believe that confronting Gianelli, Albertelli, Ramasci, or others or subpoenaing them to a grand jury would persuade them to cooperate and provide truthful pertinent information, as they would risk substantial retribution if they were to cooperate with law enforcement; the loyalty of the organization's members and its close-knit nature would preclude a member from cooperating with law enforcement; and any attempt to contact one or members would likely alert other members of the organization to the existence of the investigation, thereby jeopardizing it;

- Two confidential informants (CI-I and CI-2) whom the MSP were using were not familiar with the entire conspiracy, were unable to penetrate the organization to any significant degree, would not testify publicly, were not willing to wear any kind of electronic or bugging device on their person, and were willing to provide information only on the condition that their identities not be disclosed because they believed that their safety would be

-39-

jeopardized if it became known that they were cooperating with law enforcement;

- Search warrants would be of only limited value, as it was unlikely that the seizure of records and any resulting arrests would lead to the identification of all the participants in the various levels of the organization, and once the targets learned of the execution of search warrants, records and other evidence relating to the criminal conspiracy would likely be destroyed;

- None of the informants assisting law enforcement authorities was willing to introduce an undercover officer into the organization due to the informants' fear of reprisal, and without such an introduction, an undercover officer would not be able to infiltrate the conspiracy at a high enough level to be useful;

- A trash analysis would at most reveal the existence of illegal gaming and would not fully identify the scope of the conspiracy or its higher-ranking members;

- Although physical surveillance of the targets of the investigation had been used, additional extensive physical surveillance would be detrimental to the investigation because past surveillance had shown that Gianelli, Albertelli, and Ramasci employed counter-surveillance techniques, and the investigation would be jeopardized if the officers were detected while conducting physical surveillance; and

- Telephone toll analysis and public record analysis had failed to result in the collection of sufficient evidence to identify fully the members of the entire organization and otherwise achieve the goals of the investigation.

[G.App.175-181].   Hence, as in *Martinez*, Orlando's affidavit does not "simply reiterate 'conclusory evidence' [but rather] explain[s] in detail how and why other

-40-

normal investigative techniques were either exhausted or not feasible."  452 F.3d at

5.

The defendants nonetheless contend (AGBrief at 39-40) that the necessity

requirement was not met here because Orlando's affidavit contained "boilerplate"

allegations that are identical or near-identical to those from affidavits in other wiretap

investigations.  Moreover, they argue (AGBrief at 41), these allegations are "even

more meaningless to this specific case" because "before the MSP sought the wiretap,

they knew that Gianelli no longer operated a 'typical' bookmaking business."  But this

Court rejected the same claim in *Martinez,* holding that the affidavit in that case

"explain[ed] in detail how and why other normal investigative techniques were either

exhausted or not feasible," which included "the DEA's use, or consideration and

rejection, of eight traditional investigative techniques: (1) physical surveillance; (2)

cooperating witnesses; (3) undercover officers; (4) witness interviews; (5) grand jury

subpoenas; (6) search warrants; (7) pen registers; and (8) telephone tolls."  *Id.*

Similarly, in this case, Orlando's affidavit explains in specific detail why these very

same traditional investigative techniques were either exhausted or not feasible, and it

too, satisfies the necessity requirement.  In addition, as the district court concluded,

"[b]ecause investigations of gambling conspiracies may encounter the same

difficulties when using normal investigative techniques," Orlando and Russolillo

-41-

"may have encountered the same reasons for necessity in more than one of their cases," and there is no requirement that law enforcement officers "draft entirely new language for every wiretap affidavit." 585 F. Supp. 2d at 157.

The defendants also assert (AGBrief at 41-42) that the MSP had already identified those at the highest levels of the organization – Gianelli, Albertelli, and Ramasci – and that a wiretap consequently was not necessary. It is well-settled, however, that wiretaps are permissible when one of the goals of law enforcement is to uncover the full scope of a conspiracy and most or all of its members. *See, e.g., United States v. Santana*, 342 F.3d 60, 66 (1st Cir. 2003); *Villarman-Oviedo*, 325 F.3d at 10. Here, Orlando stated in his affidavit that a "primary goal" of the investigation was "to identify, apprehend, and bring about the successful prosecution of those persons involved at all levels of this organization and conspiracy, including persons other than" Gianelli, Albertelli, and Ramasci. [G.App.175]. As in *Santana* and *Villarman-Oviedo*, those aims were legitimate, and the government's knowledge of Gianelli, Albertelli, and Ramasci does not undermine that conclusion.

The defendants' other arguments are misplaced both as a factual and legal matter. The defendants assert (AGBrief at 42), for example, that the necessity requirement was not satisfied because "Orlando recounts only two specific instances where Gianelli might have used counter-surveillance techniques" and "does not allege

-42-

any difficulties with surveillance of Ramasci and/or Albertelli and, in fact, suggests that there were none." In fact, Orlando specifically detailed that past surveillance of Gianelli, Albertelli, and Ramasci had shown "that they employ counter-surveillance techniques in the event they are being followed," including "making abrupt stops, accelerating to great speeds, and otherwise operating in such a manner that poses too great a risk of the surveillance being exposed." [G.App.179]. Moreover, necessity is not determined by a specific number of counter-surveillance efforts.

The defendants likewise err in asserting (AG Brief at 43) that the MSP "made no effort to introduce an undercover agent." Orlando explained that none of the informants currently assisting law enforcement was willing to attempt to introduce an undercover officer into the organization, and that "without such an introduction an undercover officer would not be able to infiltrate the conspiracy at high enough levels to gather sufficient evidence to achieve the goals of this investigation. At best, an undercover officer attempting to infiltrate the organization without an introduction would be able to do little more than place bets." [G.App.178]. Also unavailing is the assertion (AGBrief at 43) that the MSP "made no attempt to cultivate new informants or investigate Gianelli's, Albertelli's, or Ramasci's finances." Orlando explained that based on his personal knowledge of the organization, "the loyalty of the organization's members and its close-knit nature would preclude a member from

cooperating with law enforcement," and that even if a search warrant were executed to discover records, "it is unlikely that the seizure of such records and the arrests of such persons, without more, would lead to the identification of all of the participants in the various levels of the organization and achieve the other goals of the investigation." [G.App.177-178].

The defendants' arguments also reflect a basic misunderstanding of the relevant legal principles. As this Court has stated, "[t]o establish necessity, the government is *not* required to show that other investigative methods have been wholly unsuccessful, nor must the government exhaust all other investigative measures before resorting to wiretapping." *Cartagena*, 593 F.3d at 109 (emphasis added). Rather, all that is required is that a wiretap application establish a "reasonable likelihood" that traditional investigative techniques have been tried and failed or appear unlikely to succeed if tried or were too dangerous to try. *Id.* Orlando's affidavit easily passes muster under that standard.

### E.     The October 31, 2003 Wiretap Application Established Probable Cause

The defendants lastly contend (GABrief at 21-39; DABrief at 31-35) that the October 31, 2003 warrant application failed to establish probable cause. In particular, they claim that Orlando's affidavit did not establish probable cause to believe that:

-44-

(1) There was a violation of §17 of the Massachusetts gaming statute, because Orlando failed to identify a place in Massachusetts where bets were being registered (GABrief at 23-33);

(2) Gianelli and Dennis Albertelli operated the football card operation (GABrief at 34-36);

(3) A wiretap of Dennis Albertelli or Ramasci would provide evidence that the video poker operation violated §17 in connection with organized crime, as required by Mass. Gen. Laws ch. 272, §§99(E)(2) & (F)(2)(b) (GABrief at 36-39); and

(4) Gianelli's video poker machine business satisfied the organized crime requirement of Mass. Gen. Laws ch. 272, §99(B)(7) (DABrief at 30-35).

The defendants' first claim lacks merit, and the remaining three claims are waived.

## 1.     The Preserved Probable Cause Claim

The defendants renew on appeal their claim that Orlando's affidavit failed to establish probable cause to believe there was a violation of §17, because Orlando did not identify a place in Massachusetts where bets were being registered.  That claim is unavailing.

It is well-established that "[a] magistrate's determination of probable cause should be paid great deference by reviewing courts." *Illinois v. Gates*, 462 U.S. at 236 (internal quotation omitted).  As this Court has stated, "[w]e examine the affidavit submitted to the magistrate judge in a practical, commonsense fashion, and give considerable deference to the issuing magistrate's conclusion that probable cause has

been established." *United States v. McElroy*, 587 F.3d 73, 76 (1st Cir. 2009) (internal

quotations omitted).   This deference extends to the "reasonable inferences the

[magistrate] may have drawn from the attested facts." *United States v. Barnard*, 299

F.3d 90, 92-93 (1st Cir. 2002).   Indeed, "given the strong preference for warrants

under our Fourth Amendment jurisprudence, this Court has stated that a reviewing

court will typically defer to an issuing magistrate's 'probable cause' determination in

a doubtful or marginal case." *United States v. Zayas-Diaz*, 95 F.3d 105, 111 (1st Cir.

1996) (citing, *e.g.*, *United States v. Ventresca*, 380 U.S. 102, 109 (1965)).

In this case, Orlando stated in his affidavit that there was probable cause to

believe that Gianelli, Albertelli, Ramasci, and other persons as yet unknown were part

of a "highly organized and sophisticated group engaged in a continuing conspiracy to

commit violations of the Massachusetts gaming statute, G.L. ch. 271, §17."

[G.App.116, 174].   That statute provides:

> Whoever keeps a building or room, or any part thereof, or
> occupies, or is found in, any place, way, public or private,
> park or parkway, or any open space, public or private, or
> any portion thereof, with apparatus, books or any device,
> for registering bets, * * * or whoever is present in such
> place, way, park or parkway, or any such open space, or
> any portion thereof, engaged in such business or
> employment; or, being such keeper, occupant, person found
> or person present, as aforesaid, registers such bets, or buys
> or sells such pools, or is concerned in buying or selling the
> same; or, being the owner, lessee or occupant of a building

-46-

> or room, or part thereof, or private grounds, knowingly
> permits the same to be used or occupied for any such
> purpose, * * * shall be [a crime].

Mass. Gen. Laws ch. 271, §17. Section 17 is not "limited to bookmaking in the traditional sense," but rather is "broad and encompassing." *Marder*, 48 F.3d at 567. Thus, the SJC has held that the terms "apparatus" or "device" "connotes an instrumentality utilized in betting," and that "such items as blackboards and tickets containing names of horses, telephones, number pool slips, and papers containing records of bets and the like could be found to be 'apparatus' for registering bets." *Commonwealth v. Demogenes*, 349 Mass. 585, 587, 211 N.E.2d 226 (1965). Indeed, the SJC has emphasized, even "articles (tape, pens and pencils) which could be used for innocent purposes may, when used with items designed for betting purposes, be found to be 'apparatus.'" *Id.*

The SJC also has held that one "registers" a bet under §17 by recording or noting it in some way, *see Commonwealth v. Chagnon*, 330 Mass. 278, 282, 113 N.E.2d 50 (1953), inasmuch as the term "register" "suggests in its ordinary meaning the commitment to writing of some event or transaction." *Demogenes*, 349 Mass. at 587, 211 N.E.2d 226. One can even "register" a bet by committing it to memory. *See Commonwealth v. Cosolito*, 359 Mass. 467, 470, 269 N.E.2d 679 (1971). Consequently, the "possession of any recorded memorandum intended to be a minute

-47-

of a bet is sufficient to demonstrate a violation of [§17] * * * depending upon the contents of the memorandum." *Commonwealth v. Boyle*, 346 Mass. 1, 4, 189 N.E.2d 844 (1963).

Here, Orlando's affidavit established probable cause to believe that one or more of the targets of the investigation was acting in violation of §17.  As Orlando described, although Gianelli had moved part of his bookmaking operation overseas, he still had to interact and communicate with his agents and/or bettors regularly within Massachusetts to finalize and collect payment on the organization's gaming activities. [G.App.147-148, 151-152, 155-156].  Both confidential informants (CI-1 and CI-2) informed Orlando and Russolillo, for example, that they met regularly in Essex County with Ramasci, a "runner" for the Gianelli gaming organization, to pay or collect any monies won or lost as a result of the wagers placed with the Gianelli organization.  [G.App.148, 152].  Orlando further described that on October 8, 2003, he and Trooper Timothy Foley served an arrest warrant on Stephen Russo, an agent in the Gianelli organization, at his house in Revere, Massachusetts, and found Russo in his basement apartment sitting at a table that was "littered with gaming paraphernalia, which included betting slips, papers with gambling notations, cuff sheets, football cards, sports books, a ledger identifying the code names of numerous betters, and other gaming related evidence."  [G.App.142].

Based on this information, the district court correctly determined that a magistrate could reasonably have inferred that there was "at least a fair probability" that Gianelli, Albertelli, and/or Ramasci had in their possession within Massachusetts slips or minutes of the bets placed overseas with the Gianelli organization, and that those slips or minutes of the bets would violate §17 because they constituted an "apparatus, books or any device for registering bets."  585 F. Supp. 2d at 162.

None of the defendants' contrary arguments has merit.  The defendants contend (GABrief at 23-26) that courts have interpreted §17 as requiring the actual registration of bets in Massachusetts, but they misread both the statute and the cases in so arguing. The proscribed activities set forth in §17 are separated into three subgroups, each defined by an independent clause and separated by the use of a semi-colon and the disjunctive "or," thereby reflecting their independent nature.  *See Commonwealth v. Morris M.*, 70 Mass. App. Ct. 688, 695, 876 N.E.2d 462 (2007) (citing cases).  Thus, the first clause of §17 makes it unlawful, *inter alia*, to "keep[] a building, or room, or any part thereof" or to occupy or be found in certain designated locations "with apparatus, books or any device, for registering bets"; the second clause provides that it is unlawful for anyone "being such keeper, occupant, person found or person present, as foresaid, [to] register[] such bets"; and the third clause provides that it is unlawful for "the owner, lessee or occupant of a building or room, or part thereof, or

-49-

private grounds" to engage in certain specified activities.  A defendant thus need *not* actually register bets to violate §17, as long as he or she is in possession of an "apparatus" in Massachusetts "for registering bets."

In *Commonwealth v. Carlson*, 331 Mass. 449, 120 N.E.2d 384 (1954), for example, the SJC upheld a conviction under §17 where the defendant was found in a building hallway with slips of records of bets on horse races as well as "a tape, a pen, and a pencil," holding that "[a]ll of the articles, taken together, could be found to be apparatus for registering bets, although some of them could be used for innocent purposes, *and although bets could be registered without them*."  *Id.* at 450, 120 N.E.2d 384 (emphasis added).  In other words, the SJC found that the defendant violated §17 even though there was no proof that he had registered any bets in the building.

Nor do any of the cases upon which the defendants rely suggest otherwise.  In *Chagnon*, the SJC stated that under §17, "[w]hat is criminal is the keeping of a building or room, or occupying or being found in any place, with apparatus, books or device for registering bets, and the registering of bets by such keeper, occupant, person found or person present in such a place."  330 Mass. at 282, 113 N.E.2d 50. This language simply reflects what the text of statute makes clear – that §17 criminalizes the  "keeping or occupying of any place with apparatus, books, or other devices for the 'registering' of bets" *and/or* "the actual 'registering' of bets by one

-50-

present in such a place." It does not suggest that to violate §17, a defendant must be simultaneously guilty of both actions. Indeed, in *Chagnon*, the SJC overturned the defendants' convictions, in part, on the ground that "[t]here was no evidence that either the defendant or Mooney conspired to register bets as a keeper, occupier, person found or present in any place 'with apparatus, books, or any device for * * * registering bets.'" *Id.* The court's reference to the second clause of §17, as distinct from the first, confirms that a defendant need not be guilty of both clauses for §17 to be violated. For similar reasons, the defendants' reliance on *Commonwealth v. Sousa*, 33 Mass. App. Ct. 433, 600 N.E.2d 1012 (1992), and other cases is misplaced.

The district court thus correctly determined that because there was a fair probability that the defendants kept betting records in Massachusetts, Orlando's affidavit established probable cause to believe that the defendants were violating §17. 585 F. Supp. 2d at 162.

### 2.    The Unpreserved Claims

The defendants also argue (GABrief at 34-39; DABrief at 30-35) that the affidavit lacked probable cause that Gianelli and Albertelli operated the football card operation; that a wiretap of Albertelli or Ramasci would constitute evidence that the video poker operation violated §17 in connection with organized crime; or that Gianelli's video poker machine business satisfied the organized crime requirement of

-51-

Mass. Gen. Laws ch. 272, §99(B)(7).  These arguments were not included in the defendants' motion to suppress.  Consequently, they are waived.

Rule 12(e) of the Federal Rules of Criminal Procedure provides: "A party waives any Rule 12(b)(3) defense, objection, or request not raised by the deadline the court sets under Rule 12(c) or by any extension the court provides.  For good cause, the court may grant relief from the waiver."  This Court has recently joined the majority of courts of appeals in holding that a defendant's failure to raise a defense required by Rule 12(b)(3) prior to trial constitutes an unreviewable waiver under Rule 12(e) and precludes appellate review of the defaulted claim:  "We believe that Rule 12(e) says what it means and means what it says."  *United States v. Walker*, — F.3d —, 2011 WL 5865652, at *8 (1st Cir. 2011).

Rule 12(b)(3) identifies a "motion to suppress evidence" as one of the enumerated motions that must be made before trial.  Fed. R. Crim. P. 12(b)(3)(C).  The defendants here did file a pretrial motion to suppress the fruits of the wiretaps, but as to probable cause, they advanced only two claims: (1) Orlando failed to identify a place in Massachusetts where bets were registered, and thereby failed to allege a violation of §17; and (2) the information from the confidential informants was uncorroborated and unreliable.  [App.637-642].  Consequently, all three arguments which the defendants raise for the first time on appeal are waived.  *See United States*

-52-

*v. Bashorun*, 225 F.3d 9, 12-13 & n.1 (1st Cir. 2000) (noting that where the defendant's motion to suppress raised a different claim than that advanced on appeal, "[s]ince the present claim was never presented to the district court, we will not entertain it on appeal."); *United States v. Torres*, 162 F.3d 6, 11 (1st Cir. 1998) ("This waiver provision [of predecessor version of Rule 12(e)] applies not only when a defendant has failed altogether to make a suppression motion but also when, having made one, he has neglected to include the particular ground that he later seeks to argue.").

A waiver under Rule 12(e) may be excused where a defendant shows "good cause" for his failure to raise a claim. But the defendants make no such argument in their opening briefs – indeed, they do not discuss the waiver issue at all – and any argument that "good cause" exists to excuse their default also is waived. *See Walker*, 2011 WL 5865652, at *9 ("Here, however, the appellant did not make a good cause argument in the district court at any time, and he has not made a cognizable showing of good cause in this court. Given these circumstances, there is no unfairness in holding him to his waiver."); *see also United States v. Davila-Felix*, — F.3d —, 2011 WL 6155721, at *8 n.5 (1st Cir. 2011) ("This argument was not made in the defendant's opening brief and, therefore, is waived.").

In any event, because Orlando's affidavit established probable cause to believe that the defendants were violating §17 by keeping betting records in Massachusetts, the probable cause requirement was satisfied regardless of whether the affidavit also established probable cause to believe that other aspects of the Gianelli organization's gambling operations violated Massachusetts law.

### F.    The Fruits of the Wiretap Should Not Be Suppressed

Even if this Court were to find that the October 31, 2003 wiretap application was deficient on one or more ground, it should nonetheless affirm the district court's denial of the motion to suppress for two reasons.  First, the Supreme Court has emphasized that not all deficiencies in wiretap applications warrant suppression.  *See United States v. Chavez*, 416 U.S. 562, 574-75 (1974) (stating that not "every failure to comply fully with any requirement provided in Title III would render the interception of wire or oral communications 'unlawful'").  Rather, the critical inquiry is whether there has been a "failure to satisfy any of those statutory requirements that directly and substantially implement the congressional intention to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary investigative device."  *United States v. Giordano*, 416 U.S. 505, 527 (1974).

Here, DA Blodgett's authorization letter suggests that he personally reviewed the affidavit. Even if that letter left some possible doubt on that question, it was at most a technical violation that did not subvert the primary purpose of the authorization requirement. There also is nothing in the record which suggests that DA Blodgett did not, in fact, review the application. In these circumstances, where there would at most be a technical violation of the showing required by §99(F)(1), suppression would not be warranted because that failure would not "directly and substantially" undermine the purposes of Title III or the Massachusetts wiretap law.

Second, even if this Court were to conclude that the wiretap application did not satisfy the necessity or probable cause requirements of federal law, the evidence derived from that wiretap should not be suppressed under the good faith exception to the exclusionary rule.[8] The fact that a Fourth Amendment violation occurs does "does not necessarily mean that the exclusionary rule applies." *Herring v. United States*, 555 U.S. 135, 140 (2009) (internal quotations omitted). Indeed, the Supreme Court

---

[8] Although there is a circuit split on the question whether the *Leon* good faith exception applies to violations of Title III, *see United States v. Heilman*, 377 F. App'x 157, 185 n.21 (3d Cir.) (citing cases), *cert. denied*, 131 S. Ct. 490 (2010), this Court has applied the good faith exception to a claim that a wiretap violated Title III. *See United States v. Vest*, 842 F.2d 1319, 1334 (1st Cir. 1988) (declining to dismiss an indictment where tape was played to grand jury in violation of Title III because the government was "acting in accord with a reasonable if incorrect construction of the law," and "[t]o punish the government when it acts in good faith is unlikely to have a deterrent effect on future 'misconduct.'").

has emphasized that "exclusion has always been our last resort, not our first impulse," *Hudson v. Michigan*, 547 U.S. 586, 591 (2006), and the Court has identified two important principles that constrain application of the exclusionary rule to Fourth Amendment violations. First, the exclusionary rule only applies where it "result[s] in appreciable deterrence," *United States v. Leon*, 468 U.S. 897, 909 (1984), and, second, "the benefits of deterrence must outweigh the costs." *Herring*, 555 U.S. at 141. Accordingly, when law enforcement officers act pursuant to a warrant that is lacking in probable cause, the exclusionary rule does not apply if those officers acted in "objectively reasonable reliance" on the "subsequently invalidated search warrant." *Leon*, 468 U.S. at 922.

In this case, Orlando's affidavit demonstrated that traditional investigative techniques had been tried and failed or appeared unlikely to succeed if tried or too dangerous to try, and also established probable cause that the targets of the investigation were violating §17. Even if this Court were to conclude that that affidavit did not adequately satisfy the necessity or probable cause requirements, this is not a case in which the affidavit was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable," *Leon*, 468 U.S. at 923, nor one in which punishing the government would likely have a deterrent effect on

future misconduct, *see Vest*, 842 F.2d at 1334. Accordingly, suppression of the fruits of the wiretaps is not appropriate.

## II. THE DISTRICT COURT DID NOT ERR IN ALLOWING SPECIAL AGENT KELSCH TO PROVIDE EXPERT TESTIMONY REGARDING WORDS USED IN INTERCEPTED CONVERSATIONS.

Gianelli, Albertelli, and Iacaboni contend (AGBrief at 44-61; DABrief at 9; FIBrief at 43) that the district court impermissibly allowed ATF Special Agent Kelsch to provide inadmissible testimony under Fed. R. Evid. 701 and 702 regarding his interpretations of intercepted conversations, and that he also provided improper "summary" testimony. That claim lacks merit.

### A. <u>Procedural History</u>

#### 1. The Motion to Preclude Kelsch's Testimony

On March 30, 2009, Gianelli, Albertelli, and Iacaboni moved to preclude Kelsch from offering his opinion – whether expert or lay – as to the meaning of certain intercepted telephone conversations. [D.694; App.541-542]. In a supporting memorandum, they argued, *inter alia*, that because they did not speak "in any code or jargon in the calls," Kelsch could not interpret these calls as an expert under Rule 702 of the Federal Rules of Evidence, nor could he offer lay opinion testimony about the calls under Rule 701. [App.542-551]. The government opposed the motion,

arguing that because the defendants were using code or jargon during the conversations and Kelsch possessed "specialized knowledge" about arson investigations as well as the jargon used in conversations about committing an arson, he could appropriately provide expert opinion that would assist the jury in deciphering the intercepted conversations.  [D.695].

On April 7, 2009, the district court ruled as follows:

> It is my inclination at this time to allow Mr. Kelsch  to testify with respect to specific matters that may be within his expertise as someone who knows about arson and arson investigations.  But I am not going to allow more general questions as to what happened in that conversation.  If the questions are directed specifically to specific responses or portions of the conversation and they relate to matters that I believe are not entirely clear to laypersons, I will allow such testimony.  But if they don't, I will sustain objections. And, specifically, I would expect to sustain an objection to – after we've heard a conversation, if the question is, What is happening in that conversation, that is an objectionable question.

> *     *     *

> But if they are pinpointed to matters such as the – getting out of town and the alibi and maybe specifically about boats, if that is a question that leaves a layperson with some ambiguity, I would allow such a question.  But the more generalized questions I would not allow.

[TT22:85-86].

-58-

2.    **Kelsch's Testimony**

During trial, Kelsch was asked to interpret the following conversations over the defendants' specific objection that such testimony was improper under Rule 702[9]:

- Gianelli said, "What, ah, you talk to that kid[,]" and Albertelli responded, "I was with him the next morning, and asked if he wanted to take a ride, and he said he had to take care of the shop." [TT23:117].

- Gianelli said, "Gotta make sure nobody is in there, you know." [TT23:117-118].

- Albertelli said, "My other friend, do you want me – you just want me to go forward, right" and Gianelli responded, "Talk to that guy tomorrow and go forward." [TT23:120].

- Albertelli said, "Just in case, you know, we want to go for a ride or something." [TT23:121].

- Gianelli said, "This fucker got to be shut down, period, has to be shut down."  [TT23:123].

- Gianelli said, "How's that other kid?" [TT23:125].

- Albertelli said, "it's Monday that they're coming into town." [TT23:125-126].

- Gianelli said, "And ah more importantly talk to the other kid, it looks like that might be the only fuckin' solution."  [TT23:126].

---

[9] Prior to any testimony, the district court stated that an objection from one defendant would stand as an objection for all unless counsel specifically withdrew from the objection. [TT2:155].

- Gianelli said, "I forgot to ask you what time are you going to see that kid today[,]" and Albertelli responded, "I'm going to see him tomorrow." [TT23:131].

- Gianelli said, "Our way might be the only right way." [TT23:133].

- Gianelli said, "What time are you going to see that kid." [TT23:133].

- Albertelli said, "I think they're going to come over tomorrow, I'll find out, I'll get a feel for what they think.  I don't know if they're going to go over there to – to look around tonight or what." [TT23:133-134].

- Albertelli said, "But they say they go home Saturday morning.  So it will be between now and Saturday." [TT24:5].

- Gianelli said, "How's the pizza?" [TT24:6].

- Albertelli said, "I'll call him down at the store and see if he wants to see me." [TT24:6].

- Gianelli said, "I'm wondering who it was" and Albertelli responded, "Well * * * that makes me think it was you telling me that you got someone else on it." [TT24:6-7].

- Gianelli said, "I did that Friday, so it very well could be." [TT24:7].

- Albertelli said, "I didn't want to make it look like I knew anything." [TT24:7-8].

- Gianelli said, "This kid probably tried to burn the f'ing place down.  That's what I'm thinking." [TT24:8-9].

- Gianelli said, "You didn't hear nothing more bad about that thing, did you?" [TT24:12].

-60-

- Gianelli said, "Was it your guys?" [TT24:12].

- Albertelli said, "Not those guys, but someone else that I talked about with it earlier" and Gianelli responded, "So we had three or four fucking parties going here." [TT24:12-13].

- Albertelli said, "I know exactly who because they came to me." [TT24:13].

- Gianelli said, "I don't know what happened to the kid yesterday." [TT24:16].

- Gianelli said, "Larry Murray came over last night, and this kid, I don't know, he might be talking a little bit." [TT24:19-20].

- Albertelli said, "Well, no. I mean, Arthur, I told so many people about it * * *. [S]omeone said to me that they heard that, that someone got picked up at Big Dog. Ah, on an arson charge. And I * * * said, ah, in, in Lynnfield? And they said no, no it wasn't Lynnfield, but it was another one." [TT25:77-78].

- Gianelli said, "Just make sure it's right." [TT25:78-79].

## B. <u>Standard of Review</u>

This Court reviews the defendants' preserved objections to Kelsch's testimony for abuse of discretion and unpreserved objections for plain error. *United States v. Weekes*, 611 F.3d 68, 70 (1st Cir. 2010), *cert. denied*, 131 S. Ct. 3121 (2011). To succeed on plain error review, the defendants must show: "(1) that an error occurred (2) which was clear or obvious and which not only (3) affected the defendant's substantial rights, but also (4) seriously impaired the fairness, integrity, or public

reputation of judicial proceedings." *United States v. Duarte*, 246 F.3d 56, 60 (1st Cir. 2001).

### C.    The District Court Did Not Abuse its Discretion in Admitting Special Agent Kelsch's Testimony

The defendants contend (AGBrief at 50-53) that Kelsch's interpretations did not constitute proper lay or expert opinion testimony, and therefore should have been excluded under Rules 701 and 702, respectively.  They are wrong.

Rule 702 of the Federal Rules of Evidence provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Under Rule 702, "[t]he fundamental question that a court must answer in determining whether a proposed expert's testimony will assist the trier of fact is [w]hether the untrained layman would be qualified to determine intelligently and to the best degree, the particular issue without enlightenment from those having a specialized understanding of the subject matter involved." *United States v. Shay*, 57 F.3d 126, 132 (1st Cir. 1995) (internal quotation omitted).   A district court "maintains considerable discretion in making this determination." *United States v. Garcia-Morales*, 382 F.3d 12, 18 (1st Cir. 2004).

In this case, the defendants do not contend that Kelsch lacked "specialized knowledge" in arson investigations, and with good reason given his extensive testimony about his training and experience in the field. [TT23:102-106]. Rather, they contend (AGBrief at 52) that Kelsch's testimony was impermissible under Rule 702 because "[n]owhere in these calls did anyone speak in the specialized lexicon of the criminal and arsonist communities." They are wrong.

To begin with, Kelsch testified that he had been involved in arson investigations that included electronic surveillance and that, in his experience:

> [I]t's very unlikely for people to speak openly about fires and fires that have been set. A lot of times they will use code words, or sometimes they'll just refer to it as "it." So, they won't all the times speak clearly about a fire, say, I set that fire. They say, "I set it" or something to that sort. Now, of course, you do have times when people do say that, but for a majority of times you don't.

[TT23:106]. This experience was borne out by the intercepted calls in this case. As Kelsch explained, in contrast to the open discussions between Gianelli and Albertelli regarding illegal gambling activities and collecting money, whenever the subject turned to the planned arson, the conversation "became very cryptic, very short and coded." [TT25:65-66]. The defendants thus repeatedly referred to the planned arson as "it," to the North Reading Big Dog as "the boat," and to Homsi as "the kid" or "my other friend." [App.992, 1000, 1056, 1058, 1060. 1063, 1066, 1071, 1086-1087,

1104].  In a conversation on November 5, 2003, for example, Albertelli told Gianelli that "he's gonna give me a couple of days before it, before it happens * * * just in case ah you know we want to go for a ride or something." [App.1033].  Kelsch testified that "it" was a reference to the planned arson, and that "we want to go for a ride" referred to Gianelli's and Albertelli's need to have an alibi in place.  [TT23:120].  In a conversation on November 10, 2003, Iacaboni asked Albertelli "where the boat is being docked" and for a diagram, which Kelsch testified was a reference to the North Reading Big Dog.  [App.1050-1051; TT23:128].  And on November 13, 2003, Gianelli asked Albertelli, "How's the pizza?," which Kelsch testified was a reference to Romeo's Pizza.  [App.1039; TT24:6].

As these examples show, the defendants' discussions of the planned arson were not only elliptic in general, but also contained many cryptic references with which a lay juror might not be familiar.  In these circumstances, the district court did not abuse its discretion in allowing Kelsch to interpret the intercepted conversations, as his testimony assisted the jury in understanding the meaning of the conversations.  *See, e.g., United States v. Rosado-Perez*, 605 F.3d 48, 55 (1st Cir. 2010); *United States v. Rivera-Rosario*, 300 F.3d 1, 17 (1st Cir. 2002); *United States v. Lamattina*, 889 F.2d 1191, 1194 (1st Cir. 1989); *see also United States v. Ceballos*, 302 F.3d 679 , 687-88 (7th Cir. 2002) (agents allowed to interpret words "it," "them," and "both," which in

-64-

context of conversations, referred to drugs).  Thus, in *United States v. Hoffman*, 832 F.2d 1299 (1st Cir. 1987), for example, this Court held that a law enforcement officer who possessed specialized knowledge about the drug trade could testify about the coded terminology in recorded conversations, including not only the defendants' use of terms such as "six cases of wine" to connote "six kilograms of cocaine," but also "as to the more conventional argot of narcotics traffic (e.g., defining words such as 'rock' and 'fluff')." *Id.* at 1310.

Furthermore, even assuming arguendo that Kelsch was not testifying as an expert under Rule 702, his testimony would nonetheless be permissible as lay opinion testimony under Rule 701 because he had specialized knowledge of arson investigations and because, in his experience, persons who are planning an arson often use coded or cryptic references.  *See United States v. Rosado-Perez*, 605 F.3d 48, 56 (1st Cir. 2010) ("Relevant here, we have long held that government witnesses with experience in drug investigations may explain the drug trade and translate coded language for juries, either through lay or, if qualified, expert testimony."); *United States v. Santiago*, 560 F.3d 62, 66 & n. 1 (1st Cir. 2009) (observing that testimony about coded language in drug transactions may be admissible as either lay or expert testimony).

The defendants also complain about Kelsch's interpretation of one other statement made during the intercepted calls, when Albertelli said, "I kind of talked to him half ass on the phone, but ah, he doesn't speak English too good." [TT24:41]. It was the *defendants* who elicited that interpretation on cross-examination, however, and they neither objected to it nor moved to strike it. As a result, they "cannot persuasively complain about the admission of this evidence, given that it was the defense – not the government – which elicited it in the course of its cross-examination." *United States v. Rivera-Rivera*, 477 F.3d 17, 20 (1st Cir. 2007); *accord United States v. Lizardo*, 445 F.3d 73, 84 (1st Cir. 2006) ("[T]his statement was elicited on cross-examination by Lizardo's counsel, who cannot now contest his own invited error.").

### D.    Kelsch Did Not Provide Improper "Summary" Testimony

The defendants also contend (AGBrief at 53-55) that "much of Kelsch's testimony constituted improper expert 'summary' evidence," and point to nine specific examples in which, they assert, Kelsch "repeatedly alerted the jury that his interpretations were based not just on what the jurors themselves knew, but rather, on the investigation as a whole." This claim also fails. First, *five* of the challenged

statements were elicited by the defendants on cross-examination.[10]  Having elicited

this testimony on cross-examination and having failed to object to or move to strike

it, the defendants cannot now complain about it on appeal.  *See Rivera-Rivera*, 477

F.3d at 20; *Lizardo*, 445 F.3d at 84.

The government elicited the following testimony on direct examination:

- In response to question about how Kelsch arrived at his opinions, Kelsch testified: "Well, for these particular calls, we listened to the phone calls to determine if any of them were related to the arson.  Also, we used interviews that we had with cooperating defendants such as [McCormack and Homsi].    And that information they gave us allowed us to put a lot of these calls in context and determine what they were talking about, especially within the timing." [TT25:68].

- In response to question "Can you tell us when you formulated these opinions?," Kelsch testified over Gianelli's objection: "The opinions were formulated over the course of the investigation.  The investigation went on for years, continued for years.  Numerous witnesses were brought in.  Other people were brought in and spoken to.  It's taking all that information that we've collected over those years, not just what happened during this particular week and a half, that led me to my conclusions and my opinion on the calls that we have here." [TT25:69].

---

[10]  [TT24:82 ("[Slater] certainly wasn't planning to get arrested, I know that much.  I know that from speaking to other people in this investigation."); TT24:83 ("I'm not sure if it's in a report or the grand jury, but I was told that, yes."); TT25:30 ("After we had the full facts of what had gone on in this investigation, yes."); TT25:54 ("John Mousis was spoken of regularly in the calls, and he was either referred to as 'Mousis' or 'The Z Kid.'   They never referred to him as 'pizza.'"); TT25:107 (testifying that interviews of Homsi and McCormack "were a large part of – yes, of the inside  information, yes.")].

- In response to question what Kelsch's opinion regarding the motive for the arson was based on all the information that he had learned since April 2004, Kelsch testified: "Extortion." [TT25:71].

- In response to question whether Kelsch's opinion was "[b]ased upon all the evidence in the case?," Kelsch testified: "That is correct." [TT25:121].

The defendants' challenge to this testimony also fails.  To begin with, the defendants only objected to the second question, and the remaining three statements are reviewed only for plain error.  Moreover, although Gianelli did object to the second question, he did not argue that Kelsch's testimony constituted improper "summary" testimony or that Kelsch was improperly testifying as both an expert and fact witness.  The defendants did ask for a ruling from the district court whether a different witness – Sergeant Russolillo – was testifying as an expert or a lay witness with respect to a letter the government was reading into evidence.  [TT7:8-12].[11]  But they never raised a similar objection with respect to Kelsch.  Rather, the basis of Gianelli's objection throughout Kelsch's testimony was that it was improper expert testimony under Rule 702.  [TT23:117-136; TT24:6-19; TT25:66-82].  It is well-established that "an objection on one ground does not preserve appellate review of a

---

[11]  After hearing argument from the parties, the district court ruled that Russolillo would be allowed to testify as an expert witness.  [TT7:12-13].

different ground, " *United States v. Mercado*, 412 F.3d 243, 247 (1st Cir. 2005), and Gianelli's failure to object to Kelsch's testimony on the additional grounds that he now raises on appeal thus means that Kelsch's answer to the second question is also reviewed only for plain error. The defendants cannot demonstrate plain error.

First, the defendants have not argued on appeal that the district court committed plain error in admitting this testimony, and that failure itself constitutes a waiver. *See United States v. Gonzalez-Mercado*, 402 F.3d 294, 302 (1st Cir. 2005) (holding that defendant's failure to explain why purported error constitutes plain error constitutes a waiver); *cf. United States v. Miliano*, 480 F.3d 605, 608 (1st Cir. 2007) ("A defendant who waives his right to appeal and thereafter attempts to avoid the effect of the waiver must confront the waiver head-on. Where, as here, the defendant simply ignores the waiver and seeks to argue the appeal as if no waiver ever had been executed, he forfeits any right to contend either that the waiver should not be enforced or that it does not apply. * * * Miliano's appeal is subject to dismissal for this reason alone.").

Second, Kelsch was not testifying at the end of the government's case-in-chief, and he therefore was not a "summary witness" in the classic sense. *See United States v. Flores-de-Jesus*, 569 F.3d 8, 18 (1st Cir. 2009) (defining a "summary witness" as one who "testif[ies] at the end of the government's case instead of the beginning.").

Kelsch also was testifying as an expert, and, as this Court has recognized, "expert witnesses have leeway other witnesses do not." *United States v. Casas*, 356 F.3d 104, 120 (1st Cir. 2004). An expert's opinion need "not [be] based on first-hand knowledge or observation," *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 592 (1993), and Kelsch's testimony thus did not deviate from the "basic principle in the Federal Rules of Evidence that witnesses, *other than experts giving expert opinions*, should testify from personal knowledge." *Rosado-Perez*, 605 F.3d at 55 (emphasis added). That makes this case different from those in which this Court has held that law enforcement officers improperly provided lay opinion testimony as to the defendants' culpability based on the totality of the circumstances gathered in the course of the investigation. *See United States v. Vazquez-Rivera*, — F.3d —, 2011 WL 6415039, at *5 (1st Cir. 2011); *United States v. Meises*, 645 F.3d 5, 15-16 (1st Cir. 2011); *Flores-de-Jesus*, 569 F.3d at 24; *Casas*, 356 F.3d at 119.

Third, although this Court has stated that expert testimony may be excluded under Rule 403 in situations in which "the dual roles of expert and fact witness are filled by a law enforcement official, in part because the jury may unduly credit the opinion testimony of an investigating officer based on a perception that the expert was privy to facts about the defendant not presented at trial," *Flores-de-Jesus*, 569 F.3d at 20-21 (internal quotation omitted), it has also made clear that the contention that

evidence was improperly admitted because it was unduly prejudicial is a difficult one to mount. Indeed, this Court has stated that, even where a Rule 403 objection has been preserved, "[o]nly rarely – and in extraordinarily compelling circumstances – will we, from the vista of a cold appellate record, reverse a district court's on-the-spot judgment concerning the relative weighing of probative value and unfair effect." *United States v. Bayard*, 642 F.3d 59, 63 (1st Cir.), *cert. denied*, 131 S. Ct. 2944 (2011). Here, where the defendants neither argued below that Kelsch's testimony constituted improper "summary" testimony nor that his testimony should be excluded under Rule 403 because he was improperly testifying as both an expert and fact witness, the district court cannot be said to have committed an error that was plain.

Fourth, although Kelsch answered the first question by stating that "we" listened to the phone calls to determine if any of them were related to the arson, and "we" used interviews with cooperating witnesses that allowed "us" to put a lot of these calls in context, he made clear in his answer to the second question that his opinion regarding the meaning of the calls was his and his alone, testifying that: "It's taking all that information that we've collected over those years, not just what happened during this particular week and a half, that led *me* to *my* conclusions and my opinion on the calls that we have here." [TT25:69 (emphasis added)]. Kelsch's testimony thus is materially different from that which this Court has found

problematic in other cases, such as where a law enforcement officer testifying as a lay witness answered questions by stating that "we ended up identifying" the subject as being the defendant in the case. *See Vazquez-Rivera*, 2011 WL 6415039, at *5.

Finally, as set forth below, the defendants cannot show that Kelsch's testimony, even if improper, affected the outcome of the trial, as any error was harmless.

The defendants also argue (AGBrief at 55-56) that Kelsch also "repeatedly and improperly endorsed the testimony of other witnesses, most particularly, Homsi and McCormack." But each of the four specific examples they highlight was elicited by the defendants on cross-examination,[12] they neither objected to nor moved to strike Kelsch's answers, and they consequently cannot complain about that testimony on appeal. *See Rivera-Rivera*, 477 F.3d at 20; *Lizardo*, 445 F.3d at 84. They also provide other citations to the trial record introduced by a "see also," but fail to identify the specific questions or answers they deem objectionable. Any claim in this regard is also waived. *See United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) (stating

---

[12] [TT24:39 ("I'm reaching this opinion because Michael McCormack told us that he elicited Sean Slater to come into town for this fire."); TT24:52 ("I didn't tell you that, Deeb Homsi did. * * * I'm not the first person to say that. It was Deeb Homsi that told the Court that."); TT24:84 ("I've had conversations with Mr. McCormack, where he said that Sean Slater was only coming in for the week."); TT24:92-93 ("Well, no. I'm assuming that Deeb Homsi testified in this court that that's what he meant when he called Dennis Albertelli. That's what I've been told during prep sessions. I assume he said the same to this Court. But I agree with his opinion about what this phone call is about.")].

that "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

### E.    <u>Any Error Was Harmless</u>

Even if this Court were to conclude that some of Kelsch's testimony was improperly admitted, any error was harmless, because it is highly probable that the error did not affect the verdict. *See United States v. Sanabria*, 645 F.3d 505, 516 (1st Cir. 2011) ("We will find non-constitutional evidentiary errors harmless where it is highly probable that the error[s] did not influence the verdict.") (internal quotation omitted).  To begin with, the district court instructed the jury that although it "heard testimony from persons sometimes described as experts" it was for the jury to decide whether to accept that testimony:

> The mere fact that a witness is allowed to testify as one having specialized knowledge or experience does not indicate that you must believe that testimony, nor should you substitute the expert's testimony for your own reasonable judgment and common sense.  You may accept or reject it.  The credibility of each witness is for you to determine.
>
> *    *    *  It is for you to decide whether the opinions expressed were mere speculations or guesses, which you should disregard, or were instead based on sound reason, judgment and facts.

[TT28:21].

Moreover, the jury heard direct evidence from Homsi regarding Albertelli's involvement in the planned arson at the North Reading Big Dog. Homsi testified that he met with Albertelli in late October or early November 2003, and that Albertelli told him that "they had a lot of money tied up in the Big Dog and the guy was holding them back, stalling, and that was it, they wanted to burn the pizza joint." [TT21:64]. Homsi also testified that Albertelli told him that the pizza place was in North Reading, that he  gave Homsi a piece of paper with an address on it, and that he suggested a way in which to ignite a fire at the building. [TT21:65-66]. Homsi and Albertelli subsequently met on November 4, 2003, where they finalized plans for the arson at the Big Dog, and Homsi told Albertelli that McCormack would take care of it. [TT21:70-71].

In addition, because the taped conversations were admitted as co-conspirator statements, the jury could have listened to those calls – which implicated Gianelli, Albertelli, and Iacaboni – and reached their own conclusions about the content of the conversations. *See Rosado-Perez*, 605 F.3d at 56 (noting that jury could "independently evaluate" law enforcement officer's interpretations of coded conversations). Those recorded conversations showed that Gianelli called Albertelli regularly in early November 2003 for updates on the progress of "that kid," including asking Albertelli when he would be meeting with "hat kid"; admonishing Albertelli

to "stay on top" of him because "[t]hat looks like our only hope"; and asking Albertelli on November 13, 2003, "How's the pizza?" [App.992-993, 1056, 1058, 1063, 1071-1072]. The jury could reasonably infer from the substance and timing of these conversations that Gianelli and Albertelli were discussing the planned arson at Romeo's Pizza.

The jury also heard a number of telephone conversation between Albertelli and Iacaboni from which they could reasonably infer that Iacaboni, too, was involved in the planned arson. After Albertelli had described to Iacaboni the problems that he and Gianelli were having with respect to the ownership of the Lynnfield Big Dog, Iacaboni called Albertelli on November 10, 2003, and requested information about the North Reading Big Dog ("where the boat is being docked") as well as a diagram of it with "no signs or anything" including the "number of floors," which Albertelli was to give to the "Bullet" (Robert Davies) that day "in an envelope." [App.1060-1061; TT6:152-153; TT16:89-90]. Later that same day, after Albertelli had delivered the diagram (via Davies) to Iacaboni, Albertelli answered Iacaboni's questions about the diagram and informed Iacaboni that the "boat" was in North Reading and had "the thing on top." [App.1066-1068]. Iacaboni responded, "Yeah. I saw the triangle." [App.1068]. The North Reading Big Dog had a triangle on the top. [TT15:71-72; Exh.183]. The following day, November 11, 2003, Iacaboni told Albertelli that he

had met with "the people" who were "ready to go right?," and that "the positive was, was the pizza joint, [was] there right?" [App.1086]. However, Iacaboni reported, the persons he met with needed a key to get inside, as the plan was to light toilet paper until it would smolder and ignite, particularly if near the ovens, and leaving no trace of the arson. [App.1086-1087].

Moreover, the jury heard additional testimony regarding events after the failed arson attempt that further implicated Gianelli and Albertelli. Homsi testified that when, on November 13, 2003, he told Albertelli that "[a] couple of friends of mine are in jail" and that "the two guys that were going to burn the pizza place down got arrested," he was informing Albertelli about McCormack's and Slater's arrests. [App.1094; TT21:73]. In a telephone call on November 21, 2003, Homsi asked, "What do you want me to tell him?," to which Albertelli responded, "I don't know what to tell him, Deebo. I mean, he, he, he didn't do a very good job, I mean, that's what you can tell him." [App.1108-1109]. Homsi testified that they were discussing McCormack and Slater on November 21 and that Albertelli was referring to the fact that "[t]hey didn't burn the pizza joint down." [TT21:77]. Two days later, on November 23, 2003, Homsi met with Albertelli and McCormack to discuss paying Slater's bail, and later that same day, Albertelli gave McCormack $10,000 to pay for Slater's bail. [TT19:105-110; TT21:78-80; Exh.44A].

Based on this evidence, it is highly probable that, even without Kelsch's testimony, the jury would have concluded that Gianelli, Albertelli, and Iacaboni conspired with each other and others to commit an arson at the North Reading Big Dog, and any error in the admission of that testimony therefore did not affect the verdict.

## III.  IACABONI WAIVED HIS CONTENTION THAT LAW ENFORCEMENT OFFICERS IMPROPERLY TESTIFIED AS "FACT," "EXPERT" AND "OVERVIEW" WITNESSES SIMULTANEOUSLY, BECAUSE HE FIRST PRESENTED THAT ARGUMENT TO THE DISTRICT COURT IN A MOTION FOR RECONSIDERATION, THE DENIAL OF WHICH HE DOES CHALLENGE ON APPEAL.

Iacaboni contends (FIBrief at 41-65), joined by both Albertellis (DABrief at 30; GABrief at 40), that he is entitled to a new trial because the district court impermissibly allowed law enforcement officers to testify variously as "fact," "overview," and "summary" witnesses.  This claim is waived, as Iacaboni only raised this argument below in a motion for reconsideration of the district court's denial of his motion for a new trial, and yet he does not argue on appeal that the district court abused its discretion in denying that motion for reconsideration.  Even if this Court were to reach this issue, the district court did not err in admitting the challenged testimony, and any error was harmless in any event.

A.   **Procedural History**

1.     **The Objection at Trial**

On March 11, 2009, the eleventh day of trial, Gianelli asked for a ruling during

a sidebar conference whether Sergeant Russolillo was testifying as an expert or a lay

witness with respect to a letter the government was reading into evidence. [TT7:8-12].

Gianelli acknowledged that Russolillo could testify as an expert under this Court's

decisions, but argued that he could not simultaneously testify as a lay witness:

> **THE COURT:**  Well, if he's being asked as an expert, I
> don't qualify experts in my court; I don't say the witness is
> now qualified as an expert.  But what is the magic for you,
> Mr. Sheketoff, if he puts on for a moment an expert's hat
> and is allowed to testify as to this with respect to his
> expertise?
>
> **GIANELLI:**  The case law is bad for me in terms of his
> expertise; I concede that.  It's just bad.  But the case law on
> lay opinion testimony is not so bad for me.
>
> **THE COURT:**  All right.  So, let's take that as a given; he
> can't testify as a lay person on this, but he can  testify as an
> expert.

[TT7:11-12].  After further discussion, the district court ruled that Russolillo would

be allowed to testify as an expert witness:

> I am going to permit  this witness to be treated, for this
> purpose, as an expert, but I agree with Mr. Sheketoff and
> defense counsel he can't testify with respect to his lay
> opinion at the same time.  So, you  couch your questions

-78-

>that are directed at his expertise and not at his lay opinion
>overall – overlying this letter.  Is that understood?

[TT7:12-13].

## 2.    Iacaboni's Motion for Reconsideration

On October 4, 2009, more than five months after the jury verdict, Iacaboni filed a motion for reconsideration of the denial of his motion for a new trial under Fed. R. Crim. P. 33, arguing, *inter alia*, that the government had improperly used law enforcement officers – retired MSP Lieutenant John Tutungian, Sergeant Russolillo, Special Agent Kelsch, and Special Agent Sandra Lemanski of the Internal Revenue Service – as "fact," "expert," and "overview" witnesses simultaneously in the same appearance.  [D.878].  Specifically, Iacaboni argued in a memorandum that a series of decisions from this Court and other courts of appeals, which were "never brought to [the district court's] attention at or before trial," made clear that "some of the most damaging testimony in the case should not have been introduced." [G.App.245].  The government opposed Iacaboni's motion, arguing, *inter alia*,  that it should be deemed an untimely Rule 33 motion for a new trial and denied on that basis alone, and that, in any event, the district court had properly admitted the testimony about which he was complaining.  [G.App.261-270].

On November 7, 2009, the district court denied Iacaboni's motion for reconsideration on the ground that "the motion is based upon arguments that could and should have been presented previously," and that motions for reconsideration "are not a vehicle for resuscitating a motion with 'additional arguments' that could and should have been raised previously and that is precisely what the defendant attempts to do here." *United States v. Gianelli*, 667 F. Supp. 2d 215, 218 (D. Mass. 2009) (citing *United States v. Allen*, 573 F.3d 42, 53 (1st Cir. 2009)).  The court additionally stated that, "[a]lthough the conclusions above are sufficient to deny Iacaboni's motions," that motion would nonetheless fail even if considered on the merits because "[w]ith respect to the testimony of law enforcement officers, the Court heard and considered similar objections at trial and citations to additional cases simply do not render this an 'exceptional case' worthy of a remedy 'sparingly used' to grant a new trial." *Id.*

B.    **Standard of Review**

This Court typically reviews the denial of a motion for reconsideration for abuse of discretion.  *Villanueva v. United States*, 662 F.3d 124, 128 (1st Cir. 2011).  In this case, however, because Iacaboni does not challenge the denial of his motion for reconsideration on appeal, he has waived any challenge to the arguments which

-80-

were first presented to the district court in that motion.  *See United States v. Brown*,

621 F.3d 48, 53 n.4 (1st Cir. 2010).

### C.    <u>Iacaboni's Claims are Waived</u>

In arguing that the district court impermissibly allowed law enforcement

officers to testify variously as "fact," "overview," and "summary" witnesses

simultaneously, Iacaboni does not contend that the court abused its discretion in

denying his motion for reconsideration.  Rather, he presents this argument as if it had

been properly preserved below.  It was not.

As shown above, the defendants objected to Russolillo's testimony regarding

a specific letter on the ground that he could not simultaneously testify as an expert and

fact witness, and to Kelsch's testimony on the ground that he should not be permitted

to provide expert or lay opinion testimony about his interpretations of the intercepted

conversations under Rules 701 and 702.  They did not object to the testimony of any

of the law enforcement witnesses on the grounds that Iacaboni first advanced in his

motion for reconsideration and now argues on appeal.  Indeed, in his motion for

reconsideration, Iacaboni acknowledged as much, stating that although the defendants

had interposed objections to "some" of these witnesses' testimony under Rule 702, he

was raising additional grounds on which this testimony should not have been admitted

based on cases which that were "never brought to [the district court's] attention at or

-81-

before trial." [G.App.245]. Because "an objection on one ground does not preserve appellate review of a different ground," *Mercado*, 412 F.3d at 247, the arguments which Iacaboni first presented in his motion for reconsideration were not preserved below.

Moreover, the district court made clear that it was denying Iacaboni's not on the merits of his claims but because "the motion is based upon arguments that could and should have been presented previously." 667 F. Supp. 2d at 218. This consequently is not a case in which the district court "chooses to overlook the belated nature of a filing and adjudicate the tardy claim or defense on the merits, [so] that claim or defense may be deemed preserved for purposes of appellate review." *Trenkler v. United States*, 536 F.3d 85, 96 (1st Cir. 2008).

Hence, in order to challenge the admission of the testimony of law enforcement witnesses on the grounds that he first raised in his motion for reconsideration, Iacaboni had to argue on appeal that the district court abused its discretion in denying that motion. But he has made no such argument in his brief on appeal, and it therefore is waived. *See Brown*, 621 F.3d at 53 n.4 ("On appeal, Brown does not argue that the district court abused its discretion in denying his motion for reconsideration, nor does he rely on the affidavit submitted with that particular motion in his brief. Consequently, he was waived any challenge to the court's denial of his motion for

reconsideration."); *see also CMM Cable Rep, Inc. v. Ocean Front Properties, Inc.*, 97 F.3d 1504, 1526 (1st Cir. 1996) ("We have little trouble, however, in concluding that there is absolutely no merit to CMM's preservation arguments or, for that matter, to another argument it could have advanced:  *i.e.*, that we should find its arguments preserved because they were advanced in its motion for reconsideration. All of these arguments are insufficient to prevent a finding of waiver and fall on deaf ears.").

Even if this Court were to reach Iacaboni's substantive claims, the result would not change.  Even if Iacaboni's claims are deemed forfeited rather than waived, Iacaboni has not argued on appeal that the district court committed plain error in allowing the challenged testimony, and that failure itself constitutes waiver.  *See Gonzalez-Mercado*, 402 F.3d at 302.

Moreover, the government did not use these witnesses to preview or "map out its case and to describe the role played by individual defendants," *id.* at 16, and they therefore were not "overview" witnesses in the classic sense.  *See Vazquez-Rivera*, 2011 WL 6415039, at *3 ("In the instant case, Agent Segarra took the stand as the government's penultimate witness on the first day of a five-day trial and, as such, did not 'preview' the government's case.").  Nor can Iacaboni show that the district court otherwise plainly erred in admitting this testimony.  First, Iacaboni does not identify

any specific testimony from Tutungian or Lemanski which he deems objectionable, and any challenge to their testimony therefore is waived. *See Zannino*, 895 F.2d at 17.

Second, with respect to Kelsch, as shown above, the district court did not err in allowing him to testify as an expert and interpret the intercepted conversations because the defendants' discussions about the planned arson were elliptic in general and contained many cryptic references. *See, e.g., Rosado-Perez*, 605 F.3d at 55; *Rivera-Rosario*, 300 F.3d at 17; *Lamattina*, 889 F.2d at 1194; *Hoffman*, 832 F.2d at 1310. Iacaboni thus errs in asserting (FIBrief at 56) that "[t]he prosecution clearly intended to present [Kelsch's] testimony as 'expert' to the jurors, without having to meet the 'gatekeeper' requirements of Rule 702." In fact, the district court ruled that Kelsch could testify as an expert in interpreting the conversations *prior* to his testimony. [TT22:85-86].

Third, the district court did not err in allowing Russolillo to testify as an expert and interpret intercepted conversations regarding sports gambling and football cards. Iacaboni identifies (FIBrief at 59-63) several instances of what he contends was improper expert or lay testimony regarding sports gambling, but with only two exceptions discussed below, no defendant objected to this testimony, and Iacaboni cannot show that its admission constituted plain error. As the district court explained

-84-

in allowing Russolillo to testify as an expert regarding to the meaning of the

intercepted calls regarding gaming:

> I agree with the government. I think this does involve the kind of expertise that this witness has developed over a long and extended period of time of listening and understanding how this thing operates, and I think he's entitled to say what his opinion is of it. He's certainly going to be subject to cross-examination as to whether his opinion is based upon anything more than osmosis. I think he's got enough to allow him to testify in this regard.

[TT7:7-8].

The two questions to which the defendants objected are as follows:

> **Q.** All right. Towards the end of the conversation, Mr. Gianelli says, "Oh, then take it from him. Take it from him. We're all right." What is your understanding of the relationship in this organization, in the hierarchy, between Mr. Albertelli and Mr. Gianelli as reflected by that call?
>
> **GIANELLI:** Objection.
>
> **ALBERTELLI:** Objection, your Honor.
>
> **THE COURT:** Overruled.
>
> **A.** Dennis Albertelli couldn't make the decision on this. He had to refer to his boss, Arthur Gianelli.
>
> \*   \*   \*
>
> **Q.** And toward the middle of Page 2 when Dennis Albertelli says, "She had 80 bucks going into the late game." She said, "Well, what's left," and so on. What's

-85-

your understanding of who was being discussed with the "she"?

> **GISELE ALBERTELLI:** Objection.

> **THE COURT:** Overruled.

> **A.** Gisele Albertelli.

[TT7:64, 90]. Neither of Russolillo's answers had anything to do with Iacaboni, however, and he cannot show that he suffered prejudice as a result.

Fourth, although both Albertellis join in this claim, neither defendant explains in their briefs on appeal how Russolillo's testimony specifically prejudiced *them*. This Court has held that "[a]doption by reference [under Rule 28(i)] cannot occur in a vacuum; to be meaningful, the arguments adopted must be readily transferrable from the proponent's case to the adopter's case." *United States v. David*, 940 F.2d 722, 737 (1st Cir. 1991). Here, to the extent the Albertellis believed Russolillo's answers to these questions prejudiced them, as opposed to Iacaboni, they had to explain why that was so in *their* respective briefs on appeal. Having failed to do so, any such claim is waived. *See United States v. Page*, 521 F.3d 101, 110 (1st Cir.), *modified on other grounds*, 542 F.3d 257 (1st Cir. 2008), *cert. denied,* 129 S. Ct. 958 (2009).

Fifth, in the first of these two questions, Russolillo was asked his opinion about Gianelli's and Albertelli's role in the gaming operation "as reflected in that call," and

his answer to the first question thus was not improper because it did call on him to rely on information told to him by others.  And in the second, he simply identified the "she" who was being referred to in the conversation as Gisele Albertelli, which also was permissible testimony.

### D.    Any Error Was Harmless

Even if this Court were to conclude that some of the testimony about which Iacaboni complains was improperly admitted, any error was harmless.  As set forth above in Part I.E., it is highly probable that, even without Kelsch's testimony, the jury would have concluded that Albertelli and Iacaboni conspired with each other and others to commit an arson at the North Reading Big Dog, and any error in the admission of that testimony therefore did not affect the verdict.

It also is highly probable that, even without Russolillo's testimony, the jury would have concluded that both Albertellis and Iacaboni were guilty of the illegal gambling counts.  The evidence was overwhelming that Albertelli was involved in the Gianelli organization's illegal gambling businesses, as evidenced by the gambling records seized during the execution of search warrants of his vehicle, residence, and a business Albertelli operated in Clinton.  [Exhs.20-23, 43, 45-48, 51].  Albertelli admitted to Sergeant Russolillo that $104,000 found in his home during the execution of a search warrant were gambling proceeds. [TT4:15-17].  John Doramajian, Rita

Heerter, and Michael Goudie testified that they wrote bets for the Gianelli organization and received instructions from Albertelli; Heerter also wrote bets with Albertelli at his residence. [TT9:75-86; TT10:70-82; TT11:76-85]. John Onanian and Harold Marderosian testified that they worked for Albertelli's football card business; Alan Bernstein testified that Albertelli conducted bookmaking while working for Bernstein at Forge Village Transportation; and Paul Magliozzi testified that he placed bets and was an agent for Albertelli. [TT9:136-143; TT10:170-180; TT11:17-26, 185-193; TT12:68-85].

Moreover, the jury heard evidence that Iacaboni was involved in both the sports betting and football card businesses. Heerter testified that she wrote bets once or twice with Iacaboni in 2003, and Bernstein testified that Iacaboni would come regularly to the offices of Forge Valley Transportation on Mondays when the football cards were distributed. [TT10:77-78, 82-83, 96-97; TT12:85-86]. The jury also would have listened to the intercepted conversations and reached their own conclusions about their contents, including calls in which Iacaboni proposed turning over his football card business with Albertelli's, and thereafter discussed the shared profits of the business with Albertelli. [App.1190-1212, 1217-1218].

Finally, Bernstein testified that Gisele Albertelli, who also worked at Forge Valley Transportation, would type the football sheet listing point spreads from which

-88-

the football cards were made from her desk, and Marderosian testified that Gisele Albertelli introduced him to the football card customers. [TT11:187-188; 12:82-83].

Accordingly, any error in the admission of Russolillo's testimony did not affect the verdict.

## IV.   THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN ALLOWING SERGEANT RUSSOLILLO TO TESTIFY THAT DENNIS ALBERTELLI WAS A PARTNER IN THE GAMBLING BUSINESS.

Albertelli contends (DABrief at 25-30) that the district court improperly allowed Sergeant Russolillo to opine on Albertelli's role in the Gianelli gambling operation.  This claim also lacks force.

### A.   <u>Procedural History</u>

On March 26, 2009, the fourth day of trial, Sergeant Russolillo testified about documents uncovered during the execution of a search warrant at the Albertellis' residence on March 5, 2004.  As relevant here, Russolillo was asked the following questions about one of the seized documents:

> **Q.**  Okay. Going back to the top of the page, again. * * *
> How about that FISH there?  Do you know what that is?
>
> **A.**  Yes, I do.
>
> **Q.**  And what is FISH?
>
> **A.**  That's a nickname.

**Q.** For who?

**A.** For Mr. Dennis Albertelli.

     **ALBERTELLI:** Objection, your Honor.

     **THE COURT:** Overruled.

**Q.** And, so, Mr. Albertelli is an agent or a gambler?

**A.** An agent.

[TT4:35-36]. Later, Russolillo was asked the following questions about another

seized document:

**Q.** Okay. If those particular individuals lost, how would Mr. Albertelli benefit?

**A.** He benefits from the commission that he has from the losses.

**Q.** And did you understand Mr. Albertelli's role in this organization to be more than just an agent?

**A.** Yes.

**Q.** And what did you understand his role in this organization to be?

**A.** To be partners.

**Q.** Okay.

     **ALBERTELLI:** Objection, your Honor.

     **THE COURT:** Overruled.

-90-

> **Q.** So, he shares in the profits of the business overall?
>
> **A.** Correct.

[TT4: 45].

### B.    <u>Standard of Review</u>

This Court reviews preserved objections to the testimony of Sergeant Russolillo for abuse of discretion and unpreserved claims for plain error. *See Weekes*, 611 F.3d at 70.

### C.    Sergeant Russolillo's Testimony Was Not Improper <u>Overview Testimony</u>

Albertelli contends (DABrief at 25-30) that Sergeant Russolillo improperly testified that he was "Fish," that he was an agent and accepted bets for the Gianelli organization, and that he was a "partner" in that organization.  Those claims fail.

First, Albertelli does not explain why it was impermissible for Russolillo to testify that Albertelli's nickname was "Fish," nor is the government aware of any decision that so holds.  Moreover, multiple witnesses at trial testified that Albertelli's nickname was "Fish," including Ramasci, so it is unclear what Albertelli finds objectionable about Russolillo's testimony to this same fact.  [TT3:101-102; TT5:13; TT9:114; TT10:72; TT11:79; TT14:10; TT18:79].

Second, Albertelli did not object to Russolillo's testimony that he was an agent rather than a bettor and accepted bets, and he cannot show that the admission of this testimony was plainly erroneous. Russolillo was questioned about a specific document that related to gambling – he was not being asked about Albertelli's role in the organization generally – and his opinion that the document indicated that Albertelli was an agent rather than a bettor based on his experience in organized crime investigations thus was an appropriate subject of expert testimony.

Third, Albertelli objects to Russolillo's testimony that he was a "partner" in the Gianelli organization, relying on this Court's decisions holding that a law enforcement officer's testimony that a defendant is a member of a conspiracy is not a proper subject of lay or expert opinion testimony. *See Meises*, 645 F.3d at 13-18; *Flores-de-Jesus*, 569 F.3d at 24; *Casas*, 356 F.3d at 120. But Russolillo here was not providing the "wide-ranging overview testimony" that "relied heavily on information told to [him] by others," and which this Court therefore stated was inappropriate, nor was he being asked about Albertelli's role in the overarching conspiracy. *Meises*, 645 F.3d at 14. In that case for example, the government had asked a law enforcement witness, based on "everything you observed," what four defendants' respective roles were in

conspiracy,[13] testimony which this Court held was flawed in part because it suggested that the witness's opinion was based on more than personal knowledge. *Id.* at 15. In this case, by contrast, Russolillo was not asked to describe Albertelli's role in the conspiracy "based on the totality of the information gathered in the course of the investigation" or based on "everything you observed," as in *Meises*. Rather, Russolillo was giving his opinion as to Albertelli's role in the gambling operation based on documents seized during the execution of a search warrant which Russolillo had personally examined. That testimony was permissible.

### D.    Any Error Was Harmless

Even if this Court were to conclude that Russolillo's testimony was improperly admitted, any error was harmless. Russolillo testified only to Albertelli's role in the gambling operation, and there was overwhelming evidence of Albertelli's guilt on those counts, as set forth above in Part III.D. Based on this evidence, it is highly probable that the jury would have concluded that Albertelli was guilty of the gambling counts even without Russolillo's testimony, and any error consequently did not affect the verdict.

---

[13] *See United States v. Reyes-Guerrero*, 638 F. Supp. 2d 177, 186 (D.P.R. 2009), *vacated and remanded, Meises*, 645 F.3d 5

**V.    THE DISTRICT COURT DID NOT ERR IN ALLOWING MARK O'CONNOR TO TESTIFY ABOUT CONVERSATIONS WITH ALBERTELLI, BECAUSE ALBERTELLI DID NOT ESTABLISH THAT THE TWO HAD AN ATTORNEY-CLIENT RELATIONSHIP ABOUT THE MATTER AT ISSUE, AND THE TESTIMONY IN ANY EVENT WAS ADMISSIBLE UNDER THE CRIME-FRAUD EXCEPTION.**

Albertelli contends (DABrief at 13-24) that his convictions on the arson counts (Counts 275, 276, and 277) should be overturned because the district court allowed Mark O'Connor, an attorney, to testify about what Albertelli asserts were privileged conversations regarding whether a fire at the North Reading Big Dog would further Albertelli's and Gianelli's desire to take control of the Lynnfield Big Dog.  That claim also lacks merit.

**A.    Procedural History**

On January 17, 2009, the government filed a witness list identifying O'Connor as a potential witness at trial, and the government identified O'Connor as a potential witness in its proposed voir dire questions submitted on January 22, 2009. [D.614, 622].

On March 26, 2009, the sixteenth day of trial, Gianelli's counsel informed the district court that O'Connor was an attorney who "had, at least apparently, an attorney-client relationship, clearly, with Mr. Albertelli and perhaps with my client, too, at least in terms of the civil matter about * * * the Big Dog," and further stated

-94-

that although the government likely would be relying on the crime-fraud exception to the attorney-client privilege, "it's not clear to me that each and every conversation would fit under that exception." [TT16:97-102].

The government responded that O'Connor was a long-time personal friend of Albertelli and that, although he was an attorney and had represented Albertelli on some small civil matters, he never had an ongoing attorney-client relationship with Albertelli and did not represent Albertelli or Gianelli with respect to the Big Dog. [TT16:97-98]. The government also argued that the defendants should be required to provide the court with a retainer agreement or some other evidence of an ongoing attorney-client relationship between O'Connor and any defendant. [TT16:100]. While noting that the issue was "coming to the Court, obviously, at a late hour," the district court gave the defendants the opportunity to file whatever they wished with respect to the attorney-client privilege. [TT16:99, 169-170]. None of the defendants submitted anything.

On March 27, 2009, over Albertelli's objection, O'Connor testified to the following:

> **Q.** Okay. Did you subsequently have a conversation with Mr. Albertelli regarding a possible solution to their problem?
>
> **ALBERTELLI:** Objection, your Honor –

**THE COURT:** Overruled.

**ALBERTELLI:** – to this line of questioning.

**THE COURT:** Overruled.

**A.** I had many conversations here and there.

**Q.** Well, specifically, did you have a conversation with Mr. Albertelli about the Big Dog restaurant in North Reading?

**A.** Yes.

**ALBERTELLI:** Objection, your Honor, for the same reason.

**THE COURT:** Overruled.

**Q.** Can you relate that conversation to us?

**A.** Well, one evening Dennis and I were going out to dinner, Jimmy's Steakhouse in Arlington. And before we got there, in Dennis' car, Dennis was talking about the Big Dog and various strategies that might be employed to get control. I believe this happened after I called Mr. Dalton. And I told him, you know, These guys on the other side, they're like the Keystone Cops. They're like the Three Stooges. Just give them a little time. They'll fall apart. You'll win the lawsuit. They'll fall of their own weight.

**ALBERTELLI:** Objection, your Honor. Nonresponsive.

**THE COURT:** Overruled.

**A.** My best advice was just continue with the lawsuit and they would be okay. But they wanted – Dennis said things

-96-

wanted – people wanted things to go faster and that wouldn't it be good if there was a way to cut off the money that's keeping these other partners paying the bills and paying what they have to pay in the new Big Dog, in the construction and all the mounting bills. If they could cut off their funds, wouldn't they then fall faster in a financial house of cards? And I said, Sure, but how is that going to happen? And Mr. Albertelli said, Well –

> **ALBERTELLI:** Objection once again, your Honor.

> **THE COURT:** Overruled.

**A.** – what if there was a fire at the North Reading Big Dog and they weren't able to take any income out of the place? And I was flabbergasted that he'd even bring that up because Mr. Albertelli, in all the years I've known him, has never been a person to employ violence in my experience.

**Q.** What did you say to him?

**A.** I told him it was the worst idea from a smart man I ever heard in my life. I said, How can you even ask me about that? And I spent an hour just trying to click off all the various ways it was just a terrible, awful, bad idea to get involved in something like that.

**Q.** How did he respond to you?

**A.** He listened very patiently and asked questions. Some of it was about law enforcement; my opinion of, you know, how illegal is arson. Well, you know, I told him, Probably life. I don't know. I don't practice that kind of law. And he listened. We had dinner. We didn't talk about it. After dinner I tried to start it up again, but he didn't want to hear it. He had had enough. And that was that conversation.

-97-

[TT17:96-98].

**B.**     **Standard of Review**

This Court reviews the admission of testimony to which an objection has been lodged for abuse of discretion.  *See Vazquez-Rivera*, 2011 WL 6415039, at *4.  When evaluating a privilege determination, questions of law are reviewed de novo, findings of fact for clear error, and evidentiary determinations for abuse of discretion.  *In re Grand Jury Subpoena*, 662 F.3d 65, 69 (1st Cir. 2011).

**C.**     **The District Court Did Not Err in Allowing O'Connor to Testify About His Conversations with Albertelli**

The attorney-client privilege "is the most venerable of the safeguards afforded to confidential communications and is enshrined as such in the federal common law." *In re Grand Jury Subpoena*, 662 F.3d at 70 (citing *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981).  "By safeguarding communications between attorney and client, the privilege encourages disclosures that facilitate the client's compliance with law and better enable him to present legitimate arguments when litigation arises." *Lluberes v. Uncommon Productions, LLC*, — F.3d —, 2011 WL 6015606, at *11 (1st Cir. 2011).  The privilege is not limitless, however, and "courts must take care to apply it only to the extent necessary to achieve its underlying goals." *In re Keeper of Records*, 348 F.3d 16, 22 (1st Cir.2003).

"The contours of the [attorney-client] privilege are reasonably well honed.  It protects 'only those communications that are confidential and are made for the purpose of seeking or receiving legal advice.'" *Lluberes*, 2011 WL 6015606, at *11 (quoting *In re Keeper of Records*, 348 F.3d at 22).  A party seeking to invoke the attorney-client privilege thus bears the burden of persuasion "to show that it applies to a particular communication and has not been waived." *In re Grand Jury Subpoena*, 662 F.3d at 71.  "Whatever quantum of proof is necessary to satisfy this obligation, a blanket assertion of privilege is generally insufficient." *Id.*

In this case, after having been alerted to the possibility of an attorney-client question with respect to O'Connor, the district court gave the defendants the opportunity to brief the applicability of the attorney-client privilege. [TT16:169-170].  But neither Albertelli nor his co-defendants filed anything on this issue.  Hence, the district court can hardly be faulted for allowing O'Connor to testify.

Albertelli nonetheless contends (DABrief at 19) that "[i]t is obvious that during the challenged conversation Albertelli was seeking O'Connor's legal advice" and that "[i]t is equally clear that Albertelli was discussing such matters with O'Connor at least in part because O'Connor was his attorney."  But that is precisely the sort of blanket and ipse dixit invocation of the privilege that this Court and others have condemned. *See In re Grand Jury Subpoena*, 662 F.3d at 71-72; *In re Bonanno*, 344 F.2d 830, 833

-99-

(2d Cir. 1965) (proof of existence of attorney-client privilege is not "discharged by mere conclusory or ipse dixit assertions, for any such rule would foreclose meaningful inquiry into the existence of the relationship, and any spurious claims would never be exposed."). The mere fact that O'Connor was an attorney does not mean that every conversation he had with Albertelli was privileged; rather, as this Court has stated, "[t]he fact that a person is a lawyer, or a physician, or a plumber, or a lion-tamer, does not mean that every relationship he undertakes is, or can reasonably be perceived as being, in his professional capacity." *Sheinkopf v. Stone*, 927 F.2d 1259, 1265 (1st Cir. 1991). Instead, "[t]o imply an attorney-client relationship * * * the law requires more than an individual's subjective, unspoken belief that the person with whom he is dealing, who happens to be *a* lawyer, has become *his* lawyer." *Id.* (emphasis in original). Albertelli provided the district court with nothing that satisfied that burden prior to O'Connor's testimony.

Nor, for that matter, did Albertelli elicit anything during O'Connor's cross-examination that suggested that he and O'Connor had a privileged relationship regarding the subject of the conversation in question. O'Connor testified on cross-examination that he only handled minor legal matters for the Albertellis, that he had never handled a matter in federal court, and that as soon as Albertelli "got in trouble with the Feds, boom, he was off to a federal attorney." [TT17:106-107, 147-148]. He

-100-

also testified that Albertelli was not only a good friend but perhaps O'Connor's closest friend, and that the two sometimes talked two or three times a day over the course of 15 years. [TT17:56-57, 156; TT18:6].

This testimony did not satisfy Albertelli's burden of establishing the existence of an attorney-client relationship regarding the conversation in question; indeed, if anything, it suggests the *non*-existence of such a relationship. As the Fourth Circuit has said in rejecting a defendant's assertion of an analogous claim:

> Tedder made his incriminating statements under circumstances suggesting the non-existence of an attorney-client relationship. Although Judith Patterson was Tedder's colleague, her legal practice consisted primarily of negligence work; she had never participated in a federal criminal trial. In disclosing to her his false declarations, Tedder asked no advice but merely reported that he had perjured himself. The admissions occurred over a period of time as a part of informal conversations, e.g., driving to a legal seminar, during which Ms. Patterson took no notes. The two had previously discussed the case and shared information of which they had personal, as distinct from professional, knowledge.

*United States v. Tedder*, 801 F.2d 1437, 1442 (4th Cir. 1986). Similarly, Albertelli and O'Connor were long-time friends and criminal associates who conversed often; O'Connor only handled minor legal matters for Albertelli and had never handled a federal criminal matter; the conversation in question took place while they were driving to dinner, not in O'Connor's office or any other professional venue; and in

-101-

speaking with O'Connor, Albertelli was not seeking legal advice but discussing a planned future crime.

Moreover, O'Connor testified that he had become involved in the Gianelli bookmaking operation, loaning his basement out to Gianelli and Albertelli to be used to take bets because O'Connor owed Albertelli money, and that he also laundered money for Albertelli. [TT17:59-80]. The district court therefore could reasonably have concluded that he was acting more as a co-conspirator with rather than a counselor to Albertelli.

Even if Albertelli had carried his burden of demonstrating the existence of an attorney-client relationship, O'Connor's testimony would nonetheless be admissible under the crime-fraud exception. "It is the purpose of the crime-fraud exception to the attorney-client privilege to assure that the 'seal of secrecy,' between lawyer and client does not extend to communications 'made for the purpose of getting advice for the commission of fraud' or crime." *United States v. Zolin*, 491 U.S. 554, 563 (1981). Here, Albertelli was not seeking legal advice but discussing a planned future crime and inquiring about the possible penalties for that crime would be, and that conversation thus is not privileged under the crime-fraud exception. *See, e.g., United States v. Reeder*, 170 F.3d 93, 106 (1st Cir. 1999).

### D.      Any Error Was Harmless

Finally, even if this Court were to determine that O'Connor's testimony should not have been admitted, any error was harmless given the overwhelming evidence of Albertelli's guilt in connection with the arson convictions, as set forth above in Part II.E.  Homsi testified that Albertelli recruited him to set an arson at Romeo's Pizza, and after the failed attempt, McCormack testified that Albertelli gave him $10,000 to pay for Slater's bail.   [TT19:105-110; TT21:64-80; Exh.44A].   Based on this evidence, it is highly probable that the jury would have concluded that Albertelli was guilty of the arson counts even without O'Connor's testimony, and any error consequently did not affect the verdict.

## V.      IACABONI WAIVED HIS CONTENTION THAT HE IS ENTITLED TO A NEW TRIAL BECAUSE THE DISTRICT COURT ALLOWED PREJUDICIAL TESTIMONY REGARDING ORGANIZED CRIME FIGURES, AS HE DID NOT RAISE IT IN A PRETRIAL MOTION TO SEVER, AND EVEN IF NOT WAIVED, HE CANNOT SHOW PLAIN ERROR ON APPEAL.

Iacaboni contends (FIBrief at 65-66) that he is entitled to a new trial because the district court allowed the government to introduce what he characterizes as extensive, inflammatory, and prejudicial testimony about organized crime figures and associations at trial.  Both Albertellis join in this claim (DABrief at 40-41; GABrief at 40).  Iacaboni did not raise this issue below in a pretrial motion to sever, however,

and the claim therefore is waived.  And even if the argument is deemed forfeited rather than waived, Iacaboni cannot show error, let alone plain error, on appeal.

**A.**    **Procedural History**

       **1.**    **The Pretrial Motions to Sever**

On July 11, 2007, Rafia Feghi moved to sever her case from that of her co-defendants, arguing, *inter alia*, that without severance, the "spillover" from evidence against the defendants charged with arson and extortion would severely prejudice her right to a fair trial. [D.383].  Philip Puopolo also moved to sever the case against him on March 21, 2008, and, on April 18, 2008, Joseph Yerardi, Jr. did as well, both raising the "spillover" argument  in arguing for severance. [D.463, 477].

On September 10, 2008, the district court conducted a status conference and requested that the parties submit memoranda discussing whether and how the court could sever counts and/or defendants to make the case more manageable for the court and jury.  Iacaboni filed a trial management proposal on October 3, 2008, in which he proposed a two-phase trial: Phase I would only involve Gianelli, Albertelli, and himself, and would be limited to all counts relating to arson and extortion; and Phase II would involve all remaining counts.  [D.548; G.App.203-204].  Iacaboni did not raise the issue of prejudicial spillover, however, nor did he move to sever his case from that of his co-defendants on that basis.

-104-

On the same day, Gisele Albertelli, Mary Ann Gianelli, and Feghi filed a joint motion to sever in which they proposed that the court sever their case from their male co-defendants, arguing, *inter alia*, that because this was a RICO case, "the risk of 'spillover' is extremely high" because "'[w]hen the government introduced every bad act of an enterprise, including those in which the defendant did not participate, it magnifies the danger for imputing guilt to a defendant solely on the basis of the company he keeps * * *." [D.547; G.App.205-209].

On November 7, 2008, the district court denied Feghi's, Puopolo's, and Yerardi's motions to sever, ruling that they had not shown prejudice and, in any event, that "[a]ny prejudicial spillover from evidence relating to crimes not charged against these defendants can be cured by a carefully crafted jury instruction." *United States v. Gianelli*, 585 F. Supp. 2d 186, 196 (D. Mass. 2008). The district court denied the remaining pending motions and proposals to sever on January 30, 2009. [D.629].

### 2.    Iacaboni's Request at Trial

On March 6, 2009, before opening statements, Iacaboni requested that the government not refer to organized crime in its opening statement because "it's highly prejudicial to my client and certainly has no relevance to my client whatsoever." [TT3:5]. The government opposed Iacaboni's request, arguing that the second superseding indictment alleged that the RICO enterprise was associated with members

-105-

of organized crime, that the government would introduce evidence of meetings between Gianelli and Carmen DiNunzio, the "boss" of the Boston LCN and underboss of the New England LCN, as well as payments from Gianelli's organization to DiNunzio, and that the Gianelli organization's association with members of organized crime allowed that organization to prosper. [TT3:5].

The district court denied Iacaboni's request, stating that the government would be permitted to make statements about organized crime during its opening so long as there was evidence at trial that supported any such statements. [TT3:5-6]. Iacaboni then requested that a limiting instruction be given when that testimony was first introduced by the government. [TT3:6]. The court responded that Iacaboni could submit a proposed instruction, and the court would consider it at the break. [*Id.*]. Iacaboni did not submit a proposed limiting instruction at any time during the trial, however, nor did he object to the testimony he now challenges as being unfairly prejudicial.

### 3.     Iacaboni's Motion for Reconsideration

On October 5, 2009, Iacaboni argued in a memorandum supporting his motion for reconsideration of the denial of his motion for a new trial that he had been "severely prejudiced" by trial evidence alleging a connection between the Gianelli organization and organized crime. [G.App.257-258]. The district court denied

Iacaboni's motion for reconsideration, holding that the arguments raised therein "could and should have been presented previously." 667 F. Supp. 2d at 218.

### B.    Standard of Review

Because Iacaboni did not preserve this issue below – and he has waived any challenge to the denial of his motion for reconsideration by not raising it as a separate issue in his brief on appeal, *see Brown*, 621 F.3d at 53 n.4 – this claim would ordinarily be reviewed only for plain error. *See United States v. Burnett*, 579 F.3d 129, 133 (1st Cir. 2009). The claim is waived under Rule 12(e), however, because Iacaboni did not raise the prejudicial spillover issue in a pretrial motion to sever. *See Walker*, 2011 WL 5865652, at **8-9.

### C.    Iacaboni Waived His Claim of Prejudicial Spillover

Iacaboni contends (FIBrief at 65) that testimony about organized crime figures and their associations with the defendants unfairly prejudiced him because there was no evidence that he ever met, spoke with, or knew any of the organized crime figures whose names and activities were introduced at trial, and yet "no effort was made to isolate Iacaboni from the prejudice inherent in such associations." That claim is waived because it was not presented in a pretrial motion to sever.

The claim that prejudicial evidence relevant to co-defendants might have a "spillover" effect as to another defendant is traditionally framed in the context of a

-107-

motion to sever under Fed. R. Crim. P. 14.  *See, e.g., United States v. Flores-Rivera*, 56 F.3d 319, 325 (1st Cir. 1995).  And that conclusion applies with even more force here, as the second superseding indictment put the defendants on express notice that the government was alleging that the scope of the conspiracy included evidence not only regarding the "rents" or "tributes" paid to DiNunzio, but that the association with DiNunzio and other organized crime figures enhanced the Gianelli organization's ability to operate its criminal businesses and protected the organization's members and associates from encroachment by other criminal competitors.  [G.App.7].

Hence, to the extent that Iacaboni feared that there might be an impermissible spillover effect from evidence about organized crime that did not involve him, the appropriate remedy was a motion to sever his case from those of his co-defendants prior to trial.  But while Iacaboni filed a trial management proposal, he did not raise the issue that he now complains of in that proposal or in a more formal motion to sever.  A motion to sever under Rule 14 is expressly identified in Rule 12(b)(3)(D) as a motion that must be made pretrial, and Iacaboni's failure to raise this issue in his trial management proposal or any other pleading consequently means that the claim is waived under Rule 12(e).  *See Walker*, 2011 WL 5865652, at **8-9.  For the same reason, Albertelli, who has joined in this claim and who also failed to file a pretrial motion to sever, has waived this claim.  *Id.*

Gisele Albertelli, who also joins in this claim, arguably preserved the issue by joining in a motion to sever that raised a general claim of prejudicial spillover, although it did not specifically reference testimony about organized crime. But she makes no attempt in her brief on appeal to explain how this evidence prejudiced *her*, as opposed to Iacaboni, instead simply asserting (GABrief at 40) that this testimony "creat[ed] an unassailable prejudice against her." That is insufficient. To the extent she believed testimony about organized crime and the Gianelli organization prejudiced her, as opposed to Iacaboni, she had to explain why that was so in her brief on appeal. Having failed to do so, the claim is waived. *See Page*, 521 F.3d at 110.

Even if this Court were to consider this claim on the merits, it would fail. This Court has long stated that:

> As a rule, persons who are indicted together should be tried together. * * * Thus, when multiple defendants are named in a single indictment, a defendant who seeks a separate trial can ordinarily succeed in obtaining one only by making a strong showing of evident prejudice. The hurdle is intentionally high; recent Supreme Court precedent instructs that "a district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence."

*United States v. O'Bryant*, 998 F.2d 21, 25 (1st Cir. 1993) (quoting *Zafiro v. United States*, 506 U.S. 534, 539 (1993)). In this case, the defendants were charged with,

among other things, racketeering conspiracy.  The scope of that conspiracy ranged from the "rents" or "tributes" paid to DiNunzio, to the Gianelli organization's association with DiNunzio and other organized crime figures, which allowed Gianelli to coerce payments from bettors and individuals who had taken out loans from Gianelli.  Hence, regardless of whether any particular defendant had a personal connection to the organized crime figures mentioned at trial, that testimony was relevant to the racketeering counts "as it tended to prove the existence and nature of the RICO enterprise and conspiracy," and even if the defendants had been tried separately, "it is far from clear that the potentially prejudicial impact of that evidence would have rendered it inadmissible under Federal Rule of Evidence 403."  *United States v. DeCologero*, 530 F.3d 36, 54 (1st Cir. 2008); *accord United States v. Trinh*, — F.3d —, 2011 WL 6349842, at *15 (1st Cir. 2011) ("First, the majority of the evidence presented was admissible against both Trinh and his co-defendants, whether they were tried jointly or independently; this weighs against a finding of prejudice in the denial of a severance motion.").

Moreover, the district court specifically and repeatedly instructed the jury to consider separately the charges and the evidence as to each defendant: "Remember, however, that each separate offense, and the evidence pertaining to it, should be considered separately."  [TT 28:27-28].  Jurors are presumed to follow a court's

-110-

instructions, *see United States v. Fernandez-Hernandez*, 652 F.3d 56, 70 n.11 (1st Cir.), *cert. denied*, 132 S. Ct. 353 (2011), and these instructions mitigated any possible risk of prejudicial spillover. *See Trinh*, 2011 WL 6349842, at *15; *United States v. DeLeon*, 187 F.3d 60, 64 (1st Cir. 1999) (citing cases).

Finally, Iacaboni was acquitted of Count 2, which charged him with substantive racketeering, while the other defendants were convicted of that count; Albertelli was acquitted of Count 272, which charged him with interstate travel in aid of racketeering; and Gisele Albertelli was acquitted of four money laundering counts. [D.754]. These acquittals "suggest[] that the jury was able to sift through the evidence in an analytical fashion and that the alleged spillover effect did not cause the jury merely to enter a lump conviction," *United States v. Flores-Rivera*, 56 F.3d 319, 326 n.2 (1st Cir. 1995), thereby further undercutting any possible prejudicial spillover argument. *See Trinh*, 2011 WL 6349842, at *16; *Mubayyid*, 658 F.3d at 73-74; *DeCologero*, 530 F.3d at 56.

## VII. THE EVIDENCE WAS SUFFICIENT FOR A REASONABLE JURY TO CONVICT IACABONI ON ALL COUNTS OF CONVICTION.

Iacaboni contends (FIBrief at 20-41) that the evidence was insufficient to support his convictions on all counts. That claim should be rejected.

-111-

A.    **Procedural History**

1.    **Iacaboni's Rule 29 and Rule 33 Motions**

On April 14, 2009, Iacaboni filed a motion for judgment of acquittal pursuant to Fed. R. Crim. P. 29(a), arguing, *inter alia*, that he should be acquitted of Counts 3 and 5 (the illegal gambling counts) because the government failed to present any evidence that he participated in Albertelli's football card business or the Albertelli/Gianelli sports betting business. [D.711, 712, App.535-536]. Iacaboni also joined with Gianelli and Albertelli in a motion for judgment of acquittal with respect to the extortion conspiracy and extortion attempt counts, arguing, *inter alia*, that "the only evidence of intent before the jury is that [Iacaboni] believed the alleged arson was an act of revenge." [D.741; App.530-534]. On April 27, 2009, the district court denied both Rule 29 motions in an electronic order.

On April 28, 2009, Iacaboni filed renewed motions for judgment of acquittal and for a new trial. [D.756, 758; App.537-540]. In a memorandum, Iacaboni argued, *inter alia*, that the government had failed to prove that he assisted in the effort to obtain the majority interest in the Lynnfield Big Dog, as "[t]he evidence, in the light most favorable to the government, was that Iacaboni agreed to commit arson for revenge – not to extort a majority interest in the Big Dog." [G.App.213]. On May 8, 2009, the district court denied both motions in endorsed orders. [D.774].

-112-

## 2.     Iacaboni's Motions for Reconsideration

On August 30, 2009, Iacaboni moved for reconsideration of the denial of his post-verdict motion for judgment of acquittal, arguing in a memorandum that he would "make an effort to minimize repeating arguments previously advanced, and will instead focus on case law and argument that has not yet been brought to the Court's attention." [D.858, G.App.217]. Iacaboni thus argued for the first time that his substantive arson and extortion convictions could only be based on a *Pinkerton* theory of vicarious conspiratorial liability,[14] and that "the evidence, even viewed in the light most favorable to the verdict, shows that no *agreement*, explicit or tacit, was ever concluded with Albertelli that Mr. Iacaboni would participate in the conspiracy to set an arson fire at the Big Dog on November 13, 2009, or at any other time." [G.App.223 (emphasis in original)].

On November 3, 2009, the district court denied Iacaboni's motion for reconsideration, holding that "[h]is submission is a series of arguments that could and should have been previously presented to the district court and accordingly the motion will be denied." *Iacaboni*, 667 F. Supp. 2d at 217. The district court further stated

---

[14] Under the *Pinkerton* theory of vicarious conspiratorial liability, "members of a conspiracy are substantively liable for the foreseeable criminal conduct of the other members of the conspiracy." *United States v. Rivera-Rodriguez*, 617 F.3d 581, 596 (1st Cir. 2010) (citation omitted), *cert. denied*, 131 S. Ct. 960, 131 S. Ct. 968, 131 S. Ct. 1706 (2011); *see generally Pinkerton v. United States*, 328 U.S. 640 (1946).

that, although this conclusion was "sufficient to deny Iacaboni's motions," the court had nonetheless carefully considered the substance of his arguments and the government's responses, including his sufficiency challenge, and had concluded that none warranted relief. *Id.* at 218.

## B. <u>Standard of Review</u>

This Court reviews de novo a preserved challenge to the sufficiency of the evidence, considering the evidence in the light most favorable to the verdict. *United States v. Pires*, 642 F.3d 1, 7 (1st Cir. 2011). That determination entails asking "whether any rational factfinder could have found that the evidence presented at trial, together with all reasonable inferences, viewed in the light most favorable to the government, established each element of the particular offense beyond a reasonable doubt." *United States v. Poulin*, 631 F.3d 17, 22 (1st Cir. 2011) (internal quotations omitted).

In this case, Iacaboni did not present in his Rule 29 motions for judgment of acquittal the argument that he now makes with respect to Counts 267-271 (the arson and extortion counts), but instead raised it for the first time in his motion for reconsideration. Iacaboni does not challenge on appeal the denial of that motion for reconsideration, and he therefore has waived any such claim as to the arson and extortion counts. *See Brown*, 621 F.3d at 53 n.4. Even if his challenge to his

convictions on those counts is deemed forfeited rather than waived, this Court's review would be only for plain error, *see United States v. Rivera-Rivera*, 555 F.3d 277, 285 & n.7 (1st Cir. 2009), and reversal would be warranted "only if the conviction would result in a clear and gross injustice." *United States v. Pratt*, 568 F.3d 11, 15 (1st Cir. 2009) (internal quotation omitted).  Iacaboni's claims would fail under any standard of review.

### C.    The Evidence Was Sufficient to Convict Iacaboni of the Arson and Extortion Counts

Iacaboni contends (FIBrief at 23-24) that the sole basis for charging him with the arson and extortion counts was under a *Pinkerton* theory of conspiratorial liability, inasmuch as there was no direct evidence of his involvement in the attempted arson at the North Reading Big Dog, and that "if this Court finds the evidence sufficient to support Iacaboni's arson and conspiracy conviction, the *Pinkerton* thread is broken, and he must necessarily also be acquitted of the substantive arson and use of fire counts, as well as the extortion conspiracy and substantive counts."  Iacaboni further argues (FIBrief at 24-25) that the only evidence supporting his convictions on the arson conspiracy and arson counts were his statements during six intercepted telephone conversations with Albertelli, and that even when viewed in the light most favorable to the verdict, those calls showed that "no *agreement*, explicit or tacit, was

-115-

ever consummated between Iacaboni and Albertelli to burn the Big Dog Pizza."
(emphasis in original). Indeed, Iacaboni asserts (FIBrief at 36), even if he "had met
with unknown and unidentified prospective arsonists, there was still no evidence of
a mutual agreement *between Albertelli and Iacaboni* to commit the proposed arson."
(emphasis in original). He is wrong.

A criminal conspiracy "is an agreement between two or more persons to
accomplish an unlawful purpose." *United States v. Dellosantos*, 649 F.3d 109, 115
(1st Cir. 2011). "The agreement is the sine qua non of a conspiracy, and this 'element
is not supplied by mere knowledge of an illegal activity * * *, let alone by mere
association with other conspirators or mere presence at the scene of the conspiratorial
deeds." *Id.* (quoting *United States v. Zafiro*, 945 F.2d 881, 888 (7th Cir. 1991)). At
the same time, "[s]uch an agreement may be express or tacit, that is, represented by
words or actions, and may be proved by direct or circumstantial evidence."
*Rivera-Rodriguez*, 617 F.3d at 596 (internal quotation omitted).

In this case, a reasonable jury could easily conclude from the intercepted
telephone conversations that at least a tacit agreement to commit an arson at the North
Reading Big Dog was reached between Iacaboni and Albertelli. As set forth above,
Albertelli described the problems that he and Gianelli were having with respect to the
ownership of the Lynnfield Big Dog in a lengthy conversation with Iacaboni on

-116-

November 5, 2003, and told Iacaboni that the "jumpin' bean" – a reference to Gianelli – did not want to wait for the legal proceedings to resolve but wanted to do "everything in a hurry." [App.1015-1026; TT23:19]. Five days later, on November 10, 2003, Iacaboni requested information from Albertelli about "where the boat is being docked" – a reference to the North Reading Big Dog and Romeo's Pizza – as well as a diagram with "no signs or anything" including the "number of floors," which Albertelli was to give to the "Bullet" (Davies) that day "in an envelope." [App.1060-1061; TT23:128]. Later that same day, after Albertelli delivered a diagram (through Davies) of the North Reading Big Dog to Iacaboni at Iacaboni's request, and Albertelli answered Iacaboni's questions about the diagram, informed Iacaboni that the Big Dog was in North Reading, and told him that the "boat" (the Big Dog) had "the thing on top." [App.1066-1068]. The following day, on November 11, 2003, Iacaboni informed Albertelli that he had met with "the people" who were "ready to go right?," that "the positive was, was the pizza joint, [was] there right?," and that the plan was to light toilet paper which would smolder to a spot and ignite, which was "perfect" because it would be near the ovens, which always malfunction. [App.1086-1087]. However, Iacaboni informed Albertelli, the person Iacaboni had met needed a key to get inside to accomplish this plan, and left when Iacaboni stated that he did not have a key. [App.1087-1088].

-117-

In these circumstances, a reasonable jury could easily conclude beyond a reasonable doubt that Iacaboni and Albertelli had reached at least a tacit agreement to commit an arson at the North Reading Big Dog, and that that agreement was formed no later than when Albertelli delivered the diagram of the North Reading Big Dog to Iacaboni at Iacaboni's request, answered Iacaboni's questions about the diagram, and informed Iacaboni that the Big Dog was located in North Reading and that it had "the thing on top." Moreover, although Iacaboni asserts (FIBrief at 24) that "the sole basis for [his] inclusion in the arson conspiracy were the words spoken during six intercepted telephone conversations with Albertelli, as interpreted by ATF Agent Kelsch," he fails to appreciate that his own words in those conversations – and the actions that he took as reflected therein – were powerful evidence of his participation in the conspiracy upon which a jury could reasonably rely. *Cf. Hernandez-Loring v. Universidad Metropolitana*, 233 F.3d 49, 53 (1st Cir. 2000) ("[A]n admission from a wrongdoer is powerful proof even without detail, and how his statement should be construed and whether it should be accepted as true are largely jury issues, at least where the admission is not wholly incredible."). Hence, because a reasonable jury could conclude beyond a reasonable doubt that Iacaboni and Albertelli had conspired to commit an arson at the North Reading Big Dog, Iacaboni necessarily cannot show

that his conviction on the arson and extortion counts would amount to a "clear and gross injustice."

### D. The Evidence Was Sufficient to Convict Iacaboni of the Illegal Gambling Counts

Iacaboni also contends (FIBrief at 38-40) that there was insufficient evidence to convict him of Counts 3 and 5, the illegal gambling counts. He is wrong.

Section 1955(a) provides that "[w]hoever conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business shall be fined under this title or imprisoned not more than five years, or both." 18 U.S.C. §1955(a). An illegal gambling business is defined as a gambling business which "(i) is a violation of the law of a State or political subdivision in which it is conducted; (ii) involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business; and (iii) has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day." *Id.* §1955(b)(1)(i)-(iii). With respect to the term "conduct," this Court has held that:

> In the lexicon of section 1955, the term "conduct" embraces all who participate in the operation of the specified gambling business, that is, each and every person who performs any act, function, or duty necessary or helpful in the business' ordinary operation. As we read it, the statute of conviction applies even to individuals who have no role

-119-

> in managing or controlling the business and who do not
> share in its profits.

*Zannino*, 895 F.2d at 10; *see also Murray v. United States*, 928 F.2d 1242, 1245 (1st

Cir. 1991) (holding that the term "conduct" has been recognized by the Supreme

Court to be "any degree of participation in an illegal gambling business except

participation as a mere bettor," and that the term "participation" means the

performance of acts that are "necessary or helpful" to the gambling business) (quoting

*Sanabria v. United States*, 437 U.S. 54, 70-71 n. 26 (1978).

Iacaboni contends (FIBrief at 40) that, with respect to Count 3, he "was only

seen on a single occasion taking bets or couple of hours, clearly insufficient to

constitute 'conducting' under *Murray*.  To the contrary, the jury heard ample evidence

that Iacaboni was performing acts necessary or helpful to the sports betting business.

On December 7, 2003, Albertelli gave Iacaboni betting lines for various football

games, and on January 5, 2004, Iacaboni offered to bring a large-scale bettor to

Albertelli and to split the profits evenly.  [G.App.187-201].  Heerter testified that she

wrote bets once or twice with Iacaboni in 2003.  [TT10:77-78, 82-83, 96-97].  Based

on this evidence, a reasonable jury could conclude beyond a reasonable doubt that

Iacaboni performed acts that were necessary or helpful to the sports betting business,

and that he was therefore guilty of Count 3.

With respect to Count 5, Iacaboni contends (FIBrief at 40-41) that the evidence shows only that he "operated his own small football card business during the 2003-2004 season by himself, and Albertelli operated a separate one." He is wrong here as well. On November 22, 2003, Iacaboni informed Albertelli that "the plan is that, in a few weeks, I'm gonna get out of the card business," and proposed turning his business over to Albertelli, having Albertelli use the "Bullet" (Davies) as a runner at the same pay, and that Iacaboni and Albertelli would "whack it up," meaning that they would divide the profits evenly. [App.1190-1194; TT16:93]. In subsequent calls, Iacaboni and Albertelli discussed the profits from their football card business, among other matters, including a conversation on January 19, 2004, in which Iacaboni said that when he saw Albertelli in Florida, "we'll cut it up," meaning split the profits. [App.1196-1212, 1217-1218; TT16:113]. Bernstein also testified that Iacaboni would come regularly to the offices of Forge Valley Transportation on Mondays when the football cards were distributed. [TT12:85-86]. Inasmuch as §1955(a) " applies even to individuals who have no role in managing or controlling the business and who do not share in its profits," *Zannino*, 895 F.2d at 10, a reasonable jury could conclude from this evidence that Iacaboni – who was sharing in the profits – was guilty of conducting an illegal football card business.

-121-

Iacaboni further contends (FIBrief at 41) that even if he was conducting an illegal football card business with Albertelli, "the proof of Count Five is insufficient because there was no evidence that three other persons were conducting it."  To the contrary, the evidence showed that in addition to Albertelli and Iacaboni, Gisele Albertelli, Randy Albertelli, James Nadeau, Michael Schultzberg, Onanian, Marderosian, and Bernstein all took actions that were necessary or helpful to the business' ordinary operation, including delivering cards and taking bets, introducing agents to customers, and allowing the printing of football cards at Forge Valley Transportation. [TT9:136-145; TT11:137-154, 163-172, 184-191; TT12:80-84, 124].

## VIII.  THE DISTRICT DEFENDANTS' CUMULATIVE ERROR ARGUMENT FAILS.

Finally, Iacaboni and both Albertellis contend (DABrief at 41-42; FIBrief at 66-67; GABrief at 40) that even if no single error warrants relief, the cumulative effect of the errors they identify warrant reversal.  As set forth above, however, each claim of error which they have raised either lacks merit, is waived, or is harmless, and "without *any* errors, there is nothing to accumulate." *Bayard*, 642 F.3d at 66 (emphasis in original.

## <u>CONCLUSION</u>

For these reasons, the government respectfully requests that the Court affirm

the judgments.

Respectfully submitted,

CARMEN M. ORTIZ
United States Attorney

By:    <u>/s/ *Mark T. Quinlivan*</u>
MARK T. QUINLIVAN
Assistant U.S. Attorney

**CERTIFICATE OF COMPLIANCE WITH**
**Rule 32(a)**

**Certificate of Compliance with Type-Volume Limitation**
**Typeface Requirements, and Type Style Requirements**

1.    This brief complies with this Court's Order of November 18, 2011, which granted the government leave to file an oversize consolidated responsive brief not to exceed 28,000 words, because this brief contains **27,998** words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) (*i.e.*, the corporate disclosure statement, table of contents, table of citations, addendum, and certificates of counsel).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Times New Roman 14 point, in Word Perfect X4.

/s/ *Mark T. Quinlivan*
MARK T. QUINLIVAN
Dated:  December 29, 2011

-124-

## <u>CERTIFICATE OF SERVICE</u>

I, Mark T. Quinlivan, AUSA, certify that on December 29, 2011, I electronically served a copy of the foregoing document on the following registered participants of the CM/ECF system:

Brian J. Kelly
Kelly & Associates, P.C.
21 McGrath Highway, Suite 501
Quincy, MA 02169
<u>Counsel for Gisele Albertelli</u>

Patricia A. DeJuneas
One Exeter Plaza, 12th Floor
Boston, MA 02116

Robert L. Sheketoff
One McKinley Square
Boston, MA 02109
<u>Counsel for Albert Gianelli</u>

Alan C. Caplan
301 Executive Park Blvd.
No. 610
San Francisco, CA 94134
<u>Counsel for Frank Iacaboni</u>

Richard Klibaner
Klibaner & Sabino
52 Western Avenue
Cambridge, MA 02139
<u>Counsel Dennis Albertelli</u>

_/s/ Mark T. Quinlivan_____
MARK T. QUINLIVAN

Nos.  09-2213, 09-2478, 09-2606, 10-1214

# IN THE UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

_____

## UNITED STATES OF AMERICA, APPELLEE

**v.**

## GISELE ALBERTELLI, ARTHUR GIANELLI, FRANK IACABONI, AND DENNIS ALBERTELLI, A/K/A "FISH", DEFENDANTS-APPELLANTS

_____

Addendum Table of Contents

_____

1.    18 U.S.C. §1955(a)-(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . G.Add.1

2.    18 U.S.C. §2516(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . G.Add.2

3.    18 U.S.C. §2518(1)(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . G.Add.3

4.    Mass. Gen. Laws ch. 271, §17 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . G.Add.4

5.    Mass. Gen. Laws ch. 272, §99(F)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . G.Add.5

6.    Fed. R. Evid. 702 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . G.Add.6

## 18 U.S.C. §1955(a)-(b)

**Prohibition of illegal gambling businesses**

(a) Whoever conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business shall be fined under this title or imprisoned not more than five years, or both.

(b) As used in this section –

(1) "illegal gambling business" means a gambling business which –

(i) is a violation of the law of a State or political subdivision in which it is conducted;

(ii) involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business; and

(iii) has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day.

\*     \*     \*

G.Add.1

## 18 U.S.C. §2516(2)

**Authorization for interception of wire, oral, or electronic communications**

&ast;   &ast;   &ast;

(2) The principal prosecuting attorney of any State, or the principal prosecuting attorney of any political subdivision thereof, if such attorney is authorized by a statute of that State to make application to a State court judge of competent jurisdiction for an order authorizing or approving the interception of wire, oral, or electronic communications, may apply to such judge for, and such judge may grant in conformity with section 2518 of this chapter and with the applicable State statute an order authorizing, or approving the interception of wire, oral, or electronic communications by investigative or law enforcement officers having responsibility for the investigation of the offense as to which the application is made, when such interception may provide or has provided evidence of the commission of the offense of murder, kidnapping, gambling, robbery, bribery, extortion, or dealing in narcotic drugs, marihuana or other dangerous drugs, or other crime dangerous to life, limb, or property, and punishable by imprisonment for more than one year, designated in any applicable State statute authorizing such interception, or any conspiracy to commit any of the foregoing offenses.

## 18 U.S.C. §2518(1)(C)

**Procedure for interception of wire, oral, or electronic communications**

(1) Each application for an order authorizing or approving the interception of a wire, oral, or electronic communication under this chapter shall be made in writing upon oath or affirmation to a judge of competent jurisdiction and shall state the applicant's authority to make such application. Each application shall include the following information:

\*     \*     \*

(c) a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous;

G.Add.3

## Mass. Gen. Laws ch. 271, §17

### Place for registering bets or dealing in pools; owner or occupant; custodian or depository

Whoever keeps a building or room, or any part thereof, or occupies, or is found in, any place, way, public or private, park or parkway, or any open space, public or private, or any portion thereof, with apparatus, books or any device, for registering bets, or buying or selling pools, upon the result of a trial or contest of skill, speed or endurance of man, beast, bird or machine, or upon the result of a game, competition, political nomination, appointment or election, or whoever is present in such place, way, park or parkway, or any such open space, or any portion thereof, engaged in such business or employment; or, being such keeper, occupant, person found or person present, as aforesaid, registers such bets, or buys or sells such pools, or is concerned in buying or selling the same; or, being the owner, lessee or occupant of a building or room, or part thereof, or private grounds, knowingly permits the same to be used or occupied for any such purpose, or therein keeps, exhibits, uses or employs, or knowingly permits to be therein kept, exhibited, used or employed, any device or apparatus for registering such bets, or for buying or selling such pools, or whoever becomes the custodian or depository for hire, reward, commission or compensation in any manner, of any pools, money, property or thing of value, in any manner staked or bet upon such result, shall be punished by a fine of not more than three thousand dollars or by imprisonment in the state prison for not more than three years, or in jail or the house of correction for not more than two and one half years.

## Mass. Gen. Laws ch. 272, §99(F)(1)

**Interception of wire and oral communications**

      \*    \*    \*

F.  Warrants: application.

    1. Application.  The attorney general, any assistant attorney general specially designated by the attorney general, any district attorney, or any assistant district attorney specially designated by the district attorney may apply ex parte to a judge of competent jurisdiction for a warrant to intercept wire or oral communications.  Each application ex parte for a warrant must be in writing, subscribed and sworn to by the applicant authorized by this subparagraph.

G.Add.5

## Fed. R. Evid. 702

### Testimony by Expert Witnesses

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

> (b) the testimony is based on sufficient facts or data;

> (c) the testimony is the product of reliable principles and methods; and

> (d) the expert has reliably applied the principles and methods to the facts of the case.